# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Arnold Contreras, et al.,

Plaintiffs/Cross-Defendants,

v.

ASARCO LLC, et al,,

Defendants/Cross-Plaintiffs.

**Case No.: 2:18-cv-03495-SRB**

## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into by and among Arnold Contreras, Tony Meza, Charles M. Estrada, and Celestino Flores, individually and on behalf of the Class; the Unions; and ASARCO to fully, finally, and forever resolve the Litigation.[1]

## I.      Factual Background and Recitals

1.      ASARCO provided group medical benefits to the Class prior to January 1, 2020.  Effective January 1, 2020, ASARCO ceased providing group medical coverage for Medicare-eligible Class Members and replaced that coverage with a new plan which included a Health Reimbursement Arrangement and Catastrophic Coverage Special Payments.

2.      In advance of making that change, ASARCO filed declaratory judgment suits in the United States District Courts for the Northern District of Texas (Case No. 2:19-cv-04393) and District of Arizona (Case No. 2:18-cv-03534) which together sought a

---

[1] Capitalized terms—including "Class," "Unions," "Asarco," and "Litigation"—are defined herein.

1

declaration that it had the right to modify or terminate the retiree healthcare benefits it provided to the Class.  Plaintiffs also filed suit against ASARCO in the United States District Court for the District of Arizona (Case No. 2:18-cv-03495) alleging that ASARCO breached the terms of collective bargaining agreements by unilaterally changing the healthcare benefits it was providing to the Class; Plaintiffs brought claims against ASARCO under the Labor Management Relations Act ("LMRA") and Employee Retirement Income Security Act ("ERISA").

3.      On July 15, 2019, the three cases were consolidated under the above-captioned titled and case number.

4.      On July 29, 2019, the Court granted the Plaintiffs' unopposed motions for class certification, certifying the Class.

5.      On August 2, 2019, Plaintiffs filed a Consolidated Complaint.

6.      ASARCO filed a Consolidated Answer and Cross-Complaint on August 23, 2019, which Plaintiffs answered on September 11, 2019.

7.      On October 18, 2021, ASARCO filed a motion for summary judgment, asking the Court to enter judgment in its favor as to the claims in Plaintiffs' Consolidated Complaint and the claims in its Consolidated Cross-Complaint.  Plaintiffs opposed the motion, and the Court held oral argument on December 16, 2021.

8.      On February 22, 2022, the Court granted ASARCO's summary judgment motion.

9.      Plaintiffs timely appealed to the United States Court of Appeals for the Ninth Circuit on March 11, 2022.

10.     On March 29, 2022, the Court entered a judgment in favor of ASARCO as to the LMRA and ERISA claims of the Plaintiffs and the Class and declaring that ASARCO has the right to amend or terminate the medical benefits for the Class.

11.     On April 11, 2022, Asarco filed a bill of costs, and on April 26, 2022, the Clerk of the Court taxed costs in favor of ASARCO and against Plaintiffs and Millwrights and Machine Erectors, Local 1607 in the amount of $13,414.23.

12.     On April 21, 2022, ASARCO filed a motion for attorneys' fees and related non-taxable expenses.  Plaintiffs opposed the fee and related non-taxable expense motion on May 19, 2021.

13.     Following Plaintiffs filing of their appeal, Plaintiffs and ASARCO engaged in settlement discussions under the Ninth Circuit Mediation Program.  After extensive discussions, on October 13, 2022, Plaintiffs and ASARCO agreed to finally resolve the Litigation in principle, which they have since set forth in this Settlement Agreement.

14.     Based on their investigation of the merits of this dispute, the conduct of the Litigation to date, and their knowledge and experience pursuing such actions generally, Plaintiffs and Class Counsel believe that the Settlement set forth in this Settlement Agreement is a fair, reasonable, and adequate resolution of the Litigation.  In making that conclusion, Plaintiffs and Class Counsel have considered, among other things, the risks of continued litigation, the time necessary to achieve a final resolution through appeal and trial, and the benefits to the Class under the Settlement.

15.     Although ASARCO continues to deny all liability with respect to any and all of the claims that Plaintiffs asserted in the Litigation, ASARCO nevertheless considers it

desirable that the Litigation be conclusively settled and terminated on the terms and conditions set forth below.  The settlement of the Litigation and the attendant entry of the Judgment with prejudice will avoid the substantial expense, inconvenience, and risk of continued litigation and will provide certainty as to the benefits to be provided to the Class.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED that, in consideration of the mutual covenants and promises set forth in this Settlement Agreement, the Parties hereby agree to a full and complete settlement of the Litigation, on the following terms and conditions, subject to the Court's approval:

## II.   **Definitions**

As used in this Settlement Agreement, the following terms have the meanings specified below:

1.     "ASARCO" means ASARCO LLC and ASARCO Retiree Medical Plan.

2.     "Catastrophic Coverage Special Payments" or "Catastrophic Coverage" means the reimbursement arrangement provided by ASARCO to Medicare-eligible Class Members which reimburses participants for eligible out-of-pocket prescription drug expenses incurred in excess of the Medicare Part D catastrophic threshold in a given year, as set forth in the attached ASARCO Retiree Medical Plan, Exhibit A.

3.     "Class" means the Class certified by the Court on July 29, 2019, which consists of the two subclasses defined as follows:

Pre-2007 Ray Retirees

All former union-represented employees of ASARCO's Ray Unit who retired (other than deferred vested) under the ASARCO Retirement Income Plan for Hourly-Rated Employees between November 30, 1986 and December 31,

2006 and their spouses and eligible dependents, provided that such former employees, spouses, and eligible dependents were either (i) eligible for Medicare and receiving retiree medical and prescription drug benefits from ASARCO, or (ii) could become eligible in the future to receive retiree medical and prescription drug benefits from ASARCO after becoming Medicare-eligible.

Post-2007 Retirees:

All former union-represented employees of ASARCO who retired (other than deferred vested) under the ASARCO Retirement Income Plan for Hourly-Rated Employees between January 1, 2007 and November 30, 2015 (including anyone who provided the requisite notice by November 30, 2015 and then retired within 180 days of providing the notice) and their spouses and eligible dependents, provided that such former employees, spouses, and eligible dependents were either (i) eligible for Medicare and receiving medical and prescription drug benefits from ASARCO, or (ii) could become eligible in the future to receive medical and prescription drug benefits from ASARCO after becoming Medicare-eligible.

4.  "Class Counsel" means the attorneys appointed to represent the Class by the Court on July 29, 2019: Feinstein Doyle Payne & Kravec, LLC and Gerald Barrett.

5.  "Class Members" means the individuals in the Class, including the Class Representatives.

6.  "Class Representatives" means Arnold Contreras, Tony Meza, Charles M. Estrada, and Celestino Flores.

7.  "Court" means the United States District Court for the District of Arizona.

8.  "Final Approval Order" means the order and judgment approving the Settlement.

9.  "Final Fairness Hearing" means the Court hearing required by Fed. R. Civ. P. 23(e)(2) to determine whether the Settlement is fair, reasonable, and adequate and should be finally approved.

10.      "Final Settlement Approval" means that the following has taken place: (a) entry of the Final Approval Order; and (b) the expiration of all applicable appeal periods for the appeal of the Final Approval Order without any appeal having been filed or, if any appeal is taken, entry of an order approving the Final Approval Order and the exhaustion of any and all applicable opportunities for the further reconsideration, rehearing, or appeal of any such affirmance.  The Parties agree that absent an appeal or other attempted review proceeding, Final Settlement Approval will be deemed to have occurred thirty-five (35) calendar days after the entry of the Final Approval Order.

11.      "Health Reimbursement Arrangement" or "HRA" means the reimbursement arrangement provided by ASARCO to Medicare-eligible Class Members which reimburses participants for eligible medical expenses, as set forth in the attached ASARCO Retiree Medical Plan, Exhibit A.

12.      "Judgment" means the Court's March 29, 2022 Judgment filed in the Litigation at ECF No. 188.

13.      "Litigation" means the three lawsuits consolidated under Case No. 2:18-cv-03495 and any appeal therefrom.

14.      "Parties" means Plaintiffs and ASARCO.

15.      "Plaintiffs" means the Class Representatives and the Unions.

16.      "Pre-65 Medical Plan" means the group health plan that ASARCO provides to Class Members who are not eligible for Medicare, as set forth in the 2002 Summary Plan Description attached Exhibit B, as modified by the 2007 Basic Labor Agreement attached as Exhibit C.

17. "Preliminary Approval Order" means the order granting preliminary approval to the Settlement.

18. "Settlement" means the settlement terms as set forth in this Settlement Agreement.

19. "Settlement Administrator" means American Legal Claims Services, LLC, PO Box 23650, Jacksonville, FL 32241-3650.

20. "Unions" means (i) United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW"), (ii) USW Local 886-02; (iii) USW Local 915; (iv) USW Local 5252; (v) International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Local 104; (vi) International Brotherhood of Electrical Workers ("IBEW") Local 518; (vii) IBEW Local 570; (viii) IBEW Local 602; (ix) International Association of Machinists and Aerospace Workers Local 519; (x) International Union of Operating Engineers, Local 428; (xi) International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmith, Forger, and Helpers, Local 627; and (xii) United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada Local 469.

## IV. The Settlement Terms

1. <u>Dismissal of Plaintiffs' Appeal.</u> Within seven (7) days of the execution of this Settlement Agreement by all Parties, Plaintiffs shall cause their appeal to the Ninth Circuit to be dismissed conditionally and without prejudice, subject to renewal if Final Settlement Approval is not obtained. Upon Final Settlement Approval, Plaintiffs' appeal

will be deemed dismissed with prejudice such that, in exchange for the promises and consideration set forth in this Settlement Agreement, the Judgment will be binding as to the Plaintiffs and the Class.

2.      <u>Continued Medical Benefits.</u> Upon Final Settlement Approval, ASARCO shall provide healthcare benefits to each Class Member on the following terms, notwithstanding the Judgment or any other document to the contrary, through at least June 30, 2025:

      a.      For Class Members who are Medicare-eligible, ASARCO will continue to provide the HRA and Catastrophic Coverage.  The annual HRA contribution from ASARCO will continue to be at least $1,800 for 2023 and 2024.  For 2025, the annual HRA contribution shall be at least $900.

      b.      For Class Members who are not Medicare-eligible, ASARCO will continue to provide the Pre-65 Medical Plan.  As Class Members become eligible for Medicare, they shall be offered the opportunity to enroll for the HRA and Catastrophic Coverage, and thereafter receive benefits on the same terms as the Medicare-eligible Class Members.

      c.      ASARCO shall have the right to modify the current HRA plan document attached hereto as Exhibit A effective January 1, 2025 in order to change the HRA contribution to $900 and to reflect six months of coverage for the plan year 2025.

      d.      After June 30, 2025, ASARCO will have the right to modify or terminate the retiree healthcare benefits it provides to the Class at any time

without advance notice to or approval of Plaintiffs and without any obligation to bargain over the same.  However, nothing in this Settlement Agreement requires ASARCO to do so.

3.      Checks for Medicare-Eligible Class Members Not Enrolled in the HRA. Within thirty (30) calendar days of Final Settlement Approval, ASARCO will provide Plaintiffs and the Settlement Administrator with an up-to-date list of each Medicare-Eligible Class Member who is not enrolled in the HRA and Catastrophic Coverage as set forth in the ASARCO Retiree Medical Plan at the time of Final Settlement Approval.  Upon review and confirmation of this list by Plaintiffs, ASARCO will cause to be deposited with the Settlement Administrator an amount equal to $500 for each such Class Member within fourteen (14)  calendar days.  As soon as is practicable after ASARCO's deposit of the fund, the Settlement Administrator will mail a check in the amount of $500 to each such Class Member.  The checks must be cashed within sixty (60) calendar days of mailing, and the Settlement Administrator will notify recipients of this deadline.  The amount of any uncashed checks after the deadline has passed shall be paid to the Patient Advocate Foundation.

4.      The Parties Will Bear Their Own Attorneys' Fees, Costs, and Expenses. Within seven (7) days of the execution of this Settlement Agreement by all Parties, ASARCO shall withdraw its motion for attorneys' fees and related non-taxable expenses (ECF No. 194), subject to renewal if Final Settlement Approval is not obtained.  Upon Final Settlement Approval, ASARCO agrees it will not pursue collection of the taxed costs

referenced above and that Plaintiffs and ASARCO shall each bear their own attorneys' fees, costs, and expenses incurred in connection with the Litigation.

5.     Engagement and Compensation of Settlement Administrator. Plaintiffs agree to ask the Court to appoint American Legal Claims Services, LLC to serve as the Settlement Administrator, which, as a condition of appointment, will agree to be bound by this Agreement with respect to the performance of its duties and its compensation. The Settlement Administrator's duties will include preparing, printing, and mailing the Class Notice to Class Members using the list of Class Members provided by ASARCO; conducting a National Change of Address search to update Class Member addresses before mailing the Class Notice; receiving check(s) or wired funds for Medicare-Eligible Class Members who are not enrolled in the Catastrophic Coverage and HRA pursuant to the ASARCO Retiree Medical Plan and depositing the monies into a fund that meets the requirements of a Qualified Settlement Fund ("QSF") under US Treasury Regulation section 468B-1; mailing $500.00 checks to Class Members on the list provided by ASARCO; and otherwise administering the Settlement pursuant to this Agreement. The Settlement Administrator's clients for purposes of this Settlement Agreement are Plaintiffs. The Settlement Administrator's fees and costs, including the cost of printing and mailing the Class Notice and the cost of maintaining the fund account and mailing checks, will be paid by ASARCO, up to a limit of $10,000.  Should the Settlement Administrator's fees and costs exceed $10,000, the excess fees and costs will be paid by Plaintiffs.

## V.    Settlement Approval Process

1.    <u>Preliminary approval.</u>   As soon as practicable after the execution of this Settlement Agreement by all Parties and the conditional dismissal without prejudice of Plaintiffs' appeal, Plaintiffs shall file a motion for preliminary approval of the Settlement set forth in this Settlement Agreement and apply for the Preliminary Approval Order, in the form attached hereto as Exhibit D or a substantially similar form, requesting*:*

a.    Preliminary approval of the Settlement.

b.    Approval of a customary long form of notice in the form attached hereto as Exhibit E or a substantially similar form ("Notice"), to be delivered to Class Members as set forth herein.

c.    Appointment of the Settlement Administrator.

d.    That the Final Fairness Hearing be held at least one hundred (100) calendar days from the entry of the Preliminary Approval Order.

e.    That the objection procedure set forth herein be adopted and that the deadline for objections be set for at least thirty (30) calendar days before the Final Fairness Hearing.

f.    That Plaintiffs be permitted to file a motion seeking the Final Approval Order fourteen (14) calendar days before the Final Fairness Hearing.

2.    <u>CAFA Notices.</u>   Pursuant to the Class Action Fairness Act of 2005 ("CAFA"), ASARCO shall cause the notices required by CAFA, 28 U.S.C. § 1715, to be prepared and provided to the required parties within ten (10) calendar days of Plaintiffs'

filing of the motion for preliminary approval.  ASARCO shall copy Class Counsel on any notices provided pursuant to this paragraph and shall file with the Court a certification of the date upon which the CAFA notices were served within seven (7) calendar days of service.

3.     Notice to the Class.  Within seven (7) calendar days of the Court's entry of the Preliminary Approval Order, ASARCO shall provide Plaintiffs and the Settlement Administrator with the most current mailing address for each Class Member. Settlement Administrator will process those addresses through the U.S. Postal Service's National Change of Address (NCOA) database to obtain the most current mailing addresses for Class Members.  Within fourteen (14) calendar days of receipt of the list of Class Member addresses, and no more than twenty-one (21) calendar days following entry of the Preliminary Approval Order, Settlement Administrator will mail the Notice to Class Members via U.S. first class mail, postage prepaid.  At any point prior to the Final Fairness Hearing, for any Notices that are returned as undeliverable to Settlement Administrator without a forwarding address, the Settlement Administrator will consult with Plaintiffs and undertake reasonable efforts to locate a correct address and resend the Notice.   In connection with their motion seeking the Final Approval Order, Plaintiffs shall cause to be filed with the Court an appropriate affidavit or declaration from the Settlement Administrator to the effect that they have complied with this provision.

4.     Objection Procedure.  Each Class Member who wishes to object to the Settlement shall file with the Court a timely written notice of his or her objection.  Such notice shall state: (i) the objector's full name, address, telephone number, and email

address; (ii) all grounds for the objection, including any legal support for the objection; (iii) copies of any documents upon which the objection is based; (iv) the name and address of any attorney representing the objector; (v) whether the objector will appear at the Final Fairness Hearing; and (vi) a list of all persons who will be called to testify at the Final Fairness Hearing in support of the objection.  To be timely, such notice must be filed with the Clerk of the United States District Court for the District of Arizona, Sandra Day O'Connor U.S. Courthouse, 401 West Washington Street, Phoenix, AZ 85003, at least thirty (30) calendar days prior to the date of the Final Fairness Hearing as set forth in the Notice and served upon both Class Counsel and ASARCO' counsel at the addresses set forth in the Notice.

5. <u>Final Approval.</u>  Following preliminary approval and notice to the Class, Plaintiffs shall timely file a motion for the Final Approval Order, in a substantially similar form to the from attached hereto as Exhibit F, in which they ask the Court to:

a. Approve the Settlement as fair, reasonable, and adequate.

b. Find that the Notice and notice process complied with the requirement of Fed. R. Civ. P. 23 and due process.

c. Dismiss the Litigation with prejudice.

d. Direct consummation of the Settlement in accordance with the Settlement Agreement.

6. <u>Effectiveness of Settlement.</u>  The Settlement shall become effective upon Final Settlement Approval.

## VI.   <u>Right to Terminate the Settlement</u>

1.    Any Party has the option to withdraw unilaterally from and terminate the Settlement in the event that: (i) either the Preliminary Approval Order or Final Approval Order is materially modified by the Court in a manner unacceptable to that Party; (ii) the Settlement is not approved by the Court; or (iii) the Settlement is disapproved or materially modified upon appeal.

2.    In the event the Settlement is terminated pursuant to the preceding paragraph, then the Settlement shall have no further force and effect and all negotiations, proceedings, and statements relating thereto, and any amendment thereof, shall be null and void and without prejudice to any Party and each Party shall be restored to their respective positions as if they never entered into this Settlement Agreement.

## VII.   <u>Miscellaneous</u>

1.    The Parties: (a) acknowledge that it is their intent to consummate this Settlement Agreement and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Settlement Agreement, and any applicable requirements under the Class Action Fairness Act of 2005.

2.    The Parties intend this Settlement to be a final and complete resolution of all disputes between them with respect to the Litigation.  The Settlement shall not be deemed an admission by any Party as to the merits of any claim or defense.

3.    The Parties agree that the Settlement was negotiated in good faith by the Parties and was reached voluntarily after consultation with competent legal counsel.

4.     The Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of all Parties.  All such amendments and modifications which materially affect the terms of the Settlement must be approved by the Court.

5.     This Settlement Agreement, together with its Exhibits, constitutes the entire agreement among the Parties and no representations, warranties, or inducements have been made to any party concerning the Settlement Agreement other than those contained and memorialized in this Settlement Agreement.

6.     Each counsel or other person executing this Settlement Agreement on behalf of any Party hereby warrants that such person has the authority to do so.

7.     This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Settlement Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Settlement Agreement and of signature pages by facsimile transmission or other electronic means will constitute effective execution and delivery of this Settlement Agreement as to the Parties and may be used in lieu of the original Settlement Agreement for all purposes.  Signatures of the Parties transmitted by facsimile or other electronic means will be deemed to be their original signatures for any purpose whatsoever.

8.     The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Settlement Agreement, and all Parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement.

**IN WITNESS WHEREOF**, and intending to be legally bound, the Parties execute

this Agreement on the dates indicated below:

**Class Representatives:**

Date: 12/28/2022          By: _Arnold Contreras_
                          Printed Name:  Arnold Contreras


Date: _____     By: _____
                          Printed Name:  Tony Meza


Date: _____     By: _____
                          Printed Name:  Charles M. Estrada


Date: _____     By: _____
                          Printed Name:  Celestino Flores


**ON BEHALF OF UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC ("USW"):**


Date: _____     By: _____

                          Printed Name: _____

                          Title: _____


**ON BEHALF OF USW LOCAL 886-02:**

Date: _____     By: _____

                          Printed Name: _____

                          Title: _____

**IN WITNESS WHEREOF**, and intending to be legally bound, the Parties execute this Agreement on the dates indicated below:

**Class Representatives:**

Date: _____          By: _____
                                   Printed Name:  Arnold Contreras

Date: ___12/14/2022___             By: _____
                                   Printed Name:  Tony Meza

Date: _____          By: _____
                                   Printed Name:  Charles M. Estrada

Date: _____          By: _____
                                   Printed Name:  Celestino Flores

**ON BEHALF OF UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC ("USW"):**

Date: _____          By: _____

                                   Printed Name: _____

                                   Title: _____

**ON BEHALF OF USW LOCAL 886-02:**

Date: _____          By: _____

                                   Printed Name: _____

                                   Title: _____

16

**IN WITNESS WHEREOF**, and intending to be legally bound, the Parties execute

this Agreement on the dates indicated below:

**Class Representatives:**

Date: _____       By: _____
                                  Printed Name:  Arnold Contreras


Date: _____       By: _____
                                  Printed Name:  Tony Meza


Date: *12-14-2022*                By: *Charles M Estrada*
                                  Printed Name:  Charles M. Estrada


Date: _____       By: _____
                                  Printed Name:  Celestino Flores


**ON BEHALF OF UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC ("USW"):**

Date: _____       By: _____

                                  Printed Name: _____

                                  Title: _____


**ON BEHALF OF USW LOCAL 886-02:**

Date: _____       By: _____

                                  Printed Name: _____

                                  Title: _____

16

**IN WITNESS WHEREOF**, and intending to be legally bound, the Parties execute this Agreement on the dates indicated below:

**Class Representatives:**

Date: _____          By: _____
                                   Printed Name:  Arnold Contreras     .

Date: _____          By: _____
                                   Printed Name:  Tony Meza

Date: _____          By: _____
                                   Printed Name:  Charles M. Estrada

Date: _____          By: _____
                                   Printed Name:  Celestino Flores

**ON BEHALF OF UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC ("USW"):**

Date: _____          By: _____

                                   Printed Name: _____

                                   Title: _____

**ON BEHALF OF USW LOCAL 886-02:**

Date: _____          By: _____

                                   Printed Name: _____

                                   Title: _____

**IN WITNESS WHEREOF**, and intending to be legally bound, the Parties execute this Agreement on the dates indicated below:

**Class Representatives:**

Date: _____  By: _____
Printed Name:  Arnold Contreras

Date: _____  By: _____
Printed Name:  Tony Meza

Date: _____  By: _____
Printed Name:  Charles M. Estrada

Date: _____  By: _____
Printed Name:  Celestino Flores

**ON BEHALF OF UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC ("USW"):**

Date: 12/14/22  By: _____
Printed Name:  David Jury
Title:  General Counsel

**ON BEHALF OF USW LOCAL 886-02:**

Date: _____  By: _____
Printed Name: _____
Title: _____

16

**IN WITNESS WHEREOF**, and intending to be legally bound, the Parties execute this Agreement on the dates indicated below:

**Class Representatives:**

Date: _____       By: _____
                              Printed Name:  Arnold Contreras


Date: _____       By: _____
                              Printed Name:  Tony Meza


Date: _____       By: _____
                              Printed Name:  Charles M. Estrada


Date: _____       By: _____
                              Printed Name:  Celestino Flores


**ON BEHALF OF UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC ("USW"):**

Date: _____       By: _____

                              Printed Name: _____

                              Title: _____


**ON BEHALF OF USW LOCAL 886-02:**

Date: ___1/9/2023___          By: _____
                              1431A277BBC54BD...

                              Printed Name: _____Gregory Romero_____

                              Title: _____President_____

**ON BEHALF OF USW LOCAL 915:**

Date: _____1/11/2023_____

By: _____

Printed Name: _Adrian Lopez_____

Title: _____President_____

**ON BEHALF OF USW LOCAL 5252:**

Date: _____

By: _____

Printed Name: ___Lyle Murphy____

Title: _____President_____

**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, LOCAL 104:**

Date: _____

By: _____

Printed Name: ___Kevin Hampton___

Title: _____Business Representative___

**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS ("IBEW") LOCAL 518:**

Date: _____

By: _____

Printed Name: ___Dominic Marcanti___

Title: _____Business Manager_____

**ON BEHALF OF USW LOCAL 915:**

Date: _____     By: _____

                              Printed Name: Adrian Lopez _____

                              Title: _____ President _____


**ON BEHALF OF USW LOCAL 5252:**

Date: 1/10/2023 _____     By: _____

                              Printed Name: _____ Lyle Murphy _____

                              Title: _____ President _____


**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, LOCAL 104:**

Date: _____     By: _____

                              Printed Name: _____ Kevin Hampton _____

                              Title: _____ Business Representative _____


**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS ("IBEW") LOCAL 518:**

Date: _____     By: _____

                              Printed Name: _____ Dominic Marcanti _____

                              Title: _____ Business Manager _____

DocuSign Envelope ID: 54117B02-9A55-4D19-A4AE-FE7B1FCBE0F2

**ON BEHALF OF USW LOCAL 915:**

Date: _____   By: _____

Printed Name: _____Manuel Armenta, Jr._____

Title: _____President_____

**ON BEHALF OF USW LOCAL 5252:**

Date: _____   By: _____

Printed Name: _____Lyle Murphy_____

Title: _____President_____

**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, LOCAL 104:**

Date: ____12/16/2022____   By: _____

Printed Name: _____Kevin Hampton_____

Title: _____Business Representative___

**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS ("IBEW") LOCAL 518:**

Date: _____   By: _____

Printed Name: _____Dominic Marcanti_____

Title: _____Business Manager_____

17

**ON BEHALF OF USW LOCAL 915:**

Date: _____          By: _____

                                 Printed Name: _____Manuel Armenta, Jr._____

                                 Title: _____President_____


**ON BEHALF OF USW LOCAL 5252:**

Date: _____          By: _____

                                 Printed Name: _____Lyle Murphy_____

                                 Title: _____President_____


**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, LOCAL 104:**

Date: _____          By: _____

                                 Printed Name: _____Kevin Hampton_____

                                 Title: _____Business Representative____


**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS ("IBEW") LOCAL 518:**

Date: 12/14/2022                 By: _Dominic Marcanti_____
                                     DocuSigned by:
                                     8F543AD8216342C...

                                 Printed Name: _____Dominic Marcanti_____

                                 Title: _____Business Manager_____

**ON BEHALF OF IBEW LOCAL 570:**

Date: 12/15/2022

By: _Joshua DeSpain_

Printed Name: _Joshua DeSpain_

Title: _Business Manager/Financial Secretary Treasurer_

**ON BEHALF OF IBEW LOCAL 602:**

Date: _____

By: _____

Printed Name: _Robert Melton_

Title: _Business Manager_

**ON BEHALF OF INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS LOCAL 519:**

Date: _____

By: _____

Printed Name: _____

Title: _____

**ON BEHALF OF INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 428:**

Date: _____

By: _____

Printed Name: _Mike Lee_

Title: _Business Manager_

**ON BEHALF OF IBEW LOCAL 570:**

Date: _____      By: _____

                                    Printed Name: _____

                                      Title: _____

**ON BEHALF OF IBEW LOCAL ~~509~~: 602**

Date: *12-15-22*      By: *[signature]*

                                      Printed Name: *ROBERT MELTON*

                                      Title: *Business MANAGER*

**ON BEHALF OF INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS LOCAL 519:**

Date: _____      By: _____

                                      Printed Name: _____

                                      Title: _____

**ON BEHALF OF INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 428:**

Date: _____      By: _____

                                      Printed Name: _____

                                      Title: _____

**ON BEHALF OF IBEW LOCAL 570:**

Date: _____        By: _____

                               Printed Name: _____

                               Title: _____


**ON BEHALF OF IBEW LOCAL 620:**

Date: _____        By: _____

                               Printed Name: _____

                               Title: _____


**ON BEHALF OF INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS LOCAL 519:**

Date: 1/12/2023                By: _Denise Heath_____

                               Printed Name: ___Denise Heath_____

                               Title: _President/Directing Business Representative


**ON BEHALF OF INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 428:**

Date: _____        By: _____

                               Printed Name: _____

                               Title: _____

18

**ON BEHALF OF IBEW LOCAL 570:**

Date: _____        By: _____

Printed Name: _____Joshua DeSpain_____

Title: Business Manager/Financial Secretary Treasurer


**ON BEHALF OF IBEW LOCAL 602:**

Date: _____        By: _____

Printed Name: Robert Melton_____

Title: _____Business Manager_____


**ON BEHALF OF INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS LOCAL 519:**

Date: _____        By: _____

Printed Name: _____

Title: _____


**ON BEHALF OF INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 428:**

Date: 12/15/2022____        By: _____

Printed Name: Mike Lee_____

Title: _____Business Manager_____

18

**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIPBUILDERS, BLACKSMITH, FORGER, AND HELPERS, LOCAL 627:**

Date: _1/9/2023_____    By: _Jacob Evenson_____

Printed Name: Jacob Evenson_____

Title: _Business Manager/Secretary_____

**ON BEHALF OF UNITED ASSOCIATION OF JOURNEYMAN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA LOCAL 469:**

Date: _____    By: _____

Printed Name: Mark Gallego_____

Title: _____Business Agent_____

**ON BEHALF OF ASARCO LLC:**

Date: _____    By: _____

Printed Name: _____

Title: _____

**ON BEHALF OF ASARCO RETIREE MEDICAL PLAN:**

Date: _____    By: _____

Printed Name: _____

Title: _____

19

**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIPBUILDERS, BLACKSMITH, FORGER, AND HELPERS, LOCAL 627:**

Date: _____      By: _____

Printed Name: Jacob Evenson _____

Title: _Business Manager/Secretary_____

**ON BEHALF OF UNITED ASSOCIATION OF JOURNEYMAN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA LOCAL 469:**

Date: 1/4/2023 _____      By: _____

Printed Name: Mark Gallego _____

Title: _____Business Agent_____

**ON BEHALF OF ASARCO LLC:**

Date: _____      By: _____

Printed Name: _____

Title: _____

**ON BEHALF OF ASARCO RETIREE MEDICAL PLAN:**

Date: _____      By: _____

Printed Name: _____

Title: _____

**ON BEHALF OF INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIPBUILDERS, BLACKSMITH, FORGER, AND HELPERS, LOCAL 627:**

Date: _____        By: _____

Printed Name: _____

Title: _____


**ON BEHALF OF UNITED ASSOCIATION OF JOURNEYMAN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA LOCAL 469:**

Date: _____        By: _____

Printed Name: _____

Title: _____


**ON BEHALF OF ASARCO LLC:**

Date: 12/15/2022        By: _____

Printed Name: _Jorge Lazelde_

Title: _Exentive VP Legal._


**ON BEHALF OF ASARCO RETIREE MEDICAL PLAN:**

Date: 12/15/2022        By: _____

Printed Name: _Jorge Lazelde_

Title: _Exentive VP Legal_


19

Reviewed and approved as to form by counsel:

FEINSTEIN DOYLE PAYNE & KRAVEC, LLC

Date: _1-13-2023_    By: _____

Printed Name: _Joel R Hurt_
Attorney for Plaintiffs and the Class

DAVIS & CAMPBELL, LLC

Date: _1-13-2023_    By: _____

Printed Name: _David Lubben_
Attorney for ASARCO

20

**Reviewed and approved as to form by counsel:**

**FEINSTEIN DOYLE PAYNE & KRAVEC, LLC**

Date: _1-13-2023_

By: _____

Printed Name: _Joel R Hurt_
Attorney for Plaintiffs and the Class

**DAVIS & CAMPBELL, LLC**

Date: _____

By: _____

Printed Name: _____
Attorney for ASARCO

20

# EXHIBIT A



# ASARCO Medicare Eligible Retiree Medical Plan

**Summary Plan Description**

Effective January 1, 2020

## KEY THINGS TO KNOW

ASARCO makes available to Medicare eligible retirees and their eligible dependents, the opportunity to purchase Medicare prescription drug and/or Medicare supplemental plans through Via Benefits.  Via Benefits is a private health care exchange and concierge service.

In connection with the Via Benefits program, ASARCO offers two reimbursement arrangements:
- The Health Reimbursement Arrangement (HRA), and
- The Catastrophic Coverage Special Payments (CCSP)

Eligible participants may use the HRA to reimburse Eligible Medical Expenses (as defined below).  An HRA is a notional account that does not accrue interest or other earnings of any kind.  The CCSP reimburses participants for eligible out-of-pocket prescription drug expenses incurred in excess of the Medicare Part D catastrophic threshold in a given Plan Year.  The HRA and CCSP are self-insured medical reimbursement plans under sections 105 and 106 of the Internal Revenue Code of 1986, as amended (the "Code"), and the HRA is a Health Reimbursement Arrangement as described in Internal Revenue Service ("IRS") Notice 2002-45.

In this booklet, the HRA and CCSP are referred to as the "Plan."  The provisions of the HRA and CCSP are described in this Summary Plan Description ("SPD").  Certain provisions may vary based on eligibility.

As used in this SPD, "EMPLOYER" or the "COMPANY" refers to ASARCO and its affiliates and subsidiaries that participate or participated in the applicable ASARCO benefit plans.  The Plan is intended to supplement your healthcare coverage under Medicare.

Certain other terms, which may be capitalized, are used throughout this SPD.  These terms are generally defined the first time they are used.

This document does not create a contract of employment between the Company and any individual.

This SPD reflects the terms of the Plan as of January 1, 2020.  As explained in more detail in this SPD, ASARCO reserves the right to terminate, amend or replace the Plan. If the Plan is terminated, you will not be reimbursed for any expenses incurred on or after the Plan termination date, and you will need to file request for reimbursement for expenses incurred before the termination date by the filing deadline established by the Plan Administrator. The Claim Submission Agent will not accept reimbursement requests filed after the deadline. Benefit Credits, if any, that remain credited to any Plan after timely filed requests for reimbursement have been processed will be the sole property of ASARCO. No individual has a vested right to any benefit under the Plan or any other health or welfare benefit plan sponsored by ASARCO.

# TABLE OF CONTENTS

PART I GENERAL INFORMATION ABOUT THE PLAN ....................................................1

Q-1.   What is the purpose of the Plan? ...........................................................................1
Q-2.   Who can participate in the Plan? ...........................................................................1
Q-3.   Can my dependents participate in the Plan? .........................................................1
Q-4.   When do I actually become a Participant in the Plan? .........................................1
Q-5.   How does the Plan work? .......................................................................................2
Q-6.   What is an "Eligible Medical Expense"? ..............................................................2
Q-7.   When do I cease participation in the Plan? ...........................................................3
Q-8.   What happens if I do not use all of the credits allocated to my HRA Account
       during the Plan Year? ............................................................................................4
Q-9.   How do I receive reimbursement under the Plan? ................................................4
Q-10.  What happens if my claim for benefits is denied? ...............................................5
Q-11   What happens if I die? ...........................................................................................6
Q-12.  Are my benefits taxable? .......................................................................................6
Q-13.  What happens if I receive an overpayment under the Plan or a
       reimbursement is made in error from my HRA Account? .....................................7
Q-14.  How long will the Plan remain in effect? .............................................................7
Q-15.  How does the Plan interact with other medical plans? .........................................7
Q-16.  What is "continuation coverage" and how does it work? .....................................7
Q-17.  What is alternative coverage? ...............................................................................8
Q-18.  Who do I contact if I have questions about the Plan? ..........................................8
Q-19.  What about Catastrophic Coverage Special Payment? .........................................8

PART II ERISA RIGHTS ..............................................................................................12
Receive Information about Your Plan and Benefits ........................................................12
Continue Plan Coverage ..................................................................................................12
Prudent Actions by Plan Fiduciaries ..............................................................................12
Enforcement of Your Rights ...........................................................................................12
Assistance with Your Questions ......................................................................................13

PART III LEGAL NOTICES ...........................................................................................14
Health Insurance Portability and Accountability Act .....................................................14
Section 1.  Introduction ...................................................................................................14
Section 2.  Notice of PHI Uses and Disclosures .............................................................15
Section 3.  Rights of Individuals .....................................................................................17
Section 4:  Notice of Breaches of Unsecured PHI ..........................................................20
Section 5.  Your Right to File a Complaint With the Plan or the HHS Secretary ............20
Section 6.  Whom to Contact at the Plan for More Information ......................................20
Section 7.  Conclusion .....................................................................................................20

PLAN INFORMATION APPENDIX ................................................................................21

# PART I
# ELIGIBILITY AND PARTICIPATION

## Q-1.    What is the purpose of the Plan?

The purpose of the Plan is to reimburse Participants (as defined in Q-2 and Q-3) for Eligible Medical Expenses (as defined in Q-6) which are not otherwise reimbursed by any other plan or program.   Reimbursements for Eligible Medical Expenses paid by the Plan generally are excludable from the Participant's taxable income.

## Q-2.    Who can participate in the Plan?

Retired employees of the Employer are eligible to participate in the Plan if they meet all requirements to be an Eligible Retiree as defined in Section 1 of the Plan Information Appendix. Eligible Retirees who become covered under the Plan, as explained in Q-4, are called "Participants."

Note that certain self-employed persons (such as sole proprietors, partners and 2% shareholders of an "S" corporation) may not participate in the Plan.  In addition, you are not eligible to participate in the Plan unless you are classified by the Employer as a former employee who satisfies the eligibility requirements, even if you are later determined by a court or governmental agency to be or to have been a former employee of the Employer.

## Q-3.    Can my dependents participate in the Plan?

Your dependents who meet all requirements to be Eligible Dependents may also become Participants in the Plan. Generally, an Eligible Dependent may participate in the Plan if they are eligible for Medicare. Prior to becoming eligible for Medicare, all other benefits for Eligible Dependents will be provided under another group health plan sponsored by ASARCO.     See Section 2 of the Plan Information Appendix.

You are required to provide proof of dependent status upon request by the Plan Administrator (or its designee).  Failure to provide such proof may result in a delay in benefits provided under the Plan.  In addition, the Plan will allow reimbursement of Eligible Medical Expenses for a child of yours (as defined by applicable state law) in accordance with a Qualified Medical Child Support Order ("QMCSO") to the extent the QMCSO does not require coverage not otherwise offered under this Plan.  The Plan Administrator will make a determination as to whether the order is a QMCSO in accordance with the Plan's QMCSO procedures.  The Plan Administrator will notify both you and the affected child once a determination has been made.  You may request a copy of the Plan's QMCSO procedures, free of charge, by contacting the Plan Administrator at the address listed in the Plan Information Appendix.

## Q-4.    When do I actually become a Participant in the Plan?

An Eligible Retiree or an Eligible Dependent actually becomes a Participant in the Plan on the later of the Effective Date of the Plan as provided in the Plan Information Appendix or the date that he or she has satisfied all of the following requirements:

- He or she has become eligible for Medicare;
- He or she has purchased a Medicare supplement or Medicare Advantage plan through Via Benefits prior to the enrollment deadline.  You may also purchase Prescription Drug, Dental or Vision coverage through Via Benefits; and

- He or she has completed any enrollment forms or procedures required by the Plan Administrator.

Participants in U.S. Territories:  Via Benefits does not offer plans in Puerto Rico, Guam, the U.S. Virgin Islands, American Samoa or the Northern Mariana Islands.  If you satisfy all of the criteria except that you have not enrolled in a Via Benefits plan because of these coverage limitations, you will nevertheless be eligible to participate in the plan if you enroll in a Medicare supplement or Medicare Advantage plan outside of Via Benefits.  Individuals in U.S. territories must contact Via Benefits to coordinate reimbursement through their HRA.

### Q-5.   How does the Plan work?

One HRA Account will be established for all Participants in your family.  Benefit Credits for all Participants in your family will be credited to that HRA Account. The account holder will be in the name of the retiree.  If both spouses are retirees of the Employer, the HRA account will be setup according to how benefits were setup as an active employee.  For example, if one of the retirees enrolled the other retiree under them as a dependent, they will have a joint HRA account. If both retirees were enrolled in active benefits separately, both retirees will have separate HRA accounts through Via Benefits.

Benefit Credits will be credited to HRA Accounts by the Employer in the amount and at the times specified in Sections 7 and 8 of the Plan Information Appendix and will be reduced from time to time by the amount of any Eligible Medical Expenses for which the Participant is reimbursed under the Plan.  At any time, the Participant may receive reimbursement for Eligible Medical Expenses up to the amount in his or her HRA Account.   Note that the law does not permit Participants to make any contributions to their HRA Accounts.

An HRA Account is merely a bookkeeping account on the Employer's records; it is not funded and does not bear interest or accrue earnings of any kind.  All benefits under the Plan are paid entirely from the Employer's general assets.

### Q-6.   What is an "Eligible Medical Expense"?

An Eligible Medical Expense means the cost of <u>premiums</u> for enrollment in a Medicare Supplement Plan, a Medicare Advantage Plan, a Medicare Prescription Drug Plan, Medicare Part B, a voluntary individual dental insurance plan, or a voluntary individual vision insurance plan for the Eligible Retiree and/or Eligible Dependent

Some examples of common items that are <u>not</u> Eligible Medical Expenses include:

- Prescription drug medications
- Dental expenses;
- Dermatology;
- Physical therapy;
- Contact lenses or glasses used to correct a vision impairment;
- Birth control pills;
- Chiropractor treatments;
- Hearing aids;
- Wheelchairs;

2

- Baby-sitting and child care;
- Long-term care services;
- Cosmetic surgery or similar procedures (unless the surgery is necessary to correct a deformity arising from a congenital abnormality, accident or disfiguring disease);
- Funeral and burial expenses;
- Household and domestic help;
- Custodial care;
- Health club or fitness program dues (unless specific requirements are satisfied); and
- Cosmetics, toiletries, toothpaste, etc.

Only Eligible Medical Expenses incurred (as defined in Section 9 of the Plan Information Appendix) while you are a Participant in the Plan may be reimbursed from your HRA Account. Similarly, only Eligible Medical Expenses incurred while your Eligible Dependent is a Participant in the Plan may be reimbursed from your HRA Account. Health insurance premiums are incurred for the coverage period to which they apply. An expense that has been paid but not incurred (e.g. pre-payment for premiums) will not be reimbursed until the coverage period to which they apply.

The following expenses may <u>not</u> be reimbursed from an HRA Account:

- expenses incurred for qualified long term care services;
- expenses incurred for covered Part D prescription drugs;
- expenses incurred *prior to the date* that you became a Participant in the HRA;
- expenses incurred *after the date* that you cease to be a Participant in the HRA;
- expenses that have been reimbursed by another plan or for which you plan to seek reimbursement under another health plan; and
- any other expenses specifically identified as excluded in Section 9 of the Plan Information Appendix.

### Q-7.   When do I cease participation in the Plan?

If you are an Eligible Retiree, you will cease being a Participant in the Plan on the earliest of:

- the date you cease to be an Eligible Retiree for any reason;
- the date you are rehired by the Employer as an active employee;
- if you were eligible for Medicare, the date thereafter that you cease to be eligible for Medicare (unless you remain eligible under another provision of the Plan);
- your date of death;
- the effective date of any amendment terminating your eligibility under the Plan; or
- the date the Plan is terminated.

If you are an Eligible Dependent, you will cease being a Participant in the Plan on the earliest of:
- the date you cease to be an Eligible Dependent for any reason;
- if you were eligible for Medicare, the date thereafter that you cease to be eligible for Medicare (unless you remain eligible under another provision of the Plan);
- in the case of an Eligible Dependent spouse, the date you divorce the Eligible Retiree;
- the effective date of any amendment terminating your eligibility under the Plan; or
- the date the Plan is terminated.

You may not obtain reimbursement of any Eligible Medical Expenses incurred after the date your eligibility ceases.  (For the definition of "incurred," see Q-6.)  You have 180 days after your eligibility ceases, however, to request reimbursement of Eligible Medical Expenses you incurred before your eligibility ceased.

In addition, your Eligible Dependents may be eligible to continue coverage under the Plan beyond the date that their coverage would otherwise end if coverage is lost for certain reasons. Their continuation of coverage rights and responsibilities are described in Q-16 below.

**Q-8.    What happens if I do not use all of the credits allocated to my HRA Account during the Plan Year?**

If you do not use all of the amounts credited to your HRA Account during a Plan Year, those amounts will be carried over to subsequent Plan Years, as reflected in Section 10 of the Plan Information Appendix.

**Q-9.    How do I receive reimbursement under the Plan?**

You must complete a reimbursement form and mail or fax it to the Claims Submission Agent as provided in the Plan Information Appendix, along with a copy of your insurance premium bill, an "explanation of benefits" or "EOB," or, if no EOB is provided, a written statement from the service provider.  The written statement from the service provider must contain the following: (a) the name of the patient, (b) the date service or treatment was provided, (c) a description of the service or treatment, (d) the amount incurred and (e) name of provider.  You can obtain a reimbursement form from the Third Party Administrator identified in the Plan Information Appendix.  Your claim is deemed filed when it is received by the Claims Submission Agent.

If your claim for reimbursement is approved, you will be provided reimbursement as soon as reasonably possible following the determination.  Claims are paid in the order in which they are received by the Claims Submission Agent.

The Claims Submission Agent shall determine the method or mode of reimbursement payments, including whether by direct deposit, written check or otherwise.

Any HRA Account payments that are unclaimed (e.g., uncashed benefit checks or unclaimed electronic transfers) shall automatically forfeit twelve months after the check was mailed or the payment was otherwise attempted. If the Claims Submission Agent needs information to process your claim, the Claims Submission Agent will notify you, in writing, within 30 days after receiving your claim of the specific information required and the date when you can expect a determination. This date will be no later than 45 days after the date you filed your initial claim. You will have 45 days to provide the additional information. The determination period to respond to your claim will be suspended as of the date the Claims Submission Agent sends the notice and will resume again once you have provided the information.

If you do not provide the requested information within the specified timeframe, the Claims Submission Agent will decide the claim without the requested information.

If the Claims Submission Agent, due to reasons beyond its control, determines that extra time is required to process your claim, it will notify you in writing of the reasons for the extension and the new due date for its response to your claim. The Claims Submission Agent will notify you of

the extension within 30 days after its initial receipt of your claim. The new due date will not be later than 45 days after the date you filed your initial claim.

Once you have filed a claim, the Claims Submission Agent will notify you of its decision as soon as practical, but no later than 30 days after receipt of the claim. Claims are paid in the order in which they are received by the Claims Submission Agent. If you do not follow the required procedures for filing a claim, the Claims Submission Agent will notify you and explain the proper procedures to follow in filing your claim.

### Q-10.   What happens if my claim for benefits is denied?

If your claim for reimbursement is wholly or partially denied, you will be notified in writing within 30 days after the Claims Submission Agent receives your claim unless an extension is necessary because you failed to provide sufficient information to allow the claim to be decided. For more information see Q-9 above.  The notice of denial will contain:

- the reason(s) for the denial and the Plan provisions on which the denial is based;

- a description of any additional information necessary for you to perfect your claim, why the information is necessary, and your time limit for submitting the information;

- a description of the Plan's appeal procedures and the time limits applicable to such procedures; and

- a description of your right to request all documentation relevant to your claim.

If your request for reimbursement under the Plan is denied in whole or in part and you do not agree with the decision of the Claims Submission Agent, you may file a written appeal.  You should file your appeal with the Plan Administrator at the address provided in the Plan Information Appendix no later than 180 days after receipt of the denial notice.  You should submit all information identified in the notice of denial, as necessary, to perfect your claim and any additional information that you believe would support your claim.

You will be notified in writing of the decision on appeal no later than 60 days after the Plan Administrator receives your request for appeal.  The notice will contain the same type of information provided in the first notice of denial provided by the Claims Submission Agent.

If your appeal is denied, you will receive written notice of the decision, including the following information:

- The specific reason(s) for the denial of the claim;

- Reference to the specific Plan provision on which the denial is based; and

- If applicable and upon request, a copy of the internal rule, guideline, or protocol that was relied upon to make the claim determination.

Upon request to the Plan Administrator, you will also be provided (free of charge) copies of all of the documents, records, and other information relevant to your claim. You will have the right

to bring a civil action under ERISA Section 502(a). You must appeal your claim, and that appeal must be denied by the Plan Administrator, before you may bring a civil action under ERISA.

Any claim or action that is filed in a court or other tribunal against or with respect to the Plan and/or the Plan Administrator must be brought within the following timeframes:

- For any claim or action relating to HRA Account benefits, the claim or action must be brought within 18 months of the date of the denied appeal.

- For all other claims (including eligibility claims), the claim or action must be brought within two years of the date when you know or should know of the actions or events that gave rise to your claim.

## Q-11   What happens if I die?

**Combined Account**

If the Eligible Retiree dies with no Eligible Dependents who are Participants in the Plan, his or her HRA Account is immediately forfeited upon death, but the deceased Eligible Retiree's estate or representatives may submit claims for Eligible Medical Expenses incurred by the Eligible Retiree and his or her Eligible Dependents before his or her death.  Claims must be submitted within 180 days of his or her death.

If the Eligible Retiree dies with one or more Eligible Dependents who are Participants, any unused funds remaining in his or her HRA Account shall remain and the Eligible Dependents who are Participants can continue to submit Eligible Medical Expenses for reimbursement. Eligible dependents will continue to receive benefit credits after the Retiree's death.

## Q-12. Are my benefits taxable?

The Plan is intended to meet certain requirements of existing federal tax laws, under which the benefits you receive under the Plan generally are not taxable.

The Company cannot guarantee the tax treatment to any given participant, as individual circumstances may produce different results.  The Plan Administrator makes no commitment or guarantee that any amounts paid to or for the benefit of a Participant under the Plan will be excludable from the Participant's gross income for federal, state, or local income tax purposes. By accepting benefits under the Plan, Participants agree to be liable for any tax plus any interest that may be imposed with respect to those benefits. You should consult your own tax advisor.

**Q-13.  What happens if I receive an overpayment under the Plan or a reimbursement is made in error from my HRA Account?**

If the Plan Administrator determines that you received an overpayment or a payment was made in error (for example, if you were reimbursed from your HRA for an expense that is later paid by another medical plan), you will be required to return the overpayment or erroneous reimbursement plus interest. If you do not return the overpayment or erroneous payment, plus interest, the Company or the Plan may offset (reduce) your account, future reimbursements, and future dollar credits until the overpayment or erroneous payment is recovered; the Company may also recover overpayments or erroneous payments, plus interest, by withholding funds from any other amounts due to you from the Company.

**Q-14.  How long will the Plan remain in effect?**

Although the Sponsor expects to maintain the Plan indefinitely, it has the right to modify or terminate the program at any time for any reason, including the right to change the classes of persons eligible for participation, and to reduce or eliminate the amount credited to HRA in the future.

Employers participating in the Plan other than the Sponsor (such as a related affiliate of the Sponsor) may terminate their participation in the Plan at any time upon 60 days written notice to the Sponsor and Plan Administrator.

**Q-15.  How does the Plan interact with other medical plans?**

Only expenses that have not been or will not be reimbursed by any other source may be Eligible Medical Expenses (to the extent all other conditions for Eligible Medical Expenses have been satisfied).  You must first submit any claims for medical expenses to the other plan or plans before submitting the expenses to this Plan for reimbursement.

**Q-16.  What is "continuation coverage" and how does it work?**

Under a federal law called "COBRA," Eligible Dependents under the Plan who are the spouse, former spouse or dependent child of a Participant may elect to continue coverage under the Plan for a limited time after the date they would otherwise lose coverage because of a divorce or legal separation from the Participant, the Participant's death or a dependent child ceasing to be an Eligible Dependent.  These are called "qualifying events."

Note that the Eligible Dependents are required to notify the Plan Administrator in writing of a divorce or legal separation or a dependent child losing dependent status within 60 days of the event or they will lose the right to continue coverage under the Plan.

If an Eligible Dependent elects to continue coverage, he or she is entitled to the level of coverage under the Plan in effect immediately preceding the qualifying event.  He or she may also be entitled to an increase in his or her HRA Account equal to the amounts credited to the HRA Accounts of similarly situated Participants (subject to any restrictions applicable to similarly situated Participants) so long as he or she continues to pay the applicable premium.

In order to continue coverage, the qualified beneficiary must pay a monthly premium equal to 102% of the cost of the coverage, as determined by the Plan Administrator.   The Plan

Administrator will notify qualified beneficiaries of the applicable premium at the time of a qualifying event.

Coverage may continue for up to 36 months following the qualifying event, but will end earlier upon the occurrence of any of the following events:

- The date the qualified beneficiary's HRA Account is exhausted;
- The date the qualified beneficiary notifies the Plan Administrator that he or she wishes to discontinue coverage;
- Any required monthly premium is not paid when due or during the applicable grace period;
- The date, after the date of the qualified beneficiary's election to continue coverage, that he or she becomes covered under another group health plan that does not contain any exclusion or limitation with respect to any pre-existing condition of the qualified beneficiary; or
- The Employer ceases to provide any group health plan.

### Q-17.  What is alternative coverage?

The Sponsor may make available to a qualified beneficiary (as defined in Q-16 above) other coverage in lieu of the continued coverage described in Q-16 above.  The Sponsor will provide more information on any alternative coverage that may be available under the Plan upon the occurrence of a qualifying event (as defined in Q-16 above).

If the qualified beneficiary chooses the continuation coverage above, he or she waives the right to the alternative coverage.  If the qualified beneficiary chooses the alternative coverage, he or she waives the right to continuation coverage as described above.

### Q-18.  Who do I contact if I have questions about the Plan?

If you have any questions about the Plan, you should contact the Third Party Administrator or the Plan Administrator.  Contact information for the Third Party Administrator and the Plan Administrator is provided in the Plan Information Appendix.

### Q-19.  What about Catastrophic Coverage Special Payment (CCSP)?

CCSP provides catastrophic coverage for prescription drugs and is intended to supplement coverage under a Medicare Part D prescription drug plan.

If you reach a threshold for catastrophic coverage under Medicare, your Medicare prescription drug plan generally pays the full cost of your prescription drugs except for a set fee or coinsurance you are responsible for.  CCPS will cover 100% of your eligible out-of-pocket expenses above the threshold.  CCPS does not apply to costs for drugs not covered by your Medicare Part D prescription drug plan.

Here's how the CCPS works with standard Medicare Part D prescription drug coverage:

- If you are covered under a standard Medicare Part D prescription drug plan, each year you generally must pay 100% of your prescription drug costs until those costs reach an annual deductible, if your plan has a deductible.

- Above the annual deductible, you will pay a portion of your prescription drug costs and the standard Medicare Part D prescription drug plan will pay the remaining portion of those costs, until the total costs reach the initial coverage limit for the year.

- After you reach the initial coverage limit, you will pay a portion of your prescription drug costs until your true out-of-pocket expenses for the year reach the Medicare Part D catastrophic threshold.  You will not reach the catastrophic threshold until your actual out-of-pocket costs reach the threshold.  Amounts covered or reimbursed by a plan, insurance policy, or employer do not count towards the catastrophic threshold.

- After you reach the catastrophic threshold, the CCPS will pay your out-of-pocket expenses for eligible prescription drugs – to the extent not payable by your Medicare Part D prescription drug plan for the remainder of the year.

## <u>Administrative Information</u>

### Discretionary Authority of the Plan Administrator

The Plan Administrator has responsibility for the interpretation and construction of the Plan and final authority for the operation and administration of the Plan, including its day-to-day operation and administration. The Plan Administrator has the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities, powers, and duties under the Plan. All determinations of the Plan Administrator as to any question involving its responsibilities, powers, and duties under the Plan, including interpretation of the Plan or as to any discretionary actions to be taken under the Plan are solely at the discretion of the Plan Administrator and are final, conclusive, and binding on all persons claiming to have any rights or interest in or under the Plan.

In addition to any implied powers and duties, the specific powers and duties of the Plan Administrator include the power and duty to:

- Determine the eligibility of any individual to participate in the Plan and the amount of Benefit Credits an individual is eligible for under the Plan;

- Determine when, to whom, in what amount, and in what form reimbursements are to be made under the Plan;

- Construe and interpret the terms and provisions of the Plan and all documents which relate to the Plan and to decide any and all matters arising there under, including the right to remedy possible ambiguities, inconsistencies, or omissions;

- Investigate and make such factual or other determinations as will be necessary or advisable for the administration of the Plan or for the determination of benefits under the Plan;

- Make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan;

- Review benefit claims and approve or deny any such benefit claims;

- Appoint such agents, counsel, accountants, consultants, and other persons as may be required to assist in administering the Plan; and

- Allocate and delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan.

### Clerical Error

A clerical error or other administrative error does not create benefits under the Plan. You are responsible for the accuracy of information pertaining to your participation in the Plan including, but not limited to, your birthday, address, and Social Security Number. It is your responsibility to confirm the accuracy of statements that are based on such information and to promptly report errors to the Plan Administrator.

### Electronic Media

The Plan Administrator may use electronic media in accordance with ERISA to satisfy all disclosure and recordkeeping obligations imposed on the Plan under Title I of ERISA.

### Indemnification

ASARCO indemnifies and holds harmless the Plan Administrator and any employee of ASARCO to whom fiduciary responsibilities have been delegated from and against any liability, damage, cost, and expense (including attorneys' fees and amounts paid in settlement of any claim approved by ASARCO) incurred by or asserted against him/her by reason of his/her occupying or having occupied fiduciary positions in connection with the Plan, However, no indemnification is provided if the Plan Administrator or any employee of ASARCO personally profited from any act or transaction in respect of which indemnification is sought.

Additionally, no indemnification is provided to the extent that any loss, cost, expense, or damage with respect to which any fiduciary shall seek indemnification is held by a court of competent jurisdiction, in a final judgment from which no appeal can be taken, to have resulted either from the gross negligence or willful misconduct of one or more of the fiduciaries or from the violation or breach of any fiduciary duty imposed under ERISA on one or more of the fiduciaries.

**Nonassignment of Benefits**

Assignment or alienation of any reimbursements provided by the Plan will not be permitted or recognized except as otherwise required by applicable law. This means that, except as required by applicable law, reimbursements provided under the Plan are not subject to sale, assignment, anticipation, alienations, attachment, garnishment, levy, execution, or any other form of transfer. Generally, state and local laws will not be recognized unless permitted by or under an applicable federal law, such as ERISA.

## PART II
## ERISA RIGHTS

This Plan is an employee welfare benefit plan as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  ERISA provides that you, as a Plan Participant, will be entitled to:

### Receive Information about Your Plan and Benefits

- Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts, collective bargaining agreements, and a copy of the latest annual report (Form 5500 series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.
- Obtain, upon written request to the Plan Administrator, copies of all documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 series) and updated Summary Plan Description.  The Plan Administrator may apply a reasonable charge for the copies.
- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### Continue Plan Coverage

Continue Plan coverage for your eligible spouse or dependents if there is a loss of coverage under the plan as a result of a qualifying event.  However, your spouse or your dependents may have to pay for such coverage.  Review this SPD and the documents governing the Plan for the rules governing COBRA continuation coverage rights.

### Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of the Plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit from the Plan, or from exercising your rights under ERISA.

### Enforcement of Your Rights

If your claim for a welfare benefit under an ERISA-covered plan is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Plan review and reconsider your claim. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator. If you have a claim for benefits that is denied or ignored in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan's decision or

lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in federal court. If it should happen that plan fiduciaries misuse the Plan's money or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees (e.g., if it finds your claim is frivolous).

### Assistance with Your Questions

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance obtaining documents from the Plan Administrator, you should contact the nearest office of the U.S. Department of Labor, Employee Benefits Security Administration listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Ave., N.W., Washington, D.C., 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## PART III
## LEGAL NOTICES


### Health Insurance Portability and Accountability Act

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT
YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN
GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY**


**Section 1.  Introduction**

The Plan is dedicated to maintaining the privacy of your health information.  The Plan is required by law to take reasonable steps to ensure the privacy of your personally identifiable health information or "Protected Health Information" ("PHI") and to inform you about:

- the Plan's uses and disclosures of PHI;
- your privacy rights with respect to your PHI;
- the Plan's duties with respect to your PHI;
- your right to file a complaint with the Plan and to the Secretary of the U.S. Department of Health and Human Services; and
- the person or office to contact for further information about the Plan's privacy practices.

The term "Protected Health Information" or "PHI" includes all individually identifiable health information transmitted or maintained by the Plan, regardless of form (oral, written, electronic). The Plan is required by law to maintain the privacy of PHI and to provide individuals with notice of its legal duties and privacy practices.

The Plan is required to comply with the terms of this notice. However, the Plan reserves the right to change its privacy practices and to apply the changes to all PHI received or maintained by the Plan, including PHI received or maintained prior to the change. If a privacy practice described in this Notice is materially changed, a revised version of this notice will be provided to all individuals then covered under the Plan for whom the Plan still maintains PHI.  The revised notice will be provided by mail or by another method permitted by law.

Any revised version of this notice will be distributed within 60 days of the effective date of any material change to the uses or disclosures, the individual's rights, the duties of the Plan or other privacy practices stated in this notice.

**Please note that the Plan Sponsor obtains summary PHI, enrollment and disenrollment, termination of coverage and specific appeals information from the Plan.  Most records containing your PHI are created and retained by the Third Party Administrator for the Plan.  In the event that the Plan Sponsor receives PHI, the Plan has been amended to require that the Plan Sponsor only use and disclose PHI received from the Plan for plan administrative purposes or as otherwise permitted by federal law**.  **This notice only applies to Protected Health Information or PHI as defined in the applicable HIPAA privacy rules.**

14

**Section 2.  Notice of PHI Uses and Disclosures**

Except as otherwise indicated in this notice, uses and disclosures will be made only with your written authorization, subject to your right to revoke such authorization.

*A.  Required PHI Uses and Disclosures*

Upon your request, the Plan is required to give you access to certain PHI in order to inspect and copy it.

Use and disclosure of your PHI may be required by the Secretary of the Department of Health and Human Services to investigate or determine the Plan's compliance with the privacy regulations.

The Plan also will disclose PHI to the Plan Sponsor for plan administrative purposes or as otherwise permitted by law.  The Plan Sponsor has amended its plan documents to protect your PHI as required by federal law.

The Plan contracts with business associates for certain services related to the Plan.  PHI about you may be disclosed to the business associates so that they can perform contracted services.  To protect your PHI, the business associate is required to appropriately safeguard the protected health information.  The following categories describe the different ways in which the Plan and its business associates may use and disclose your PHI.

*B.  Uses and disclosures to carry out treatment, payment and health care operations*

The Plan and its business associates will use PHI without your consent, authorization, or opportunity to agree or object, to carry out treatment, payment and health care operations.

*Treatment* is the provision, coordination or management of health care and related services. It also includes but is not limited to consultations and referrals between one or more of your providers.  For example, the Plan may disclose to a treating cardiologist the name of your treating physician so that the cardiologist may ask for your lab results from the treating physician.

*Payment* includes but is not limited to actions to make coverage determinations and payment (including billing, claims management, subrogation, plan reimbursement, reviews for medical necessity and appropriateness of care and utilization review and preauthorizations).    For example, the Plan may tell a doctor whether you are eligible for coverage or what percentage of the bill will be paid by the Plan.

*Health care operations* include but are not limited to quality assessment and improvement, reviewing competence or qualifications of health care professionals, underwriting, premium rating and other insurance activities relating to creating or renewing insurance contracts. It also includes disease management, case management, conducting or arranging for medical review, legal services and auditing functions including fraud and abuse compliance programs, business planning and development, business management and general administrative activities.  For example, the Plan may use information about your claims to refer you to a disease management program, project future benefit costs or audit the accuracy of its claims processing functions.

15

### C. Authorized uses and disclosures

You must provide the Plan with your written authorization for the types of uses and disclosures that are not identified by this notice or permitted or required by applicable law.

Any authorization you provide to the Plan regarding the use and disclosure of your health information may be revoked at any time **in writing**.  After you revoke your authorization, the Plan will no longer use or disclose your health information for the reasons described in the authorization, except for the two situations noted below:

The Plan has taken action in reliance on your authorization before it received your written revocation; or
You were required to give the Plan your authorization as a condition of obtaining coverage.

### D.  Uses and disclosures for which consent, authorization or opportunity to object is not required

Use and disclosure of your PHI is allowed without your consent, authorization or request under the following circumstances:

When required by law.

When permitted for purposes of public health activities, including when necessary to report product defects, to permit product recalls and to conduct post-marketing surveillance. PHI may also be used or disclosed if you have been exposed to a communicable disease or are at risk of spreading a disease or condition, if authorized by law.

When authorized by law to report information about abuse, neglect or domestic violence to public authorities if there exists a reasonable belief that you may be a victim of abuse, neglect or domestic violence. In such case, the Plan will promptly inform you that such a disclosure has been or will be made unless that notice would cause a risk of serious harm. For the purpose of reporting child abuse or neglect, it is not necessary to inform the minor that such a disclosure has been or will be made. Disclosure may generally be made to the minor's parents or other representatives although there may be circumstances under federal or state law when the parents or other representatives may not be given access to the minor's PHI.

To a public health oversight agency for oversight activities authorized by law. This includes uses or disclosures in civil, administrative or criminal investigations; inspections; licensure or disciplinary actions (for example, to investigate complaints against providers); and other activities necessary for appropriate oversight of government benefit programs (for example, to investigate Medicare or Medicaid fraud).
When required for judicial or administrative proceedings. For example, your PHI may be disclosed in response to a subpoena or discovery request provided certain conditions are met. One of those conditions is that satisfactory assurances must be given to the Plan that the requesting party has made a good faith attempt to provide written notice to you, and the notice provided sufficient information about the proceeding to permit you to raise an objection and no objections were raised or were resolved in favor of disclosure by the court or tribunal.

For law enforcement purposes, including to report certain types of wounds or for the purpose of identifying or locating a suspect, fugitive, material witness or missing person. The Plan may also disclose PHI when disclosing information about an individual who is or is suspected to be a victim of a crime, but only if the individual agrees to the disclosure or the covered entity is unable to obtain the individual's agreement because of emergency circumstances. Furthermore, the law enforcement official must represent that the information is not intended to be used against the individual, the immediate law enforcement activity would be materially and adversely affected by waiting to obtain the individual's agreement and disclosure is in the best interest of the individual as determined by the exercise of the Plan's best judgment.

When required to be given to a coroner or medical examiner for the purpose of identifying a deceased person, determining a cause of death or other duties as authorized by law. Also, disclosure is permitted to funeral directors, consistent with applicable law, as necessary to carry out their duties with respect to the decedent.

For research, subject to conditions.

When consistent with applicable law and standards of ethical conduct if the Plan, in good faith, believes the use or disclosure is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public and the disclosure is to a person reasonably able to prevent or lessen the threat, including the target of the threat.

When authorized by and to the extent necessary to comply with workers' compensation or other similar programs established by law.

Notwithstanding the above, and to the extent provided in applicable law, the Plan shall not use or disclose your PHI that is classified as genetic information for purposes of any underwriting activity.

## Section 3.  Rights of Individuals

### A.  Right to Request Restrictions on PHI Uses and Disclosures

You may request that the Plan restrict uses and disclosures of your PHI to carry out treatment, payment or health care operations, or restrict uses and disclosures to family members, relatives, friends or other persons identified by you who are involved in your care or payment for your care. However, the Plan is not required to agree to your request.

With respect to a health care provider, you have a right to request that a health care provider restrict disclosure of your PHI and not disclose such PHI and related claim information to the Plan, if the PHI pertains solely to a health care item or service for which you or another person on your behalf has paid the health care provider and you have not requested reimbursement from the Plan.

The Plan will accommodate reasonable requests to receive communications of PHI by alternative means or at alternative locations as required by law.  You or your personal representative will be required to complete a form to request restrictions on uses and disclosures of your PHI.  Such requests should be made to the Plan at the address provided at the end of this Notice specifying the requested method of contact or the location where you wish to be contacted.

17

**B.  Right to Inspect and Copy PHI**

With certain exceptions described below, you have the right to inspect and copy your PHI if it is part of a "Designated Record Set" or "DRS." The DRS is the group of records maintained by or on behalf of the Plan contained in the enrollment, payment, claims adjudication, and case or medical management record systems of the Plan, and any other records which are used by the Plan to make decisions about individuals. This right does not extend to psychotherapy notes, information gathered for certain civil, criminal or administrative proceedings, and information maintained by the Sponsor that duplicates information maintained by a Plan business associate in its DRS.

The Plan must provide you with access to the PHI contained in a DRS in the form and format requested by you. However, if the PHI is not readily producible in such form or format, it must be produced in a readable hard copy form or such other form as agreed to by the Plan and you. Further, if the PHI is maintained in an electronic DRS, you may request an electronic copy of the PHI in an electronic form or format. However, if the PHI is not readily producible in a specific electronic form and format requested by you, the Plan and you must agree on the electronic form or format in which it will be produced.

If you request a copy of your PHI contained in a DRS, the Plan may charge you a reasonable, cost-based fee for the expense of copying, mailing and/or other supplies associated with your request. To inspect and obtain a copy of your PHI that is part of a DRS, you must submit your request in writing.

If you exercise your right to access your PHI, the Plan will respond to your request within 30 days, subject to a one-time extension of an additional 30 days. In the case of an extension, the Plan must provide you with a written explanation for the delay and the date by which it will respond to your request.

The Plan may deny your request to inspect and copy your PHI in certain limited situations. If you are denied access to your PHI, you will be notified in writing. The notice of denial will include the basis for the denial, and a description of any appeal rights you may have and the right to file a complaint with the Plan or with the Department of Health and Human Services. If the Plan does not maintain the PHI that you are seeking but knows where it is maintained, the Plan will notify you of where to direct your request.

**C.  Right to Amend PHI**

If you believe that your PHI in a DRS is incorrect or incomplete, you may request that the Plan amend the PHI. Any such request must be made in writing and must include a reason that supports your requested amendment.  The Plan must respond to your request within 60 days. If the Plan is not able to respond within this 60-day period, it may have a one-time 30-day extension by providing you with a written explanation for the delay and the date by which it will respond to your request.

In limited situations, the Plan may deny your request to amend your PHI. For example, the Plan may deny your request if (1) the PHI was not created by the Plan (except where you are unable to request an amendment from the person or entity that created the PHI because the person or entity is no longer available); (2) the Plan determines the information to be accurate or complete;

(3) the information is not part of the DRS; or (4) the information is not part of the information which you would be permitted to inspect and copy, such as psychotherapy notes. If your request is denied, you will be notified in writing. The notice of denial will include the basis for the denial, a description of your right to submit a statement of disagreement and a description of your right to file a complaint with the Plan or with the Department of Health and Human Services.

### D.  Right to Receive an Accounting of PHI Disclosures

You have the right to request an accounting of certain types of disclosures of your PHI made by the Plan during a specified period of time.  You do not have the right to request an accounting of all disclosures of your PHI. For example, you do not have the right to receive an accounting of (1) disclosures for purposes of Treatment, Payment or Health Care Operations; (2) disclosures to you or your personal representative regarding your own PHI; (3) disclosures pursuant to an authorization; or (4) disclosures prior to April 14, 2003 (or the inception of the Plan, whichever is later).

Your request must indicate the time period for which you are seeking the accounting, such as a single month, six months or two calendar years. This time period may not be longer than six [6] years and may not include any disclosures of PHI made before April 14, 2003 (or the inception of the Plan, whichever is later). The Plan must respond to your request within 60 days. If the Plan is not able to respond within this 60-day period, it may have a one-time 30-day extension by providing you with a written explanation for the delay and the date by which it will respond to your request.

The Plan will provide the first accounting you request in any 12-month period free of charge. The Plan may impose a reasonable, cost-based fee for each subsequent accounting request within the 12-month period. The Plan will notify you in advance of the fee and provide you with an opportunity to withdraw or modify your request.

### E.  The Right to Receive a Paper Copy of This Notice Upon Request

To obtain a paper copy of this Notice at any time contact the Plan Administrator.  The Notice is also posted on the Plan Sponsor's intranet site.   Even if you have agreed to receive this Notice electronically, you are still entitled to a paper copy of this Notice.

### F.  A Note About Personal Representatives

You may exercise your rights through a personal representative. Your personal representative will be required to produce evidence of his/her authority to act on your behalf before that person will be given access to your PHI or allowed to take any action for you. Proof of such authority may take one of the following forms:

a power of attorney for health care purposes, notarized by a notary public;
a court order of appointment of the person as the conservator or guardian of the individual; or
an individual who is the parent of a minor child.

The Plan retains discretion to deny access to your PHI to a personal representative to provide protection to those vulnerable people who depend on others to exercise their rights under these

rules and who may be subject to abuse or neglect. This also applies to personal representatives of minors.

**Section 4:  Notice of Breaches of Unsecured PHI**

Under HIPAA, the Plan and its business associates, are required to maintain the privacy and security of your PHI. The goal of the Plan and its business associates is to not allow any unauthorized uses or disclosures of your PHI. However, regrettably, sometimes an unauthorized use or disclosure of your PHI occurs. These incidents are referred to as "breaches." If a breach affects you and is related to unencrypted PHI, the Plan or its applicable business associate will notify you of the breach and the actions taken by the Plan or the business associate to mitigate or eliminate the exposure to you.

**Section 5.  Your Right to File a Complaint With the Plan or the HHS Secretary**

If you believe that your privacy rights have been violated, you may complain to the Plan in care of the Plan Administrator. You may file a complaint with the Secretary of the U.S. Department of Health and Human Services, Hubert H. Humphrey Building, 200 Independence Avenue S.W., Washington, D.C. 20201.  The Plan will not retaliate against you for filing a complaint.

**Section 6.  Whom to Contact at the Plan for More Information**

If you have any questions regarding this Notice or the subjects addressed in it, you may contact the Plan Administrator.

**Section 7.  Conclusion**

PHI use and disclosure by the Plan is regulated by a federal law known as HIPAA (the Health Insurance Portability and Accountability Act). You may find these rules at 45 *Code of Federal Regulations* Parts 160 and 164. This Notice attempts to summarize the regulations. The regulations will supersede any discrepancy between the information in this Notice and the regulations.

If you wish to exercise one or more of the rights listed in this Notice, contact the Plan Administrator.

# PLAN INFORMATION APPENDIX

## GENERAL PLAN INFORMATION

| | |
|---|---|
| **Name of Plan:** | ASARCO Medicare Eligible Medical Plan |
| | |
| **Effective Date:** | January 1, 2020 |
| | |
| **Name, address, and telephone number of the Plan Sponsor:** | ASARCO LLC<br>5285 E. Williams Circle, Suite 2000<br>Tucson, AZ 85711-7711 USA<br>520-798-7500 |
| | |
| **Name, address, and telephone number of the Plan Administrator:**<br><br>The Plan Administrator has the exclusive right to interpret the Plan and to decide all matters arising under the Plan, including the right to make determinations of fact, and construe and interpret possible ambiguities, inconsistencies, or omissions in the Plan and the SPD issued in connection with the Plan.  The Plan Administrator may delegate one or more of its responsibilities to one or more individuals or committees. | ASARCO LLC<br>5285 E. Williams Circle, Suite 2000<br>Tucson, AZ 85711-7711 USA<br>520-798-7500 |
| | |
| **Agent for Service of Legal Process:** | ASARCO LLC<br>5285 E. Williams Circle, Suite 2000<br>Tucson, AZ 85711-7711 USA<br>520-798-7500 |
| | |
| **Sponsor's federal tax identification number:** | 81-0666284 |
| | |
| **Plan Number:** | 575 |
| | |
| **Plan Year:** | January 1 to December 31 of each year |
| | |
| **Third Party Administrator:** | Via Benefits<br>10975 South Sterling View Drive<br>South Jordan, UT  84905<br>(844) 256-0920<br>my.viabenefits.com/asarco |

| | |
|---|---|
| **Claims Submission Agent:**<br><br>All reimbursement forms, and supporting documentation, must be provided to the Claims Submission Agent.  Forms should not be mailed to the Third Party Administrator. | Via Benefits<br>P.O. Box 981156<br>El Paso, TX 79998-1156<br>Fax #: 866-886-0878 |
| | |
| **Funding:** | Benefits are paid from the Employer's general assets. There is no trust or other fund from which benefits are paid. |

## PLAN TERMS

1.   **Eligible Retiree:**  Eligible Retiree means:  You are eligible for Medicare and were an employee-participant (or a dependent of an employee-participant or a spouse of an employee-participant) in the ASARCO employee benefit plans that provided for retiree healthcare and prescription drug benefits, and who retired after November 30, 1986 and before January 1, 2007 (or who is a dependent of an employee participant or a spouse of an employee-participant who retired during this same period of time) from a union-represented position at the ASARCO Ray Complex, or you were an employee-participant (or a dependent of an employee-participant or a spouse of an employee-participant) in the ASARCO welfare benefit plans that provided for retiree medical and prescription drug benefits as set forth in section 1 of the 2002 Ray SPD, and who retired between January 1, 2007 and November 30, 2015, including any retirees who provided the requisite retirement notice by November 30, 2015 and then retired within 180 days of providing the notice, or a dependent of an employee-participant or a spouse of an employee-participant who retired between January 1, 2007 and November 30, 2015 (or provided the requisite retirement notice by November 30, 2015 and then retired within 180 days of providing the notice) from a union-represented position with ASARCO under the terms of the retirement income plan for hourly-rated employees.

For purposes of this section 1, the following terms shall have the meanings set forth herein:

"ASARCO Ray Complex" means: ASARCO's Ray Operation and Hayden Concentrator.

"2002 Ray SPD" means: the Summary Plan Description for the Employee Benefits Plans for Hourly Employees of Ray Unit of ASARCO Incorporated, Effective July 1, 2002.

2.   **Eligible Dependents:**  Eligible Dependents include an Eligible Retiree's Spouse and any Eligible Disabled Adult Child.  An Eligible Dependent may be a Participant in the Plan regardless of whether the Eligible Retiree is a Participant (the Eligible Retiree would need to be a Participant of this plan or another group health plan sponsored by ASARCO).

3.   **Spouse:** Spouse means: a person who is eligible for Medicare and resides in the United States and who is in a legal union with the Eligible Retiree that is recognized as a marriage in the state the legal union was established. The term Spouse for purposes of this plan is determined on the same date the Employee separated from employment with the Employer and attained Eligible Retiree status.

A Spouse shall <u>not</u> include any person who is:

- legally separated or divorced from the Eligible Retiree,
- re-married following the Eligible Retiree's death,
- participating in benefits herein as an Eligible Retiree,
- not a resident of the United States of America,
- in a legal union that is recognized as a common law marriage in the state where the marriage was established, or
- in a legal union that is recognized as a marriage in the state where the marriage was established and such legal union occurred after the Eligible Retiree's employment separation date with the Employer.

4.   **Eligible Disabled Adult Child:** Eligible Disabled Adult Child means: an Eligible Retiree's unmarried child who is eligible for Medicare, who, prior to attaining age 19, such child was totally and permanently disabled or mentally incapacitated. Such child must be principally dependent upon the Eligible Retiree for maintenance and support. An Eligible Disabled Adult Child must be certified by the

corporate medical director as suffering from an illness or injury which prevents them from living independently of their parents and obtaining employment.

For purposes of this section 4, the term "child" shall include:

- a natural child of the Eligible Retiree;
- stepchildren (i.e.: the natural children of the Eligible Retiree's Spouse) residing in the Eligible Retiree's household and supported solely by the Eligible Retiree;
- a legally adopted child of the Eligible Retiree or his or her Spouse; or
- a child who has been committed by a court of law to the custody of the Eligible Retiree or his or her spouse.

**5.**    **Insurance Coverage Exception**:   In lieu of obtaining an individual health insurance policy through Via Benefits, an Eligible Retiree or Eligible Dependent may establish that he or she:

(a)      Resides outside the United States or within the U.S. Territories

**6.**    **Account Structure:**   *Combined Account*.   Only one HRA Account will be established for all Participants in a single family and all credits for such family members will be credited to such HRA Account.

**7.**    **Benefit Credit:**   Benefit Credits are discretionary, to be determined in the sole discretion of ASARCO each Plan Year. For the 2020 Plan Year, the Benefit Credit will be $1,800. For Plan Years after 2020, and on an annual basis thereafter, the Benefit Credit will be adjusted based solely on the Plan Administrator's discretion. If a Participant enrolls on a date other than January 1, the Benefit Credit shall be multiplied by a fraction, the numerator of which is the number of months or partial months remaining in the calendar year from the Participant's enrollment date and the denominator is twelve. Eligible Participants may contact Third Party Administrator, Via Benefits, to find out their specific Benefit Credit.

**8.**    **Timing of Benefit Credit:**   Benefit Credits will be credited to HRA Accounts on the first day of each Plan Year.

**9.**   **Eligible Medical Expense**:   Eligible Medical Expenses means the cost of <u>premiums</u> for enrollment in: a Medicare Supplement Plan, a Medicare Advantage Plan, a Medicare Prescription Drug Plan, Medicare Part B, a voluntary individual dental insurance plan, or a voluntary individual vision insurance plan for the Eligible Retiree and/or Eligible Dependent.

For purposes of this Plan, an expense is "incurred" when the Eligible Retiree and/or Eligible Dependent pays a monthly premium for an individual plan giving rise to the claimed expense.

**10.**    **Carryover of Accounts**:   Credits remaining in an HRA Account at the end of a Plan Year shall be carried over to the following Plan Year to reimburse Participants for Health Care Expenses incurred during subsequent Plan Years.

**11.**    **Death**:   Participants who are Eligible Dependents shall continue to receive Benefit Credits but not those of the retiree after the Eligible Retiree's death.

12.   __Catastrophic Coverage Reimbursement__.

(a)     Participants who are Eligible Retirees and/or Eligible Dependents shall receive Catastrophic CCPS Reimbursement for qualifying prescription drug expenses:

(b)     The CCPS Reimbursement will begin only after the Participant has accumulated covered Part D expenses in an amount equal to the true out of pocket (TrOOP) limit set by CMS for the applicable Plan Year.

(c)     The CCPS Reimbursement benefit will be administered based on the following:  Once the Participant has reached the level set forth in (b), all eligible claims for qualifying prescription drug expenses will be reimbursed for the remainder of the applicable Plan Year.

# EXHIBIT B

# SUMMARY PLAN DESCRIPTION

**Employee Benefit Plans**

**for**

**Hourly Employees**

**of**

# Ray Unit

**of**

# ASARCO Incorporated

**Equal Opportunity Employer**

Effective July 1, 2002 to June 30, 2005

# TABLE OF CONTENTS

|  | Page No. |
| --- | --- |
| **Subject** | |
| **INTRODUCTION** | 1 |
| **LIST OF UNIONS** | 1 |
| **ASARCO HEALTH PLAN** | 5 |
|   **ELIGIBILITY AND EFFECTIVE DATES** | 5 |
|   **DEFINITIONS** | 5 |
|   **PROVISIONS APPLICABLE IF YOU CEASE WORK** | 9 |
|     **LAYOFF** | 9 |
|     **LEAVE OF ABSENCE** | 9 |
|     **STRIKE** | 9 |
|     **DISABILITY** | 10 |
|     **DISCHARGE/TERMINATION OF EMPLOYMENT** | 10 |
|   **RETIREMENT** | 10 |
|     **MEDICAL BENEFITS FOR RETIRED EMPLOYEES AND ELIGIBLE DEPENDENTS** | 10 |
|   **DEPENDENT BENEFITS AFTER THE EMPLOYEE'S DEATH** | 11 |
|   **NON-DUPLICATION OF BENEFITS** | 11 |
|     **MEDICARE FOR RETIRED EMPLOYEES** | 13 |
|   **EMPLOYEE COMPLAINTS** | 13 |
|   **TERMINATION OF BENEFITS WHILE HOSPITALIZED** | 14 |
|   **HOW TO FILE A MEDICAL CLAIM** | 14 |
|   **COMPREHENSIVE PLAN** | 14 |
|   **PREFERRED PROVIDER NETWORK** | 15 |
|   **MANAGED CARE** | 15 |
|   **DEDUCTIBLE** | 15 |
|   **MAXIMUM OUT-OF-POCKET EXPENSE** | 16 |
|   **LIFETIME MAXIMUM** | 16 |
|   **MONTHLY CONTRIBUTIONS** | 16 |
|   **WEEKEND ADMISSIONS** | 16 |
|   **REASONABLE AND CUSTOMARY PAYMENT** | 16 |
|   **COVERED EXPENSES** | 17 |
|   **EXCLUSIONS** | 19 |
|   **PREVENTIVE CARE** | 22 |
|   **REHABILITATION CENTERS** | 23 |
|   **EXTENDED CARE FACILITIES** | 23 |
|   **HOME HEALTH CARE** | 24 |
|   **HOSPICE CARE** | 25 |
|   **SECOND SURGICAL OPINION** | 26 |
|   **PRE-ADMISSION TESTING** | 27 |
|   **AMBULATORY SURGERY** | 27 |
|   **WEEKLY ACCIDENT AND SICKNESS BENEFITS** | 28 |
|   **OPT OUT OF MEDICAL COVERAGE** | 29 |
| **VISION CARE PLAN** | 30 |
|   **ELIGIBILITY AND EFFECTIVE DATE** | 30 |
|   **COVERED CHARGES** | 30 |
|   **SCHEDULE OF BENEFITS** | 31 |

LIMITATIONS .............................................................................31
EXCLUSIONS ..............................................................................32
PAYMENT OF BENEFITS ...........................................................33
NON-DUPLICATION OF BENEFITS ..........................................33
PROOF OF LOSS ........................................................................33
PRESCRIPTION DRUG PLAN COVERAGE ....................................35
EFFECTIVE DATES AND ELIGIBILTY ....................................35
COVERED PRESCRIPTIONS .....................................................35
RETAIL PROGRAM ...................................................................35
MAIL ORDER PROGRAM .........................................................35
MONTHLY CONTRIBUTIONS ...................................................36
ASARCO DENTAL PLAN ...................................................................37
ELIGIBILTIY AND EFFECTIVE DATES ...................................37
DEFINITIONS ............................................................................37
THE DEDUCTIBLE .....................................................................39
MAXIMUM BENEFIT AVAILABLE ..........................................39
COVERED DENTAL EXPENSES ................................................39
ORTHODONTIC TREATMENT ..................................................41
PREDETERMINATION OF BENEFITS ......................................41
LIMITATIONS ............................................................................42
EXCLUSIONS .............................................................................43
PROVISIONS APPLICABLE IF YOU LEAVE WORK ................43
    LAYOFF ...............................................................................43
    LEAVE OF ABSENCE ..........................................................44
    STRIKE .................................................................................44
    DISABILITY ..........................................................................44
DISCHARGE/ TERMINATION OF EMPLOYMENT ....................44
DATE EXPENSES ARE INCURRED ...........................................44
HOW TO FILE A CLAIM ............................................................44
NON-DUPLICATION OF BENEFITS ..........................................45
PROOF OF CLAIM .....................................................................46
BENEFITS AFTER CESSATION OF COVERAGE .......................46
FLEXIBLE SPENDING ACCOUNTS ...................................................47
HOW FSAs WORK ......................................................................47
REIMBURSABLE EXPENSES .....................................................47
IRS RULES .................................................................................48
TAX ADVANTAGES ...................................................................48
DEPENDENT CARE TAX CREDIT .............................................49
GROUP LIFE INSURANCE PLAN .....................................................50
SCHEDULE OF INSURANCE ....................................................50
COVERAGE AFTER RETIREMENT ..........................................50
TOTAL DISABILITY ..................................................................50
ACCIDENTAL DEATH OR DISMEMBERMENT BENEFITS ......51
CONVERSION PRIVILEGE ........................................................51
BENEFICIARIES ........................................................................52
CONTRIBUTORY LIFE BENEFITS ...........................................52
DEPENDENT LIFE INSURANCE ...............................................52
    CONTINUANCE OF DEPENDENT COVERAGE ...................53
IMPORTANT INFORMATION ...........................................................54

iv

PLAN IDENTIFICATION ............................................................................55
PLAN ADMINISTRATOR ..........................................................................55
TYPE OF ADMINISTRATION ...................................................................55
ANNOUNCEMENT BOOKLET ..................................................................56
COST OF BENEFITS .................................................................................56
CLAIMS PROCEDURE ..............................................................................56
HEALTH PLAN, VISION CARE PLAN, PRESCRIPTION DRUG PLAN, DENTAL
PLAN, FLEXIBLE SPENDING ACCOUNT AND GROUP LIFE INSURANCE
PLAN...........................................................................................................56
COBRA ...............................................................................................................59
STATEMENT OF ERISA RIGHTS ..................................................................62
OTHER RIGHTS .................................................................................................63
AMENDMENT AND TERMINATION ..............................................................64
RETIREMENT INCOME PLAN ........................................................................65
INTRODUCTION ........................................................................................67
ELIGIBILITY ..............................................................................................67
VESTING......................................................................................................67
CONTINUOUS SERVICE ..........................................................................67
BREAK IN SERVICE .................................................................................68
RETIREMENT DATES ...............................................................................69
BENEFIT FORMULA .................................................................................70
NORMAL OR DEFERRED RETIREMENT .............................................71
60/10 BENEFIT ...........................................................................................72
60/30 BENEFIT ...........................................................................................73
30-YEAR BENEFIT ....................................................................................74
70/80 BENEFIT ...........................................................................................75
PERMANENT AND TOTAL DISABILITY BENEFITS ...................................77
DEFINITION OF PERMANENT AND TOTAL DISABILITY ...............77
PRE-RETIREMENT SPOUSE'S PENSION .............................................77
POST-RETIREMENT SPOUSE'S PENSION ...........................................79
CONTINGENT ANNUITANT OPTION ....................................................79
VESTED DEFERRED BENEFIT ...............................................................81
PRE-RETIREMENT SURVIVOR ANNUITY ("PSA") ..........................83
WHEN PENSIONS ARE PAID...................................................................83
TOP-HEAVY PROVISIONS.......................................................................83
IMPORTANT INFORMATION..........................................................................85
PLAN ADMINISTRATOR ..........................................................................87
PLAN TRUSTEE .........................................................................................87
PLAN INVESTMENT MANAGERS ..........................................................87
TYPE OF ADMINISTRATION ...................................................................88
FUNDING ....................................................................................................88
CLAIMS PROCEDURE ..............................................................................88
STATEMENT OF ERISA RIGHTS ..................................................................90
AMENDMENT AND TERMINATION ..............................................................91
WHAT HAPPENS IF YOUR PLAN IS TERMINATED ..........................91

# INTRODUCTION

This Summary Plan Description includes benefits provided to hourly, represented employees at the Ray Unit.

Section 1 of this booklet outlines the Welfare Plans (Asarco Health Plan, Asarco Prescription Drug Plan, Asarco Dental Plan, Asarco Group Life Insurance Plan, Asarco Security and Severance Plan and Asarco Plan of Permanent and Total Disability Benefits) and Section 2 outlines the Pension Plan (Retirement Income Plan) for Hourly-Rated Employees at the Ray Complex.  All of these plans are in accordance with the contract negotiated between ASARCO Incorporated and the Union(s) representing the Hourly employees at the Ray Unit.  Copies of the collective bargaining agreement as well as other pertinent documents relating to the Plans may be examined by you or your beneficiaries at your local Human Resources Office or, upon written request, may be obtained from the Plan Administrator.

# LIST OF UNIONS

United Steelworkers of America, Local 5252

United Steelworkers of America, Local 915

United Steelworkers of America, Local 886-02

International Brotherhood of Boilermakers, Iron Shipbuilders,
Blacksmiths, Forgers and Helpers, Local 627

International Association of Machinists
and Aerospace Workers, Local 2181

International Brotherhood of Electrical Workers, Local 518

United Association of Journeymen and Apprentices of the Plumbing
and Pipefitting Industry of the United States & Canada, Local 741

Millwright Local 1914

**NOTA:**     Para los participantes y beneficiarios que hablan solamente español, el Departamento de Personal les ayudará entender este documento.

# SECTION 1 - WELFARE PLANS

**The Welfare Plans section of this booklet is comprised of summaries of the following Plans:**

**Asarco Health Plan**

**Asarco Prescription Drug Plan**

**Asarco Dental Plan**

**Asarco Vision Plan**

**Asarco Flexible Spending Account Plan**

**Asarco Group Life Insurance Plan**

# ASARCO HEALTH PLAN

## ELIGIBILITY AND EFFECTIVE DATES

If you are an employee as defined herein you will become eligible for the Comprehensive Plan on the first day of the calendar month coincident with or next following completion of three consecutive months of employment.

If you are not actively at work on the date your medical benefits would otherwise become effective because of confinement in a hospital, such coverage shall not be effective as to the conditions for which you are hospitalized until you are discharged from the hospital.

Your dependents are eligible for benefits under this Plan on the later of:

(a)    The date you are eligible for benefits, or
(b)    The date you acquire your first eligible dependent, provided that you had benefits for yourself on the day immediately preceding that date.

If on the effective date of the benefits for your dependents, a dependent is confined in a hospital, medical benefits for that dependent shall not be effective as to the conditions for which the dependent is hospitalized until he or she has been discharged from the hospital.  Confinement of a newborn child will not postpone benefits for such child.

When you become eligible for benefits you will be automatically enrolled, but you will be asked to sign a card indicating whether you have dependents, as defined herein.

## DEFINITIONS

"Ambulatory Surgical Facility" is a state-approved and licensed public or private institution, other than private offices or clinics of physicians.  It has an organized medical staff of physicians with permanent facilities that are equipped and operated primarily for the purpose of performing surgical procedures.  It also provides continuous physician's services and registered professional nursing services whenever a patient is in the facility.  It does not provide services or other accommodations for patients to stay overnight.  In states where no state approval program exists, the Plan may approve facilities on the basis of the above described requirements.

Before you enter an ambulatory surgical facility, you should inquire as to whether such facility meets the above requirements.

"Approved Rehabilitation Center" is a treatment center approved by the Plan and specifically engaged in the rehabilitation of those suffering from alcoholism or drug addiction.

Such center (1) provides a program of effective medical and therapeutic treatment for alcoholism or drug addiction,  (2) maintains a detailed regimen requiring full-time residence and participation by the patient, and (3) has a member of its staff who is a duly licensed physician or has a written agreement with one or more duly licensed physicians who shall be responsible for

the quality of care rendered to patients.  In states where no state approval program exists, the Plan may approve centers on the basis of satisfying the above described requirements.

Before you enter a rehabilitation center, you should inquire as to whether such center meets the above requirements.

"Certified Nurse-Midwife" is a person who (1) is a licensed registered professional nurse, (2) is certified, licensed or otherwise authorized by the proper state authority to practice nurse-midwifery, including the performance of deliveries, in the state where the services are being performed, (3) performs deliveries with supervising responsibility being provided by a physician, and (4) is affiliated or practicing in conjunction with a legally constituted health service facility approved to operate in the state where the nurse-midwife is performing the services.

"Covered Person" is an employee or a dependent on whose account benefits are in effect under this Plan.

"Custodial Care" is that type of care (including room and board needed to provide that care) which (1) is given mainly to help a person with personal hygiene or to perform the activities of daily living, and (2) can, in terms of generally accepted medical standards, be safely and adequately given by people who are not trained or licensed medical or nursing personnel.

Some examples of custodial care are training to help to:  get in and out of bed, bathe, dress, prepare special diets, eat, walk, use the toilet, or take oral drugs or medicines or those which can usually be self-administered.

Services are custodial care regardless of (1) who recommends, provides or directs the care, or (2) where the care is given.

"Dependent" means:

    (a)    The employee's spouse, including a spouse who is a retiree of the Company.
    (b)    The employee's unmarried child(ren) under age 19.  Such child(ren) include:
        (1)    A natural child of the employee
        (2)    Stepchildren (i.e.: the natural children of the employee's spouse) residing in the employee's household and supported solely by the employee,
        (3)    A legally adopted child of the employee or his or her spouse, or
        (4)    A child who has been committed by a court of law to the custody of the employee or his or her spouse.
        All cases of dependents in categories (2), (3) or (4) must be submitted to your unit Human Resources Department for Corporate approval.
    (c)    With respect to employees prior to their retirement only, the employee's unmarried child(ren) after attainment of age 19 but not beyond attainment of age 23 if any such child is a full-time student at any accredited school, college or university principally dependent upon the employee for maintenance and support. Proof of enrollment must be submitted to your unit Human Resources Department each semester.
    (d)    The employee's unmarried child(ren) over age 19, if upon attaining age 19 such child(ren) is (are) totally and permanently disabled or mentally incapacitated.  Such child(ren) must be principally dependent upon the employee for maintenance and support.  Dependent children must be certified by the Corporate Medical Director as

suffering from an illness or injury which prevents them from living independently of their parents and obtaining employment.

(e)    Children for whom coverage is required under a Qualified Medical Child Support Order (QMCSO).  All cases must be submitted for approval. A Qualified Medical Child Support Order (QMCSO) is an order, decree, judgment, or administrative notice (including a settlement agreement) issued by a domestic relations court or other court of competent jurisdiction, or through an administrative process established under state law which has the force and effect of law in that state, which meets the requirements of Section 609 of ERISA.

The term "dependent" does not include any person who is eligible for benefits under this Plan as an employee.  Also, no person shall be a "dependent" of more than one employee.

Written proof that a child qualifies as a dependent after attainment of age 19 must be furnished by the employee to the Company.

"<u>Employee</u>" means a regular full time hourly employee of Ray Complex, who is represented by a Union.

"<u>Employer</u>" means the Ray Complex of ASARCO Incorporated.

"<u>Extended Care Facility</u>" is an institution that furnishes room and board and skilled nursing care 24 hours a day, either by or under the supervision of a registered professional nurse.  The institution must be recognized as an extended care facility by Medicare or must be accredited by the Joint Commission on Accreditation of Hospitals as an extended care facility, and must be operating in accordance with any applicable local laws.  An extended care facility is not, other than incidentally, a place for rest, a place for domiciliary care, a place for the aged, a place for drug addiction, a place for alcoholics, a hotel or a motel.

"<u>Home Health Care Agency</u>" is an agency providing intermittent nursing services or therapy in your home.  These services must be performed by or under the supervision of a licensed registered or practical nurse, and must follow a plan established by a physician.  A home health care agency will be approved by the Plan if:

(1)    It qualifies as a home health care agency under Medicare, or
(2)    The Plan determines that it meets the standards of Medicare certification, and
(3)    Where necessary, has been approved by the applicable area-wide Health Care Planning Agency.

"<u>Hospital</u>" is an institution which meets fully <u>every one</u> of the following tests, namely:

(a)    It is legally licensed as a hospital.
(b)    It is primarily engaged in providing medical care for its patients on an inpatient basis, and maintains diagnostic and therapeutic facilities for the surgical and medical diagnosis, treatment and care of injured and sick persons by or under the supervision of a staff of physicians.
(c)    It continuously provides twenty-four hour a day nursing services by or under the supervision of registered graduate nurses.
(d)    It operates continuously and provides organized facilities for operative surgery.

(e)     It is not, other than incidentally, a place for rest, a place for the aged, a place for drug
        addicts, a place for alcoholics, a nursing home or a facility for the long-term treatment
        of tuberculosis or mental disorders.

"Hospital" also includes (1) an approved rehabilitation facility for the treatment of drug addiction
and alcoholism and (2) state-approved and licensed surgical centers and psychiatric facilities.

"Maternity Center (Birth Center)" is a freestanding facility which offers comprehensive
maternity care to carefully screened patients who are expected to have an uneventful pregnancy
with a normal, uncomplicated childbirth. The facility must have a prearranged agreement with a
nearby hospital for emergency transfer of mother and/or infant if an unexpected complication
occurs.  The maternity center must be approved by the Plan.

"Non-occupational", as applied to any injury or sickness, means:

(a)     Any injury not arising out of or in the course of any employment for wage or profit, or
(b)     Any sickness not entitling the person who has contracted the sickness to benefits under
        any Workers' Compensation or occupational disease law.

"Physician" means any doctor of medicine (M.D.) or doctor of osteopathy (D.O.) who is legally
qualified and licensed to practice medicine.  For certain services doctors of dental surgery
(D.D.S) and doctors of podiatric medicine (D.P.M.) are also deemed to be physicians.

Practitioners, Other Than Physicians or Surgeons
If a duly licensed practitioner, while acting within the scope of his license, and provided there are
statutory or regulatory provisions applicable to the Group Policy which require recognition of the
covered services of such a practitioner, performs any services in connection with injury or
sickness or gives any recommendation or approval required by the provisions of this booklet,
expenses incurred on account of, or disability due to, such injury or sickness will be considered
for benefits subject to the same terms and limitations as if such services were performed by or
such recommendation and approval were given by a physician or surgeon legally licensed to
practice medicine.

"Psychologist" means a person who meets one of the following qualifications:

(a)     If practicing in a State or Province where statutory licensure or certification of
        psychologists exists, he or she holds a valid credential (as legally specified) for such
        practice;
(b)     If practicing in a State or Province where statutory licensure or certification of
        psychologists does not exist, but where valid, nonstatutory (professional) certification is
        established by the jurisdiction's recognized psychological association, he or she holds
        such certification;
(c)     If practicing in State or Province where neither statutory nor nonstatutory licensure or
        certification of psychologist exists, he or she holds a statement of qualification by a
        committee established for the purpose by the jurisdiction's recognized psychological
        association or, in the absence of such a committee, he or she holds a diploma in the
        appropriate specialty awarded by the American Board of Examiners in Professional
        Psychology or its Canadian equivalent.

"<u>Qualified Change in Family Status</u>" is any status change that enables you to add/delete coverage for yourself or your dependents. The options you select at your time of hire (and during any enrollment periods that may occur) will remain in effect unless you experience a qualifying change in family status.  Examples of qualifying changes include:

- Marriage, divorce or separation
- Birth or adoption of a child
- Death of a spouse or child
- A significant change in your spouse's medical coverage
- A change in your benefits due to loss of eligibility (for example, your hours are reduced and you're no longer eligible to participate)
- The issuance of a Qualified Medical Child Support Order
- A loss of your spouse's employment when you were relying on his/her employer's benefits.

In any of these instances you'll be able to change your coverage.  But, keep in mind that the change must be consistent with the qualifying event.  For example, if you have a baby you're allowed to increase medical coverage, but you aren't permitted to decrease coverage.

If you have a qualifying change in family status and want to change coverage, contact your local Human Resources representative.  **Please keep in mind that you must make the change within 31 days of the qualifying event**.

"<u>Surgery</u>" is any generally accepted operative and cutting procedure for the treatment of disease or injury.  Surgery also means the correction of a fracture, the reduction of a dislocation and the manipulation of a joint.

"<u>You</u>" or "<u>your</u>" means the employee who is a covered person for personal benefits.  They do not include a dependent of the employee.

# PROVISIONS APPLICABLE IF YOU CEASE WORK

**Layoff**

Comprehensive Plan benefits for you and your dependents will terminate at the end of the month in which your layoff commences.  If you return to work from a layoff after such benefits have terminated, you will be provided benefits on your first day of work, subject to the applicable contribution for such coverage.

**Leave of Absence**

Comprehensive Plan benefits for you and your dependents will continue for six months following the month in which the leave of absence became effective, unless the leave of absence is for local union business in which case benefits under the Comprehensive Plan will continue for the entire period of such leave.

**Strike**

Comprehensive Plan benefits for striking employees and their dependents will terminate at the end of the month the strike commences.  In the event of a strike, continuation of coverage of the Comprehensive Plan may be available under certain conditions.  Please see page 59 for an explanation of your rights to continuation coverage ("COBRA").

**Disability**

(a)   With respect to your benefits under the Comprehensive Medical Plan:

    (i)   If you become totally disabled due to occupational or non-occupational accident or illness and do not receive a pension from the Company, your benefits will be continued during such disability, but not beyond 24 months after the last day you were actually at work.

    (ii)   If you are absent from work because you are permanently and totally disabled due to occupational or non-occupational accident or illness, your benefits will continue for 24 months after the last day you are actually at work or to the date of your 65th birthday, whichever first occurs.  At such time, if you have ten (10) or more years of continuous service under the Company's Pension Plan you will be provided benefits for as long as you are totally disabled.  If you have less than ten (10) years of continuous service at such time, your benefits will terminate.

    (iii)   In the event you recover from a disability within twenty-four (24) months after your last day of work and are unable to return to work because of a reduction in force for lack of work, your coverage will terminate at the end of the month in which you are unable to return to work.

**Discharge/Termination of Employment**

In the event you are discharged by the Company Comprehensive Plan benefits for you and your dependents will terminate as of your date of discharge.  If it is subsequently determined that you were improperly discharged, there shall be no break in such coverages and benefits.  Please see page 59 for an explanation of your rights to continuation coverage ("COBRA").

In the event you or your dependent is hospitalized as a bed patient on the date your benefits under the Comprehensive Plan terminate, in-hospital benefits shall be covered as provided in the Comprehensive Plan until the earlier of (a) completion of the hospital stay; and (b) the date on which the hospital stay reaches the maximum number of days provided in the Comprehensive Plan.

# RETIREMENT

If you retire under the Asarco Retirement Income Plan for Hourly-Rated Employees, Comprehensive Plan benefits are continued for you and your dependents as set forth below.

**Medical Benefits for Retired Employees and Eligible Dependents**

If you retire (other than deferred vested) under the Retirement Income Plan for Hourly-Rated Employees of ASARCO Incorporated, coverage under the Comprehensive Plan may continue for you, your spouse and eligible dependents as long as they remain eligible, subject to the limits explained later in this booklet.

The benefits otherwise provided for covered medical expenses shall be reduced by any benefits for or because of such expenses being available under the Health Insurance for the Aged Act and Disabled Provisions for the United States Social Security Act as enacted or thereafter amended (Medicare), excluding benefits due to being in the first 18 months of end stage renal disease.  The Comprehensive Plan is primary, subject to coordination of benefits provisions, for benefits due to being in the first 18 months of end stage renal disease.

The remaining parts of this section of this booklet describe the benefits, general provisions relating to them, how you and your dependents become covered, when and how coverage terminates and the effect of coverage by other group plans, including Medicare. You should read the following explanations for more complete information as to the Plan.

## DEPENDENT BENEFITS AFTER THE EMPLOYEE'S DEATH

If you should die in active service after you have 10 years of continuous service and after you have been married for at least one year, the Comprehensive Plan benefits applicable to eligible dependents of active employees will still apply to your eligible dependents.

If you die as a retired employee and your spouse is eligible to receive a post-retirement spouse's pension allowance, the Comprehensive Plan benefits applicable to eligible dependents of retired employees will still apply to your eligible dependents.

## NON-DUPLICATION OF BENEFITS

The Comprehensive Plan contains a non-duplication of benefit provision. When you, your spouse or your dependent children are covered by more than one group plan, there is a procedure followed to determine which plan pays first (the "primary" plan) and which plan pays second (the "secondary" plan). This procedure exists to avoid duplicate payments by the secondary plan. When the Asarco Plan is secondary, the Asarco Plan will pay its usual benefits after first reducing the covered expenses by the benefits paid by the primary plan.

"Plan" means these types of medical or dental care benefit coverages: (1) coverage under a governmental program or coverage that is provided or required by statute, including any motor vehicle no-fault coverage required by statute and (2) group insurance or other coverage for a group of individuals, including student coverage obtained through an educational institution.

Asarco reserves the right to obtain and exchange benefit information from other organizations, carriers and individuals and to regain any overpayment made to or on behalf of you or your dependent as a result of failure to report other group coverage.

If you have other group coverage, you will expedite the processing of your claim by providing all required information regarding other plans when you submit your claim. Space is provided for such information on your claim form.

In order to obtain all of the benefits available, you and your dependents should file claims under each plan.

Benefits available to any covered individual under any provision of the Asarco Health Plan shall be reduced to the extent like benefits are available under the provisions of any group insurance plan or group pre-payment plan. In the event a dependent or early retiree covered under the Asarco Health Plan is, or shall become, covered, or eligible for coverage, under any group insurance or group pre-payment plan by virtue of employment, benefits under the Asarco Health Plan shall be secondary to the benefits provided or available under such other plan and aggregate benefits payable under both plans may not exceed the benefits that would have been payable under the Asarco Health Plan. Asarco Health Plan benefits shall be secondary to such other coverage which is available to a dependent or early retiree regardless of whether such other coverage is taken, even if such other coverage requires that a contribution be made by the dependent or early retiree.

The Asarco Health Plan shall be the primary source of coverage for active employees who continue to work beyond their Medicare entitlement date. The dependents of such employees will also continue to be eligible for coverage, provided that the employee is actively at work.

Expenses and benefits which are recovered by legal action or settlement are not covered under any provision of the Asarco Health Plan. Accordingly, the Company shall be entitled to a refund for any benefits paid under any provision of the Asarco Health Plan which are recovered by legal action or settlement. The right of the Asarco Health Plan to a refund shall be applied to the aggregate amount recovered by the employee or covered dependent from legal action or settlement related to non-occupational injuries for which Plan benefits were paid.

Reimbursement to the Asarco Health Plan shall not exceed the portion of such expenses or benefits which are covered by legal action or settlement which is attributed to health care benefits.

Reasonable legal expenses (attorney's fee and costs) incurred in obtaining payments from a third party will not be considered as included in the aggregate amount subject to reimbursement.

Employees are required to notify Asarco promptly of the fact of such legal action, or of a judgment or settlement in favor of the employee (or covered dependent) and make available all information relevant to the administration of any provision of the Plan.

When you or one of your covered dependents is eligible for more than one plan of benefits, the rules establishing which plan is primary and which one is secondary, are the following:

- The benefits of a group plan which covers the person other than as a dependent shall be determined before the benefits of a group plan which covers such person as a dependent.

- In the case of dependent children who are eligible for coverage under any other group insurance or group pre-payment plan, questions concerning which plan is primary shall be resolved using the Birthday Rule.

**Birthday Rule**:   The benefits of the plan of the parent whose birthday falls earlier in a year shall be primary and the benefits of the plan of the parent whose birthday falls later in the year shall be secondary.

**NOTE**:   *If your spouse's birthday falls first in the year and their employer's plan requires a contribution in order to obtain dependent coverage, your dependents will only be covered on a secondary basis by the Asarco Health Plan, even if you choose not to enroll them in that plan.*

If a dependent child is covered under both parents plans, the primary plan for coverage will be the plan covering the parent whose birthday comes earlier in the year, unless:

(a)   The parents are separated or divorced and the parent with custody of the child has not remarried.  In such a case, the benefits of the plan covering the child as a dependent of the parent with custody will be determined before the benefits of the plan covering the child as a dependent of the non-custodial parent.

(b)   The parents are divorced and the parent with custody of the child is remarried.  In such a case, the benefits of a plan covering the child as a dependent of the parent with custody will be determined before the benefits of a plan provided by the stepparent, whose benefits will be determined before those of the parent without custody.

(c)   A court decree has established one parent as having financial responsibility for the medical, dental or other health care expenses of the child.  In such a case, the benefits of the plan of that parent will be considered primary.

- When the rules do not establish an order of benefit determination, the benefits of the group plan which has covered the person for the longer period of time will be considered to be primary.

- When only one plan has a non-duplication (or coordination) of benefits provision the plan without such provision will determine its benefits first.

- If a person is being covered as an employee under two plans, the benefits of the plan which has covered the employee for the longer period of time will be determined first.

**Medicare For Retired Employees**

As a retired employee, if you or any of your dependents are eligible for Medicare, benefits under the Comprehensive Plan for that person will be modified in order to avoid any duplication of medical care benefits.  The benefits otherwise provided under the Comprehensive Plan will be reduced by the benefits available under Medicare Parts A and B, excluding benefits due to being in the first eighteen months of end stage renal disease.  The Comprehensive Plan is primary (subject to the coordination of benefit provisions) for benefits due to being in the first eighteen months of end stage renal disease.

Effective July 1, 1984, if you or one of your dependents is not enrolled for all coverages for which you or your dependents have become eligible under Medicare, benefits available under Medicare will nevertheless include benefits to which an individual would be entitled if enrolled for all such coverage.

# EMPLOYEE COMPLAINTS

- 13-

Both the Company and the Union have designated representatives to review employee differences arising under the Health and Welfare Plan.  If you have a question or complaint about the administration of the Welfare Plans, you should contact your Company or Union representative or both.

# TERMINATION OF BENEFITS WHILE HOSPITALIZED

In the event you or your dependent is hospitalized as a bed patient on the date your benefits under the Comprehensive Plan terminate, in-hospital benefits and in-hospital medical-surgical benefits shall be covered as provided in the Comprehensive Plan until the earlier of (a) completion of the hospital stay; and (b) the date on which the hospital stay reaches the maximum number of days provided in the Comprehensive Plan.

# HOW TO FILE A MEDICAL CLAIM

If the provider is an in-network provider, they will normally submit the claims to the third party administrator for you. If the provider is an out-of-network provider, take the claim form to the attending physician or hospital and have it completed for the treatment or services you or a dependent has received. Send the claim for and the supporting bill or invoice to the third party administrator. Attach the bill or invoice to the claim form.  The bill should show:

- Provider's Name, Address and Tax Identification Number.
- Patient's Name.
- Date of Service.
- Diagnosis.
- Service Provided.
- Charge for Services.

Remember, if the bill contains charges for items not covered by the Comprehensive Plan, you may be financially responsible for their payment.  In addition, if charges exceed reasonable and customary fees and you enter into an agreement with the provider to pay the full charge, you may be liable for any amount not paid by the Plan.

Notwithstanding anything in the Plan to the contrary, no benefits shall be payable under the Plan to any Participant who fails to submit a claim for benefits hereunder within one year after the date covered charges were incurred.

# COMPREHENSIVE PLAN
## (Effective 09/01/2002)

All active full-time hourly employees and retirees shall be covered for medical coverage under the Comprehensive Plan.  Active full-time hourly employees shall have a choice of Health Plan options as follows: Option 1, Comprehensive Coverage and Option 2, Opt Out.  To elect Option 2, employees must supply proof of other health coverage.

- 14-

If you decline enrollment for yourself or your dependents (including your spouse) because of other health coverage and you later lose that other coverage, you may be able to enroll yourself or your dependents in this plan, **provided that you request enrollment within 31 days after your other coverage ends**.

# PREFERRED PROVIDER NETWORK

The Company has contracted with a Preferred Provider Organization to provide a network of health care providers to Asarco Employees.  Employees will retain the option of continuing to secure care on a fee for service basis (out-of-network) or utilizing the network.  For in-network medical expenses, the employee co-payment shall be 10%.  For out-of-network expenses the employee co-payment will be 20%. In all other aspects, in-network coverage will be identical to fee for service coverage.

# MANAGED CARE

The Company has contracted with a Managed Care Organization to implement a pre-certification and utilization review program. This program includes the following:

> Pre-Certification for all In-Patient Courses of Treatment;
> Continuing Stay Review for all Confinements, and
> Case Management including alternative setting reviews and Discharge Planning.

Employees securing in-patient care on a fee for service basis (out-of-network) will be required to contact the Managed Care Organization (pre-certify) prior to admission. Claims for in-patient treatment submitted by employees who have failed to contact the Managed Care Organization will be subject to a per confinement penalty of $250. Emergency admissions need to be pre certified within 24 hours of admission.  Scheduled admissions need to be pre certified at least 48 hours in advance of admission.

Employees obtaining in-patient care from network providers need not contact the Managed Care Organization. This program shall include an appeals procedure.

The Plan will not restrict benefits for any length of stay in connection with childbirth for a mother or newborn child for less than 48 hours following a normal delivery, or for less than 96 hours following a cesarean section. The Plan will not require that your health care provider obtain authorization for prescribing a length of stay not in excess of the above periods.

# DEDUCTIBLE

A deductible of  **$200 per individual, $400 per family** will be applied each calendar year before benefits are paid under any provision of the Plan. This means you and your covered dependents must each incur $200 in covered medical expenses to meet the deductible.  The family deductible means that once a family incurs deductible expenses of $400, no further deductible will be required for any member of the family in that calendar year. A new deductible must be met each calendar year - January 1 through December 31.

## MAXIMUM OUT-OF-POCKET EXPENSE

The Comprehensive Plan limits the amount any individual or family has to spend for covered medical expenses to **$2,000** in any calendar year, except for expenses incurred for treatment for mental and nervous disorders and substance abuse and for the cost of surgery when you or your dependent fail to get a required second surgical opinion. When $2,000 has been paid "out-of-pocket" for covered medical expenses, the Plan pays 100% of covered medical expenses for the remainder of that calendar year.

## LIFETIME MAXIMUM

The Comprehensive Plan limits the amount that will be paid out on behalf of any individual to **$1,000,000**.

## MONTHLY CONTRIBUTIONS
### (Effective 09/01/2002)

Single Employee ......................................................................$5
Employee and One Dependent...............................................$10
Family ...................................................................................$15

## WEEKEND ADMISSIONS

The cost of weekend admissions into the hospital is not a covered medical expense, unless the admission is due to an emergency or medical necessity. Medical necessity can include admissions through the emergency room following treatment for an accident, obstetrical admissions and when surgery is performed within 24 hours. Any costs you pay for non-emergency or unnecessary weekend admissions will not apply to your deductible or to the $2,000 out-of-pocket maximum.

## REASONABLE AND CUSTOMARY PAYMENT

All benefits payable are based on reasonable and customary charges.  A "reasonable and customary charge" is no more than the reasonable and customary charge for medical services or supplies which will be covered by the Comprehensive Medical Expense Plan.  The reasonable and customary charge is the lowest of:

- The usual charge by the physician or other provider of services or supplies for the same or similar services or supplies, or
- The usual charge of most other physicians or other providers of similar training or experience in the same or a similar geographic area for the same or similar services or supplies, or
- The actual charge for the services or supplies.

Any amount that you are responsible to pay because a particular charge is in excess of the reasonable and customary charge is not considered a covered medical expense and therefore is

excluded in determining the deductible, the "Out-of-Pocket" maximum and the benefit payments under the Plan.

# COVERED EXPENSES

The Plan generally pays 90% of the following types of In-Network Covered Expenses or 80% of Out-of-Network Covered Expenses that are in excess of the deductible incurred during a calendar year.  All benefits shall be payable on a usual and customary fee basis subject to the annual deductible and co-payment.

A "Covered Medical Expense" is the reasonable and customary charge incurred for the following services which are medically necessary in terms of generally accepted medical standards, performed or prescribed by a physician or surgeon and rendered to a covered person for the treatment of sickness or injury:

- Services of physicians and surgeons, including specialists,

- Hospital Expenses - Inpatient:
  (a)   Hospital room and board charges, for up to 365 days in a semiprivate room for any one continuous confinement.  If a covered person uses a private room, the Plan will pay the hospital's average semiprivate rate.  If confinement is due to a mental and nervous disorder, substance abuse or tuberculosis, benefits will be limited to a maximum of 30 days per calendar year.  The 365-day maximum will apply for any one continuous period of confinement whether due to one or more causes or for all successive periods of confinement due to the same or related cause or causes, unless between such period (1) you have returned to active full-time work or (2) your dependent has recovered and resumed normal activities for a continuous period of thirty days.
  (b)   Services of a registered graduate nurse.
  (c)   Other hospital services required for medical or surgical care or treatment, including intensive care.
  (d)   One visitation per day from a covered person's physician for up to 365 days (up to 30 days for mental and nervous disorders, substance abuse or tuberculosis), except if it is in connection with a surgical operation, any treatment related to surgery or dental work.

- Hospital Expenses - Outpatient:
  (a)   Surgical treatment.
  (b)   Emergency room treatment of a non-occupational accident if treatment begins within 48 hours of the accident, including X-ray and diagnostic services of the hospital staff, including residents or interns.
  (c)   Treatment for the sudden and unexpected onset of an illness with severe symptoms requiring medical (non-surgical) treatment, if treatment begins within 48 hours after the onset of this illness.

- Treatment for mental and nervous disorders or substance abuse.  When rendered on an outpatient basis in the outpatient department of a hospital or psychiatric facility, or in your physician's office, treatment for mental and nervous disorders or substance abuse is payable at 50% of the cost of treatment up to $30 per visit; and there is a 50-visit

- 17-

maximum benefit per covered individual in a calendar year.

- Blood or blood plasma.

- X-ray and other diagnostic laboratory procedures.

- X-ray, radium and radiation therapy.

- Chemotherapy services.

- Anesthetics and their administration.

- Electroshock therapy.

- Oxygen and the rental of equipment for its administration.

- Services of a private registered nurse for up to $2,500 a year when certified as necessary by the attending physician, provided the private registered nurse does not reside in your home or is not a member of your family.

- Services of a physiotherapist who does not reside in your home or is not a member of your family.  Treatment may take place in the outpatient department of a hospital or in a physician's office.

- Services of a consulting physician for diagnostic or treatment purposes, but only if you or a dependent is a hospitalized bed patient.  Services are limited to one consultation per hospital or extended care facility confinement.

- Professional ambulance, other than air ambulance, for transportation to and from the hospital.  For special treatment, scheduled airline, railroad or air ambulance may be used for transportation between the place in which a covered person becomes disabled and the nearest hospital qualified to treat that person's disability.

- Bandages and surgical supplies, including appliances to replace impaired parts or to replace lost physical organs (prosthetic devices).

- Rental of durable medical equipment when prescribed by a physician and required for therapeutic use solely by the patient, such as wheelchairs, walkers and crutches, hospital beds, traction equipment, renal dialysis machines and resuscitators and positive pressure machines for the administration of oxygen.  At the sole discretion of the Company, durable medical equipment may be purchased rather than rented, and the Company will retain ownership of the purchased equipment.  Benefits are not provided for such items as air conditioners, dehumidifiers, air purifiers, arch supports, corrective shoes, hospital beds, commodes or canes.  Benefits are also not provided for monitoring or diagnostic devices such as blood pressure kits.

- **In-patient only**. Drugs and medicines for covered persons which: (1) require a prescription by a physician to dispense and (2) are approved by the United States Food and Drug Administration for general use in treating the sickness or injury for which they

are prescribed. Outpatient prescription drugs are only available through the Asarco Prescription Drug Plan.

- Services of a licensed clinical psychologist.

- Services, supplies, or appliances provided in connection with treatment to correct or treat the temporo-mandibular joint (TMJ).

- Oral Surgery--benefits will be payable for the following surgical procedures:
  - (a) Surgical removal of impacted teeth (soft tissue, partially covered by bone or completely covered by bone) or erupted teeth.
  - (b) Dental root resection.
  - (c) Alveolectomy of edentulous mouth and alveolectomy coincident to extractions.
  - (d) Excision of radicular cyst or dentigerous cyst.
  - (e) Osseous surgery.
  - (f) Gingivectomies.
  - (g) Suturing of gum as an independent procedure.
  - (h) Ridge extension, including soft tissue graft.
  - (i) Periodontal surgery.
  - (j) Frenectomies.
  - (k) Vestibuloplasties.
  - (l) Osteotomies.
  - (m) Osteoplasties.

- Maternity Benefits.  For female employees and dependent wives, pregnancy, the resulting childbirth and related complications are covered on the same basis as any other sickness. Benefits are also payable for prenatal care, delivery by a certified nurse-midwife and/or physician and postpartum care in an approved maternity center.

  **For dependent children, benefits are payable only for the complications of pregnancy.**  Complications of pregnancy include:

  - (a) Diseases of the mother which are not caused by pregnancy, but which coexist with pregnancy and may be adversely affected by it.  Treatment of heart or kidney disease, pulmonary diseases and other similar diseases would be payable as complications of pregnancy.
  - (b) Conditions directly related to and caused by the pregnancy, which makes its management more complicated or difficult.  These conditions include ectopic pregnancy, postpartum hemorrhage, toxemia of pregnancy and diseases for which Caesarean section or therapeutic abortion is performed.

## EXCLUSIONS

Expenses in connection with the following are <u>not</u> covered medical expenses:

- Services rendered prior to the effective date of coverage on account of the person who receives such services.

- Services, supplies, or appliances provided in connection with treatment to alter, correct, fix, improve, remove, replace, reposition, restore or treat:
  (a) Teeth.
  (b) The gums and tissues around the teeth.
  (c) The parts of the upper or lower jaw which contain the teeth (the alveolar process and ridges).
  (d) The meeting of upper and lower teeth.
  (e) The chewing muscles.

These services, supplies or appliances are not covered even if they are: (1) needed because of symptoms, sicknesses or injuries which affect some other part or parts of the body or (2) provided in connection with any examination or treatment of the teeth, gums, jaw or chewing muscles because of pain, injury, decay, malformation, disease or infection. However, the following will be covered if they are otherwise covered medical expenses:

  (a) Services, supplies or appliances needed to correct damage caused by an accident which happens while Comprehensive Plan Benefits for the covered person are in effect.
  (b) Hospital room and board and other hospital services while the covered person is confined.
  (c) Treatment of tumors.
  (d) Treatment of cysts which do not result from infection of the teeth or gums.
  (e) Surgery of the joint of the jaw.

- Services or supplies received because of cosmetic surgery or treatment. Cosmetic surgery or treatment is that which is performed on a body part in whole or in part in order to improve its appearance. Cosmetic surgery or treatment will be covered if it is:

  (a) Reconstructive surgery when it is incidental to or follows surgery which results from sickness or injury of the involved body part.
  (b) To correct deformities caused by sickness.
  (c) To correct damage caused by an accident which happens while Comprehensive Plan benefits for the covered person are in effect.
  (d) To correct birth defects which are outside the normal range of human variation.

- Examinations for the prescription or fitting of eyeglasses, hearing aids or dental appliances.

- Routine health check-ups and immunization procedures.

- For dependent children, abortions not performed for medical reasons, miscarriage, false labor, morning sickness or minor conditions associated with normal pregnancy.

- Any injury or illness arising out of or in the course of any employment for wage or profit.

- Sickness entitling the covered person to benefits under any Workers' Compensation or occupational disease law.

- Services furnished by the U.S. Government or by an institution owned or operated by the U.S. Government.

- Care furnished under the laws of a national or state or local government of any country, except covered services for which you would have to pay.

- Injury or illness due to any act of war, either declared or undeclared, or by any act of international armed conflict or conflict involving armed forces of any international authority.

- Services for which there is no cost to a covered person or which are provided by any other plan which Asarco (or any company subsidiary to or affiliated with Asarco) contributes to or otherwise sponsors.

- Services received for convalescent or custodial care, regardless of the type of facility in which the care is rendered or the person who renders such care.

- Any treatment, services or supplies which are not medically necessary in terms of generally accepted medical standards, as determined by the Corporate Medical Director.

- Medical treatment or supplies considered research or experimental in nature in terms of generally accepted medical standards.

- Treatment programs not approved by the United States Food and Drug Administration and/or the American Medical Association.

- Marriage and family counseling services, regardless of who provides the services.

- Services or supplies rendered in connection with invitro fertilization procedures.

- Friday and Saturday hospital admissions, unless the admission is caused by an emergency or a medical necessity.  Medical necessity may include admissions through an emergency room following treatment for an accident, obstetrical admissions and when surgery will be performed within 24 hours.

- Psychological testing.

- Weight reduction programs.

- Any type of travel expenses.

The benefits otherwise provided for covered medical expenses shall be reduced by any benefits for or because of such expenses being available under the Health Insurance for the Aged Act and Disabled Provisions for the United States Social Security act as enacted or thereafter amended (Medicare).

The provisions of the preceding paragraph will not apply to a covered person while that person remains in one or more of the following Classes:

- 21-

(1)    An employee who is at least age 65 but less than age 70 and continues to be employed by Asarco.

(2)    A dependent spouse who is at least age 65 but less than age 70 and is married to an employee in Class (1).

(3)    An employee or a dependent who has end stage renal disease and is and remains entitled to enroll for Medicare solely due to the end stage renal disease, but only for the eighteen-month period which begins: (i) with the month in which the renal dialysis treatment starts for that person, or (ii) in the case of a kidney transplant, with the first month the employee or dependent is entitled to enroll for Medicare.

# PREVENTIVE CARE
## For Employees and Dependents

The following preventive care benefits will be covered under the Plan with no deductible. Amounts in excess of the stated scheduled limits are payable at the in-network or out-of-network rates after the deductible is met.

Physical Examinations: Frequency of exams is based on age:                                    $150

    People who are:
    Age 61 and over are covered for an annual exam.
    Between ages 41 and 60 are covered for an exam every two years.
    Between ages 31 and 40 are covered for an exam every three years.
    Age 30 and below are covered for an exam every four years.

Screening Exams:

    One Pap Smear test annually:                                                        $30

    Sigmoidoscopy once every three years for people age 50 and over          $225

    One mammogram annually for women age 50 and over and one
    mammogram every other year for women age 35 and over with a
    first degree relative with a history of breast cancer                      $135

Well Baby Care:

    Birth (in the hospital after birth)                                         $90
    2, 4, 6, or 8 weeks                                                   $80/visit
    4, 6, 9, 12, 15, 18 and 24 months                                    $80/visit

Immunizations:  All immunizations, with the exception of those listed below which are covered at 100% up to the amounts listed, are covered at 90% in-network or 80% out-of-network after the deductible is met.

| | |
|---|---|
| Hepatitis B | $50 |
| DPT | $35 |
| Oral Polio | $30 |
| Influenza | $40 |
| EMMR | $60 |

# REHABILITATION CENTERS

If you or a covered member of your family is confined for treatment for substance abuse (alcoholism or drug addiction) in an approved rehabilitation center, this treatment is covered by the Comprehensive Plan if it is approved by a physician.  The Plan pays 80% of the following reasonable and customary charges:

- Room and board in a semiprivate room.  If a covered person uses a private room, the Plan covers the center's most common semiprivate room rate.
- Hospital services, including physicians' and other specialists' services, supplies and equipment related to treatment.

Benefits for confinement in an approved rehabilitation center will be paid for a maximum of 30 days per calendar year.  If a covered person is initially confined to a hospital and then transferred to an approved rehabilitation center, both periods will be considered part of the same confinement for purposes of determining the 30-days benefit period.

**Expenses incurred for the treatment of substance abuse do not apply to the maximum out-of-pocket expense feature.**

# EXTENDED CARE FACILITIES

Hospitalization may be necessary when you or a dependent is extremely ill or injured.  However, once the urgent need for hospital services has passed, an alternative setting may be more appropriate.  An extended care facility provides quality medical care for patients who no longer need to be in a hospital.  If a covered person's physician recommends that you or your dependent be confined to an extended care facility for the ongoing treatment of the covered person's condition, after the covered person meets the yearly deductible, the Plan pays 100% of the reasonable and customary charges of an extended care facility for up to 365 days.  If a covered person is initially confined to a hospital and then transferred to an extended care facility, both periods will be considered part of the same confinement for purposes of determining the 365-day benefit period.

An extended care facility is <u>not</u> (other than incidentally) a place for rest, a home for the aged, a nursing home, a home for alcoholics or drug addicts or a hotel.  Extended care benefits are not paid for custodial care.

# HOME HEALTH CARE

If a covered person is confined to your home and requires intermittent nursing services or therapy, after that person meets the yearly deductible, the Plan will pay 100% of the charges of a home health care agency as an alternative to confinement in a hospital or extended care facility.

The need for home health care services must be certified by the covered person's physician and approved by the Plan Administrator.  The home health care services which are received must be performed by or under the supervision of a licensed registered or practical nurse, and must follow a plan established and periodically reviewed by the covered person's physician.

The following benefits are payable under the Home Health Care Program:

- The cost of medical and surgical supplies that are essential for effectively treating or diagnosing the covered person's illness or injury during the home health care period.  Supplies include, but are not limited to catheters, syringes and needles used in connection with prescription drugs or medicines, oxygen, irrigating solutions and surgical dressings.
- Visits in the patient's home by (1) a health worker on the agency's staff or (2) a person who is under contract or arrangement with such agency, for the purpose of providing one of the following types of services:

  (a)   Nursing service by either a registered nurse, licensed practical nurse or licensed visiting nurse.
  (b)   Physical, occupational, speech and respiratory therapy.
  (c)   Home health aid service.
  (d)   Medical social service.
  (e)   Nutritional guidance.
  (f)   Oxygen and its administration.
  (g)   Hemodialysis.
  (h)   Diagnostic service.

Visits are limited to 100 in a calendar year.

Home health care coverage <u>does not</u> provide benefits for:

- Physician's services, except for 10 physician's visits per year payable at 80%.
- Drugs and biologicals.
- Meals and housekeepers' services.
- Custodial care.
- Care for the deaf or blind.
- Care for tuberculosis, alcoholism or drug addiction.
- Care for senility, mental deficiency or mental retardation.
- Services of relatives or members of the patient's household.
- Care for mental or nervous illness other than for short-term convalescent care where the prognosis for recovery or improvement is deemed favorable.

- Expenses for which payment or reimbursement is received by or for you as a result of legal action or settlement.
- Services, supplies or treatments which are not medically necessary in terms of generally accepted medical standards.
- Services, supplies or treatments for which no charge is made that you are legally obliged to pay or for which no charge would be made in the absence of this coverage.
- Services, supplies or treatments received for illness or injury due to war (declared or undeclared) or any act of war, if such illness or injury occurred while covered for these benefits.
- Services not furnished by an approved home health care agency.

# HOSPICE CARE

If a covered person is terminally ill, that person may be eligible for the care and support service provided through a Hospice Care Program.  The following conditions <u>must</u> be met to be eligible for hospice services:

(1)   The terminally ill person must be placed in a federal or state approved Hospice Care Program at the recommendation of his or her attending physician.

(2)   The person will not be considered to be in that program until his or her physician gives certification of the existence of a terminal illness (that is unresponsive to currently available treatment) for which the life expectancy of the patient is six months or less.

(3)   Treatment will consist of palliative care only (treatment to relieve symptoms or effects of a disease, while not providing a cure).

The following expenses will be covered if they are approved by the patient's attending physician and billed through the approved Hospice Care Program:
- Room and board charges for the most common semiprivate room and board rate in a hospice facility connected to a hospital or in a freestanding hospice facility.
- Services of nurses and home health aides if they are deemed necessary by both the Hospice and the physician and provided by a registered nurse or a licensed practical nurse.
- Counseling (including bereavement counseling) expenses will be considered eligible charges for the patient or other covered family members provided:
    - (a)   It is determined by the terminal patient's physician that counseling is necessary for the enhancement of that individual's peace of mind.
    - (b)   The counseling takes place between the time of hospice enrollment and up to six months following the terminal patient's death.
    - (c)   The counseling is rendered by a licensed clinical psychologist, a psychiatrist or a member of a state-licensed social services organization.

- Respite Care--expenses incurred for limited period care at a hospital, approved hospice or extended care facility will be covered for a maximum of seven days.  This will be provided if the patient's family is temporarily unable to attend to the terminally ill patient in the home environment.
- Local ambulance or commercial special transport--between the patient's home and hospice or hospice designated facility.

- Any other services provided through the Hospice Care program will be considered eligible charges provided they are deemed medically necessary in terms of generally accepted medical standards by the patient's attending physician.  These include but are not limited to:  physical, respiratory and speech therapy, dietary and nutritional assistance, medical supplies, medicines, furnished drugs, physician's services and rental of durable medical equipment for a short term.  See benefit limitations below.

The following services are not covered hospice services:

- Purchase of durable medical equipment (long-term and/or short-term, unless purchase is less costly than rental).
- Any volunteer services or other services which would normally be provided free of charge.
- Private duty nursing (bedside nursing service rendered by one nurse to one patient, either in a hospital or patient's home, as opposed to a general duty nurse, who renders his or her services to a number of hospital patients).
- Services provided in the areas of both legal and/or financial advice, including but not limited to preparation and execution of wills, estate planning and liquidation, and financial investment.
- Counseling by clergy.
- Services of a person who ordinarily resides in the home of the terminally ill individual or member of his or her family or spouse's family.
- Any services not provided and billed through the Hospice Care Program and approved by the patient's attending physician.

## SECOND SURGICAL OPINION

If a surgeon recommends surgery, a covered person may want to get a second opinion to help determine whether surgery is the most appropriate course.  The Comprehensive Plan pays 100% of the reasonable and customary fee for the surgeon consulted for the second surgical opinion and for any diagnostic X-rays or laboratory procedures, provided the surgeon examines the covered person in person and submits a written report with the claim.

If the second opinion differs from the original recommendation of the surgeon in charge of the case, these same benefits will also be payable for a third surgical opinion.

There are at least 14 surgical procedures that are often performed unnecessarily.  If a covered person's physician recommends any of these procedures, unless the surgery is an emergency, diagnostic or involves a malignancy, that person will be required to get a second opinion.  If this is not done, the Plan will pay only 50% of the reasonable and customary cost of the surgery.

The following is the list of 14 procedures for which a second opinion is required:

- Foot surgery, excluding incision and/or drainage of cysts, removal of toenails.
- Laminectomy (removal of bony structure of the spine).
- Knee surgery.
- Cataract surgery.
- Cholecystectomy (removal of the gall bladder).

- Hemorrhoidectomy (removal of hemorrhoids).
- Herniorrhaphy (repair of hernia).
- Total hip replacement.
- Nasal surgery.
- Tonsillectomy and adenoidectomy.
- Hysterectomy (removal of uterus).
- Prostate surgery.
- Mastectomy.
- Varicose vein ligation and stripping.

It is important to note that the Plan will pay 100% of the cost of a second surgical opinion (and a third surgical opinion, if necessary, subject to previous limitations) for any surgery that is recommended, not just the 14 required procedures.

## PRE-ADMISSION TESTING

Frequently, when a covered person has to be hospitalized, that person will be asked to check in a day early for tests.  Often these tests can be performed on an outpatient basis.  As an incentive for the covered person to avoid the cost and inconvenience of an extra day's stay in the hospital, after a covered person meets the deductible, the Plan pays 100% of all covered expenses for such tests if that person receives them as a hospital outpatient or in the physician's office before that person is admitted to the hospital.

## AMBULATORY SURGERY

Advances in medical care make it possible for you or a dependent to have many operations without staying overnight in a hospital.  Ambulatory surgery can be performed in the outpatient department of a hospital, in a physician's office or in a surgi-center.  Ambulatory surgery allows you or a dependent to have an operation and go home the same day.  In most cases, this can eliminate up to three days of hospitalization--the day before the operation, the day of the surgery and the day after the operation.

There are a number of surgical procedures frequently performed on an inpatient basis which can be performed outside the hospital.  To encourage ambulatory surgery in those cases where it may be appropriate, after you or a dependent meets the yearly deductible, the Plan pays 100% of all reasonable and customary expenses for any of the following procedures when they are performed on an outpatient basis in a surgical center, the outpatient department of a hospital or a physician's office.

- Surgery, usually, customarily and actually performed under general or spinal anesthesia.
- Removal of skin lesions, or other tissue under the skin, but only when stitches are required.
- Removal or drainage of a large abscess.
- Varicose vein surgery.
- Removal of breast mass.
- Removal of anal tag.
- Tongue surgery (Frenulectomy).
- Drainage of middle ear (Myringotomy).
- Removal of labial lesion.

- Freezing and biopsy of the cervix (cervical conization).
- Excision of Bartholin gland or cyst.
- Lymph node biopsy.
- Biopsy of mouth, tongue, gums and palate.
- Prostate or testicle biopsy.
- Antrotomy (Caldwell Luc).
- Inferior turbinate resection.
- Cataract surgery.
- Retina surgery.
- Excision of canthus.
- Conjunctivoplasty.
- Removal of nasal polyp.
- Removal of mucosal lining from sinus (Ethmoidectomy).

When you or a dependent has any of these procedures performed as a hospital inpatient, the Plan will pay only 80% of the covered expenses.

# WEEKLY ACCIDENT AND SICKNESS BENEFITS
## For Employees Only (Non-Occupational)

If you become totally disabled as a result of an accident or sickness so as to be prevented from performing the duties of your occupation or employment, you will be eligible to receive weekly benefits set forth in the Schedule of Benefits below.  Benefits are payable as follow:

(a)   The first day of disability due to an accident,
(b)   The eighth day of disability due to sickness or the first day you are confined in a hospital, if earlier,
(c)   The first day of disability if you undergo a surgical procedure performed in or out of a hospital.

Such weekly benefits are payable up to a maximum of 39 weeks during any one period of disability, except that benefits terminate when pension benefits begin under the provisions of the Company's Pension Plan. The amount of your weekly benefit is $250 per week.

If you return to work after receiving weekly benefits, you must be continuously employed on a full-time active basis for a period of three (3) weeks before establishing eligibility for another benefit period for the same reason or some disability related thereto.

Where successive disabilities occur for unrelated conditions but not separated by your return to work, benefits will be paid for the second disability provided that if the second disability is caused by sickness and there is no hospital confinement, the seven-day waiting period shall apply.

In order for you to be eligible for weekly benefits, you must be under the care of a licensed physician. Where the first day of disability precedes the date of the first treatment by a physician, weekly benefits will be paid from the actual date on which the disability occurred if the disability is caused by sickness and there is no hospital confinement or surgery required, the seven-day waiting period shall apply.

Weekly benefits otherwise payable for any period of disability shall be reduced by any sum paid or payable for the same period of disability or any part thereof under any Workers' Compensation or occupational disease law.

In the event you are receiving payments under any Workers' Compensation or occupational disease law and suffer a non-occupational disability prior to your return to work, benefits will be paid for such disability if it persists after your Workers' Compensation or occupational disease payments have ceased, provided that if the disability is caused by sickness and there is no hospital confinement, the seven day waiting period shall apply.

During the period you are absent from work under the Weekly Accident and Sickness Benefits Program, you must continue to pay your monthly premiums.

# OPT OUT OF MEDICAL COVERAGE
### (Effective 09/01/2002)

Active full-time hourly employees who elect to opt out of Asarco Health Plan coverage must supply proof of other coverage.  Employees who elect to opt out will receive the following monthly reimbursement:

Single Employee ..................................................................$25
Employee and One Dependent...............................................$25
Family ................................................................................$25

# VISION CARE PLAN
**For Employees and Dependents**

# ELIGIBILITY AND EFFECTIVE DATE

The administration and payment of Vision Care benefits are offered in conjunction with the Asarco Health Plan.  All active full-time hourly employees who have completed eight (8) consecutive months of service are eligible for covered vision care benefits.

An eligible employee's coverage for vision care benefits includes coverage for their eligible dependents, as defined under the Asarco Health Plan.

Coverage for employees and their eligible dependents will be continued during certain periods of temporary absence in accordance with the following:

- Employees who become sick or disabled by a non-occupational illness or accident will be covered by the Plan for the period of their disability, not exceeding six (6) months.

- Employees who become sick or disabled by an occupational illness or accident will be covered by the Plan for the period of their disability, not exceeding twelve (12) months.

- Employees on layoff or leave of absence will remain eligible under the Plan for a period not to exceed ninety (90) days following the day when their layoff or leave of absence became effective.  Employees on leave of absence for Union business will remain eligible under the Plan for the lesser of the duration of such leave or twelve (12) months.

# COVERED CHARGES

The following services and products (subject to the limitations set forth in the following pages) are covered vision care expenses:

- Vision examination performed by an ophthalmologist, a physician licensed to perform vision examination, or an optometrist to evaluate the health and visual status of the eyes.

  Case History.
  Visual acuity (clearness of vision).
  External examination and measurement.
  Interior examination with ophthalmoscope.
  Pupillary reflexes and eye movements.
  Retinoscopy (shadow test).
  Subjective refraction.
  Coordination measurements (far and near).
  Tonometry (glaucoma test).
  Medicating agents for diagnostic purpose, if applicable.
  Analysis of findings with recommendations and a prescription, if required.

- Two glass lenses when prescribed by an ophthalmologist, a physician licensed to prescribe lenses, or an optometrist.  Plastic lenses, tints equal to Tints #1 or #2, or contact

- 30-

lenses may be substituted for glass lenses.  Lenses must meet Z80.1 or Z80.2 standards of the American National Standards Institute.

- Frame adequate to hold lenses.

- Dispensing services performed by an ophthalmologist, a physician licensed to perform vision examinations and prescribe lenses, an optometrist or an optician who, based on the prescription, prepares or orders the eyeglasses or contact lenses selected, verifies lens accuracy and assures proper fit.

An eligible employee may utilize duplicate copies of the prescription for which a vision examination benefit is payable under this program to obtain lenses and frames under a Company safety glass program (if any), provided said employee is eligible under both programs and complies with the procedures of each.  However, benefit payments in the Schedule of Benefits will not be payable for lenses and frames provided under a Company safety glass program.

## SCHEDULE OF BENEFITS

Subject to the limitations and exclusions below, payment for covered vision care expenses will be made in accordance with the following schedule:

- Vision Examination: Not more than $20 per examination.

-                                   Lenses (Effective 09/01/2002):

      Not more than                   $22.50 per single vision lens.
                                                 $27.50 per bifocal lens.
                                                   $32.50 per trifocal lens.
      $37.50 per lenticular lens.
      $27.50 per contact lens.

- Frames: Not more than $14 per frame.

- Benefit payments for lenses and frames include the allowance for dispensing services.

## LIMITATIONS

Benefits are payable for an eligible employee or dependent who has previously received benefits under the Plan for a vision examination, lenses or a frame, for covered vision care expenses only if two or more years have elapsed since:

- With respect to a vision examination, the date of such previous vision examination.

- With respect to lenses and/or frames, the date of such previous lenses and/or frames were ordered.

Lenses and/or frames will not be covered unless:

- The new prescription differs from the most recent prescription in either eye by an axis change of 20 degrees of .50 diopter sphere or cylinder change; and

- the lenses improve visual acuity by at least one line on the standard eye chart.

# EXCLUSIONS

Covered vision care expenses do not include nor are benefits payable for:

- Benefit amounts paid for services or supplies for which the person is entitled to under any other Company program or as provided under a Company safety glasses program.

- Sunglasses (tinted lenses with a tint other than Tints #1 or #2 are considered to be sunglasses for the purposes of this exclusion).

- Extra charges for photosensitive or anti-reflective lenses.

- Drugs or any other medication not administered for the purpose of a vision examination.

- Medical or surgical treatment of the eye.

- Special or unusual procedures such as, but not limited to, orthoptics, vision training, subnormal vision aids, aniseikonic lenses and tonography.

- Vision examinations rendered and lenses or frames ordered:

  - before the person became eligible for vision care benefits coverage; or
  - after termination of vision care benefits coverage.

- Lenses or frames ordered while covered for vision care benefits, but not delivered more that 60 days after termination of such coverage.

- Services or supplies not prescribed as necessary by a licensed physician, optometrist or optician.

- Charges for services or supplies experimental in nature.

- Replacement of lenses or frames which are lost or broken unless at the time of such replacement the covered person is otherwise eligible under the frequency and, in the case of lenses, the prescription-change limitations previously described.

- Services or supplies which are covered by any workers' compensation laws or employer's liability laws or services or supplies which an employer is required by law to furnish in whole or in part.

- Services or supplies for which no charge is made that eligible employees or covered dependents are legally obligated to pay or for which no charge would be made in the absence of vision care benefits coverage.

- Services or supplies which may be obtained by eligible employees or covered dependents from any governmental agency without cost by compliance with laws or regulations enacted by any federal, state, municipal or other government body.

# PAYMENT OF BENEFITS

Vision care benefits will be paid for Covered Vision Care Expenses incurred by eligible employees and covered dependents subject to the maximum, frequency and prescription change limitations and exclusions.

Payment of approved claims will be made by the third party administrator.

# NON-DUPLICATION OF BENEFITS

Benefits available to any individual under any provision of the Asarco Vision Care Plan will be reduced to the extent like benefits are payable under provisions of any group insurance plan or group prepayment plan.

If benefits have been paid under any provision of the Asarco Vision Care Plan on account of services received and thereafter it is established that the charges for such services were not paid by the Employee or the Dependent or the Employee or Dependent was otherwise reimbursed therefore, the Company will be entitled to a refund of the amount of the benefits paid which is in excess of the benefits that would have been payable based on the actual charges incurred and paid by the Employee or Dependent.

The rules establishing the order of benefit determination are:

- The benefits of a Group Plan which covers the person other than as a dependent shall be determined before the benefits of a Group Plan which covers such person as a dependent.

- In the case of dependent children who are covered under any other group insurance plan or group prepayment plan, questions of primacy of coverage shall be resolved using the **Birthday Rule**.  The benefits of the plan of the parent whose birthday falls earlier in a year shall be primary and the benefits of the plan of the parent whose birthday falls later in that year shall be secondary.
- When the rules do not establish an order of benefit determination, the benefits of a Group Plan which has covered the person for the longer period of time will be considered primary.

# PROOF OF LOSS

The Company or its insurance carrier shall have the right at its discretion to accept, or to require verification of, any alleged fact or assertion pertaining to any claim for vision care benefits.  As part of the basis for determining benefits payable, the Company or its insurance carriers may require appropriate diagnostic and evaluative materials.

# PRESCRIPTION DRUG PLAN COVERAGE
### For Employees, Retirees and Dependents

## EFFECTIVE DATES AND ELIGIBILTY

Effective September 1, 2002, prescription drugs (those provided on an out-patient basis) are only covered by the Asarco Prescription Drug Plan.  Active full-time hourly employees and retirees who desire prescription drug coverage for themselves and their dependents must enroll in the Prescription Drug Plan.  You will be able to enroll in the Plan when you are first employed with Asarco, when you retire (during the open enrollments, if any) and whenever you have a Qualified Change In Family Status.

General administration including eligibility, effective date of coverage, eligible dependents, and termination of coverage is identical to the Asarco Health Plan.

## COVERED PRESCRIPTIONS

Most drugs which require a prescription under federal law are covered.  All drugs, including insulin and insulin needles and syringes, must be prescribed in writing by a doctor licensed to practice medicine in the United States.  You must contact your local Human Resources representative prior to obtaining prescriptions for Nicorette and other smoking cessation medications, Retin-A, and birth control pills (birth control pills may be covered if they are prescribed for a medical reason other than preventing pregnancy).  In order to have coverage for any of these prescriptions, you must have pre-authorization.

Please note that, certain controlled substances and several other prescribed medications may be subject to other dispensing limitations and to the professional judgment of the pharmacist.

## RETAIL PROGRAM

The Retail Program is designed for initial and short-term prescriptions. Prescriptions may be filled for up to a 30-day supply of medication at a local, participating pharmacy. The Plan will generally pay 80% of the cost with no deductible for outpatient brand name prescriptions and 90% of the cost with no deductible for outpatient generic prescriptions purchased at a Network Pharmacy.  Prescriptions obtained at a non-Network Pharmacy will be reimbursed on the same basis, but you must pay for the prescription yourself, then submit a claim to our Pharmacy Benefit Manager for reimbursement.  Such claims are only reimbursed up to the amount payable to a Network Pharmacy.

Please note that if you do not present your Prescription Drug ID card or if you use a non-participating pharmacy, you must pay the full price of the medication and file a claim form with the Pharmacy Benefit Manager.  Also, your out-of-pocket cost will be greater when you use a non-participating pharmacy or if you fail to present your ID card.  That's because you will not benefit from the discounts provided by member pharmacies.

## MAIL ORDER PROGRAM

The Mail Order Program is designed for prescriptions that are taken on a long-term basis. Prescriptions may be filled for up to a 90-day supply of medication. If you require medication to treat ongoing medical conditions – such as diabetes or high blood pressure – you'll probably want to take advantage of this program. The Plan will generally pay 100% of the cost with a $10 deductible for brand name prescriptions and a $5 deductible for generic prescriptions supplied through the Mail Order Program. Normally, your prescriptions will be delivered to your home within 14 days. If you are not sure if your medication is covered, check with your local Human Resources representative or the Pharmacy Benefit Manager.

How to use the mail order program

1.      The employee/covered dependent should ask their doctor to prescribe the medication(s) for a 90-day supply, plus refills. If an employee/covered dependent is presently taking medication, they should ask their doctor for a new prescription.

2.      Complete the Patient Profile Questionnaire which is distributed to all employees who join the program with their ID Card and informational brochure. They need only complete this profile with their first claim. All questions must be answered and the social security number must be included. Mail the completed Patient Profile Questionnaire to the Mail Order Service Provider using the postage-paid reply envelope included with your informational materials.

3.      Mail the completed original prescription to the Mail Order Service Provider using the postage-paid reply envelope included with your informational materials.

4.      The Mail Order Service Provider will process the order and send the medications either via U.S. Mail or UPS, along with re-order instructions for future prescriptions and refills. Although most orders are filled within 48 hours of receipt, please allow 14 days from the time an order is mailed to when it is received.

## MONTHLY CONTRIBUTIONS

Employees enrolled in the Prescription Drug Program will be required to pay the following monthly contributions which will be collected on a payroll deduction basis (Retirees will be required to authorize a deduction from their monthly pension check):

Single Employee ..............................................................$3
Employee and One Dependent..........................................$7
Family ...........................................................................$11

If your coverage is terminated, you may be able to continue coverage under COBRA.

# ASARCO DENTAL PLAN

## ELIGIBILTIY AND EFFECTIVE DATES

You will become eligible for the Asarco Dental Plan on the first day of the calendar month coincident with or next following completion of eight consecutive months of employment.

Your dependents are eligible for benefits under this Plan on the later of:
- (a)   the date you are eligible for benefits, or
- (b)   the date you acquire your first eligible dependent, provided that you had benefits for yourself on the day immediately preceding that date.

If on the effective date of the benefits for your dependents, a dependent is confined in a hospital, medical benefits for that dependent shall not be effective as to the conditions for which the dependent is hospitalized until he or she has been discharged from the hospital. Confinement of a newborn child will not postpone benefits for such child.

When you become eligible for benefits you will be automatically enrolled, but you will be asked to sign a card indicating whether you have dependents, as defined herein.

## DEFINITIONS

"Area" means a metropolitan area, a county or such greater area as is necessary to obtain a representative cross section of dentists rendering such services or furnishing such supplies. You should discuss the treatment plan with your dentist before treatment starts to assure that you understand the services the dentist will be performing and the costs involved.

"Course of Treatment" in the case of covered dental services means a planned program of one or more services or supplies, whether rendered by one or more dentists, for the treatment of a dental condition diagnosed by the attending dentist as a result of an oral examination. The course of treatment commences on the date a dentist first renders a service to correct or treat such diagnosed dental condition.

"Dental Expense Period" means a period beginning with any January 1 and ending with the next following December 31.

"Dentist" means an individual who is duly licensed to practice dentistry or perform oral surgery and who is operating within the scope of his license and as used herein, the term "dentist" also includes a licensed physician authorized by his or her license to perform the particular dental services he or she has rendered.

"Dependent" means:

- (a)   The employee's spouse, including a spouse who is a retiree of the Company.
- (b)   The employee's unmarried child(ren) under age 19.  Such child(ren) include:
    - (1)   A natural child of the employee
    - (2)   Stepchildren (i.e.: the natural children of the employee's spouse) residing in the employee's household and supported solely by the employee,

(3)    A legally adopted child of the employee or his or her spouse, or

(4)    A child who has been committed by a court of law to the custody of the employee or his or her spouse.

All cases of dependents in categories (2), (3) or (4) must be submitted to your unit Human Resources Department for Corporate approval.

(c)    With respect to employees prior to their retirement only, the employee's unmarried child(ren) after attainment of age 19 but not beyond attainment of age 23 if any such child is a full-time student at any accredited school, college or university principally dependent upon the employee for maintenance and support. Proof of enrollment must be submitted to your unit Human Resources Department each semester.

(d)    The employee's unmarried child(ren) over age 19, if upon attaining age 19 such child(ren) is (are) totally and permanently disabled or mentally incapacitated. Such child(ren) must be principally dependent upon the employee for maintenance and support. Dependent children must be certified by the Corporate Medical Director as suffering from an illness or injury which prevents them from living independently of their parents and obtaining employment.

(e)    Children for whom coverage is required under a Qualified Medical Child Support Order (QMCSO). All cases must be submitted for approval. A Qualified Medical Child Support Order (QMCSO) is an order, decree, judgment, or administrative notice (including a settlement agreement) issued by a domestic relations court or other court of competent jurisdiction, or through an administrative process established under state law which has the force and effect of law in that state, which meets the requirements of Section 609 of ERISA.

The term "dependent" does not include any person who is eligible for benefits under this Plan as an employee. Also, no person shall be a "dependent" of more than one employee.

Written proof that a child qualifies as a dependent after attainment of age 19 must be furnished by the employee to the Company.

"Ordered" in the case of dentures, means that impressions have been taken from which the dentures will be prepared; and in the case of fixed bridgework, restorative crowns inlays or onlays, that the teeth which will serve as abutments or support or which are being restored have been fully prepared to receive, and impressions have been taken from which will be prepared the bridgework, crowns, inlays or onlays.

"Usual, reasonable and customary charge" means the following:

**Usual:**    The "usual" fee is that which the individual dentist or physician most frequently charges the majority of his private patients for a given service rendered or supply furnished.

**Reasonable:**    A fee is "reasonable" when it meets the above two criteria or is justifiable, taking into consideration unusual circumstances or complications requiring additional time, skill and experience in connection with a particular dental service or procedure in question.

**Customary:**    A fee is "customary" when it is within the prevailing range of fees charged by dentists or physicians of similar training and experience, for the same service

rendered or supply provided within the same area (metropolitan area, county or such greater area as is necessary to obtain a representative cross-section of dentists' or physicians' fees).

# THE DEDUCTIBLE

The Dental Expense Benefits Plan requires that each covered person meet a $100 individual deductible for restorative and prosthodontic dental expenses before any benefits are paid from the Dental Expense Benefits Plan. A new deductible must be met each calendar year-January 1 though December 31. This means you and your covered dependents must each incur $100 in covered dental expenses to meet the deductible. There is no deductible for preventive dental expenses.

If you or one of your dependents incur covered dental expenses for services performed or prescribed by a dentist while covered under this Plan, benefits will be paid in an amount equal to the applicable percentage of the usual, reasonable and customary charge, for such dental expenses, as set forth below.

# MAXIMUM BENEFIT AVAILABLE

The maximum benefit payable for all covered dental expenses incurred during any one dental expense period shall be $1,000 for each individual. The lifetime maximum orthodontic benefit is **$650** per covered person.

# COVERED DENTAL EXPENSES

Covered dental expenses are those incurred in connection with the following dental services:

(a) **PREVENTIVE SERVICES -** The Plan pays 100% of the usual, reasonable and customary charges for the following preventive services.

| Covered Dental Services | Limits |
| --- | --- |
| 1. Routine oral examinations and prophylaxis (scaling or cleaning of teeth). | Not more than twice in any twelve-month period, if separated by at least 150 days. |
| 2. Topical application of fluoride. | |
| 3. Space Maintainers. | To replace prematurely lost teeth for children under age 19. |
| 4. Emergency treatment for the temporary relief of pain which does not affect a definite cure. | |

(b) **RESTORATIVE SERVICE** - After you have satisfied the $100 deductible, the Plan pays 85% of usual, reasonable and customary charges for the following restorative services. You pay 15%.

| Covered Dental Services | Limits |
|---|---|
| 1. Dental X-rays, including full mouth and supplementary bitewing X-rays as are required in connection with the diagnosis of a specific condition requiring treatment. | One full-mouth X-ray in any period of thirty-six (36) consecutive months and one supplemental bitewing X-ray in any period of six (6) consecutive months. |
| 2. Fillings. | Amalgam, silicate, acrylic, synthetic porcelain, or composite filling restorations to restore diseased or accidentally broken teeth. |
| 3. Inlays, onlays, gold fillings or crown restorations. | To restore diseased or accidentally broken teeth, as a result of extensive caries or fracture, but only when they cannot be restored with the type of filings described above. |
| 4. Extractions and oral surgery. | If not covered by your medical benefits. |
| 5. General anesthetics. | When medically necessary and administered in connection with oral or dental surgery. |
| 6. Periodontal treatment and treatment of other diseases of the gums and tissues of the mouth. | |
| 7. Endodontic treatment, including root canal therapy. | |
| 8. Injection of antibiotic drugs. | When administered by the attending dentist. |
| 9. Repair or recementing of crowns, inlays, onlays, bridgework or dentures. | When performed more than six (6) months after installation. |
| 10. Relining or rebasing dentures. | When performed more than six (6) months after the installation, but not more that once in thirty-six (36) months. |

(c) **PROSTHODONTIC SERVICES** - After you have satisfied the $100 deductible, the Plan pays 50% of the usual, reasonable and customary charges for the following prosthodonic services. You pay 50%.

**Covered Dental Services**                    **Limits**

1. Initial installation of fixed bridgework (including inlays and crowns as abutments) or of partial or full removable dentures.

   Includes precision attachments and any any adjustments during the six (6) months following installation.

2. Replacement of an existing partial or full removable denture or fixed bridgework by a new denture or by new bridgework, or the addition of teeth to an existing partial removable denture or to bridgework.

   Only if satisfactory evidence presented that:
   - the service required to replace one or more teeth extracted after the existing denture or bridgework is installed; or
   - the existing denture or bridgework cannot be made serviceable and, if it was installed (and paid for) under the Plan, at least five years have elapsed prior to its replacement, or
   - the existing denture is an immediate temporary denture, it cannot be made permanent and replacement by a permanent denture takes place within twelve (12) months from the date of initial installation of the immediate temporary denture.

**NOTE**:  Normally, dentures will be replaced by dentures; but if a professionally adequate result can be achieved only with bridgework, such bridgework will be a covered dental expense.

# ORTHODONTIC TREATMENT

Orthodontic diagnostic procedures and treatment consisting of surgical therapy and/or appliance therapy, including related oral examinations, shall be covered under the Asarco Dental Plan. Coverage shall be limited to dependent children under 19 years of age.  Charges shall be reimbursed at 50% of the usual, reasonable, and customary charge.  There shall be a lifetime maximum per covered individual of $650.

# PREDETERMINATION OF BENEFITS

Predetermination of benefits provides a procedure for you, your dentist and the Plan to review the proposed course of treatment and expected charges before services begin and expenses are incurred.  Through this procedure both you and your dentist will know ahead of time how much the Plan will pay and what you will have to pay.

If a course of treatment can reasonably be expected to involve covered dental expenses of $250.00 or more, a description of the procedures to be performed and an estimate of the dentist's charges should be filed with the Plan prior to the commencement of the course of treatment.

The Plan will notify you and the dentist of the benefits certified as payable based upon such course of treatment.  In determining the amount of benefits payable, consideration will be given to alternate procedures, services, or courses of treatment based on accepted standards of dental practice, that may be performed for the dental condition concerned in order to accomplish a satisfactory result.  The amount included as a certified dental expense will be the appropriate amount as provided herein.

 If a description of the procedures to be performed and an estimate of the dentist's charges are not submitted in advance, the Plan reserves the right to make a determination of benefits payable taking into account alternate procedures, services or courses of treatment, based on accepted standards of dental practice.  To the extent verification of covered dental expenses cannot reasonably be made by the Plan, the benefits of the course of treatment may be for a lesser amount than would otherwise have been payable.

This predetermination requirement will not apply to courses of treatment under $150.00 or to emergency treatment, routine oral examinations, X-rays, prophylaxis and fluoride treatments.

# LIMITATIONS

The following limitations apply:

(a)  Restorative:

   (1)  Gold, baked porcelain restorations, crowns and jackets.  If a tooth can be restored with a material such as amalgam, payment of the applicable percentage of the charge for that procedure will be made toward the charge for another type of restoration which you and your dentist may select.  In such case, you are responsible for the balance of the treatment charge.

   (2)  Reconstruction.  Payment based on the applicable percentage will be made toward the cost of procedures necessary to eliminate oral disease and to replace missing teeth. Appliances or restorations necessary to increase vertical dimension or restore the occlusion are considered optional and their cost remains your responsibility.

(b)  Prosthodontics:

   (1)  Partial Dentures.  If a cast chrome or acrylic partial denture will restore the dental arch satisfactorily, payment of the applicable percentage of the cost of such procedure will be made toward a more elaborate or precision appliance that you and your dentist may choose to use; and the balance of the cost remains your responsibility.

   (2)  Complete Dentures.  If, in the provision of denture services, you and your dentist decide on personalized or specialized techniques as opposed to standard procedures, payment of the applicable percentage of the cost of the standard denture services will be made toward such treatment and the balance of the cost remains your responsibility.

   (3)  Replacement of Existing Dentures.  Replacement of an existing denture will be a covered dental expense only if the existing denture is unserviceable and cannot be made serviceable.  Payment based on the applicable percentage will be made toward the cost of services which are necessary to render such appliances serviceable.  Replacement of prosthodontic appliances will be a covered dental expense only if at least five years have elapsed since the date of the initial installation of that appliance, except as provided on page 40 under the heading "Covered Dental Services".

# EXCLUSIONS

Expenses incurred for any of the following services are not covered dental expenses:

(a)   Services for which benefits are otherwise provided under the Comprehensive Medical Expense Plan;

(b)   Treatment by other than a dentist, except that scaling or cleaning of teeth and topical application of fluoride may be performed by a licensed dental hygienist if the treatment is rendered under the supervision and guidance of the dentist;

(c)   Veneers or similar properties of crowns and pontics placed on or replacing teeth, other than the ten upper and lower anterior teeth;

(d)   Services or supplies that are cosmetic in nature, including charges for personalization or characterization of dentures;

(e)   Prosthetic devices (including bridgework) crowns, inlays and onlays, and the fitting thereof which were ordered while the individual was not covered for Dental Expense Benefits or which were ordered while the individual was covered for Dental Expense Benefits but are finally installed or delivered to such individual more than sixty (60) days after termination of coverage;

(f)   Replacement of a lost, missing, or stolen prosthetic device;

(g)   Failure to keep a scheduled visit with the dentist;

(h)   Replacement or repair of an orthodontic appliance;

(i)   Services or supplies which are covered by any Workers' Compensation laws or employer's liability laws;

(j)   Services rendered through a medical department, clinic or similar facility provided or maintained by the patient's employer;

(k)   Services or supplies for which no charge is made that you or a covered dependent is legally obligated to pay or for which no charge would be made in the absence of Dental Expense Benefits;

(l)   Services or supplies which are not necessary, according to accepted standards of dental practice, or which are not recommended or approved by the attending dentist;

(m)   Services or supplies which do not meet accepted standards of dental practice, including charges for services or supplies which are experimental in nature;

(n)   Services or supplies received as a result of dental disease, defect or injury due to an act of war, declared or undeclared;

(o)   Services or supplies which may be obtained by you or a covered dependent from any governmental agency without cost by compliance with laws or regulations enacted by any federal, state, municipal or other government body;

(p)   A spare or a duplicate prosthetic device or any other duplicate appliance;

(q)   Sealants and for oral hygiene and dietary instruction;

(r)   The completion of any claim forms;

(s)   A plaque control program;

(t)   Implantology;

(u)   Orthodontic procedures and treatment.

# PROVISIONS APPLICABLE IF YOU LEAVE WORK

**Layoff**

Dental Expense Benefits for, you and your dependents will terminate at the end of the month in which your layoff commences.  If you return to work from a layoff after such benefits on your benefits on your first day of work.

**Leave of Absence**

Dental Expense Benefits for you and your dependents will continue for sixty (60) days of you are on leave of absence for union business after which time such Benefits may be continued if you make monthly contributions shall reflect current experience and shall be due no later than the fifteenth day of each month.

**Strike**

Dental Expense Benefits for striking employees and their dependents will terminate at the end of the month the strike commences.  In the event of a strike, continuation of coverage of the Dental Expense Plan Benefits may be available under certain conditions.

**Disability**

With respect to your Dental Expense Benefits:
(i)     If you are absent from work due to a non-industrial accident or illness, your benefits will continue until the earlier of the end of the 12th month following the month in which the accident or illness occurred, or the end of the month in which your retirement commences.
(ii)    If you are absent from work due to an industrial accident or an occupational disease and are collecting Worker's Compensation benefits, your benefits will continue until the end of the 24th month following the month in which your retirement commences. If your receive a lump sum Worker's Compensation award in lieu of weekly benefits, the period of time upon which the lump sum was based shall be used in determining your continued eligibility.

# DISCHARGE/ TERMINATION OF EMPLOYMENT

In the event you are discharged by the Company, Dental Expense Benefits for you and your dependents will terminate as of your date of discharge.  If it is subsequently determined that you were improperly discharged, there shall be no break in such coverages and benefits.  Please see page 59 for an explanation of your rights to continuation coverage ("COBRA").

# DATE EXPENSES ARE INCURRED

Benefits are provided only for covered dental expenses incurred on a date when coverage by the Dental Expense Benefits provision in this section is in effect for you or your dependent who incurs such expense.  Covered dental expenses are considered to have been incurred on the date when the applicable dental services, supplies, or treatments are received, except as otherwise provided under "Exclusions."

# HOW TO FILE A CLAIM

When you need to file a claim, you can obtain claim forms from your Human Resources office. The claim form includes instructions on how to fill it out and where to send it.

If predetermination of benefits is not applicable, complete your portion of the claim form and have your dentist complete his or her portion.

You and the attending dentist should make sure that all questions are answered fully.  An incomplete claim may cause delay in payment of your claim.  Claims must show:

- Provider's Name and Address.
- Patient's Name.
- Date of Service.
- Services Provided.
- Charge of Services.

If predetermination of benefits is applicable, the dentist should contact the third party administrator before performing the services.

Remember, if the claim contains charges for items not covered by the Dental Expense Benefits Plan, you may be financially responsible for their payment.  In addition, if charges exceed usual, reasonable and customary fees and if you enter into an agreement with the provider to pay the full charge, you may be liable for any amount not paid by the Plan.

## NON-DUPLICATION OF BENEFITS

Benefits available to any covered individual under any provision of the Asarco Dental Plan will be reduced to the extent like benefits are payable under provisions of any group insurance plan or group prepayment plan.

If benefits have been paid under any provision of the Asarco Dental Plan on account of services received and thereafter it is established that the charges for such services were not paid by the Employee or the Dependent or the Employee or Dependent was otherwise reimbursed therefore, the Company will be entitled to a refund of the amount of the benefits paid which is in excess of the benefits that would have been payable based on the actual charges incurred and paid by the Employee or Dependent.

The rules establishing the order of benefit determination are:

- The benefits of a Group Plan which covers the person other than as a dependent shall be determined before the benefits of a Group Plan which covers such person as a dependent.
- In the case of dependent children who are covered under any other group insurance plan or group prepayment plan, questions of primacy of coverage shall be resolved using the **Birthday Rule**.  The benefits of the plan of the parent whose birthday falls earlier in a year shall be primary and the benefits of the plan of the parent whose birthday falls later in that year shall be secondary.
- When the rules do not establish an order of benefit determination, the benefits of a Group Plan which has covered the person for the longer period of time will be considered primary.

# PROOF OF CLAIM

The Third Party Administrator reserves the right at its discretion to accept, or to require verification of, any alleged fact or assertion pertaining to any claim for Dental Expense Benefits. As part of the basis for determining benefits payable, the Third Party Administrator may require submission of X-rays and other appropriate diagnostic and evaluative materials.  When these materials are unavailable, and to the extent that verification of covered dental expenses cannot reasonably be made by the Third Party Administrator based on the information available, benefits for the course of treatment may be for a lesser amount than that which otherwise would have been payable.

# BENEFITS AFTER CESSATION OF COVERAGE

If you or a covered dependent is receiving dental care or treatment for a prosthetic device which was ordered prior to the date Dental Expense Benefits cease, benefits will be payable as though the coverage had continued in force for expenses incurred for such dental care or treatment, provided that no benefits will be payable for any covered dental expenses on account of such prosthetic device after the date sixty (60) days following the date the coverage ceased and provided further that such prosthetic device must be delivered within sixty (60) days following the date the coverage ceased.

# FLEXIBLE SPENDING ACCOUNTS
### (For Active Employees only)

Almost everybody has some type of out-of-pocket medical expense and, in this day-and-age, many people also have dependent care expenses.  Effective January 1, 2003, with a Flexible Spending Account (FSA), you, as an active full-time hourly employee, can stretch your health care and dependent care budget and, at the same time, reduce your income taxes.  That's because the FSAs let you get reimbursed for eligible health and dependent care expenses with tax-free dollars.

With FSAs, you can choose to:
- Participate in the Health Care FSA
- Participate in the Dependent Care FSA
- Participate in both FSAs
- Not participate

# HOW FSAs WORK

You should estimate your out-of-pocket health care and dependent care expenses for the upcoming year.  (You can do this by looking at this year's costs and then increasing them a little to account for inflation.)  Then, select the amount you want to contribute to one or both FSAs.  You can contribute between:

- $240 and $2,400 annually to the Health Care FSA
- $480 and $4,800 annually in the Dependent Care FSA

Your contributions are deducted from your pay before taxes have been taken out.  When you have an eligible health or dependent care expense, pay it.  Then, you can file a claim for reimbursement with tax-free dollars from your account.

# REIMBURSABLE EXPENSES

Each FSA reimburses different expenses.  You can use the Health Care FSA to pay for expenses not covered under your health care options or your spouse's plan.  This includes deductibles and your share of the cost of care, the difference in cost between a private and semi-private room, dental expenses, the cost of glasses or contact lenses, and cosmetic surgery.  It also includes out-of-pocket costs for care received by an IRS defined dependent who isn't covered under the Asarco Health Plan.

For purposes of this account, the IRS considers an eligible dependent to include your spouse and dependents who lived with you as a member of your household for the entire Plan year or are related to you.  Such dependents must also be a U.S. citizen or resident, or a resident of Canada or Mexico for some part of the calendar year in which your tax year began, and you must provide over half of that person's total support for the calendar year.  In all instances, such persons must have been your (IRS defined) dependents at the time the medical services were provided or at the time you paid the expenses.

When it comes to the Dependent Care FSA, you can get reimbursed for the cost of care that allows you and your spouse (if you're married) to work.  Eligible expenses include after-school care, day care centers, summer day camp, senior centers or home health aids.  Care provided by a dependent or spouse is not covered.

Under the Dependent Care FSA, an eligible dependent as defined by the Internal Revenue Service (IRS) is any of the following persons:

- Dependent child under age 13
- Disabled, dependent spouse or parent
- Dependent child over age 13 who is physically or mentally incapable of caring for himself or herself, spends at least 8 hours a day in your home, and is listed as a dependent on your federal income tax return

If you are unsure as to whether or not someone qualifies as an eligible dependent for purposes of either the Health Care or the Dependent Care Flexible Spending Accounts, or if you have questions concerning the types of expenses which may be reimbursed through these accounts, please contact your personal accountant or ask your Human Resources representative to provide you with a copy of the IRS regulations.

# IRS RULES

Here are a couple of IRS rules to keep in mind regarding FSAs.

- **The IRS requires that any money left in your FSAs at the end of the year is forfeited.** This acts as a balance to the tax savings available through the accounts.  However, you have until March 31st of the following year to claim reimbursement.  To reduce the risk of losing any money, you should estimate your expenses carefully.

- To use the Dependent Care FSA, you must provide your care-giver's taxpayer identification or Social Security number.  Without this number, you will not be eligible for reimbursement.

# TAX ADVANTAGES

The best way to illustrate the tax advantages of the FSAs is by giving an example.  Let's assume you and your spouse, filing jointly, have a combined income of $50,000.  Also assume that you'll have $1,500 in out-of-pocket health expenses during the upcoming year and another $3,000 in eligible dependent care expenses.  The following table shows the difference between participating in the FSAs and paying these expenses on your own.

| | If you Participate In The FSAs… | If You Do Not Participate… |
|---|---|---|

| **Your Annual Income** | $50,000 | $50,000 |
|---|---|---|
| **Before-Tax Contributions to FSAs** | -$4,500 | -$0 |
| **Taxable Income** | $45,500 | $50,000 |
| **Estimated Federal Income & FICA Taxes\*** | -$8,903.25 | -$9,922.50 |
| **Expenses Paid After Taxes** | -$0 | -$4,500 |
| **Take Home Pay After Taxes And Expenses** | $37,596.75 | $35,577.50 |
| **Difference** | $2,019.25 | |

\*Taxes are based on 2001 tax tables.

As you can see, by participating in the FSAs, your take-home pay will increase by $2,019.25.

# DEPENDENT CARE TAX CREDIT

If you are currently paying for dependent care, you're probably familiar with the federal income tax credit.  It allows you to subtract a percentage of your expenses for care from the federal taxes you owe.  The percentage depends on your taxable household income.

IRS rules say you cannot claim the same expenses under both the Dependent Care FSA and the federal tax credit.  So, you're going to have to determine which offers a better tax advantage to you.  As a general rule of thumb, if your taxable income is $24,000 or more, the Dependent Care FSA may be more beneficial to you.  Of course, you may want to seek professional tax advice before making this decision.

If your coverage is terminated, you may be able to continue coverage under COBRA.

# GROUP LIFE INSURANCE PLAN

In the event of your death, an amount, as set forth in the Schedule of Insurance, will be payable to any person you designate as beneficiary.  You have the right to change the beneficiary at any time by completing and returning to the Company the proper beneficiary change form.

In the event of your accidental death, an amount, as set forth in the Schedule of Insurance, will also be payable to the person you designate as beneficiary of your life insurance benefits.  Benefits for accidental death are paid only if death occurs within nine months after the injury and is not caused by disease or infection (except pyogenic infection which shall occur through an accidental cut or wound), suicide, attempted suicide or intentionally self-inflicted injury or any act of war or warlike action in time of peace.

If the loss is caused wholly or partly, directly or indirectly, by injury arising out of or in the course of any employment for wage or profit the amount of benefit may be reduced.

## SCHEDULE OF INSURANCE

Effective 9/1/02, the amount of each eligible active full-time employees life insurance is $26,500.

Effective 7/1/04, the amount of each eligible active full-time employees life insurance is $28,000.

## COVERAGE AFTER RETIREMENT

If you retire on a pension under the provisions of the Pension Plan, the amount of your Life Insurance after retirement will be as follows:

(a)  <u>Employees Retired Prior to July 1, 1990</u>
     30% of the amount of insurance in force on your life on the day before your date of retirement or $3,000 whichever is greater.
(b)  <u>Employees Retired on and After July 1, 1990</u>
     $4,500 of Life Insurance will be continued during retirement.

## TOTAL DISABILITY

You will be considered totally and permanently disabled when you become disabled as a result of bodily injury or disease which prevents you from engaging in any employment of the type covered by a basic labor agreement.  Your disability must be determined by a qualified physician appointed by the Company to be permanent and continuous during the remainder of your lifetime.  You will be considered to have satisfied the requirement for being permanently and totally disabled if you furnish written proof of qualification for disability benefits under the Social Security Act.

# ACCIDENTAL DEATH OR DISMEMBERMENT BENEFITS

Benefits for accidental dismemberments or accidental loss of sight occurring while you are an active employee will be paid in accordance with the following schedule:

| Dismemberment and for Loss of Sight | Amount of Benefits Expressed as a Percentage of The Amount of Your Accidental Death Insurance |
|---|---|
| Both hands or both feet | 100% |
| Sight of both eyes | 100% |
| One hand and one foot | 100% |
| One hand and entire sight of one eye | 100% |
| One foot and entire sight of one eye | 100% |
| One hand or one foot | 50% |
| Sight of one eye | 50% |

Benefits for accidental death, accidental dismemberment or accidental loss of sight are paid only if the accidental death, dismemberment or loss of sight occurs within nine months after the injury and is not caused by disease or infections (except pyogenic infection which shall occur through an accidental cut or wound), suicide, attempted suicide or intentionally self-inflicted injury or any act of war or warlike action in time of peace.

If you die or suffer the loss of hand, foot, or sight of eye, as the result of an occupational accident, any sum received pursuant to any State Workers' compensation or occupational disease law, will be deducted from the sum otherwise payable.

The benefits for loss of hand, foot or sight of eye will be paid to you.  The benefits for loss of life will be paid to your beneficiary.  Only one benefit is payable for loss resulting from one accident.

# CONVERSION PRIVILEGE

Upon application to the Plan Carrier within 31 days after your Life Insurance terminates, you may arrange to continue Life Insurance coverage under an individual policy, for an amount not greater than the amount of Life Insurance coverage you had under the plan at the time of such termination, without medical examination.  Such individual policy may be on any one of the forms of policy issued by the Plan Carrier, other than a policy of term insurance or one which provides disability benefits or special benefits in the event of accidental death, and such individual policy will be issued at the rate applicable to your age and class of risk at that time.

Any such individual life insurance policy will become effective at the end of the 31-day conversion period referred to, and if you should die during such period, whether or not you have applied for such a policy, an amount equal to the amount of life insurance in force under the Plan immediately prior to termination will be payable to your beneficiary.

# BENEFICIARIES

You may designate any person(s) you choose as the Beneficiary or Beneficiaries under the Plan. The Beneficiary will be the person(s) named by you as shown on the records kept on the Group Policy.  You may choose to have the amount paid to your Beneficiary in a lump sum or in installments.

You may change your Beneficiary at any time by written notice using the form available from your Human Resources representative.  Such change will take effect when officially recorded.

Your Beneficiary may, after your death, designate a person to receive any amount which, in the event of your Beneficiary's death, would be payable to his or her estate.

Any part of your insurance for which there is no Beneficiary living at your death will be payable in a single sum to the first surviving class of the following classes of "successive preference beneficiaries":

 1.  Your surviving spouse.
 2.  Your surviving children.
 3.  Your surviving parents.
 4.  Your surviving brothers and sisters.
 5.  Your executors or administrators.

If your insurance under the Group Policy replaces another group policy, the Beneficiary named under the replaced policy will be in effect until you:  (a) name a Beneficiary under the current Group Policy; or (b) change your Beneficiary as set forth above.

In the absence of a legal guardian, a minor's share may be paid at a rate not exceeding $50 a month to an adult or adults who, in the opinion of the insurer, have assumed the custody and principal support of such minor.

If you die after having applied to convert your Group Life Insurance to Individual Life Insurance, the Beneficiary named under the Individual Policy or in the application for it will receive any benefits payable under the Group Policy.

# CONTRIBUTORY LIFE BENEFITS
### (Effective 09/01/02)

In addition to the Non-Contributory Life Benefits, active full-time hourly employees have the option to elect Contributory Life Benefits when they are first hired and during annual open enrollments.  This supplemental life insurance is voluntary and offered at cost to the employee. The employee is responsible for the payment of the premiums.

Option 1 …………..$25,000
Option 2 …………..$50,000

# DEPENDENT LIFE INSURANCE
### (Effective 09/01/02)

Active full-time hourly employees also have the option to elect dependent life insurance when they are first hired and during annual open enrollments.  Dependent Life Insurance is voluntary and offered at cost to the employee. The employee is responsible for the payment of the premiums.

Option 1………Spouse  $5,000; Each Child $1,000
Option 2………Spouse  $10,000; Each Child $2,000

If any of your dependents are eligible for coverage as an employee, that person is not eligible for that coverage as a dependent.  If both you and your spouse are insured as employees, your children may only be enrolled as dependents of you or your spouse, not as dependents of both.

**Continuance of Dependent Coverage**

If you leave the employ of Asarco, your dependent's Group Life insurance protection goes on for thirty-one days.  If you die while insured for "Employee Life Benefits," your dependents' protection goes on for six months.  Your dependent may convert this protection to Individual Life insurance, in accordance with the conversion privilege, after:

- You leave employment with Asarco or you die;
- Your dependent reaches the limiting age of coverage;
- Your marriage ends due to divorce or annulment

Your dependent does not have to give evidence of good health.

# IMPORTANT INFORMATION

# PLAN IDENTIFICATION

**Asarco's Employer Identification Number:**
13-4924440

**Type of Plans:**
Employee Welfare Plans

| Plan Name | Plan Number | Ending Date of Plan Year |
|---|---|---|
| Asarco Group Life Insurance Plan | 503 | December 31 |
| Asarco Health Plan | 504 | December 31 |
| Asarco Dental Plan | 510 | December 31 |
| Asarco Vision Care Plan | 519 | December 31 |
| Asarco Prescription Drug Plan | 530 | December 31 |
| Asarco Health Care Flexible Spending Account | 532 | December 31 |
| Asarco Dependent Care Flexible Spending Account | 533 | December 31 |

# PLAN ADMINISTRATOR

ASARCO Incorporated is the Sponsor of the following Employee Welfare Plans:

Asarco Health Plan
Asarco Vision Care Plan
Asarco Prescription Drug Plan
Asarco Dental Plan
Asarco Group Life Insurance Plan
Asarco Health Care Flexible Spending Account
Asarco Dependent Care Flexible Spending Account

The Administrator of the Plans is:

ASARCO Incorporated
Administrative Committee
Debra J. Baker, Secretary
PO Box 8
Hayden, AZ  85235
(520) 356-7811

Any legal process relating to the Welfare Plans should be served upon the Plan Administrator as indicated above.

# TYPE OF ADMINISTRATION

**Asarco Health Plan, Asarco Vision Care Plan, Asarco Prescription Drug Plan, Asarco Dental Plan, Flexible Spending Accounts**

All benefits under the Plan are directly provided by Asarco and administered by a Third Party Administrator.  Benefits are paid from the general assets of the Company and are not guaranteed under a contract of insurance. The Third Party Administrator is North American Administrators.

North American Administrators          Group Number:  8550
P.O. Box 9501
Amherst, New York 14226-9501
1-800-766-2835

**Group Life Insurance Plan**

All benefits under the Plan are provided through and guaranteed under a group insurance contract with Hartford Life Insurance Company.

Hartford Life Insurance Company          Account Number:  GL-674272
200 Hopmeadow Street
Simsbury, CT 06070
1-888-563-1124

# ANNOUNCEMENT BOOKLET

This announcement booklet, a copy of which is given to each employee, includes the pertinent provisions of the Asarco Health Plan, Asarco Vision Care Plan, Asarco Prescription Drug Plan, Asarco Dental Plan, Asarco Flexible Spending Accounts, and Asarco Group Life Insurance Plan. The benefits pertaining to each of these Plans as described in this booklet are subject to the terms and conditions of the Plan Documents.

# COST OF BENEFITS

The Company and the employee will share in the cost of benefits provided in the Welfare Plans Section of this booklet, including any increases required for such benefits.

# CLAIMS PROCEDURE

The Claims Procedure for the Employee Welfare Plans is divided into two parts as set forth below. Part A is the procedure to be followed for claims relative to the Asarco Health Plan, Asarco Prescription Drug Plan, Asarco Dental Plan, Group Life Insurance Plan and other Welfare Plans, the benefits of which are provided or administered by an insurance carrier.

# HEALTH PLAN, VISION CARE PLAN, PRESCRIPTION DRUG PLAN, DENTAL PLAN, FLEXIBLE SPENDING ACCOUNT AND GROUP LIFE INSURANCE PLAN

1. **Who May File A Claim**

A claim should be filed by the employee participating in the Plan.  A non-employee participant/beneficiary (e.g., a retiree or surviving spouse) may file a claim when he or she has a direct interest in a benefit as a recipient, or when the employee participant is deceased or is incapacitated and thereby unable to adequately represent his or her interests.

(Applies to Health Plan, Dental Plan, Prescription Drug Plan and Flexible Spending Account Plan only.)
Additionally, claims may be submitted by qualified beneficiaries who have elected continuation of coverage in accordance with the Consolidated Omnibus Budget Reconciliation Act ("COBRA") of 1986 as amended.  Any such person who believes that he or she is then entitled to receive a benefit under the Plan, including one greater than that initially determined by the Asarco Administrative Committee or its designee, may file a claim in writing with such Administrative Committee.

2. **How to File A Claim**

In order to file a claim for benefits, contact your Human Resources Department to obtain claim forms and filing instructions.  Carefully complete the necessary form(s) or application(s), provide any additional information required, make a copy for your files, and submit the data to the third-party administrator designated to handle your claim.  Claims must be submitted within 12 months from the date of service with the exception of Flexible Spending Account claims which must be submitted by March 31st of the following year.

3. **Initial Claim Determination**

(a)   A Determination of your claim should be made within ninety (90) days following its filing.  If special circumstances warrant an extension of time for processing the claim, you should be notified within the 90-day period of the extension of time and of the expected date by which a Determination of your claim will be made.  If your claim is denied, you will receive a Notice of Denial of Claim.

(b)   **Notice of Denial of Claim**.  If your claim is denied in whole or in part, you will be notified in writing of:

- The specific reason(s) for the denial and of the Plan provisions on which the denial is based.

- Additional materials or information (if any) necessary to establish your claim.

- Your right to appeal this determination or denial, the procedure for appeal and the identity of the person, Administrative Committee or insurance carrier, as the case may be, to whom the appeal should be sent.

(c)   Complaints involving such claims may be brought to the attention of the Plant Manager or his designated representative by the complaining employee participant and his or her local union representative.  If this does not result in a satisfactory settlement, the

complaint shall be reviewed by Asarco's Corporate Office representatives.  The informal review contemplated herein shall have no effect on the operation of the contractual grievance and arbitration procedure referred to in paragraph 4(a) below unless the claim in dispute is settled by such discussions.

4.    **Appeal of Denied Claims**

(a)    **Appeal of Denied Claims to the Grievance/Arbitration Procedure of the Labor Contract.**  When a claim involves a dispute concerning a benefit, eligibility or coverage of the employee and/or spouse or dependents, and is of such a nature that it can be submitted for resolution under the terms and conditions of a collectively bargained grievance and arbitration procedure, the right to submit the disputed claim under such procedure is limited to the employee participant as the exclusive remedy of the employee in his or her own right, or on behalf of his or her spouse and/or dependents as the case may be.

Detailed information concerning various Benefit Plans and of the Grievance and Arbitration procedure is available in the labor contract booklets distributed to union-represented employees.

(b)    **Appeal of Denied Claims in Cases other than by Submission under the Grievance/Arbitration Procedure.**

1.    Where a claim is not determinable under a grievance and arbitration procedure and/or the claimant does not have a sufficient interest or standing to invoke such a procedure, a claimant who wishes to appeal a claim denied in whole or in part may submit a request in writing directed to the Asarco Administrative Committee or to a person designated by the Administrative Committee to review and make decisions on claim denials, or, in the case of a Plan providing benefits or administered by an insurance carrier subject to the insurance laws of any State, to such insurance carrier.  So as to avoid confusing the claimant in respect to how and to whom the request for appeal should be made, the claimant will be provided with specific information for this purpose in the Notice of Denial of Claim outlined in paragraph 3(b) on the preceding page.

2.    The written request to appeal a denied claim shall be filed by the claimant or his or her duly authorized representative no later than ninety (90) days after receipt of the "Notice of Denial of Claim." The claimant (or representative) may review pertinent documents if requested and may submit issues and comments in writing and indicate the factual basis and/or other reasons for the claimant's belief that the claim was improperly denied.

3.    The decision, following a full and fair review of the claim and its denial, shall be made by the Administrative Committee or other person or insurance carrier specified in the "Notice of Denial of the Claim" within sixty (60) days after receipt of the Request for Review by such Administrative Committee, person or insurance carrier, unless special circumstances require an extension of time for processing in which case the decision will be rendered as soon as practicable but not later than

120 days after receipt of the Request for Review.  If the decision is not issued within the time period stated above, the claim shall be deemed denied on review.

5.   Nothing in this Claims Procedure shall be construed to supersede or in any manner enlarge, diminish or otherwise modify the rights and/or obligations of the employer, the union and/or employees represented by the union under the terms and conditions of the collective bargaining agreement, including the grievance and arbitration procedure.

6.   **Administrative Appeal is Mandatory.**
Participants and beneficiaries shall not be entitled to challenge the Administrative Committee's determinations in judicial or administrative proceedings without first complying with the Claims Procedures.  The Administrative Committee's decisions made pursuant to the Claims Procedure are intended to be final and binding on Participants, beneficiaries and others.

7.   **Limitations**.
Notwithstanding anything in the Plan to the contrary, no benefits shall be payable under the Plan to any Participant who fails to submit a claim for benefits hereunder within one year after the date covered charges were incurred (with the exception of FSA claims which must be submitted by March 31st of the following year) or the beginning of the period, as the case may be, with respect to which the claim is made; provided that the Administrative Committee in its sole discretion, may accept a claim after such time has elapsed if extenuating circumstances prevented the Participant from making a claim during such period.  Claims for benefits shall be submitted at such time as provided in the Plan.  Each Participant, beneficiary or other interested person shall file such pertinent information concerning himself, and in such manner and form as the Administrative Committee or its designee may specify or provide, and such person shall not have any rights or be entitled to any benefits or further benefits hereunder, as the case may be, unless such information is filed by him or on his behalf.  Each Participant or beneficiary claiming benefits under the Plan shall supply at such times and in such manner as the Administrative Committee or its designee, in its sole discretion may require, written proof that covered expenses were incurred or that the benefit is covered under the Plan.  If the Administrative Committee or its designee, in its sole discretion, shall determine that a Participant or covered dependent shall fail to furnish such proof as is requested, no benefits or no further benefits hereunder, as the case may be, shall be payable to such Participant or covered dependent.

The Administrative Committee in its sole discretion, shall have the right at the expense of the employer of a Participant or covered dependent claiming benefits hereunder as determined by the Administrative Committee, and as often as the Administrative Committee may determine is reasonably necessary, to examine or to have a physician designated by it to examine such Participant or covered dependent and to have an autopsy conducted in the case of death where not precluded by law.

# COBRA

## RIGHT TO CONTINUE HEALTH, PRESCRIPTION DRUG, DENTAL, VISION, AND FLEXIBLE SPENDING ACCOUNT PLANS AND COVERAGE

Effective January 1, 2002 continuation of coverage under the Asarco Health, Prescription Drug, Dental, Vision, and Flexible Spending Account Plans is available to the following persons if their coverage ceases due to the reasons stated below:

(a)   Employees and their covered dependents in the case of employees whose employment is terminated (other than those terminated due to their gross misconduct)--a maximum continuation period of 18 months.

(b)   Employees and their covered dependents in the case of employees whose coverage ceases due to a reduction in the employee's working hours--a maximum continuation period of 18 months.

(c)   Employees and their covered dependents if any covered family member is disabled on the date that their coverage terminates or are determined to be disabled within the first 60 days of COBRA continuation coverage, and are eligible for disability benefits under the Social Security Act--a maximum continuation period of 29 months.  Notice of the determination of such disability must be provided to the Company before the end of the first 18 month continuation period.

(d)   Covered dependent spouses and covered dependent children of those dependent spouses in the case of divorce or legal separation from the employee--a maximum continuation period of 36 months.

(e)   Covered dependent spouses and covered dependent children in the case of the employee's death--a maximum continuation period of 36 months.

(f)   Dependent children who cease to be dependent as defined--a maximum continuation period of 36 months.

(g)   Covered dependent spouses and covered dependent children in the case where the employee becomes entitled to MEDICARE and then within 18 months, terminates employment--a maximum continuation period of 36 months from the date of the employee's MEDICARE entitlement.

(h)   Covered dependent spouses and covered dependent children in the case where the employee becomes entitled to MEDICARE while employee and family are on COBRA continuation coverage - a maximum continuation period of 36 months from the date of termination of coverage due to termination of employment.

The maximum continuation periods given above include any periods of continuation offered by the employer in other sections of this booklet.

Coverage may be discontinued before the end of the period stated above in the following situations:

(a)   If the plan (as well as all other employer plans of a similar nature) terminates for all employees.

(b)     If timely payment of premium is not made for a person whose coverage is being continued.

(c)     If a person whose coverage is being continued subsequently becomes covered under another group medical, dental, or prescription drug plan which does not have an applicable pre-existing condition exclusion or limitation or that person subsequently becomes entitled to benefits under MEDICARE.

(d)     For a dependent spouse whose coverage is being continued, if the spouse remarries and becomes covered under any other group medical, dental, or prescription drug plan, or

(e)     with regard to the additional 11 months of coverage due to disability, the disabled individual  is determined to no longer be eligible for disability benefits under the Social Security Act.

An eligible employee and/or dependent has 60 days to elect continued coverage after notification of their continuation rights by the Company.  Each individual eligible for continued coverage can make an election of whether or not to continue coverage.

It is the responsibility of the employee or dependent to notify the Company if a covered dependent becomes eligible for continued coverage due to legal separation, divorce or no longer meeting the children's dependency criteria.  Such notification must be made within 60 days of the event.  Failure to notify the Company will result in a loss of eligibility for extended benefits.

An 18-month period of coverage continuation can be extended up to a full 36 months for a dependent who incurs a second event (divorce, legal separation, death of employee, or child no longer dependent) during that 18-month period of continuation.

The cost of COBRA continuation coverage is 102% of the total premium.  For individuals covered for the additional 11-month disability extension, the cost of COBRA continuation coverage may be up to 150% of the total premium during the 11 month extension.  The initial premium must be paid within 45 days after the election of COBRA coverage.  Subsequent monthly payments must be made within 30 days of the first of the month.

Effective January 1, 1997, children born to or placed for adoption with the employee while on continuation coverage will be Qualified Beneficiaries.

# STATEMENT OF ERISA RIGHTS

As a participant in the Asarco Health Plan, Asarco Dental Plan, Asarco Prescription Drug Plan, Group Life Insurance Plan and Plan of Permanent and Total Disability Benefits, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all plan participants shall be entitled to:

- Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all plan documents, including insurance contracts, collective bargaining agreements, and copies of all documents filed by the Plan with U.S. Department of Labor such as detailed annual reports and plan descriptions.

- Obtain copies of all plan documents and other plan information upon written request to the plan administrator.  The administrator may make a reasonable charge for the copies.  Receive a summary of the plan's annual financial report.  The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries.  No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.  If your claim for a welfare benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial.  You have the right to have the plan review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights.  For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in a federal court.  In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator.  If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court.  If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.  If you have any questions about your plan, you should contact the plan administrator.  If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210.

# OTHER RIGHTS

**Your Rights Under the Newborns' and Mothers' Health Protection Act**
Group health plans and health insurance issuers offering group insurance coverage generally may not, under Federal law, restrict benefits for any *hospital* length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section, or require that a provider obtain authorization from the plan or the insurance issuer for prescribing a length of stay not in excess of the above periods.  (However, you may still need pre-certification from the plan to avoid a reduction of the dollar amount covered by the plan.)

**Your Rights Under the Women's Health and Cancer Rights Act of 1998**
This act requires that all health plan participants receive written notice annually regarding coverage for reconstructive surgery following a mastectomy.  The Asarco Health Plan covers expenses associated with:

- Reconstruction of the breast on which the mastectomy was performed;

- Surgery and reconstruction of the other breast to produce a symmetrical appearance; and

- Prostheses and treatment of physical complications at all stages of the mastectomy, including lymphedemas.

These services will be subject to normal plan deductibles and coinsurance.

**Health Insurance Portability and Accountability Act (HIPAA)**
A federal law, the Heath Insurance Portability and Accountability Act of 1996 (HIPAA), requires that health plans protect the confidentiality of your private health information.  A complete description of your rights under HIPAA can be found in the Plan's privacy notice, which was distributed to you upon enrollment and is available from your local human resources department.

This Plan, and the Plan Sponsor, will not use or further disclose information by HIPAA ("protected health information") except as necessary for treatment, payment, health plan operations and plan administration, or as permitted or required by law.  By law, the Plan has required all of its business associates to also observe HIPAA's privacy rules.  In particular, the Plan will not, without authorization, use or disclose protected health information for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Plan Sponsor.

Under HIPAA, you have certain rights with respect to your protected health information, including certain rights to see and copy the information, receive an accounting of certain disclosures of the information and, under certain circumstances, amend the information.  You also have the right to file a complaint with the Plan or with the Secretary of the U.S. Department of Health and Human Services if you believe your rights under HIPAA have been violated.

This Plan maintains a privacy notice, which provides a complete description of your rights under HIPAA's privacy rules.  For a copy of this notice, please contact your local Human Resources.

If you have questions about the privacy of your health information or if you wish to file a complaint under HIPAA, please contact Debra J. Baker, Senior Benefits Manager.

# AMENDMENT AND TERMINATION

The Company expects and intends to continue the Plans indefinitely.  However, the Company reserves the right to amend or terminate the Plans at any time and for any reason.  If the Plans are amended or terminated, you and other active and retired employees may not receive benefits as described in other sections of this booklet.  You may be entitled to receive different benefits, or benefits under different conditions.  However, it is possible that you will lose all benefit coverage.  This may happen at any time, even after you retire, if the Company decides to terminate the Plans or your coverage under the Plans.  In no event will you become entitled to any vested rights under these Plans.

# SECTION 2

# RETIREMENT INCOME PLAN

# INTRODUCTION

As an hourly employee of Asarco you are covered by the Retirement Income Plan for Hourly-Rated Employees of ASARCO Incorporated (the "Plan") which will provide income for you after retirement.  Your pension under this Plan is in addition to any benefits you receive from Social Security.

On July 31, 1987, the Retirement Income Plan for Hourly-Rated Employees of ASARCO Incorporated (the "Prior Plan") was terminated.  All accrued benefits under the Prior Plan are provided through Group Annuity Contracts GAC-499 issued by Metropolitan Life Insurance Company ("Metropolitan") and/or GAC-13272 issued by Aetna Life Insurance Company ("Aetna"). Metropolitan and Aetna are contractually liable to pay such Prior Plan benefits.

The pension benefit payable to you from this Plan is based only on your periods of employment with Asarco after August 1, 1987.  Your pension benefit accrued under the Prior Plan is payable to you by Metropolitan and/or Aetna pursuant to the terms of the previously mentioned Group Annuity Contracts.

If however, you are a former employee of Kennecott Corporation and you participated in a Kennecott Corporation Pension Plan immediately prior to your employment with Asarco on November 18, 1986, your period of employment with Kennecott Corporation which was recognized under the Kennecott Plan will be combined with your Continuous Service since November 18, 1986. However, the pension benefit payable to you from this Plan will be offset by your Kennecott Plan benefit. Note, for purposes of illustration, the examples in this summary of the amounts of benefits payable include the amount of benefit, if any, payable to you under the Prior Plan or the Kennecott Plan.

# ELIGIBILITY

If you are a full-time hourly employee, you will be an eligible participant on the first day of the month following your employment.

If you are not employed on a full-time basis, you are a Casual Employee, and you will become an eligible participant on the first day of the month following the completion of 1,000 hours of service within the twelve-month period commencing on the date of your employment.

# VESTING

Upon the completion of 5 years of Continuous Service or attainment of age 65 you will be 100% vested in your accrued benefit under the Plan.

# CONTINUOUS SERVICE

The amounts of your benefits under the Plan, your vested interest in those benefits, and your right to receive benefits upon termination of employment are determined to a considerable extent by your Continuous Service.  In order to compute Continuous Service for purposes of determining your right to a vested benefit, but not the amount of the benefit, generally periods of service with Asarco and certain of its affiliates will be included.  However, in no event will benefits under this Plan duplicate benefits under other qualified pension plans of the Company or its affiliates.  How you earn Continuous Service depends upon whether you are employed on a full-time basis or if you are a Casual Employee.

<u>Full-Time Employees</u>

Your Continuous Service is based on periods of employment with Asarco, for which you are paid on a regular and fixed hourly basis and most periods of recognized absence from your date of hire or rehire to the date on which service is broken.

<u>Casual Employees</u>

Your Continuous Service is based on the number of Years of Service you earn while employed by Asarco.  As a Casual Employee you will accrue a Year of Service for each twelve month period on which you complete 1,000 hours of service commencing on your date of employment or reemployment upon which you complete one hour of service.  These twelve month periods are called "computation periods".  You will be credited with an hour of service for each hour you are directly or indirectly entitled to compensation from Asarco.  This means that you will receive credit for hours you work plus certain hours during which you are not performing duties but for which you are compensated.  For example: vacation, sickness, temporary disability, and hours for which back pay is awarded are credited as hours of service.

Generally, all periods of service are aggregated in the computation of Continuous Service for purposes of determining both your vested interest and benefit eligibility except if your service is broken before you have completed 5 years of Continuous Service and the period of your break exceeds 5 years.

Continuous Service will also include:

- The first 24 months of a leave of absence due to Local Union Business.

- The first 24 months of a layoff or absence due to occupational or non-occupational disability.

- The first 3 months of a leave of absence or any other recognized absence.

- Periods of absence due to occupational disability for which Worker's Compensation benefits are paid.

After you have completed at least 5 years of Continuous Service, all of your service will be aggregated.

## BREAK IN SERVICE

<u>Full-Time Employees</u>

- 68-

Continuous Service is broken by termination or severance of employment, unless you are reemployed within 1 year. If you are reemployed within 1 year, the period of severance will be counted for vesting purposes <u>only</u>.

If you are absent due to pregnancy, or in connection with the birth or adoption of a child, or caring for a child immediately following the birth or adoption, you will not incur a Break in Service, provided you return to work within the 24 months of the date the absence commenced. If you return to work within the 24 months, the first 12 months of the absence will be counted <u>only</u> for Vesting purposes. The second 12 month period will not be counted for vesting or accrual purposes.

<u>Casual Employees</u>

You will incur a Break in Service for any computation period in which you do not earn 501 hours of service.

If you are absent due to pregnancy, birth or adoption of a child, caring for a child immediately following the birth or adoption, you will be credited up to 501 hours for the computation period in which your absence begins for purposes of not incurring a Break in Service. If, however, as of the date your absence commences, you had already completed 501 hours within the computation period, you will be credited with 501 hours in the next computation period. In no event will you be credited more than 501 hours within a computation period.

Continuous Service is also broken at the expiration of:

- Loss of seniority

- Dismissal or separation due to the permanent shutdown of the Plant department or subdivision, unless you are rehired within three years.

- A 3-year period of layoff.

- A 3-year period of non-occupational disability.

- Leaves of absence when you fail to return to work without permission.

If your Continuous Service is broken and you are subsequently rehired, any benefit entitlement for the pre-break period will be determined under the Plan provisions in effect when your break occurred.

For example, suppose that you resign at a time when the annual basic benefit is $21.00 for each month of Continuous Service, and thereafter the Plan is amended to provide a $22.00 benefit.  If you are rehired and become entitled to a benefit, the $21.00 benefit level rather than the $22.00 level would apply to your pre-break period of service.

# RETIREMENT DATES

<u>Normal Retirement Date:</u>  Normal Retirement Date under the Plan is the last day of the month in which you attain age 65.

<u>Deferred Retirement Date:</u> If you continue to work beyond age 65, you will retire on a Deferred Retirement Date.

<u>Early Retirement Date:</u> Based on certain eligibility rules you may be entitled to retire prior to age 65.  There are five Early Retirement Benefits available under the Plan.

# BENEFIT FORMULA

Effective July 1, 2002, if you were actively employed on or after this date, your benefit under the Plan will be calculated based on the following benefit schedule for each month of Continuous Service.

| <u>Length of Service</u> | Benefit Per Year for each <br> <u>month of Continuous Service</u> |
|---|---|
| 1st 15 Years of Service (1-180 mos.) | $32.00 |
| 16 through 30 Years of Service (181-360 mos.) | $33.50 |
| Over 30 Years of Service (361 or more mos.) | $35.00 |

**IMPORTANT:** *If you were not employed on July 1, 2002, but were employed before that date and you returned to work after that date, the amount of your benefit will be equal to the sum of the benefit calculated under the formula in effect when you left the Company for each month of Continuous Service completed before July 1, 2002 and the benefit calculated under the above mentioned formula for each month of Continuous Service completed thereafter.  Benefit illustrations in this booklet assume you were employed on or after July 1, 2002.*

# NORMAL OR DEFERRED RETIREMENT

If you retire from employment with Asarco on or after your Normal Retirement Date, the amount of your annual pension will be calculated in accordance with the Benefit Formula described on page 72 for each month of your Continuous Service with Asarco.  Following is an example of a Normal Retirement Benefit for an employee who has worked for Asarco continuously for 35 years (420 mos.).

Example:

|  |  |  |  |  |
|---|---|---|---|---|
| 1st 180 months | x $32.00 = | $5,760.00 | | |
| Next 180 months | x $33.50 = | $6,030.00 | | |
| Next 60 months | x $35.00 = | $2,100.00 | | |
| 420 months | | $13,890.00 | per year or | |
| | | $1,157.50 | per month | |

Additional Examples of Benefits payable at Normal Retirement Date

| CONTINUOUS SERVICE | | BENEFIT AMOUNTS | |
|---|---|---|---|
| Years | Months | Annual | Monthly |
| 10 | 120 | $3,840.00 | $320.00 |
| 15 | 180 | $5,760.00 | $480.00 |
| 20 | 240 | $7,770.00 | $647.50 |
| 25 | 300 | $9,780.00 | $815.00 |

# 60/10 BENEFIT

If you have reached your 60th birthday while employed and have completed at least 10 years of Continuous Service, you may elect to retire under the 60/10 Benefit and receive a reduced pension.  The annual amount of your early retirement pension will be calculated in accordance with the Benefit Formula described on page 72 for each month of Continuous Service with Asarco; however, since payment will be made for a longer period of time, this pension is reduced by approximately 4% per year for each year you retire prior to age 62.

Example of a 60/10 Benefit

If you retire at age 60 after completing 300 months of Continuous Service (25 years), you will receive an annual pension of approximately 92% of the pension amount you would have received if you were age 62. Your 60/10 Benefit payable under the Plan would be as follows:

|  |  |  |
|---|---|---|
| 180 months x $32.00 = | $5,760.00 | |
| plus 120 months x $33.50 = | $4,020.00 | |
| | $9,780.00 | |
| reduced by 8% ($782.40) | | |
| for early commencement = | $8,997.60 | per year or |
| | $749.80 | per month |

Additional examples of 60/10 Benefits payable at different ages are listed below.

| Continuous Service at Retirement | Age at Retirement | |
|---|---|---|
| | Age 60 | Age 61 |
| 10 Years (120 Months): | | |
| Annual Pension | $3,225.60 | $3,686.40 |
| Monthly Pension | $268.80 | $307.20 |
| 15 Years (180 Months): | | |
| Annual Pension | $4,838.40 | $5,529.60 |
| Monthly Pension | $403.20 | $460.80 |
| 20 Years (240 Months): | | |
| Annual Pension | $6,526.80 | $7,459.20 |
| Monthly Pension | $543.90 | $621.60 |

# 60/30 BENEFIT

If you are 60 years of age or more but under age 65 and have completed at least 30 years of Continuous Service, you may elect to retire from employment with Asarco under the 60/30 Benefit.  Your annual pension will be calculated in accordance with the Benefit Formula described on page 72 for each month of Continuous Service without reduction for early commencement.

In addition to your unreduced benefit, you will receive a supplemental payment of $400 each month until you reach age 62, at which time the supplement will be reduced to $170 per month until you reach age 65.  However, payment of these supplemental amounts will terminate in the event of your death, or in the event you become eligible for unreduced Social Security benefits prior to reaching age 62 or 65, as applicable.

Examples of Pension Amounts Payable Under the 60/30 Benefit

| Continuous Service at Retirement: | Monthly Basic Benefit | Monthly Supplement | Monthly Total |
|---|---|---|---|
| 30 Years (360 Months): | | | |
| Age 60 to Age 62 | $982.50 | $400.00 (A) | $1,382.50 |
| Age 62 to Age 65 | $982.50 | $170.00 (B) | $1,152.50 |
| | | | |
| 35 Years (420 Months): | | | |
| Age 60 to Age 62 | $1,157.50 | $400.00 (A) | $1,557.50 |
| Age 62 to Age 65 | $1,157.50 | $170.00 (B) | $1,327.50 |
| | | | |
| 40 Years (480 Months): | | | |
| Age 60 to Age 62 | $1,332.50 | $400.00 (A) | $1,732.50 |
| Age 62 to Age 65 | $1,332.50 | $170.00 (B) | $1,502.50 |

(A)   At age 62, or when you are eligible to receive unreduced Social Security Benefits, or die, whichever event first occurs, the $400 monthly supplement no longer will be paid.

(B)   At age 65, or when you are eligible to receive unreduced Social Security Benefits, or die, whichever event first occurs, the $170 monthly supplement no longer will be paid.

# 30-YEAR BENEFIT

If you have completed at least 30 years of Continuous Service, regardless of your age, you may elect to retire under the 30-Year Benefit.  Your unreduced annual pension will be calculated in accordance with the Benefit Formula described on page 72.

Examples of Pension Amounts payable under the 30-year Benefit

| Continuous Service at Retirement: | Benefit |
|---|---|
| 30 Years (360 Months): | |
|   Annual Pension | $11,790.00 |
|   Monthly Pension | $982.50 |
| | |
| 35 Years (420 Months): | |
|   Annual Pension | $13,890.00 |
|   Monthly Pension | $1,157.50 |
| | |
| 40 Years (480 Months): | |
|   Annual Pension | $15,990.00 |
|   Monthly Pension | $1,332.50 |

# 70/80 BENEFIT

If you are laid-off due to the permanent shutdown of the total plant at which you work, you may qualify for an unreduced pension under this provision of the Plan if you meet one of the following requirements:

- You have reached age 55 and your age plus your Continuous Service equals at least 70 at commencement of layoff.

Examples of Age and Service Requirements:

        Age 60 + 10 years service = 70
        Age 59 + 11 years service = 70
        Age 58 + 12 years service = 70
        Age 57 + 13 years service = 70
        Age 56 + 14 years service = 70
        Age 55 + 15 years service = 70

- You are under age 55 and your age plus your Continuous Service equals at least 80 at commencement of layoff.

Examples of Age and Service Requirements:

        Age 54 + 26 years service = 80
        Age 53 + 27 years service = 80
        Age 52 + 28 years service = 80
        Age 51 + 29 years service = 80
        Age 50 + 30 years service = 80

**The 70/80 Benefit is not elective.  Eligibility for the 70/80 Benefit is subject to approval by the Asarco Administrative Committee.**

If you qualify for a 70/80 Benefit under the Plan, your annual pension will be calculated in accordance with the Benefit Formula described on page 72 for each month of Continuous Service with Asarco. If you are a former Kennecott employee as described on page 69, the 70/80 benefit payable from this Plan will not be reduced by your Kennecott Plan benefit until the earliest such benefit would commence (age 60).

In addition to your unreduced benefit, you will receive a supplemental payment of $300.00 each month until you are eligible for an unreduced Social Security benefit, a Social Security disability pension, reach age 62 or die, whichever event first occurs.

Examples of Pension Amounts payable under the 70/80 Benefit

Age 55 with 15 years of service (180 months):

|  | Annual | Monthly |
|---|---|---|
| 180 months x $32.00 = | $5,760.00 | $480.00 |
| Plus supplement (A) = | $3,600.00 | $300.00 |
|  | $9,360.00 | $780.00 |

Age 53 with 27 years of service (324 months):

|  | Annual | Monthly |
|---|---|---|
| 1st 180 months x $32.00 = | $5,760.00 | $ 480.00 |
| Next 144 months $33.50 = | $4,824.00 | $ 402.00 |
|  | $10,584.00 | $ 882.00 |
| Plus supplement (A) | $3,600.00 | $ 300.00 |
|  | $14,184.00 | $1,182.00 |

(A)   Supplement terminates when you become eligible for an unreduced Social Security benefit, a Social Security disability pension, reach age 62 or die, whichever event first occurs.

# PERMANENT AND TOTAL DISABILITY BENEFITS

If you become permanently and totally disabled while actively employed with the Company, you may be eligible for a Permanent and Total Disability benefit if you meet all of the following requirements:

1) You are a regular, full-time employee of the Company.

2) You have filed a written Application for Disability benefits before your termination of employment.  Such a written application for Disability benefits may be filed before eligibility for a Social Security Disability Benefit has been established.

3) You have completed at least 10 years of Continuous Service with the Company.

4) A qualified physician designated by the Company has established that you are permanently and totally disabled as defined in the Plan, as well as the Company Medical Director.

5) You have been permanently and totally disabled for at least five consecutive months.

6) You have been declared eligible for and are receiving a Social Security Disability benefit.

## DEFINITION OF PERMANENT AND TOTAL DISABILITY

The term "permanent and total disability" means disability by bodily injury or disease which prevents you from engaging in any occupation or employment of the type covered by the basic labor agreement of the collective bargaining unit in which you work which, in the opinion of a qualified physician appointed by the Company, will be permanent and continuous during the remainder of your lifetime, and you have been declared for, and are receiving Social Security Disability Benefits, and which the appointee of the Company shall determine:

- Was not contracted, suffered or incurred while you were engaged in a felonious criminal enterprise.

- Did not result from a self-inflicted injury.

- Did not result from service in the armed forces after the effective date of this Plan, which prevents return to employment with the Company, and for which you receive a military disability pension.

Upon retirement due to disability, you will receive a monthly retirement benefit for the rest of your life or until recovery from disability prior to age 65. Your disability benefit will be calculated in the same manner as a normal retirement benefit as described on page 79 provided, however, that in no event will it be less than $150 per month.

## PRE-RETIREMENT SPOUSE'S PENSION
### (ACTIVE EMPLOYEES)

After having completed at least 5 years of Continuous Service, your spouse will automatically be provided with a lifetime pension in the event of your death while you are an active employee at Asarco. You must have been married to your spouse throughout the one year period immediately prior to death to be entitled to this coverage.

Your spouse will be eligible to receive an amount equal to one-half of the pension you would have received had you retired on the date of your death.

Example of Pre-Retirement Spouse's Pension:

If you die at age 60 when you are actively employed after completing 240 months (20 years) of Continuous Service, your spouse would receive a benefit of $3,885.00 per year or $323.75 per month, calculated as follows:

| | |
|---|---|
| 180 months x $32.00 = | $5,760.00 |
| plus 60 months x $33.50 = | $2,010.00 |
| Annual Pension | $7,770.00 |

50% of $7,770.00 = $3,885.00 annually or $323.75 monthly.

# POST-RETIREMENT SPOUSE'S PENSION

Upon retirement, if you were married for one year, your spouse will automatically be eligible for a lifetime pension unless you refuse this benefit within the 90 day period prior to your benefit commencement date with notarized spousal consent.

To provide the Post-Retirement Spouse's Pension, your accrued pension at retirement date will be reduced by 10%.

The amount of the Post-Retirement Spouse's Pension payable to your spouse following your death will equal 55% of your pension payment (plus or minus 1/24 of 1% for each full month your spouse is more than 60 months older or younger than you) at the time of your death.  In the event your spouse predeceases you, the 10% reduction will be stopped and your full pension will be paid to you.

Supplemental payments which you may be entitled to at time of death are excluded from these calculations.

Example of a Post-Retirement Spouse's Pension:

Assuming you and your spouse are the same age, at retirement, if you retire at age 65 after completing 300 months (25 years) of Continuous Service and did not refuse the Post-Retirement Spouse's Pension, upon your death your surviving spouse would receive a benefit of $4,841.10 per year or $403.43 per month, calculated as follows:

|  |  |
|---|---|
| 180 months x $32.00 = | $5,760.00 |
| plus 120 months x $33.50 = | $4,020.00 |
|  | $9,780.00 |
| Less 10% reduction | - $978.00 |
| Annual Pension | $8,802.00 |

55% of $8,802.00 = $4,841.10 annually or $403.43 monthly.

# CONTINGENT ANNUITANT OPTION

If you are married and have refused the Post-Retirement Spouse's Pension with notarized spousal consent, or if you are not married, you may elect the Contingent Annuitant Option. This election will become effective at the latest of your Normal Retirement Date, actual retirement date or the expiration of the 1-year period following the date on which the election is filed. If you or your designated Contingent Annuitant die prior to the effective date of your election of the Contingent Annuitant Option, the election is void.

If you elect a Contingent Annuitant Option, your retirement benefit will be calculated in the same manner as a normal retirement as described on page 72, actuarially reduced to provide either 100% or 50% (as you elect) of your reduced pension to your designated Contingent

Annuitant, with payments commencing after your death and continuing for the life time of your designated Contingent Annuitant. Your pension will be calculated by application of the appropriate actuarial equivalent factor to your unreduced pension plus (+) or (-) an adjustment for each year your contingent annuitant is older or younger than yourself.

Actuarial Equivalent Factors

| CAO Percentage Elected | Actuarial Equivalent | Age Difference Discount |
|---|---|---|
| 50% | 86% | +/- ½% (.0050) |
| 100% | 75% | +/- 1% (.0100) |

If benefit commencement occurs prior to age 65, the Actuarial Equivalent Factor will be increased by 0.6% (.006) for each full year your benefit commences prior to age 65, subject to a maximum 98% Actuarial Equivalent Factor.

# VESTED DEFERRED BENEFIT

If you leave Asarco's employ before you qualify for an immediate pension, you will be eligible for a Vested Deferred Benefit when you reach age 65 provided you have completed at least 5 years of Continuous Service, no matter what your age when you leave Asarco's employ.

If you qualify for a Vested Deferred Benefit, your annual benefit payable when you reach age 65 will be calculated based on your accrued Continuous Service using the Benefit Formula in effect at the time of your termination of employment.

You may apply for early commencement of your Vested Deferred Benefit between age 60 and 65. However, if you elect to receive benefits prior to age 65, your benefits will be reduced by 1/3 of 1% for each month that the commencement date precedes the last day of the month in which you reach age 65.

The amount of your benefit at early retirement commencement date will equal the amount which would have been payable to you at age 65, multiplied by the percentage shown below opposite your age at the time the benefit starts.

| Age Benefit Begins | Percentage of Age 65 Benefit Payable | Age Benefit Begins | Percentage of Age 65 Benefit Payable |
|---|---|---|---|
| 65 | 100 | 59 | 63.3 |
| 64 | 93.3 | 58 | 60.0 |
| 63 | 86.7 | 57 | 56.6 |
| 62 | 80.0 | 56 | 53.3 |
| 61 | 73.3 | 55 | 50.0 |
| 60 | 66.7 | | |

To commence payment of your Vested Deferred Benefit, you must apply for the benefits within 90 days immediately prior to the date you wish benefits to commence.

Example of a Vested Deferred Benefit:
Assuming you terminate employment at age 45 with 20 years of service.

Continuous Service and Age
at Benefit Commencement Date:                                                        Benefit

20 Years Service, Age 61:

    Monthly Vested Deferred Benefit payable at age 65:                $647.50

    Monthly Vested Deferred Benefit payable at age 61:                $474.62
       (73.3% of $647.50)

If you are married for at least one year at the time of your benefit commencement date, the amount of your Vested Deferred Benefit will be reduced by 10% to provide a 55% Joint and Survivor Annuity, unless you refuse such spouse's benefit with notarized spousal consent within the 90-day period prior to your benefit commencement date.

<u>Examples of a Vested Deferred Benefit with and without the Joint and Survivor Annuity Benefit</u>:

<u>Example 1</u>:
Assuming that you had 20 years of service, were 61 years of age at benefit commencement and you and your spouse are the same age.

|  | Your Benefit<br>Without J&S | Your Benefit<br>With J&S | Your Spouse's<br>Benefit |
|---|---|---|---|
| Annual Pension | $5,695.44 | $5,034.77 | $2,517.39 |
| Monthly Pension | $474.62 | $419.56 | $209.78 |

($5,695.44 less 11.6% = $5,034.77 x 50% = $2,517.39 annually, or $209.78 monthly)

<u>Example 2</u>:

Assuming that you had 20 years of service, were 61 years of age at benefit commencement and your spouse was 54 years of age.

|  | Your Benefit<br>Without J&S | Your Benefit<br>With J&S | Your Spouse's<br>Benefit |
|---|---|---|---|
| Annual Pension | $5,695.44 | $4,835.43 | $2,417.72 |
| Monthly Pension | $474.62 | $402.95 | $201.48 |

($5,695.44 less 15.1% = $4,835.43 x 50% = $2,417.72 annually, or $201.48 monthly)

If you had Pre-Retirement Survivor Annuity (PSA) coverage in effect prior to benefit commencement date, your Vested Deferred Benefit will be reduced by the cost of such coverage for the period it was in effect prior to benefit commencement.

# PRE-RETIREMENT SURVIVOR ANNUITY ("PSA")

If you are eligible for a Vested Deferred Benefit upon your termination of employment, your spouse will automatically be eligible for a lifetime pension in the event of your death prior to your benefit commencement date, provided that you and your spouse had been married for at least one year.  You may refuse the benefit with notarized spousal consent.

The PSA benefit will equal 50% of your Vested Deferred Benefit, actuarially reduced due to the early commencement date, further reduced to provide a 50% Joint and Survivor Annuity and finally reduced by the cost of this coverage.  The cost for the PSA coverage shall equal 1/5 of 1% per year (prorated for partial years) prior to age 55 and 3/4 of 1% per year (prorated for partial years) thereafter for periods during which this coverage was in effect.  If you subsequently decide to revoke the PSA coverage, you may do so by filing a written refusal with notarized spousal consent with the Secretary of the Administrative Committee.  In such event, the cost for periods during which such PSA coverage was in effect will remain a permanent reduction in the benefit subsequently payable to you under the Plan.

**NOTE**:     *If the present value of the Pre-Retirement Survivor Annuity payable to your surviving spouse does not exceed $5,000, the Administrative Committee shall direct that such present value be paid immediately in a lump sum.*

# WHEN PENSIONS ARE PAID

Your first pension payment will be made to you on the last day of the month in which you retire and continue monthly for the rest of your life through the last day of the month preceding the month in which your death occurs.

If you defer retirement beyond Normal Retirement Date, benefit payments must begin by the earlier of your actual retirement date or the April 1 following the calendar year in which you attain age 70½.  Payments to an eligible spouse will be made for his or her life through the last day of the month preceding the month in which death occurs.  For information on how to file a claim, see page 88.

Benefits under the Plan are for the exclusive benefit of participants and beneficiaries.  These benefits may not be assigned or alienated in any way except by a Qualified Domestic Relations Order that complies with Internal Revenue Code Section 414(p).

# TOP-HEAVY PROVISIONS

Federal law provides special rules in the event the Plan becomes what is called "top-heavy".  Simply stated, a plan is top-heavy when more than 60 percent (60%) of the present value of the cumulative accrued benefits under the plan are cumulative accrued benefits of "Key employees".  "Key employees" are generally officers, shareholders and certain highly compensated individuals.  It is unlikely that the Plan will ever be top-heavy; however, if the Plan is top-heavy, minimum benefit provisions and a more rapid vesting schedule will apply.  The Plan includes provisions specifying these requirements and the circumstances under which they will apply.

# IMPORTANT INFORMATION

# PLAN IDENTIFICATION

| | |
|---|---|
| **Asarco's Employer Identification Number** | **Type of Plan** |
| 134924440 | Defined Benefit |

| | | |
|---|---|---|
| | | **Ending Date of** |
| **Plan Name** | **Plan Number** | **Plan Year** |
| Retirement Income Plan | 008 | June 30 |
| for Hourly-Rated Employees | | |
| of ASARCO Incorporated | | |

# PLAN ADMINISTRATOR

ASARCO Incorporated
Debra J. Baker, Sr. Manager
Benefit Plans
PO Box 8
Hayden, AZ  85235
(520) 356-7811

Any legal process relating to the Retirement Income Plan should be served upon the Plan Administrator or Plan Trustee at the appropriate address as indicated above.

# PLAN TRUSTEE

Mellon Bank, N.A.
One Mellon Bank Center
Pittsburgh, PA 15258

# PLAN INVESTMENT MANAGERS

Alliance Capital
1345 Avenue of the Americas
New York, NY 10105

Ark Asset Management Co., Inc.
125 Broad Street
New York, NY 10004

Capital Guardian Trust Company
630 5th Avenue
New York, NY 10111

Wellington Trust Co.
100 Vanguard Blvd.
Malvern, PA  19355

Wasatch Advisors
150 Social Hall Avenue
Salt Lake City, UT 84111

# TYPE OF ADMINISTRATION

The Plan is an Employer Administered Plan and was initially effective November 18, 1986.  The Plan is administered by an Administrative Committee in accordance with authority delegated from the Fiduciary Committee appointed by the Board of Directors of Asarco.  The Fiduciary Committee is the Named Fiduciary of the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA").  All questions relating to the interpretation of the Plan, eligibility of employees and the amount of benefits payable in each individual case will be determined by the Administrative Committee in accordance with the Plan provisions.  The Claims Procedure, including an appeals procedure is described below.  If you are denied a benefit under this Plan, you must exhaust the remedies available to you under the Claims Procedure before you file suit in state or federal court.

# FUNDING

The entire cost of benefits under the Plan is paid by Asarco.  All contributions are made to a trust fund or to an insurance company as actuarially required in order to maintain the financial solvency of the Plan.  The trust fund is for the exclusive benefit of the participants in the Plan and their beneficiaries.  The amount of contributions needed to maintain the Plan on a sound basis, as well as the ability of the fund to meet future obligations, is determined each year by an independent firm of consulting actuaries.

# CLAIMS PROCEDURE

A.   Any application or claim for benefits under the Plan shall be filed in writing with the Secretary of the Administrative Committee or other duly designated person on a form prescribed by the Administrative Committee.  Written notice of the disposition of a claim or other advice shall be furnished the claimant within 90 days after a duly completed application or other claim for benefits is so filed.  If special circumstances require an extension of time for processing the claim, the claimant shall be given written notice prior to the expiration of the 90-day period that an additional period not to exceed 90 days, is required in which to process the claim and of the date by which the rendering of a final decision is expected.  The notice shall indicate the special circumstances requiring the extension.  For the purpose of Paragraphs A, B and C of this Claims Procedure, the word "claimant" also includes persons, other than employees, who have sufficient interest to claim a Plan benefit and who allege a controversy exists in respect thereto, e.g., a surviving spouse, a retired employee or a terminated employee.

B.   If the claim is denied, the specific reasons for the denial shall be set forth in writing, pertinent provisions of the Plan on which the denial is based shall be cited and there shall be provided a description of any additional material or information necessary for the claimant to perfect the claim, an explanation of why such material or information is necessary, and an explanation of the steps to be taken if the claimant wishes to submit his or her claim for review.

C.  Except as provided by Paragraph D below, if a claimant wishes to appeal a denied claim, he or she may request, in writing directed to the Administrative Committee or other duly designated person, a full and fair review of the claim and its denial.  Such written request shall be filed by the claimant or the duly authorized representative of the claimant no later than 90 days after receipt of the written notification provided for in Paragraph B on the preceding page.  The claimant or his or her duly authorized representative may review the pertinent documents and may submit issues and comments in writing.  The decision following such full and fair review shall be made by no later than the date of the meeting of the Administrative Committee which immediately follows receipt of a request for review, unless the request for review is filed within 30 days preceding the date of such meeting, in which event a decision may be made by no later than the date of the second meeting following the receipt of the request for review.  If special circumstances require further extension of time for processing, a decision shall be rendered no later than the third meeting of the Administrative Committee following the receipt of the request for review.  The decision shall be communicated in writing to the claimant.  If the decision on review is not furnished within the time period set forth above, the claim shall be deemed denied on review.

D.  Appeals Procedure

This procedure which applies only to bargaining unit employees is set forth in the relevant Pension Agreement and provides for the arbitration of disputes arising between such employees and the Company as to:

   1.  The number of years of Continuous Service of an employee.

   2.  The age of such employee.

If agreement cannot be reached, the question may be submitted for arbitration to the Federal Mediation and Conciliation Service.  The Arbitrator will decide the question under the Pension Agreement and the Plan provisions.  The expense of arbitration will be borne equally between the parties, unless they agree otherwise.

The Appeals Procedure is the exclusive remedy for the determination of any dispute concerning the employee's number of years of Continuous Service or age; recourse to the procedure specified in Paragraph C above is available only where the question in dispute does not involve the employee's Continuous Service or age.

E.  Nothing in this Claims Procedure shall be construed to supersede or in any manner enlarge, diminish or otherwise modify the rights and/or obligations of the employer, the union and/or employees represented by the union under the terms and conditions of the relevant Pension Agreement by and between the parties and the Appeals Procedure thereof.

# STATEMENT OF ERISA RIGHTS

As a participant in the Retirement Income Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all Plan participants shall be entitled to:

- Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements, and copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and Plan descriptions.
- Obtain copies of all Plan documents and other Plan information upon written request to the Plan administrator.  The administrator may make a reasonable charge for the copies.
- Receive a summary of the Plan's annual financial report.  The Plan administrator is required by law to furnish each participant with a copy of this summary annual report.
- Obtain a statement telling you whether you have a right to receive a pension at normal retirement age (age 65) and if so what your benefits would be at normal retirement age if you stop working under the Plan now.  If you do not have a right to a pension, the statement will tell you how many more years you have to work to get a right to a pension.  This statement must be requested in writing and is not required to be given more than once a year.  The Plan must provide the statement free of charge.

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.  No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension benefit or exercising your rights under ERISA.  If your claim for a pension benefit is denied in whole or in part you must receive a written explanation of the reason for the denial.  You have the right to have the Plan review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights.  For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court.  In such a case, the court may require the Plan administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator.  If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court.  If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.  If you have any questions about your Plan, you should contact the Plan administrator.  If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor Management Services Administration, Department of Labor.

# AMENDMENT AND TERMINATION

The Company expects and intends to continue the Plans indefinitely.  However, the Company reserves the right to amend or terminate the Plans at any time and for any reason.  If the Plans are amended or terminated you and other active and retired employees may not receive benefits as described in other sections of this booklet.  You may be entitled to receive different benefits, or benefits under different conditions.  However, it is possible that you will lose all benefit coverage. This may happen at any time, even after you retire, if the Company decides to terminate the Plans or your coverage under the Plans.  In no event will you become entitled to any vested rights under these plans.

# WHAT HAPPENS IF YOUR PLAN IS TERMINATED

It is Asarco's present intention to continue the Plan, however, the Company reserves the right to modify or terminate the Plan as and to the extent legally permissible.  Were the Plan to be terminated, the available assets of the trust fund will be used to defray the cost of reasonable Plan expenses and the cost of providing benefits to Plan participants; any residual assets in excess of assets needed to pay such benefits and expenses shall be returned to the Company.  In addition, certain benefits under this Plan are insured by the Pension Benefit Guaranty Corporation (PBGC) if the Plan terminates.  Generally, the PBGC guarantees most vested normal age retirement benefits, early retirement benefits, and certain disability and survivor's pensions.  However, PBGC does not guarantee all types of benefits under covered plans, and the amount of benefit protection is subject to certain limitations.

The PBGC guarantees vested benefits at the level in effect on the date of Plan termination. However, if a plan has been in effect less than five years before it terminates, or if benefits have been increased within the five years before termination, the whole amount of the plan's vested benefits or the benefit increase may not be guaranteed.  In addition, there is a ceiling on the amount of monthly benefit that PBGC guarantees, which is adjusted periodically.

In the event the Plan is terminated and the then present value of a Vested Deferred Benefit of a terminated employee who has not yet reached a benefit commencement date is $5,000 or less, such present value shall be payable as soon as practicable in a single lump sum.

For more information on the PBGC insurance protection and its limitations, ask the PBGC. Inquiries to the PBGC should be addressed to the Office of Communications, PBGC, 2020 K Street N.W., Washington, D.C. 20006.  The PBGC Office of Communications may also be reached by calling (202) 778-8800.

# EXHIBIT C

**FINAL**

# Agreement

### Between

## Asarco LLC

### and the

## United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC

## International Brotherhood of Electrical Workers, Locals 518, 570; and 602

## International Association of Machinists and Aerospace Workers, Local 2181

## International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmith, Forgers and Helpers, Local 627

## International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Local 104

## International Union of Operating Engineers, Local 428

## Millwrights, Local 1914 and

## United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 741.

### January 1, 2007

# TABLE OF CONTENTS

**ARTICLE 1.  AGREEMENT** .................................................................................. **1**

   **SECTION A.**   PARTIES TO THE AGREEMENT ........................................... **1**
   **SECTION B.**   TERM OF THE AGREEMENT .............................................. **2**

**ARTICLE 2.  UNION SECURITY** ......................................................................... **4**

   **SECTION A.**   RECOGNITION AND COVERAGE ....................................... **4**
   **SECTION B.**   UNION MEMBERSHIP AND DUES CHECKOFF .................. **8**
   **SECTION C.**   PAC AND SOAR CHECKOFF .......................................... **9**
   **SECTION D.**   SUCCESSORSHIP ........................................................... **10**
   **SECTION E.**   NEUTRALITY ................................................................... **11**
   **SECTION F.**   BARGAINING UNIT WORK ............................................... **16**
   **SECTION G.**   PRINTING OF CONTRACTS ............................................. **21**
   **SECTION H.**   HIRING PREFERENCE ..................................................... **21**
   **SECTION I.**   UNION OFFICERS - STRAIGHT SHIFTS ........................... **21**
   **SECTION J.**   BULLETIN BOARDS ........................................................ **22**

**ARTICLE 3.  HEALTH, SAFETY AND THE ENVIRONMENT** .............................. **23**

   **SECTION A.**   EMPLOYEE AND UNION RIGHTS .................................... **23**
   **SECTION B.**   SAFE AND HEALTHFUL WORKPLACE .............................. **23**
   **SECTION C.**   RIGHT TO REFUSE UNSAFE WORK ................................ **24**
   **SECTION D.**   PERSONAL PROTECTIVE EQUIPMENT ........................... **24**
   **SECTION E.**   SAFETY AND HEALTH TRAINING .................................... **25**
   **SECTION F.**   MEDICAL PROGRAM FOR WORKPLACE INJURIES AND ILLNESSES ... **25**
   **SECTION G.**   POLICY ON ALCOHOLISM AND DRUG ABUSE ................. **26**
   **SECTION H.**   JOINT SAFETY AND HEALTH COMMITTEE ..................... **26**
   **SECTION I.**   JOINT ENVIRONMENTAL ISSUES .................................... **28**
   **SECTION J.**   UNION SAFETY AND HEALTH REPRESENTATIVES ........... **28**
   **SECTION K.**   RIGHT TO PARTICIPATE IN ACCIDENT INVESTIGATIONS ... **28**
   **SECTION L.**   CARBON MONOXIDE CONTROL, TOXIC SUBSTANCES AND HARMFUL PHYSICAL AGENTS ... **29**
   **SECTION M.**   ERGONOMICS ................................................................. **29**
   **SECTION N.**   SAFETY SHOE ALLOWANCE ........................................... **30**
   **SECTION O.**   NO UNION LIABILITY ...................................................... **30**
   **SECTION P.**   SHOWERING ................................................................... **30**
   **SECTION Q.**   NEW OR CHANGED WORK PROCESSES ......................... **30**
   **SECTION R.**   SAFETY EDUCATION AND TRAINING .............................. **30**

**ARTICLE 4.  CIVIL RIGHTS** ............................................................................... **31**

   **SECTION A.**   NON-DISCRIMINATION .................................................... **31**
   **SECTION B.**   CIVIL RIGHTS COMMITTEE ............................................ **32**
   **SECTION C.**   WORKPLACE HARASSMENT, AWARENESS AND PREVENTION ... **33**
   **SECTION D.**   CHILD CARE, ELDER CARE AND DEPENDENT CARE ....... **34**

**ARTICLE 5.  WORKPLACE PROCEDURES** ...................................................... **35**

   **SECTION A.**   LOCAL WORKING CONDITIONS ...................................... **35**
   **SECTION B.**   JOB EVALUATION AND NEW OR CHANGED JOBS ........... **36**
   **SECTION C.**   HOURS OF WORK ........................................................... **37**
   **SECTION D.**   OVERTIME ...................................................................... **39**

SECTION E.    SENIORITY ....................................................................... 41
SECTION F.    TESTING .......................................................................... 45
SECTION G.    INDEFINITE SHUTDOWNS .............................................. 46
SECTION H.    MANNING OF NEW FACILITIES ........................................ 47
SECTION I.    ADJUSTMENT OF GRIEVANCES ........................................ 48
SECTION J.    MANAGEMENT RIGHTS ................................................... 57
SECTION K.    PROHIBITION ON STRIKES AND LOCKOUTS ...................... 57
SECTION L.    WORKPLACE PROBLEM-SOLVING COMMITTEE ................... 57
SECTION M.    CLOTHING AND TOOL REPLACEMENT ............................... 58
SECTION N.    ABSENTEE CONTROL POLICY .......................................... 58
SECTION O.    EXTENDED SHIFT SCHEDULES ........................................ 58

ARTICLE 6.  JOINT EFFORTS .............................................................. 60

SECTION A.    PARTNERSHIP ................................................................ 60
SECTION B.    CONTRACT COORDINATORS ............................................ 63
SECTION C.    NEW EMPLOYEE ORIENTATION ....................................... 64

ARTICLE 7.  TRAINING ....................................................................... 65

SECTION A.    WORKFORCE TRAINING PROGRAM ................................... 65

ARTICLE 8.  EARNINGS SECURITY ...................................................... 67

SECTION A.    SUPPLEMENTAL UNEMPLOYMENT BENEFITS ..................... 67
SECTION B.    INTERPLANT JOB OPPORTUNITIES .................................. 70

ARTICLE 9.  ECONOMIC OPPORTUNITY ............................................... 72

SECTION A.    WAGES .......................................................................... 72
SECTION B.    SHIFT PREMIUM .............................................................. 79
SECTION C.    COPPER PRICE BONUS .................................................... 80
SECTION D.    TRAVEL TIME AND TIME DONNING AND DOFFING PROTECTIVE EQUIPMENT ...... 82
SECTION E.    APPRENTICESHIP ........................................................... 82
SECTION F.    PAYMENT FOR COMPANY MANDATED TRAINING ................. 83

ARTICLE 10.  PAID TIME OFF AND LEAVES OF ABSENCE ....................... 84

SECTION A.    HOLIDAYS ...................................................................... 84
SECTION B.    VACATIONS .................................................................... 86
SECTION C.    BEREAVEMENT LEAVE .................................................... 90
SECTION D.    JURY OR WITNESS DUTY ................................................ 90
SECTION E.    LEAVE OF ABSENCE FOR EMPLOYMENT WITH THE UNION ...... 91
SECTION F.    SERVICE WITH THE UNIFORMED SERVICES ....................... 92
SECTION G.    FAMILY AND MEDICAL LEAVE ACT ................................... 94
SECTION H.    POLITICAL LEAVE ........................................................... 96

ARTICLE 11.  CORPORATE GOVERNANCE ............................................. 97

SECTION A.    BOARD OF DIRECTORS ................................................... 97
SECTION B.    INVESTMENT COMMITMENT ............................................ 98
SECTION C.    UPSTREAMING .............................................................. 99
SECTION D.    RIGHT TO BID ............................................................... 100

ARTICLE 12.  BENEFITS ..................................................................... 101

SECTION A.    ACTIVE WELFARE BENEFITS .......................................... 101
SECTION B.    GENERAL ..................................................................... 101

SECTION C.     EFFECTIVE DATE OF COVERAGE ................................................................ 101
SECTION D.     DEPENDENT COVERAGE .......................................................................... 102
SECTION E.     TERMINATION OF COVERAGE .................................................................. 103
SECTION F.     COVERAGE FOLLOWING RETIREMENT ...................................................... 105
SECTION G.     CONTINUOUS SERVICE .......................................................................... 105
SECTION H.     SUMMARY OF LIFE INSURANCE BENEFITS ................................................ 105
SECTION I.     SUMMARY OF ACCIDENTAL DEATH OR DISMEMBERMENT BENEFITS ............ 106
SECTION J.     SUMMARY OF WEEKLY SICKNESS AND ACCIDENT BENEFITS ...................... 106
SECTION K.     SUMMARY OF MEDICAL BENEFITS ........................................................... 106
SECTION L.     SUMMARY OF VISION CARE .................................................................... 114
SECTION M.     FLEXIBLE SPENDING ACCOUNTS .............................................................. 114
SECTION N.     SUMMARY OF DENTAL BENEFITS ............................................................ 115
SECTION O.     RETIREE HEALTH CARE ........................................................................... 116
SECTION P.     401(K) SAVINGS PLAN .......................................................................... 117
SECTION Q.     PENSION PLAN ..................................................................................... 119

LETTERS OF UNDERSTANDING ON .............................................................. 120

ESTABLISHMENT OF NEW WAGE SCALE .......................................................... 120
EL PASO RECALL RIGHTS .............................................................................. 122
EL PASO PLANT .......................................................................................... 123
LOCAL SUPPLEMENTAL AGREEMENTS ............................................................. 124
ADDITIONAL BENEFITS CHANGES ................................................................... 126
RETIREE HEALTH CARE ENROLLMENT ............................................................. 127
MISCELLANEOUS CORPORATE ISSUES ............................................................. 129
EFFECTIVE DATE OF PENSION MULTIPLIER ...................................................... 131

MEMORANDA OF UNDERSTANDING .............................................................. 133

SIGNING BONUS 133
FLEXIBILITY .............................................................................................. 134

EXHIBIT A ................................................................................................. 137

ALCOHOL AND DRUG ABUSE POLICY ............................................................... 137

# Article 1.  Agreement

**Section A.      Parties to the Agreement**

1.   This Agreement (the Basic Labor Agreement, BLA or the Agreement), is between Asarco LLC (Asarco or the Company as further defined below) and the following Unions or their successors (the Union) on behalf of the Employees of the Company:

   a.   United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (USW);

   b.   International Brotherhood of Electrical Workers, Locals 518, 570; and 602;

   c.   International Association of Machinists and Aerospace Workers, Local 2181;

   d.   International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmith, Forgers and Helpers, Local 627;

   e.   International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Local 104;

   f.   International Union of Operating Engineers, Local 428;

   g.   Millwrights, Local 1914; and

   h.   United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 741.

2.   "Agreement" shall mean this contract and all other agreements, including any and all benefits agreements, memoranda of understanding, letters of agreement and local supplemental agreements.  References to the male gender herein also refer to the female gender unless otherwise required by the context.

3.   Except as otherwise provided in this Agreement, the Company shall include any current or future Affiliate of Asarco.

   a.   An Affiliate shall mean any business enterprise that Controls, is under the Control of, or is under common Control with Asarco.

   b.   Control of a business enterprise shall mean possession, directly or indirectly, of either:

      (1)   fifty percent (50%) of the equity of the enterprise; or

      (2)   the power to direct the management and policies of said enterprise.

# Article 1.  Agreement

**Section B.**    **Term of the Agreement**

1.   The effective date of the Agreement shall be January 1, 2007, (the Effective Date) except as otherwise expressly provided.

2.   Except as otherwise provided below, this Basic Labor Agreement shall terminate at the expiration of sixty (60) days after either party shall give written notice of termination to the other party, but in any event shall not terminate earlier than June 30, 2010 (the Termination Date).

3.   If either party gives such notice, it may include therein notice of its desire to negotiate with respect to insurance, pensions, successorship and supplemental unemployment benefits. If the parties do not reach agreement with respect to such matters by the Termination Date, either party may thereafter resort to strike or lockout, as the case may be, in support of its position with respect to such matters, as well as any other matter in dispute. This Paragraph shall apply to all such matters, including insurance, pensions, successorship and supplemental unemployment benefits, notwithstanding any contrary provision of existing agreements on those subjects.

4.   a.   Any notice to be given under this Agreement shall be given by certified mail and shall be postmarked by the required date. Mailing of notice to the Company should be addressed to Asarco, 1150 North 7th Avenue, Tucson, Arizona 85705. Mailing of notice to the Unions should be addressed to:

   (1)   the United Steelworkers of America, Five Gateway Center, Pittsburgh, Pennsylvania 15222;

   (2)   International Brotherhood of Electrical Workers, Local 518, P.O. Box 88, Globe, Arizona 85502;

   (3)   International Brotherhood of Electrical Workers, Local 570, 750 South Tucson Blvd., Tucson, Arizona 85716;

   (4)   International Brotherhood of Electrical Workers, Local 602, P.O. Box 143, Amarillo, Texas 79105;

   (5)   International Association of Machinists and Aerospace Workers, Local 2181, P.O. Box 96, Hayden, Arizona 85235;

   (6)   International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmith, Forgers and Helpers, Local 627, P.O. Box 13268, Phoenix, Arizona 85002;

   (7)   International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Local 104, 238 West Elm, Tucson, Arizona 87505;

    (8)    International Union of Operating Engineers, Local 428, 6601 North Black Canyon Highway, Phoenix, Arizona 85015;

    (9)    Millwrights, Local 1914 c/o United Brotherhood of Carpenters & Joiners of America, 3985 North Benan Venture Drive, Tucson, Arizona 85705; and

    (10)    United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 741, 2475 East Water Street, Tucson, Arizona 85719-3455.

b.    Either party may, by like written notice, change the address to which certified mail notice shall be given.

## Article 2.  Union Security

**Section A.     Recognition and Coverage**

1.    The Company recognizes:

a.    the USW; International Union of Operating Engineers, Local 428; International Brotherhood of Electrical Workers, Local 570; and International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Local 104; as the exclusive joint representative of a bargaining unit made up of employees at the Mission Complex as certified by the National Labor Relations Board ("NLRB") in Case No. 28-RC-3311 dated June 27, 1977;

b.    the International Brotherhood of Electrical Workers, Local 518, as the sole bargaining agent for all of its employees in the Electrical Department and Powerhouse at the Hayden Smelter in accordance with Certification of the NLRB of August 15, 1949, Case No. 21-RC-818 and September 4, 1953, Case No. 21-RC-3069; all other employees at that location are excluded from representation by Local 518;

c.    the USW as the sole bargaining agent for its production and maintenance employees at the Hayden Smelter in accordance with the Certification of the National Labor Relations Board of June 12, 1951, Case No. 21-RC-1941.  Hourly-paid Employee(s) assigned to the Warehouse will be recognized as being part of the bargaining unit but such assignment(s), if any, shall be at the discretion of the Company.  Executive, administrative, technical employees, supervisors, assistant supervisors, engineers, metallurgists, chemists, assayers, secretaries, clerks, accountants, auditors, watchmen, electricians, electrician helpers and electrician apprentices, powerhouse operators, powerhouse utilitymen and powerhouse helpers are excluded from representation by the USW;

d.    the International Brotherhood of Electrical Workers, Local 602 as the sole bargaining agent for all the skilled electricians and apprentices employed in the Amarillo Copper Refinery as certified by the NLRB in Case No. 16-RC-7100 and 16-RC-7108 dated May 5, 1976;

e.    the USW as the sole bargaining agent for its production and maintenance employees at the Amarillo Copper Refinery as certified by the NLRB in Case No. 16-RC-7100 and 16-RC-7108 dated May 5, 1976;

f.    the unions in this subparagraph f are recognized as the sole collective bargaining representatives for all Employees covered by this Agreement at the Ray Complex in their respective units.  The Employees so covered shall be only those employed in the job classifications set forth in the local supplemental agreement, at the Company's Concentrator and Smelter Plants located at Hayden, Arizona and the Mines Plant located at Ray, Arizona.  The NLRB certification numbers for the appropriate bargaining units, covered by this Agreement are as follows: USW Local 5252, 915 and 886-02: 28-RC-974 and 28-RC-5088; International Association of Machinists

and Aerospace Workers (IAM) Local 2181: 28-RC-856 and 28-RC-5091; International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers (Boilermakers) Local 627: 28-RC-857; United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (UA) Local 741: 28-RC-858; Millwright Local 1984: 28-RC-863; International Brotherhood of Electrical Workers (IBEW) Local 518: 21-RC-769 and 28-RC-5099; and

g.   the USW as the exclusive bargaining agent for all employees of its Silver Bell Mining, L.L.C., who come under the jurisdiction of the USW for the purpose of collective bargaining.

2.   Individuals in the bargaining unit shall be referred to in this Agreement as "Employees." Individuals who are employed by the Company and are not in the bargaining unit shall be referred to as "non-bargaining unit employees." Individuals who are in the bargaining unit and those who are not in the bargaining unit shall be collectively referred to as "employees."

3.   Except as expressly provided herein, the provisions of this BLA constitute the sole procedure for the processing and settlement of any claim by an Employee or the Union of a violation by the Company of this Agreement. As the representative of the Employees, the Union may process grievances through the grievance procedure, including arbitration, in accordance with this BLA or may adjust or settle same.

4.   When the Company establishes a new or changed job whose duties include a material level of production or maintenance work; the resulting job shall be considered a job covered within the bargaining unit; provided that where non-bargaining unit duties are added to a job in the bargaining unit on a temporary basis, they may be withdrawn.

5.   It is understood that supervisors at a plant shall not perform work on a job normally performed by the bargaining unit except:

a.   experimental work;

b.   demonstration work performed for the purpose of instructing and training Employees; and

c.   work required by conditions which, if not performed, might result in interference with operations, bodily injury or loss or damage to material or equipment.

6.   If a supervisor or other non-bargaining unit employee performs work in violation of Paragraph 5 and the Employee who otherwise would have performed this work can reasonably be identified, the Company shall pay such Employee his/her applicable Regular Rate of Pay for the time involved or for one (1) hour, whichever is greater.

7.  Day-Pay Supervisors

    a.  An Employee assigned as a temporary foreman or supervisor will not issue discipline to Employees, provided that this provision will not prevent a temporary foreman or supervisor from relieving an Employee from work for the balance of the shift for alleged misconduct. An Employee will not be called by either party in the grievance procedure or arbitration to testify as a witness regarding any events involving discipline which occurred while the Employee was assigned as a temporary foreman or supervisor.

    b.  Day pay supervisors will be used only to replace regular supervisors who are absent, other than for flex days, or to fill permanent vacancies due to termination of employment or transfers.

    c.  On a monthly basis, the Company will provide the Union with a listing of those Employees who have been temporarily assigned to supervisory positions during the previous month. Such listing shall include the number of supervisory shifts worked during that month.

8.  Leadpersons

    a.  During the term of this Agreement, the Company will make every effort, when appropriate, to utilize working leadpersons in lieu of day pay supervisors in their work area and on their regular shift, provided the leadperson has demonstrated the necessary leadership skills.

    b.  A leadperson will direct, oversee and assist a work crew in addition to his/her assigned work.

    c.  The Company will provide the training necessary for the leadperson to perform his/her duties which may include warehouse requisition, work order entry and closure, on-line requisition entry and timekeeping.  Nothing herein shall be construed to mean that these tasks are exclusively bargaining unit work.

    d.  Leadpersons shall not have the authority to discipline, terminate or make recommendations for disciplinary or termination actions.

    e.  Leadpersons will be paid the greater of:

        (1)  one-level above the highest level of the employees the leadperson is leading, or

        (2)  $1.00 per hour above their regular wage level.

    f.  Promotions to the classification of leadperson shall be based on seniority and qualifications.  Where qualifications are substantially equal, seniority shall govern. The Company shall determine qualifications.  In the event a junior person is selected

to fill a leadperson position, the Union may file a grievance over the Company's determination of qualifications.

g.    The parties agree that in the event the National Labor Relations Board or the courts issue any decision(s) placing in question the supervisory status, as defined under the National Labor Relations Act, of any bargaining unit leadman classification, then the parties will, if necessary, modify the duties and responsibilities of said classification so that said classification remains a bargaining unit position.

# Article 2.  Union Security

**Section B.      Union Membership and Dues Checkoff**

1.   The Company will check off dues or service charges each payroll period, including, where applicable, initiation fees and assessments, each in amounts as designated by the International Union Secretary-Treasurer, effective upon receipt of individually signed voluntary checkoff authorization cards. The Company shall within ten (10) days remit any and all amounts so deducted to the International Union Secretary-Treasurer (or equivalent) with a completed summary of USW Form R-115 (or its equivalent).

2.   At the time of employment, the Company will advise each new Employee that s/he may voluntarily execute an authorization for the checkoff of amounts due or to be due under Paragraph 1. A copy of the card will be forwarded at the time of signing to the Financial Secretary of the Local Union.

3.   To the extent available through the Company's Information System, the Union will be notified of the amount transmitted for each authorizing Employee (including the hours and earnings used in the calculation of such amount) and, where applicable, the reason for non-transmission with respect to any Employee formerly on checkoff, such as in the case of interplant transfer, layoff, discharge, resignation, leave of absence, sick leave, retirement, death or insufficient earnings.

4.   The Union shall indemnify the Company and hold it harmless against any and all claims, demands, suits and liabilities that shall arise out of or by reason of any action taken by the Company for the purpose of complying with the foregoing provisions.

# Article 2.  Union Security

**Section C.      PAC and SOAR Checkoff**

1.   The Company will deduct Political Action Committee (PAC) contributions for active Employees who have submitted authorization for such deductions from their wages and for retirees who have submitted authorization for such deductions from their pension. Such deductions shall be on a form reasonably acceptable to the Company and shall be promptly remitted to the Secretary-Treasurer of the Union's PAC Fund.

2.   For retirees who are or wish to become members of the Steelworkers Organization of Active Retirees (SOAR) (or equivalent for other Unions) and who have submitted authorization for such deductions from their pension, the Company will deduct monthly SOAR dues from their pension. Such deductions shall be on a form reasonably acceptable to the Company and shall be promptly remitted to the International Union Secretary-Treasurer.

## Article 2.  Union Security

**Section D.        Successorship**

1.  The Company agrees that it will not sell, convey, assign or otherwise transfer, using any form of transaction, any plant or significant part thereof covered by this Agreement (any of the foregoing, a Sale) to any other party (Buyer), unless the following conditions have been satisfied prior to the closing date of the Sale:

    a.  the Buyer shall have entered into an Agreement with the Union recognizing it as the bargaining representative for the Employees working at the plant(s) to be sold; and

    b.  the Buyer shall have entered into an Agreement with the Union establishing the terms and conditions of employment to be effective as of the closing date of the Sale.

2.  This Section is not intended to apply to any transactions solely between the Company and any of its Affiliates.

3.  This Section shall not apply to a public offering of registered securities.

4.  Notwithstanding the provisions of the Term of the Agreement, this Section shall expire one (1) year after the Termination Date.

# Article 2.  Union Security

**Section E.        Neutrality**

1.    Introduction

The Company and the Union have developed a constructive and harmonious relationship built on trust, integrity and mutual respect.  The parties place a high value on the continuation and improvement of that relationship.

2.    Neutrality

a.    To underscore the Company's commitment in this matter, it agrees to adopt a position of Neutrality regarding the unionization of any hourly-paid production and maintenance employees of the Company in the United States and Canada.

b.    Neutrality means that, except as explicitly provided herein, the Company will not in any way, directly or indirectly, involve itself in any matter which involves the unionization of its employees, including but not limited to efforts by the Union to represent the Company's employees or efforts by its employees to investigate or pursue unionization.

c.    The Company's commitment to remain neutral as defined above may only cease upon the Company demonstrating to the arbitrator under Paragraph 5 below that in connection with an Organizing Campaign (as defined in Paragraphs 3(a) through 3(c) below) the Union is intentionally or repeatedly (after having the matter called to the Union's attention) materially misrepresenting to the employees the facts surrounding their employment or is unfairly demeaning the integrity or character of the Company or its representatives.

3.    Organizing Procedures

a.    Prior to the Union distributing authorization cards to non-represented employees at a facility owned, controlled or operated by the Company, the Union shall provide the Company with written notification (Written Notification) that an organizing campaign (Organizing Campaign) will begin.  The Written Notification will include a description of the proposed bargaining unit.

b.    The Organizing Campaign shall begin immediately upon provision of Written Notification and continue until the earliest of:  (1) the Union gaining recognition under Paragraph 3(d)(5) or; (2) written notification by the Union that it wishes to discontinue the Organizing Campaign.

c.    Upon Written Notification the following shall occur:

(1)    Notice Posting

The Company shall post a notice on all bulletin boards of the facility where notices are customarily posted as soon as the Unit Determination Procedure in Paragraph 3(d)(3) below is completed.  This notice shall read as follows:

"NOTICE TO EMPLOYEES

We have been formally advised that the United Steelworkers is conducting an organizing campaign among certain of our employees.  This is to advise you that:

1.  The Company does not oppose collective bargaining or the unionization of our employees.

2.  The choice of whether or not to be represented by a union is yours alone to make.

3.  We will not interfere in any way with your exercise of that choice.

4.  In their conduct of the organizing effort, the Union and its representatives are prohibited from misrepresenting the facts surrounding your employment.  Nor may they unfairly demean the integrity or character of the Company or its representatives.

5.  If the Union secures a simple majority of authorization cards of the employees in [insert description of bargaining unit provided by the Union] the Company shall recognize the Union as the exclusive representative of such employees without a secret ballot election conducted by the National Labor Relations Board.

6.  The authorization cards must unambiguously state that the signing employees desire to designate the Union as their exclusive representative.

7.  Employee signatures on the authorization cards will be confidentially verified by a neutral third party chosen by the Company and the Union."

Following receipt of Written Notification, the Company will not communicate to its employees on subjects which directly or indirectly concern unionization on the issues covered in the Notice set forth above or raised by other terms of this Neutrality Section.

(2)  Employee Lists

Within five (5) days following Written Notification, the Company shall provide the Union with a complete list of all of its employees in the proposed bargaining unit who are eligible for Union representation.  Such list shall include each

employee's full name, home address, job title and work location.  Upon the completion of the Unit Determination Procedure described in Paragraph 3(d)(3) below, an amended list will be provided if the proposed unit is changed as a result of such Unit Determination Procedure.  Thereafter during the Organizing Campaign, the Company will provide the Union with updated lists monthly.

(3)   Determination of Appropriate Unit

As soon as practicable following Written Notification, the parties will meet to attempt to reach an agreement on the unit appropriate for bargaining.  In the event that the parties are unable to agree on an appropriate unit, either party may refer the matter to the Dispute Resolution Procedure contained in Paragraph 7 below.  In resolving any dispute over the scope of the unit, the arbitrator shall apply the principles used by applicable U.S. Labor Law.

(4)   Access to Company Facilities

During the Organizing Campaign the Company, upon written request, shall grant continuous access to well-traveled areas of its facilities to the Union for the purpose of distributing literature and meeting with unrepresented Company employees.  Distribution of Union literature shall not compromise safety or production or unreasonably disrupt ingress or egress or the normal business of the facility.  Distribution of Union literature and meetings with employees shall be limited to non-work areas during non-work time.

(5)   Card Check/Union Recognition

(a)   If, at any time during an Organizing Campaign which follows the existence of a substantial and representative complement of employees in any unit appropriate for collective bargaining, the Union demands recognition, the parties will request that a mutually acceptable neutral conduct a card check within five (5) days of the making of the request.

(b)   The neutral shall confidentially compare the authorization cards submitted by the Union against original handwriting exemplars of the entire bargaining unit furnished by the Company.  If the neutral determines that a simple majority of eligible employees has signed cards which unambiguously state that the signing employees desire to designate the Union as their exclusive representative for collective bargaining purposes, and that cards were signed and dated during the Organizing Campaign, then the Company shall recognize the Union as the exclusive representative of such employees without a secret ballot election conducted by the National Labor Relations Board.

(c)   The list of eligible employees submitted to the neutral shall be jointly prepared by the Union and the Company.

4.   Definitions and Scope of this Agreement

    a.   Rules with Respect to Affiliates and Ventures

        (1)   For purposes of this Section, the Company includes (in addition to the Company) any entity which is either an Affiliate or Venture of the Company.

        (2)   An Affiliate shall mean any business enterprise that Controls, is under the Control of, or is under common Control with Asarco.

                Control of a business enterprise shall mean possession, directly or indirectly, of either:

            (a)   fifty percent (50%) of the equity of the enterprise; or

            (b)   the power to direct the management and policies of said enterprise.

        (3)   Venture shall mean a business enterprise in which the Company owns a substantial and material interest.

    b.   Rules With Respect to Existing Affiliates and Ventures

        The Company agrees to cause all of its existing Affiliates and/or Ventures to become a party/parties to this Section and to achieve compliance with its provisions.

    c.   Rules with Respect to New Affiliates and Ventures

        The Company agrees that it will not consummate a transaction which would result in the Company having or creating (1) an Affiliate or (2) a Venture, without ensuring that the New Affiliate and/or New Venture, agrees to and becomes bound by this Section.

5.   Dispute Resolution

    a.   Any alleged violation or dispute involving the terms of this Section may be brought to a joint committee of one (1) representative each from the Company and the Union. If the alleged violation or dispute cannot be satisfactorily resolved by the parties, either party may submit such dispute to the arbitrator.  A hearing shall be held within ten (10) days following such submission and the arbitrator shall issue a decision within five (5) days thereafter.  Such decision shall be in writing and need only succinctly explain the basis for the findings.  All decisions by the arbitrator pursuant to this article shall be based on the terms of this Section and the applicable provisions of the law.  The arbitrator's remedial authority shall include the power to issue an order requiring the Company to recognize the Union where, in all the circumstances, such an order would be appropriate.

b.   The arbitrator's award shall be final and binding on the parties and all employees covered by this Section.  Each party expressly waives the right to seek judicial review of said award; however, each party retains the right to seek judicial enforcement of said award.

c.   For any dispute under this Section, the parties shall choose the arbitrator from the list of arbitrators described in the Grievance and Arbitration procedure, contacting them in the order listed, and retaining the first to indicate an ability to honor the time table set forth above for the hearing and the decision.

## Article 2.  Union Security

**Section F.      Bargaining Unit Work**

1.   Guiding Principle

   a.   The Guiding Principle is that to the greatest extent possible the Company will use Employees to perform any and all work which they are or could be capable (in terms of skill and ability) of performing (Bargaining Unit Work).

   b.   Any individual or entity other than an Employee who performs Bargaining Unit Work shall be referred to herein as an Outside Entity.

2.   Exceptions

   It is understood unless the work meets one of the exceptions outlined in this Paragraph 2 it will normally be performed by Employees unless there is a legitimate and necessary reason to deviate from the Guiding Principle as stated in paragraph 1, above.

   a.   Work Performed In or Around the Plant

      (1)   New Construction Work

         New Construction Work is that portion of the work associated with significant (in the context of the facility) capital projects involving the installation, replacement or reconstruction of any equipment or productive facilities. The Company may use Outside Entities to perform New Construction Work.

      (2)   Surge Maintenance Work

         Surge Maintenance Work is that portion of maintenance and repair work which is required by bona fide operational needs performed on equipment where the Company temporarily uses Outside Entities to supplement bargaining unit forces and where: (a) the use of Outside Entities would materially reduce the downtime of the equipment; or (b) the work cannot reasonably be performed by bargaining unit forces. The Company may use Outside Entities to perform Surge Maintenance Work provided that the Company has offered all reasonable and appropriate requested overtime to all qualified Employees who, by working such overtime, could reduce the amount of Surge Maintenance Work performed by Outside Entities in an efficient manner.

   b.   Work Performed Outside the Plant or its Environs

      (1)   Fabrication and Repair Work

Fabrication Work is the creation outside of the plant or its environs of items or parts used in the Company's business which are not themselves, either directly or after additional work is performed on them, sold to customers. Repair Work is the repair, renovation or reconstruction of those items. Fabrication and Repair Work may be performed by Outside Entities only where the location of the work's performance is for a bona fide business purpose and the Company can demonstrate a meaningful sustainable economic advantage to having such work performed by an Outside Entity. In determining whether a meaningful sustainable economic advantage exists, lower wage rates, if any, of the Outside Entity shall not be a factor.

(2)   Production Work

The Company may use Outside Entities to perform production work outside the plant and its environs provided the Company demonstrates that it is utilizing plant equipment to the maximum extent consistent with equipment capability and customer requirements and the Company is making necessary capital investments to remain competitive in the copper business and is in compliance with Article Eleven, Section B (Investment Commitment).

c.   Warranty Work

Warranty Work is work performed pursuant to a warranty obtained at the time of purchase on new or rehabilitated equipment or systems. Warranty Work is work which is not a service contract and which is performed pursuant to a pre-existing warranty on new or rehabilitated equipment or systems. The Company may use Outside Entities to perform Warranty Work provided the guarantor of the Warranty Work is responsible for the cost of such work.

3.   Commitment

In addition to the understandings described in Paragraphs 1 and 2 above, the Company agrees that:

a.   where total hours worked by employees of Outside Entities over a period of time are sufficient to indicate that the work is full time and of a continuing duration, the work performed by such Outside Entities will be assigned to Employees and the number of Employees will be appropriately increased if necessary, unless the Company is able to clearly demonstrate: that the work cannot be performed by the addition of an Employee(s); that assignment of the work to Employees would not be economically feasible; or that the Company, despite its best efforts, has been unable to hire Employees necessary to perform the work. In determining whether the assignment of the work to Employees is or is not economically feasible, the lower wage rates, if any, of an Outside Entity shall not be a factor.

b.  The parties agree that the Union may at any time enforce the obligations described above, irrespective of the Company's compliance with any other obligation in this Section or any other part of the Agreement, and that an arbitrator shall specifically require the Company to meet the above Commitment, including imposing hiring orders and penalties.

c.  The Company shall supply the Bargaining Unit Work Committee (as defined below) with all requested information regarding compliance with the Commitment.

4.  Bargaining Unit Work Committee

At each plant a committee consisting of four (4) individuals, two (2) individuals designated by each of the parties, shall be constituted to serve as the Bargaining Unit Work Committee. The Committee shall meet as required but not less than monthly to:

a.  review bargaining unit force levels for the plant;

b.  review historical contractor utilization by the plant;

c.  review projections for contractor utilization by the plant;

d.  monitor the implementation of new programs or hiring to reduce contractor utilization; and develop new ideas and implementation plans to effectively reduce contractor usage as per the terms of this Section.

5.  Notice and Information

a.  Prior to the Company entering into any agreement or arrangement to use Outside Entities to perform Bargaining Unit Work, the Company will provide written notice to the Bargaining Unit Work Committee in sufficient time to permit a final determination, using the Expedited Procedure, of whether or not the proposed use of Outside Entities meets the criteria herein.  Such notice shall include the following:

(1)  location, type, duration and detailed description of the work;

(2)  occupations involved and anticipated utilization of bargaining unit forces;

(3)  effect on operations if the work is not completed in a timely fashion; and

(4)  copies of any bids from Outside Entities and any internal estimating done by or on behalf  of the Company regarding the use of the Outside Entities.

b.  Should the Union believe a meeting to be necessary, a written request shall be made within five (5) days (excluding Saturdays, Sundays and holidays) after receipt of such notice. The meeting shall be held within three (3) days (excluding Saturdays, Sundays and holidays) thereafter. At such meeting, the parties shall review in detail the plans

for the work to be performed and the reasons for using Outside Entities. The Union shall be provided with all information available to the Company concerning the use of Outside Entities at issue.

c.   Should the Company fail to give notice as provided above, then not later than thirty (30) days from the later of the date of the commencement of the work or when the Union becomes aware of the work, a grievance relating to such matter may be filed.

6.   Mutual Agreement

a.   As of the Effective Date, all agreements, understandings or practices of any kind that directly or indirectly permit the use of Outside Entities to perform Bargaining Unit Work are hereby agreed to be null and void.

b.   In the event the Bargaining Unit Work Committee resolves a matter in a fashion which in any way permits the use of Outside Entities, such resolution shall be final and binding only as to the matter under consideration and shall not affect future determinations under this Section.

c.   No agreement, whether or not reached pursuant to this Section, which directly or indirectly permits the use of Outside Entities on an ongoing basis, shall be valid or enforceable unless it is in writing and signed by the President/Unit Chair and the Grievance Committee Chair/Unit Grievance Committeeperson of the affected Local Union. Any such valid agreement shall expire on the Termination Date of this Agreement, unless signed by a Representative of the International Union.

7.   Expedited Procedure

In the event the Union requests an expedited resolution of any dispute arising under this Section, it shall be submitted to the Expedited Procedure in accordance with the following:

a.   Within three (3) days (excluding Saturdays, Sundays and holidays) after the Union determines that the Bargaining Unit Work Committee cannot resolve the dispute, the Union may advise the Company in writing that it is invoking this Expedited Procedure.

b.   An expedited arbitration must be scheduled within three (3) days (excluding Saturdays, Sunday and holidays) of such notice and heard at a hearing commencing within five (5) days (excluding Saturdays, Sundays and holidays) thereafter.

c.   The arbitrator shall render a decision within forty-eight (48) hours (excluding Saturdays, Sundays and holidays) of the conclusion of the hearing.

d.   No testimony offered by an individual associated with an Outside Entity may be considered in any proceeding unless the party calling the outsider provides the other party with a copy of each Outside Entity document to be offered in connection with

19

such testimony at least forty-eight (48) hours (excluding Saturdays, Sundays and holidays) before commencement of that hearing.

e.    Notwithstanding any other provision of this Agreement, any case heard in the Expedited Procedure before the work in dispute was performed may be reopened by the Union if such work, as actually performed, varied in any substantial respect from the description presented in arbitration. The request to reopen the case must be submitted within seven (7) days of the date on which the Union knew or should have known of the variance.

8.   Quarterly Review

a.    Not less than quarterly, the Bargaining Unit Work Committee shall meet with the Local Union President/Unit Chair and the General Manager of the plant, for the purpose of reviewing all work for which the Company anticipates utilizing Outside Entities at some time during the next or subsequent quarters. The Union shall be entitled to review any current or proposed contracts concerning such work and shall keep such information confidential.

b.    During the review, the Bargaining Unit Work Committee may (1) agree on items of work that should be performed by Outside Entities for which Notice under Paragraph 5 above is therefore not required; or (2) disagree on which items of work should be performed by Employees and which should be performed by Outside Entities for which notice under Paragraph 5 is therefore required.

c.    During the quarterly review, the Company will provide to the Bargaining Unit Work Committee a detailed report showing work performed by Outside Entities since the last such report. For each item of work the report shall include the date and shift the work was performed; a description of the work; the trade, craft or occupation of the individual(s) performing the work; and the total number of hours worked by each contracting entity or individual.

## Article 2.  Union Security

**Section G.      Printing of Contracts**

1.   Immediately after the Effective Date of this Agreement, the parties will create mutually
     acceptable labor and benefits agreement documents for printing.  These agreements shall,
     at the expense of the Company, be printed in a form (size, paper stock, number of copies,
     etc.) and in a manner of distribution mutually acceptable to the parties. The distribution of
     the Basic Labor Agreement shall occur within three (3) months of the Effective Date.
     Distribution of the benefit agreements shall occur as close in time thereafter as can
     reasonably be accomplished. A union printer shall be used provided that its price is not
     more than 10% higher than the lowest price received. If the lowest proposed price from a
     union printer is more than 10% above the lowest proposed price received from a nonunion
     printer, the Company will inform the Union before a contract to print is signed with the
     nonunion printer and allow the Union a reasonable amount of time to seek a union printer
     whose printing price is within the 10% margin.

2.   The Company will provide the Union with electronic versions of this Agreement and all
     negotiated benefit agreements.

**Section H.      Hiring Preference**

1.   In all hiring for bargaining unit positions, the Company shall, subject to its obligations
     under applicable equal employment opportunity laws, regulations and Executive Orders
     and tribal preference requirements, give consideration to the direct relatives (children,
     children-in-law, step-children, spouse, siblings, grandchildren, nieces and nephews) of
     Employees who meet reasonably established hiring criteria.

2.   Such hiring shall conform to applicable lines of progression, bidding, promotion and other
     requirements under this Agreement.

3.   The Company shall, subject to these and other applicable provisions, have the final
     discretion for accepting or rejecting a particular applicant for employment. The Company
     shall have no obligation to reveal information it obtains on a reference check or whether it
     has obtained such information.

**Section I.      Union Officers - Straight Shifts**

Current practices concerning the assignment of Union officers and other Union representatives to
straight day shifts will remain in effect.

**Article 2. Union Security**

**Section J.        Bulletin Boards**

Bulletin Boards shall be provided at convenient locations on the Company's property for the exclusive use of the Union.  All posted notices shall have been approved by the president or secretary of the Union.  The Union agrees not to post literature derogatory of the Company or its employees.

## Article 3.  Health, Safety and the Environment

**Section A.      Employee and Union Rights**

1.   Employees have the right to a safe and healthful workplace, to refuse dangerous work that constitutes an Unsafe Condition, as described in Article 3, Section C, paragraph 1, to adequate personal protective equipment, to safety and health training, to a proper medical program for workplace injuries and illnesses, and to a reasonable alcoholism and drug abuse policy.

2.   Subject to the provisions in this Article, the Union has the right to participate in active and informed Joint Safety and Health and Environmental Committees, to appoint Union health and safety representatives, to join in regular safety audits and accident investigations, to receive full and continuing access to all information (including all OSHA and MSHA reports), and to participate in programs which address certain special hazards. The Company will provide the Union Safety Department with prompt telephonic notification of the basic facts concerning any employee fatality at the worksite, followed by a written communication. The Company will also provide the Union Safety Department with a copy of any related fatal accident report.

3.   The Company will develop and implement, with the involvement of the Union, policies and programs for ensuring these rights. Nothing in this Article or the parties' commitment to joint efforts shall detract from the Company's right to manage the workplace to optimize safety and to adopt reasonable safety rules, policies and programs following satisfaction of its statutory bargaining obligations.

4.   Nothing in this Agreement shall mean that the Company shall have violated this Agreement solely because a workplace accident, injury or illness has occurred.

**Section B.      Safe and Healthful Workplace**

1.   The Company will provide safe and healthful conditions of work for its Employees and will, at a minimum, comply with all applicable laws and regulations concerning the health and safety of Employees at work and the protection of the environment. The Company will install and maintain any equipment reasonably necessary to protect Employees from hazards.

2.   The Company will make every reasonable effort to ensure that all equipment is maintained in a safe condition. Its inspection and maintenance program will give top priority to equipment critical to Employee safety and health. Where faulty equipment creates an abnormal risk to Employees, the Company will take all necessary steps to eliminate the risk.

3.   The Company will provide suitable heating and ventilation systems and keep them in good working order.

**Section C.      Right to Refuse Unsafe Work**

1.   If an Employee, acting in good faith and on the basis of objective evidence, believes that there exists an unsafe or unhealthful condition beyond the normal hazards inherent in the operation (Unsafe Condition), s/he shall notify his/her immediate supervisor. The Employee and the supervisor will make every attempt to resolve the condition in the interest of safety. Thereafter, s/he has the right, subject to reasonable steps for protecting other Employees and equipment, to be relieved from duty on that job and to return to that job only when the Unsafe Condition has been remedied. The Company may assign the Employee to other available work in the plant, consistent with this Agreement and without displacing another Employee.

2.   If the Company disputes the existence of the allegedly Unsafe Condition, the Grievance Chair, appropriate Union Safety Committee Representative, and the Plant General Manager or their designees will immediately investigate and determine whether it exists.  Thereafter, should the Company assign another Employee to the job, s/he will be advised of the dispute before assignment.

3.   If after the investigation it is determined that the Unsafe Condition existed, the Employee will be made whole for any lost time in connection with the condition. If after the investigation the Company does not agree that an Unsafe Condition exists, the Union has the right to present a grievance in writing to the appropriate Company representative and thereafter the Employee shall continue to be relieved from duty on the job. The grievance will be presented without delay directly to an arbitrator, who will determine whether the Employee acted in good faith in leaving the job and whether the Unsafe Condition was in fact present.

4.   No Employee who in good faith exercises his/her rights under this Section will be disciplined therefore.

5.   If an arbitrator determines that an Unsafe Condition within the meaning of this Section exists, s/he shall order that the Condition be corrected and that the correction occur before the Employee returns to work on the job in question and the Employee shall be made whole for any lost earnings.

**Section D.      Personal Protective Equipment**

The Company will provide, without cost to the Employee, goggles, hard hats, non-prescription safety glasses, hearing protectors, face shields, respirators, special-purpose gloves, protective clothing, harnesses, and other effective protective equipment, in good working order when required by law or regulation or when necessary to protect Employees from injury or illness. When a non-probationary Employee requires prescription safety glasses, the Company will pay for up to two (2) pairs as necessary in each two (2) year period. Prescription safety glasses shall

**Article 3. Health, Safety and the Environment**

be selected by the Employee from Company-authorized vendors and product lists. The Company may assess a fair charge to cover loss or willful destruction by the Employee.

**Section E.      Safety and Health Training**

1.   All Employees will be provided with periodic safety and health training. In addition, before the initial assignment to a particular job, Employees will receive training on the nature of the operation or process; the hazards of the job; controls in place; safe working procedures and the reasons for them; the purpose, use and limitations of the required personal protective equipment; and other controls or precautions associated with the job. Such training will also be provided when the job changes in a way that affects the nature or severity of the hazards.

2.   All training programs will be fully discussed and reviewed by the Joint Safety and Health Committee. The Company will make a reasonable effort to also use Employees chosen by the Union Co-Chair of the Joint Safety Committee as trainers and will instruct trainers in effective teaching techniques. Upon request, the Union's Health, Safety and Environment Department (Union Safety Department) will be provided with a copy of all training materials and be afforded the opportunity to review the training.

**Section F.      Medical Program for Workplace Injuries and Illnesses**

1.   The Company will provide first aid equipment and trained first aid personnel in close proximity to each of its facilities. The Company will provide Employees who are seriously injured on the job with prompt emergency transportation to an appropriate treatment facility and return transportation to the plant or the Employee's residence.

2.   An Employee who, as a result of occupational injury or illness, is unable to work for the balance of the shift on which s/he is injured will be paid for the balance of his/her scheduled shift that day.  If such an Employee is not able to be seen by a licensed health care provider until the next day and misses scheduled work for that reason, s/he will be paid for scheduled time missed that next day. Such an Employee, who returns to work on subsequent days and who thereafter requires follow up medical appointments directed by a licensed health care provider, shall be paid up to three (3) hours straight time earnings for lost time on the day of each such follow up appointment for up to three (3) appointments.

3.   The Company will make medical screening for occupational illnesses available to Employees in jobs where a government agency requires screening.

4.   The Company will not require any Employee to submit to any medical test or answer any medical history question that is not related to the Employee's ability to perform his/her job.

5.   The Company will maintain the privacy of reports of medical examinations of its Employees and will only furnish such reports to a physician designated by the Employee

with the written authorization of the Employee; provided that the Company may use or supply such medical examination reports of its Employees in response to subpoenas, requests by a governmental agency authorized by law to obtain such reports, in arbitration or litigation of any claim or action involving the Company and the Employee, and otherwise within the Company strictly on a need-to-know basis.  Upon written request by the Employee, the Company will provide the Employee with a copy of the Employee's medical records at no cost to the Employee. All medical examinations will be conducted by or under the supervision of a licensed physician.

**Section G.      Policy on Alcoholism and Drug Abuse**

1.    To facilitate rehabilitation of Employees who abuse alcohol or drugs, before they violate the Alcohol and Drug Abuse Policy, the Company and the Union agree to establish an Employee Assistance Program (EAP) administered and funded by the Company. The EAP will utilize professional and/or peer counselors and will operate under strict rules of need-to-know confidentiality.

2.    The Company may require an Employee to submit to a drug or alcohol test as set forth in the attached Exhibit A, Alcohol and Drug Abuse Policy.

3.    Employees will not be required to submit to drug or alcohol testing for any other reason, unless such testing is required by law.  The Company agrees that it will not test for drugs or alcohol based solely on anonymous tips.

4.    Drug and alcohol tests will utilize scientifically accepted methods for evaluating impairment. When a biological sample is taken, a portion will be retained for retesting, should the Employee dispute the initial results.

5.    Employees who are found through testing to have abused alcohol or drugs will be offered rehabilitation. However, this provision does not affect the right of the Company to discipline or discharge Employees for violation of Exhibit A, plant rules or for working or attempting to work while impaired. A positive test result will be proof of impairment.

**Section H.      Joint Safety and Health Committee**

1.    A Joint Safety and Health Committee (Joint Safety Committee) will be established at each facility to be composed of not less than three (3) nor more than five (5) Employees designated by the Union, including a Local Union President/Unit Chair, and an equal number of employees designated by the Company, including the General Manager or his designee.  The parties will designate their respective Co-Chairs and provide each other with updated lists of their members of the Joint Safety Committee.

2.    The Joint Safety Committee will have the following functions: participating in the design of Employee safety and health programs; assisting in the establishment of safe job

**Article 3. Health, Safety and the Environment**

procedures; overseeing and participating in plant safety and health audits (including annual comprehensive audits of the entire plant); reviewing plant safety rules; participating in the investigation of workplace accidents; reviewing accident, injury, illness and other statistics related to safety and health; participating in the design of Employee safety and health training programs; reviewing changes in plant technology or operations for their personal protective equipment; discussing the Company's response to proposed regulations and legislation affecting safety and health; participating in and reviewing the results of safety and health inspections or industrial hygiene monitoring by OSHA, MSHA, and NIOSH; collecting and responding to safety and health concerns raised by individual members of the Joint Safety Committee or Employees; and working together to promote an awareness of safety and health hazards and safe work procedures.

3. The Joint Safety Committee will hold periodic meetings at times jointly determined by the Co-Chairs, but no less often than monthly. The Co-Chairs may jointly call a special meeting of the Joint Safety Committee.

4. The Company and the Union will each keep minutes of meetings. Prior to every regular meeting, the Company will prepare a written response to concerns or action items noted at the previous meeting, as well as any open items from previous meetings. The two (2) sets of minutes, or a jointly agreed reconciled version, along with the Company's written response to concerns and action items, will be included in the official record of the meeting.

5. The Company will not make any non-emergency changes to plant safety and health programs, policies or rules; introduce new protective equipment or eliminate existing protective equipment; or modify safety and health training, unless the Joint Safety Committee has been notified and the Union has been provided the opportunity to discuss the change.

6. The Joint Safety Committee will not handle grievances, although it may discuss safety and health issues that have led to a grievance.

7. Members of the Joint Safety Committee will be afforded access, consistent with their own safety and the safety of the operation, to all operational areas of the plant, upon notification to the appropriate management representative. The director of the Union Safety Department or his/her designee will be allowed access to the plant upon notification to the Company.

8. The parties will sponsor an annual safety and health meeting, attended by Union members of the Joint Safety Committee from each plant covered by this Agreement, appropriate Company counterparts and members of the Union Safety Department. The Company will pay reasonable travel expenses, including lodging and meals, and lost time earnings.

9. The Union members of the Joint Safety Committee will be compensated for all time spent meeting with the Company on Committee work.

**Article 3. Health, Safety and the Environment**

**Section I.      Joint Environmental Issues**

1.      A Joint Environmental Sub-Committee of the Joint Safety and Health Committee will be established at each location, composed of an equal number of Employees designated by the Union and the Company. The Joint Safety and Health Committee will meet regularly to discuss environmental issues affecting the Company and to make appropriate recommendations.

2.      The Company will make available for review to the Joint Safety and Health Committee all environmental reports, monitoring results, analyses, materials received from the EPA and other agencies, and any other documents related to the Company's environmental program and obligations.

**Section J.      Union Safety and Health Representatives**

The Joint Safety Committee, Company Safety Department and Union Safety Department will cooperate in designing and implementing training for Union safety and health representatives.

**Section K.      Right to Participate in Accident Investigations**

1.      When an accident occurs that results, or could have resulted, in a serious injury to an Employee, the Company will immediately notify the Union Co-Chair of the Joint Safety Committee who will have the right to immediately visit the accident scene, or to assign another Union member of the Joint Safety Committee to visit the accident scene, consistent with his/her safety. The Joint Safety Committee will investigate all such accidents and prepare an accident report. The Company will provide the Joint Safety Committee with full access to the accident site and any information relevant to understanding the causes of the accident.

2.      If the Company requires an Employee to testify at the formal investigation into the causes of an accident or disabling injury, the Employee will be advised that s/he may have a Union representative present at the proceedings. The Union will be furnished with a copy of the Employee's testimony, if it is transcribed.

3.      No employee will be disciplined or discriminated against in any way solely for suffering an injury or illness or for reporting an accident.  Employees may be subject to discipline for proper cause based on failure to take standard safety precautions or making fraudulent accident reports.

Article 3. Health, Safety and the Environment

**Section L.        Carbon Monoxide Control, Toxic Substances and Harmful Physical Agents**

1.    The Company will routinely perform engineering surveys of hazards, periodic in-plant industrial hygiene sampling, and testing for harmful physical agents at each location covered by this Agreement. The survey, to be conducted by qualified personnel, will list locations from which significant amounts of carbon monoxide, toxic substances and harmful physical agents could escape, the conditions which might cause such a release, and the steps necessary to minimize or control the hazard. The survey will be updated annually and whenever significant changes are made to the gas-handling system or procedure.

2.    Based on sampling and surveys, the Company will implement a program for the control of such hazards as necessary including engineering and equipment changes necessary to eliminate or reduce the hazards identified in the survey; necessary amendments to safe job procedures; the installation and regular testing of fixed automatic monitors equipped with alarms; the use of portable monitors; regular inspection and maintenance of testing equipment; provision of an adequate number of approved breathing apparatus appropriate for emergency operations and in locations readily accessible to Employees; Employee training including regular drills; an emergency rescue program with appropriate rescue and trained personnel; and the investigation by the Joint Safety Committee of all incidents which involve the accidental releases of such hazards, cause an alarm to trigger or result in an elevated level of carboxyhemoglobin in any exposed person. The Joint Safety Committee will review the survey and the program whenever it is updated.

3.    Where the Company is currently using chemicals, solvents and/or compounds or when new chemicals, solvents and/or compounds are to be introduced, the Company will inform the Joint Management-Union Safety and Health Committee what known hazards in normal use are involved, if any, and what precautions will be taken to assure the safety and health of employees involved.  Those employees that will be required to work with or in the area of such chemicals, solvents and/or compounds, will be instructed in the hazards, precautions and handling procedures of such materials.  On request of the committee's Union representatives, the Company will provide written assurance that such steps have been taken.

4.    The Company will keep such records of exposure as may be required by the U.S. Department of Labor.  On request of the Committee's Union Representatives, the Company will review the results of exposure measurements with them.

**Section M.    Ergonomics**

The parties will establish a program to identify ergonomic risks in the plant and recommend controls.

**Article 3. Health, Safety and the Environment**

**Section N.      Safety Shoe Allowance**

On October 1 of each year, each Employee, other than a probationary Employee, will be provided a voucher for use at local vendor(s) designated by the Company for the full purchase price from an approved list of one (1) pair of safety shoes for the Employee's use at work; however, the Company will continue its safety shoe practice in OSHA regulated areas.

**Section O.      No Union Liability**

The Company has the exclusive legal responsibility for safety and health conditions in the plant and for environmental matters. Neither the Union nor its representatives, officers, employees or agents will in any way be liable for any work-related injuries or illnesses or for any environmental pollution that may occur.

**Section P.      Showering**

The Company may require certain Employees to shower immediately before or after the completion of the workday. In such cases, fifteen (15) minutes will be allotted for showering and related activities when required before the end of the workday or if so designated by the Company, where required after the completion of the Employees' workday.

**Section Q.      New or Changed Work Processes**

When the Company plans to implement significant changes in its work processes or the introduction of new machinery, the Company will notify the Union(s) of such plans.  The Employees who work on the changed or new work process or the new machinery shall be instructed in their safe operation.

**Section R.      Safety Education and Training**

1.    All newly-hired Employees shall be given an orientation by the Company concerning the Company's safety and health programs.  The newly-hired Employee shall then be taken to the supervisor in the area in which he/she is to work and instructed on safety and health matters relating to the job and his safety responsibilities to himself/herself and to fellow workers.  Likewise, he/she shall be introduced to the area's Union Safety and Health Committeeperson, or the Union Safety and Health Chairman, when one of these and the Employee are both available.

2.    Instructions on safety and health matters will be given to all affected Employees as changes in circumstances or assignments may warrant.

# Article 4.  Civil Rights

**Section A.**     **Non-Discrimination**

1.   The provisions of this Agreement shall be applied to all Employees without regard to:

   a.   race, color, religious creed, national origin, sexual orientation, handicap or disability or status as a veteran; or

   b.   sex or age, except where sex or age is a bona fide occupational qualification; or

   c.   citizenship or immigration status, except as permitted by law.

2.   Harassment by the Company or the Union on any of the bases set forth in this Section shall be considered discrimination under this Section.

3.   Neither the Company nor the Union shall retaliate against an Employee who complains of discrimination or who is a witness to discrimination.

4.   There shall be no discrimination, restraint or coercion against any Employee because of membership or non-membership in the Union.

5.   The Company shall have no right to discipline in any way an Employee solely because of his/her failure to perform his/her duties as a representative or officer of the Union.

6.   Nothing herein shall be construed in any way to deprive any Employee of any right or forum under public law.

# Article 4.  Civil Rights

**Section B.       Civil Rights Committee**

1.    A Joint Committee on Civil Rights (Joint Committee) shall be established at each location covered by this Agreement. The Union shall appoint three (3) members, one of whom shall be a Local Union President/Unit Chair or Grievance Chair. The Company shall appoint an equal number of members, including the Plant Manager or his designee.  The parties shall each appoint a Co-Chair and shall provide each other with updated lists of the members of the Joint Committee.

2.    The Joint Committee shall meet as necessary and shall review and investigate matters involving civil rights and attempt to resolve them.

3.    The Joint Committee shall not displace the normal operation of the grievance procedure or any other right or remedy and shall have no jurisdiction over initiating, filing or processing grievances.

4.    In the event an Employee or Union representative on the Joint Committee brings a complaint to the Joint Committee, the right to bring a grievance on the matter shall be preserved, in accordance with the following:

    a.    The complaint must be brought to the attention of the Joint Committee within the same timeframe that a complaint must be brought to the First Step 1 of the grievance procedure.

    b.    The Employee must provide the Joint Committee with at least sixty (60) days to attempt to resolve the matter.

    c.    At any time thereafter, if the Joint Committee has not yet resolved the matter, the Employee may request that the Grievance Chair file it as a grievance in Step 2 of the grievance procedure, and upon such filing the Joint Committee shall have no further jurisdiction over the matter.

    d.    If the Joint Committee proposes a resolution of the matter and the Employee is not satisfied with such resolution, then the Union may file the complaint at Step 2 of the grievance procedure, provided such filing is made within thirty (30) days of the Employee being made aware of the Joint Committee's proposed resolution.

# Article 4.  Civil Rights

**Section C.**      **Workplace Harassment, Awareness and Prevention**

1.  All Employees shall be educated in the area of harassment awareness and prevention on a periodic basis.

2.  Within six (6) months of the Effective Date of this Agreement, members of the Joint Civil Rights Committee will be trained in matters relative to this provision.

3.  All new Employees (and all Employees who have not received such training) will be scheduled to receive training as to what harassment is, why it is unacceptable, its consequences for the harasser and what steps can be taken to prevent it.

4.  All Employees shall be compensated in accordance with the standard local plant understandings for time spent in training referred to in this Section.

# Article 4.  Civil Rights

**Section D.**      **Child Care, Elder Care and Dependent Care**

1.    The parties agree to identify programs to meet the changing needs of working families, particularly in regard to dependent care.

2.    At each location covered by this Agreement, the parties shall create a Dependent Care Committee, comprised of a Contract Coordinator (if this Agreement otherwise provides for Contract Coordinators), a designee of the General Manager (two designees if there is a Contract Coordinator) and the Local Union President/Unit Chair. The Committee shall meet and be responsible for the development of dependent care programs. The Committee will utilize local community resources which are able to support the issues of child, elder and dependent care.

3.    The Committee's efforts shall include fact finding and identifying working model programs during the term of this Agreement, such as:

    a.    twenty-four (24) hour resources and referral systems;

    b.    subsidy and/or reimbursement provisions for dependent care services;

    c.    pre-tax programs;

    d.    near-site or on-site dependent care centers;

    e.    before and after work care for extended workdays;

    f.    holiday, emergency and sick care on workdays; and

    g.    development of community-based groups with other unions and companies in the region to cost effectively provide dependent care services.

# Article 5.  Workplace Procedures

**Section A.      Local Working Conditions**

1.   Deprivation of Benefits

In no case shall Local Working Conditions deprive an Employee of rights under this Agreement and the conditions shall be changed to provide the benefits established by this Agreement.

2.   Benefits in Excess

Any provision of a local supplemental agreement or Local Working Condition which provides benefits that are in excess of, or in addition to, but not in conflict with benefits established by this Agreement shall remain in effect for the term of this Agreement.

# Article 5.  Workplace Procedures

**Section B.       Job Evaluation and New or Changed Jobs**

1. At each location covered by this Agreement, the Union shall designate up to two (2) individuals to serve on a Job Evaluation Committee. When the Committee meets with the Company the Committee shall be paid any lost time.

2. In the event the Company chooses to permanently modify substantial duties of an existing job or create a new job, it shall follow the procedure outlined below.

3. The Company shall meet with the Job Evaluation Committee and present it with a written description of how it intends to modify an existing job or a complete description of a proposed new job. The description shall include:

   a. the requirements of such new or modified job in the areas of training, skill, responsibility, effort and surroundings (Requirements);

   b. the Company's view as to how these Requirements compare to the Requirements for existing jobs at the plant; and

   c. based on Paragraphs (a) and (b) above, at what rate the Company believes the job should be paid.

4. The Job Evaluation Committee shall be provided with any additional relevant information requested in connection with its assessment of the new or modified job.

5. If the parties are unable to agree upon the appropriate rate of pay for the new or modified job, they shall submit their dispute to arbitration under Article 5, Section I, and the arbitrator shall have authority to decide only the rate of pay for the job, slotting it into proper relationship with existing jobs and rates.

6. The arbitrator shall base his/her decision on the Requirements of the new or modified job and how those Requirements compare to the Requirements for the existing jobs at the plant and other plants of the Company covered by this Agreement.

# Article 5.  Workplace Procedures

**Section C.      Hours of Work**

1.   Normal Workday and Work Week

    a.   The normal workday shall be any regularly scheduled consecutive twenty-four (24) hour period comprising eight (8) consecutive hours of work and sixteen (16) consecutive hours of rest. The normal work week shall be five (5) consecutive workdays beginning on the first day of any seven (7) consecutive day period. The seven (7) consecutive day period is a period of 168 consecutive hours and may begin on any day of the calendar week and extend into the next calendar week. On shift changes, the 168 consecutive hours may become 152 consecutive hours depending upon the change in the shift. In the event extended shifts are adopted in accordance with applicable extended shift language, the eight (8) hours of work above shall become up to twelve (12) hours and the sixteen (16) hours of rest above shall become not less than twelve (12) hours.

    b.   Schedules showing Employees' workdays shall be posted or otherwise made known to Employees not later than 2:00 p.m. Wednesday of the week preceding the calendar week in which the schedule becomes effective. The Company will establish a procedure affording any Employee whose last scheduled shift ends prior to the posting of his/her schedule for the following week an opportunity to obtain information relating to his/her next scheduled shift. This procedure will also be applicable with respect to Employees returning from vacation.

2.   No Guarantee

    Nothing contained in this Agreement shall be construed as a guarantee of work or that any particular schedule cannot be changed. This paragraph is not intended to void any agreement between the parties for the manner in which shifts will be assigned or selected.

3.   Absenteeism

    It is expected that Employees shall adhere to their prescribed schedule. When an Employee must be absent from work, s/he shall, as promptly as possible, contact the designated person and provide the pertinent facts and when the Employee expects to return to work.

4.   Overtime

    a.   The parties recognize that schedules that regularly require a substantial level of overtime are undesirable and should be avoided where possible.

    b.   Where local practices or agreements with respect to the distribution of overtime do not presently exist, the Company and the Local Union Grievance Committee, if

requested by either party, shall promptly conclude an agreement providing for the most equitable overtime distribution consistent with the efficiency of the operation.

c.   The Company will consider an Employee's request to be excused from overtime work and shall endeavor to reasonably accommodate those requests which are practicable and reasonable under the circumstances. Nevertheless, no Employee shall refuse a directive to work overtime and any disputes about the Company's compliance with this paragraph shall be subject to the grievance procedure.

5.   Reporting to Work and Call-Out Pay

a.   When an Employee reports for work on a regular shift, or is instructed to report for work on a special shift, and upon reporting at the scheduled time, he shall be given six (6) hours work at his/her regular rate, in whatever job classification is available as determined by Management, unless that Employee is notified at least four (4) hours prior to the starting time not to report. Notification will be by telephone. If the Employee provides no telephone number to the Company, the notification requirement is waived. An unanswered telephone call will be the same as notification. The foregoing shall not apply where the employer's failure to provide work is occasioned by, or results from:

(1)   Plant delay, resulting from causes beyond the control of the Company, and the Employee is notified at least two (2) hours prior to his starting time not to report, or

(2)   When an Employee has been absent from one shift or more and said Employee fails to notify the departmental supervisor then in charge at least eight (8) hours prior to the commencement of this shift to which the Employee intends to return.

b.   An Employee returning to work as called between his/her regular shifts shall be paid one and one-half (1 -1/2) times the hourly straight-time pay rate for the classification of work to be performed with a minimum payment equivalent to five (5) hours at such straight-time rate. This minimum payment shall not apply to overtime work consecutive to the regular scheduled shift. Employees scheduled off for vacation or on an authorized leave of absence shall not be called out for work.

c.   An Employee who is called for duty on his/her scheduled day(s) off shall be paid for not less than six (6) hours at the straight-time pay rate for the classification of the work to be performed.

d.   Pay for time not worked under the above sub-paragraphs 5 a, b and c will not be considered as time worked in the computation of overtime.

# Article 5.  Workplace Procedures

**Section D.      Overtime**

1.   Definitions

   a.   The payroll week shall consist of seven (7) consecutive days beginning at 12:01 a.m. Sunday or the shift change nearest to that time (or as agreed by the parties in the applicable Supplemental Agreement).

   b.   The workday for the purposes of this Section is the twenty-four (24) hour period beginning with the time the Employee is scheduled to begin work.

   c.   The Regular Rate of Pay as used in Paragraph 2 below (and in this Agreement) shall mean the Base Rate of Pay for the job on which the overtime hours are worked.

2.   Conditions Under Which Overtime Rates Shall Be Paid

   a.   Unless worked pursuant to an Alternative Work Schedule, overtime at the rate of one-and-one-half times the Regular Rate of Pay shall be paid for:

      (1)   hours worked in excess of eight (8) hours in a workday;

      (2)   hours worked in excess of forty (40) hours in a payroll week;

      (3)   hours worked on the sixth workday of a regularly scheduled workweek during which five (5) days were worked; and

      (4)   hours worked on a second reporting in the same workday where the Employee has been recalled or required to report to work after working eight (8) hours.

   b.   Overtime at the rate of double the Regular Rate of Pay shall be paid for hours worked on the seventh workday of a regularly scheduled workweek during which six (6) days were worked.

3.   Holidays

   Holidays not worked shall not be considered as time worked in the computation of weekly overtime.

4.   Non-Duplication of Overtime

   Overtime shall not be duplicated by using the same hours paid at overtime rates more than once for the purpose of calculating overtime payments.  There shall be no pyramiding of overtime and/or premium pay.

5.    Overtime Lunches

    a.    An Employee required to work unscheduled overtime for two (2) or more hours beyond the end of the regular shift will be furnished an overtime lunch. If an Employee works beyond six (6) hours beyond the end of the regular shift, s/he will be furnished with another overtime lunch. In the event an overtime lunch is waived by the Employee, s/he shall receive ten dollars ($10.00) pay in lieu thereof for each overtime lunch waived.

    b.    It is understood, in the event an Employee waives an overtime lunch, s/he will be provided time to eat as if s/he had accepted the overtime lunch rather than pay in lieu of the overtime lunch.

    c.    An Employee called out to work will provide his/her own lunch unless determined otherwise by the Company.

6.    16-Hour Rule

    a.    No employee(s) shall be offered overtime if his regular schedule would require him to work within eight (8) hours or less after having completed sixteen (16) hours of service in the scheduled work day, except emergency where life, property and/or production are in imminent danger.

    b.    Should any employee be required to work in excess of sixteen (16) hours as stated in paragraph 1 above, the employee(s) shall be allowed an eight (8) hour rest interval before reporting to work.

    c.    If the rest interval would involve time lost from the employee(s) regular posted schedule, he shall be paid the regular scheduled rate for that time he would have worked had he not been on the rest interval.

# Article 5.  Workplace Procedures

**Section E.      Seniority**

1.   Seniority Status of Employees

   a.   The parties recognize that promotional and other in-plant opportunities and job security should increase in proportion to length of Seniority and that the fullest practicable consideration shall be given to Seniority in such cases.

   b.   Seniority, as defined by Paragraph 4 below, shall be used for all purposes under all labor and benefits agreements, unless explicitly provided otherwise by this Agreement or local supplemental agreement; provided, however, that accumulation in excess of two (2) years during a period of layoff shall be counted only for purposes of this Section, including local agreements thereunder.

   c.   In all cases of promotions, reductions in force and recalls after layoffs, Seniority (as defined below in Paragraphs 3 and 4 and as provided in the local supplemental agreements) shall govern if ability to perform the work and physical fitness are relatively equal.

2.   Determination of Seniority Units

   a.   Seniority shall be applied on a job and departmental or larger unit basis, as agreed upon. A job may be in one seniority unit for one purpose and in a different unit for another.

   b.   The seniority units, lines of progression, departments and rules for the application of seniority factors in effect as of the Effective Date shall remain in effect unless modified by a local written agreement signed by the President or Unit Chair of the affected Local Union.

3.   Seniority Unit Definitions

   a.   Company seniority is defined as an Employee's total credited length of service in one or more plants owned by the Company or its (predecessor).

   b.   Plant seniority is defined as an Employee's total unbroken credited length of service in a plant.

   c.   Departmental seniority is defined as an Employee's total unbroken credited length of service in a particular department.

   d.   Sub-departmental seniority is defined as an Employee's total unbroken credited length of service in a particular sub-department.

e.   Occupational/craft seniority is defined as an Employee's total unbroken credited length of service in a particular classification.

f.   Jurisdictional seniority is defined as an Employee's total credited length of service in a particular bargaining unit.

g.   Upon satisfactory completion of an apprenticeship, craft seniority shall be the date of the apprentice's indenture date.

4.   Calculation of Seniority

a.   Seniority shall be determined by the Employee's first employment or reemployment following a break in Seniority in any facility of the Company covered by this Agreement.

(1)   Employees Who Were Employees of Any Predecessor Company

Seniority for  Employees who were employees (within the meaning of the relevant basic labor agreement with the Union) of any predecessor company (a Union-represented company some or all of whose assets are or were acquired by the Company) will be the length of time measured from the Employee's Seniority date under that predecessor company's basic labor agreement subject to the employee's eligibility dates agreed to by the parties, except as otherwise provided by this Agreement or other agreements between the parties.

(2)   All Other Employees

Seniority for all other Employees will be the length of time measured from the Employee's first date of employment with the Company.

b.   Company Seniority shall be the length of time measured from the Employee's first date of employment or reemployment following a break in Seniority with the Company.

c.   Plant Service shall be the length of time measured from the Employee's first date of employment or reemployment following a break in Seniority in his/her plant.

d.   Seniority (including Company Seniority and Plant Service) shall only be broken if an Employee:

(1)   quits;

(2)   retires;

(3)   is discharged for cause;

(4)     if on layoff, fails to report to the Employment Office within ten (10) days of certified mail notice sent to his/her last address s/he provided to the Company.

(5)     is absent due to a compensable disability incurred during the course of employment and does not return to work within thirty (30) days after final payment of statutory compensation for the disability or after the end of the period used to calculate a lump-sum payment. If the seniority of an Employee does not permit a return to work, the Employee will be placed on layoff.

(6)     has not worked for more than thirty-six (36) months.

5.   Probationary Employees

a.   New Employees hired after the Effective Date of this Agreement will serve a probationary period for the first 480 hours of actual work and will receive no Seniority credit during such period.  Probationary Employees shall not have access to the grievance procedure to contest their discharge.

b.   Probationary Employees who continue in the service of the Company beyond the first 480 hours of actual work shall receive full Seniority credit from their original date of hire.

c.   Where a probationary Employee is laid off and is subsequently rehired at the same location within one (1) year from the date of such layoff, the hours of actual work accumulated during the first employment shall be added to the hours of actual work accumulated during the second employment in determining when the Employee has completed 480 hours of actual work; provided, however, that his/her Seniority date will be the date of hire of the second hiring.

6.   Interplant and Intraplant Transfers

It is recognized that conflicting seniority claims among Employees may arise when plant or department facilities are created, expanded, added, merged or discontinued. In the event the local parties are unable to resolve such conflicts, the International Union and the Company may reach such agreements as they deem appropriate, irrespective of existing seniority agreements, or submit the matter to arbitration.

7.   Seniority Status of Grievance Committee Members and Local Union Officers

When a decrease of force is effected, the Local Union President/Unit Chair, Vice President and the Chair of the Grievance Committee shall, if they would otherwise be laid off, be retained at the lowest rated job in the unit that they represent. The intent of this provision is to retain in active employment individuals who can provide continuity in the administration of the Agreement; provided that an individual shall not be retained in employment unless work which s/he can perform is available.

8.    Administration of Seniority

The Company shall post in each department, on a bulletin board maintained for that purpose, the Plant Service date of all Employees in that department.

9.    Compensation for Improper Layoff or Recall

In the event of improper layoff or failure to recall an Employee in accordance with his/her seniority rights, the Employee shall be made whole for the period during which s/he is entitled to retroactivity.

10.    Disabled Employees

Provided there is a vacancy and the employee is qualified, an employee who becomes physically unable to perform the duties of his/her job and who is ineligible for permanent total disability retirement may apply for a vacant job if such job is to be filled.  The Union and the Company may waive seniority procedures to temporarily place the disabled employee in a vacancy.  No job incumbent shall be required to vacate a job involuntarily to accommodate the disabled employee.  A disabled employee who is temporarily placed in a job by other than the standard seniority procedure shall accrue seniority in his/her previous regular job, will accrue no seniority in his/her disability assignment, and will not share overtime in any job where he/she is not currently assigned.  Upon a Company doctor's determination that he/she can return to regular employment, the employee shall be reassigned to his/her regular assignment.

11.    Interunion Transfers

Employees transferring into other bargaining units on a trial basis and who are disqualified by the company within the trial period shall be allowed to return to their former jobs without loss of seniority.

12.    Curtailments

For the purposes of this Agreement, curtailments shall be considered reductions in force, regardless of their duration, except as otherwise provided by local practice or agreement.

# Article 5.  Workplace Procedures

**Section F.      Testing**

1.   Where tests are used as an aid in making pre-selection determinations of the ability to perform the work, such a test must in all events be:

    a.   job related;

    b.   in accordance with Article 4, Section A (Non-Discrimination); and

    c.   uniformly applied within each relevant work group.

2.   A job related test, whether oral, written or in the form of an actual work demonstration, is one which measures whether an Employee can satisfactorily meet the specific requirements of that job including the ability to absorb any training which may necessarily be provided in connection with that job.

3.   Testing procedures shall in all cases include notification to an Employee of any deficiencies and an offer to counsel how to overcome the deficiencies.

4.   Where, in accordance with this Agreement, a test is used by the Company as an aid in making a determination of the Employee's ability to perform the work and where the use of the test is challenged in the grievance procedure, the following shall pertain:

    a.   The Company will furnish to a designated representative of the appropriate International Union either the test itself or examples of test questions. All test questions shall be job-related.  In cases where all or part of the test is non-written, a complete description of the test shall be provided.

    b.   All such test questions and descriptions will be held in strictest confidence and will not be copied or disclosed to any other person; provided that such test questions and descriptions may be disclosed to an expert in the testing field for the purpose of preparing the Union's position in the grievance procedure and to an arbitrator, if the case proceeds to that step. All test questions and descriptions will be returned to the Company following resolution of the dispute.

    c.   Copies of transcripts and exhibits presented in the arbitration of cases involving the challenge to a test will also be held in confidence and will not be copied or otherwise published.

# Article 5.  Workplace Procedures

**Section G.      Indefinite Shutdowns**

1.   Before the Company decides to indefinitely shutdown or discontinue a plant, department or operating unit (a Shutdown for purposes of this Section) it shall give the Union advance written notice of at least sixty (60) days prior to the proposed Shutdown date if the Shutdown is within the Company's control.  Along with such notice, the Company shall provide the Union with a detailed statement of the reasons for the proposed action and how and where the work which was performed at the shut down unit will be performed.

2.   Thereafter, the Company will meet with appropriate Union representatives in order to provide them with an opportunity to discuss the Company's proposed course of action, provide the Union with any additional requested relevant and non-confidential information and bargain in good faith over any suggested alternatives.

3.   No less than thirty (30) days prior to the Shutdown date within the Company's control, the Company shall advise the Union of its final decision, which decision shall be the exclusive function of the Company.

4.   Any Employee affected by a Shutdown shall, after exercising any rights to which s/he may be entitled, be placed on layoff in accordance with this Agreement.

# Article 5.  Workplace Procedures

**Section H.       Manning of New Facilities**

1.  In the manning of production or maintenance jobs at new facilities in existing plants covered by this Agreement, the jobs shall be filled utilizing the criteria as set forth in Article 5, Section E, Paragraph 1(c) except that Seniority shall be Plant Service from the following categories in the following order but subject to the other provisions of this Section:

    a.   Employees displaced from any facility being replaced in the plant by the new facilities;

    b.   Employees otherwise displaced as a result of the installation of the new facilities;

    c.   Employees presently employed on like facilities in the plant;

    d.   Employees presently on layoff from like facilities in the plant; and

    e.   Employees in the plant with two (2) or more years of Plant Service; provided, that if sufficient qualified applicants from this source are not available, the Company shall fill the remaining vacancies as it deems appropriate.

2.  The local parties shall meet to seek agreement on the standards to be used to determine the qualifications entitling Employees otherwise eligible to be assigned to the jobs in question.

3.  Should the local parties fail to agree on the standards for determining qualifications, assignments to the jobs in question shall be made pursuant to Article 5, Section E, 1, c, above (selection of Employees in promotions, reductions in force, and recalls).

# Article 5.  Workplace Procedures

**Section I.**       **Adjustment of Grievances**

1.   Purpose

Should any differences arise between the Company and the Union as to the interpretation or application of, or compliance with, the provisions of this or any other Agreement between the Company and the Union, prompt and earnest efforts shall be made to settle them under the following provisions.

2.   Definitions

a.   "Grievance" shall mean a complaint by the Union which involves the interpretation or application of, or compliance with, the provisions of this or any other Agreement between the Company and the Union.

b.   "Day" as used in this Section shall mean a calendar day, excluding Saturdays, Sundays and holidays.

3.   Grievance Procedure

a.   An Employee may informally discuss a complaint with his/her supervisor, with or without his/her steward being present.

b.   Step 1.  Any Employee or representative of the Union having a grievance may, within fifteen (15) days of the date on which the Employee first knew or should have known of the facts which gave rise to the grievance, present the grievance to his/her immediate supervisor, who shall attempt to adjust it.  The Employee or Employees presenting the grievance may be accompanied by a steward.  The supervisor shall give his/her decision within seven (7) days.  If the supervisor's answer does not satisfactorily adjust the grievance, the grievance may be taken to the next step.  Grievance responses at this step of the procedure will not set precedent.

c.   Step 2.  If not settled at Step 1, the grievance must then be reduced to writing by the Grievance Committee noting the alleged facts, applicable provisions of the Agreement, and the remedy sought and presented for Step 2 within seven (7) days of the supervisor's answer. The General Supervisor and Human Resources Manager or their designees will hear the grievance within ten (10) days from receipt of the grievance in the presence of the Union Grievance Committee.  The Company will render a written decision within ten (10) days after the hearing to the Union's Grievance Chair and to the Union's International Representative or designee.

d.   Step 3. If a satisfactory settlement is not reached in Step 2, the grievance may be appealed to the General Manager or his designee, by the Union's International Representative or designee, within ten (10) days following receipt of the Step 2

decision.  The General Manager or his designee and the International Union Representative and/or the Grievance Committee shall meet within ten (10) days of the appeal notice to review the facts and the Step 2 positions in an attempt to mutually resolve the grievance.  The Company shall render its written decision within ten (10) days from the conclusion of the Step 3 hearing.

e.  The International Union Representative  may appeal a grievance to arbitration by sending a written notice to the Company Step 3 representative within ten (10) days of the Union's receipt of the Step 3 written answer.

f.  The time limits above may be extended by mutual agreement.

g.  Grievances at Step 1 only may be presented to the Company during the grievant's scheduled working hours, provided such procedure does not interfere with production or the orderly operation of the business.

h.  Grievance meetings at Step 2 and Step 3 will be held during normal working hours on day shift.  Aggrieved employees and a reasonable number of witnesses will be allowed to attend meetings at Step 2 if they have testimony which the Union Grievance Committee represents is relevant, material, non-repetitive and necessary to the resolution of the grievance.  If committee members, aggrieved Employees, or witnesses are scheduled to work during a hearing, once notified by the Company that the hearing has been scheduled they must provide to their supervisors reasonable advance notice that they will attend.  Aggrieved Employees may be called at the request of either the Company or the Union at any step and will be paid for time lost. In Bargaining Unit Work or safety grievances, a representative of the relevant committee shall also be present.

i.  Multiple grievances arising within the bargaining unit at a single plant and from a single cause may be consolidated by mutual agreement.

4.  General Provisions

a.  Upon request from the Union, the Company shall provide the Union with reasonable forms for filing and appealing grievances and the special form referenced in subparagraph f below.  The Union shall be responsible for timely requesting from the Company a re-supply of forms.  The parties shall document the Step 2 and Step 3 written records.

b.  The Company and the Union shall provide each other with updated written lists of their Step 1, Step 2 and Step 3 representatives and their designees who shall have the authority to settle grievances at their respective steps and, for the grieving party, to withdraw or appeal such grievances.

c.  The settlement or withdrawal of a grievance prior to arbitration shall be without precedent or prejudice to either party's position.

d.    Any grievance filed directly in Step 2 or higher shall be initiated within thirty (30) days of the event upon which the grievance is based, or the date on which such event should reasonably have become known except as otherwise provided in this Agreement.

e.    Except as otherwise provided in this Agreement, all grievances shall be initiated at Step 1 and grievances which are not initiated in the proper step shall be referred there for processing.

f.    Upon mutual agreement, a single grievance may be processed with the facts of additional violations presented as well. Additional claimants shall sign a special form for this purpose. When the original grievance is resolved, the additional claims shall be reviewed in light of the resolved grievance. If the additional claims are not settled, they shall be considered as grievances and processed accordingly.

g.    In the case of a grievance that involves a large group of Employees, only a reasonable number may participate in any discussion of the grievance.

h.    In any settlement involving cash payments, payment not made within thirty (30) days will accrue interest from the date of settlement at the same rate as established at the local Federal Credit Union.

i.    If, for any reason, the time limits specified in Paragraph 3 above for:

  (1)    meetings between the parties are not met, the grievance shall be considered denied as of the last day within the time limit for such meeting and the appropriate Union representative shall have the right to move the grievance to the next step;

  (2)    the Union to act are not met, the grievance shall be considered withdrawn; or

  (3)    the Company to act at Step 2 or Step 3 are not met, then the grievance shall be considered granted, along with the requested remedy if it is reasonable; however, any dispute over an appropriate contractual remedy may proceed further through the grievance procedure and, if necessary, to arbitration.

j.    An Employee who is summoned to meet with a supervisor or other representative of the Company for the purpose of discussing possible suspension or discharge of the Employee shall be entitled to be accompanied by a steward and, if no steward or other Union representative is available, the meeting shall be deferred and the Employee may be suspended pending the meeting.  In the event no steward or other Union representative is available and the Company elects to suspend the Employee pending the meeting, the Company shall make a good faith effort to advise the Local Union President/Unit Chair or Grievance Chair as soon as possible that day.

k.   No Employee shall be required to submit to a lie detector test. The results of lie detector tests will not be used by the Company or the Union.

l.   Notwithstanding anything to the contrary, the grievance procedure may be utilized by the Union with or without an individual grievant. Such grievances shall be filed in Step 2.

m.   In the event an Employee dies, the Union may process his/her grievance on behalf of his/her heirs.

n.   The Chair of the Union Negotiating Committee, the District Director and the International Representative (or equivalent)  shall have access to the plant at reasonable times to investigate issues with which they are concerned.

o.   The Company will pay for all lost time of Employee participants in Steps 1, 2 and 3 of the grievance procedure and disciplinary hearing (described above) in accordance with current practice.

5.   Grievance Committee

a.   The Union shall provide the Company with an updated list of Employees  who comprise its Grievance Committee, including a chair and a secretary.  The number of members of the Committee at each Company location shall be consistent with current practice.

b.   Committee members will be afforded time off upon reasonable notice and approval to:

(1)   attend scheduled committee meetings;

(2)   attend meetings pertaining to suspension or discharge or other matters which cannot reasonably be delayed; and

(3)   visit departments at reasonable times for the purpose of transacting the legitimate business of the Grievance Committee after notice to the head of the department to be visited and after reasonably granted permission from his/her own department head if the Grievance Committee member is at work.

c.   Where the Grievance Committee so decides, the steward may be designated to aid the Committee in a particular matter. The Union shall notify the Company in writing when it so decides.

d.   Each steward shall:

(1)   with respect to the handling of grievances, be limited to Step 1 within the plant unit represented by him/her; and

    (2)    upon reasonable notice to and reasonable approval by his/her immediate supervisor, be afforded time off to investigate the facts essential to the settlement of any grievances.

6.    Board of Arbitration

    a.    The Board of Arbitration (the Board) for the term of this Agreement shall consist of the following individuals:

        (1)    Michael D. Rappaport
        (2)    Steven Briggs
        (3)    Chester Brisco
        (4)    Richard Bloch
        (5)    Howard Block

    b.    In the event of the resignation, incapacity or death of a member of the Board, the parties shall promptly agree upon a successor. If the parties cannot agree on a successor, each party shall submit seven (7) names and use a "strike" method to determine the final selection and a "flip of a coin" to determine the party that "strikes" first.

    c.    The member of the Board (arbitrator) chosen in accordance with Paragraph 7(a) below shall have the authority to hear and decide any grievance appealed in accordance with the provisions of the grievance procedure. The arbitrator shall not have jurisdiction or authority to add to, detract from or alter in any way the provisions of this Agreement.

    d.    The decision of the arbitrator shall be final and binding upon the Company, the Union, and all Employees concerned.

    e.    In cases involving repeated violations of the same or similar provisions of the Agreement, including the provisions of the grievance procedure, the arbitrator shall fashion a remedy designed to significantly deter such repeated violations; however such remedy shall require no more than is reasonably necessary to have the desired deterrent effect.

    f.    Where the parties are in disagreement with respect to the meaning and application of a decision, either party may apply to the Board for a compliance hearing in accordance with rules that the Board shall prescribe. Such application shall be given priority and be resolved by the Board within thirty (30) days.

    g.    Expenses connected with specific cases shall be shared equally by the Company and the relevant Local Union.

7.   Arbitration Hearings

   a.   An arbitrator will be selected from the Board of Arbitration on a case-by-case rotation basis, starting with the first case being handled by the first Board member listed above, unless the parties mutually agree to select a Board member on some other basis. Discharge cases will be placed first in the order of priority of cases to be heard. Hearings will be scheduled by mutual agreement on dates provided by the arbitrator.

   b.   The hearing shall be scheduled as required at a mutually acceptable location.

   c.   On each hearing date, subject to the time available, the parties shall attempt to present all discharge cases previously appealed to arbitration or any other cases appealed to arbitration.

   d.   Failure to present a case when it is scheduled for arbitral hearing shall constitute withdrawal of the grievance and failure to respond to a case when presented shall constitute granting of the grievance.  A hearing may be postponed by mutual agreement or if the arbitrator determines that circumstances clearly require postponement.

8.   Rules For Hearings

   a.   The parties agree that the prompt resolution of cases brought to arbitration is of the highest importance. Therefore, except as provided in Paragraph 8(b) below, arbitration hearings shall be heard in accordance with the following rules:

      (1)   the hearing shall be informal;

      (2)   no briefs shall be filed or transcripts made in discipline cases;

      (3)   there shall be no formal evidence rules;

      (4)   the arbitrator shall assure that the hearing is, in all respects, fair;

      (5)   the arbitrator shall issue a decision no later than two (2) days after conclusion of the hearing in a discipline case. The decision shall include a brief written explanation of the basis for the conclusion; and

      (6)   the Board shall adopt such other rules as it deems necessary.

   b.   In the event the Union or the Company believes that the issues involved in a discipline case are of meaningful precedential significance or great complexity, it may petition the arbitrator to allow the filing of briefs as follows:

(1)     the moving party will notify the other party that it intends to so argue at least seventy-two (72) hours prior to the start of the hearing;

(2)     the hearing shall begin with the arbitrator taking no more than fifteen (15) minutes of testimony from each side on that issue;

(3)     the arbitrator shall rule from the bench on the issue of whether briefs may be filed and the hearing on the case shall commence immediately thereafter; and

(4)     if the arbitrator rules that briefs are to be allowed, then briefs shall, without exception, be due within thirty (30) days of the close of the hearing and the arbitrator's decision shall be rendered within thirty (30) days thereafter.

c.     The Company agrees that it shall not compel, by subpoena or otherwise, any Employee or retired Employee to testify in an arbitration hearing. The Union agrees that it shall not compel, by subpoena or otherwise, any non-bargaining unit employee or retiree to testify in an arbitration hearing.

9.     Suspension and Discharge Cases

a.     No Peremptory Discharge

(1)     Within three (3) days of notification by the Company that the conduct of an Employee may warrant disciplinary suspension or discharge, a hearing will be held by a representative designated by the Company, with the Employee and the Union Grievance Committee. The purpose of the hearing is to provide for an investigation and determination of the facts. The Company will notify the Employee and the Union of its decision in writing within five (5) days after such hearing.  Any grievance over disciplinary suspension or discharge shall be filed in Step 2 of the grievance procedure within five (5) days of the notice of the Company decision. The Company may suspend the Employee pending the hearing.

(2)     Before imposing a discharge (which must be in accordance with Paragraph 9(b) below) the Company shall give written notice of its intent to the affected Employee and the Grievance Chair.

(3)     Where the Union files a grievance protesting such intended discharge within five (5) days of receipt of the notice, the Company may impose no more than a suspension on such Employee except as otherwise provided in Paragraph 9(b) below.

(4)     The grievance protesting the intended discharge shall be filed at Step 2 of the grievance procedure and the Step 2 Answer shall be given prior to the Company converting the suspension to a discharge. At the Step 2 meeting, the Company

shall provide a written statement of the facts and circumstances supporting its proposed disciplinary action.

(5)     In the event the Company does convert the suspension to a discharge, the action shall be treated as a denial of the grievance at Step 2 and the Union may thereupon move the case through the balance of the grievance procedure.

b.      Justice and Dignity

(1)     In the event the Company imposes a suspension or discharge (which must be in accordance with paragraph 9(a) above), and the Union files a grievance within five (5) days after notice of the suspension or discharge, the affected Employee shall remain on or return to the job to which his/her seniority entitles him/her until there is a final determination on the merits of the case.

(2)     This subsection 9(b) will not apply to cases involving offenses which endanger the safety of employees or the plant and its equipment, including use and/or distribution on Company property of drugs, narcotics and/or alcoholic beverages; possession of firearms or weapons on Company property; destruction of Company property; gross insubordination; threatening bodily harm to, and/or striking another employee; theft; activities prohibited by Article 5, Section K (prohibition on Strikes and Lockouts), or any other offenses for which the Company has just cause to impose immediate discharge without benefit of progressive discipline.

(3)     When an Employee is retained pursuant to this procedure and the Employee's discharge is finally held to be for just cause, the removal of the Employee from the active rolls shall be effective for all purposes as of the final resolution of the grievance.

(4)     When a discharged Employee is retained at work pursuant to this provision and is discharged again for a second dischargeable offense, the Employee will no longer be eligible to be retained at work under these provisions.

c.      Any case involving a suspension or a discharge may be filed at Step 2 of the grievance procedure.

d.      The Company will not make use of any personnel records of previous disciplinary action against the Employee involved where the disciplinary action occurred more than eighteen (18) months  prior to the date of the event which is the subject of the suspension or discharge, except records relevant and necessary to establish progressive discipline of the action in dispute, but in no event longer than three (3) years.

e.   Should the arbitrator determine that an Employee has been suspended or discharged without just cause, the arbitrator shall have the authority to modify the discipline and fashion a remedy warranted by the facts.

f.   Nothing in these provisions shall restrict or expand the Company's right to relieve an Employee for the balance of such Employee's shift under the terms of the Agreement.

10.   Arbitration of Disputes Involving Asarco Benefits Plans

a.   If any difference shall arise concerning a benefit, eligibility or coverage of the Employee and/or spouse or dependents under the Pension, Health and/or other Welfare Plans, the issue may be the proper subject of a grievance after completion of any claim or pre-litigation dispute resolution procedure in the applicable plan. If agreement cannot be reached between the Company and the applicable Union representative, such question shall be referred to arbitration as described herein.

b.   The Union may appeal a benefits grievance to arbitration by sending a written notice to the Company Step 3 representative within sixty days of the Union's receipt of the Step 3 written answer. However, the time limits for filing a grievance under the grievance procedure shall not apply until after the claim or pre-litigation dispute resolution procedure in the applicable plan has been exhausted.

c.   An arbitrator shall be selected from a list obtained from the Federal Mediation and Conciliation Service (FMCS) of arbitrators with specialized experience with issues involving Pension and Welfare Plans. The parties shall request a panel of seven such names from the FMCS and shall strike names from the list until an arbitrator is selected. If the parties are unable to reach agreement on an arbitrator from the submitted list, the parties shall request another panel and repeat the procedure until an arbitrator is selected.

d.   The arbitrator shall have authority only to decide the question pursuant to the provisions of this Agreement and of the applicable Plan, but shall not have authority in any way to alter, add to or subtract from any of such provisions.

e.   The decision of the arbitrator shall be final and binding and judgment on the award may be entered in any court having jurisdiction. The expense of arbitration shall be borne equally between the parties unless they agree otherwise.

# Article 5.  Workplace Procedures

**Section J.       Management Rights**

The management of the plants and the direction of the working forces, including but not limited to the right to: hire, transfer, suspend or discharge for proper cause, relieve Employees from duty; determine the work to be performed; change or curtail operations; fill, change, add or eliminate jobs; shall be vested exclusively in the Company.  In the exercise of its prerogatives as set forth above, the Company shall not deprive an Employee of any rights under any agreement with the Union.

**Section K.       Prohibition on Strikes and Lockouts**

1.    There shall be no strikes, sympathy strikes, or other work stoppages or the interruption or impeding of work. No officer or representative of the Union shall authorize, instigate, aid or condone any such activities. No Employee shall participate in any such activities.

2.    The applicable procedures of this Agreement will be followed for the settlement of all complaints or grievances.

3.    There shall be no lockouts.

**Section L.       Workplace Problem-Solving Committee**

1.    At each Company location, the Union (or, if applicable, the Unions, collectively) shall appoint up to six (6) Employees, including a Local Union President/Unit Chair or his/her designee, and the Company shall appoint up to an equal number of individuals, including the General Manager or his designee, to a Workplace Problem-Solving Committee (Workplace Committee).  The Workplace Committee shall meet at least monthly to continue the parties' labor-management meetings and address matters of common interest and concern including, but not limited to, improvements in productivity and efficiency, multi-skilling, training, expansion of the helper classification, cost reduction techniques, enhancement of Employee job satisfaction, and other topics as agreed by the parties.  The Workplace Committee shall work with and oversee other committees as may be agreed upon by the parties.

2.    The Employees on the Workplace Committee selected by the Union shall be compensated for lost time during regular business hours to attend committee meetings or for time conducting other committee business when the Company approves pay for that time.

# Article 5.  Workplace Procedures

**Section M.     Clothing and Tool Replacement**

1. Maintenance Employees will provide and maintain a full set of hand tools necessary for the performance of their work.  Apprentices will obtain such tools upon indenture date.  Other employees will obtain such tools upon being promoted or hired to the maintenance position.  Employees will be compensated for such required tools when they are unintentionally destroyed beyond repair in Company service or upon satisfactory proof that they were stolen from the workplace, provided negligence on the part of the employee is not the cause thereof.  Compensation consideration will include normal wear and quality of the tool.

2. Employees will be compensated for personal clothing or other personal items destroyed or damaged beyond repair by abnormal circumstances during work.  In determining such compensation, the prior condition of the item will be considered.

3. Except as provided in Article 3 (Health, Safety and the Environment) of this Agreement, the Company will not furnish work clothing unless applicable law or regulation requires that such clothing be furnished at Company expense.  The Company will compensate Employees for tools when they are worn out in Company service.  As determined by the Company, Employees will be provided special clothing and tools for unusual situations.

**Section N.     Absentee Control Policy**

The Absentee Control Policy at each Company location shall remain in effect for the term of this Agreement, unless the local parties mutually agree to any changes.

**Section O.     Extended Shift Schedules**

1. If the Company and the Union decide an extended shift schedule is consistent with the needs of the operation for a particular department or natural work group, the Company will provide the Union with a copy of the proposed work schedule. The proposed schedule will be adopted if the Local President/Unit Chair and the Company agree, and the schedule will be placed in effect for six months. The extended shift schedule will continue until either the Company determines it is no longer consistent with the needs of the operation or the Union gives sixty (60) days notice to cancel, in which case the Company will reinstitute the 8-hour shift.

2. Employees working extended shifts will be paid overtime if the employee works beyond his/her regularly scheduled shift in one workday or more than forty hours in one workweek. Employees will not be required to work more than sixteen hours in one workday except in case of emergency. The Company will seek volunteers for overtime before requiring employees to stay. Employees working twelve-hour shifts will not be required to work

overtime on consecutive days unless no other qualified employee is available on that shift, Employees working overtime after a twelve-hour shift will be provided an overtime lunch within approximately the first two hours of overtime; any pay in lieu of lunch will be in accordance with Article 5, Section D Paragraph 5 (B).

3.    Employees working the second shift will be paid the night shift differential. Overtime shift differentials will be paid in accordance with Article 5, Section D.

4.    Vacation pay is based upon total vacation hours eligibility. Vacation days taken during the year will be deducted from the employee's total vacation hours eligibility based upon the number of hours the employee was scheduled to work during the absence. Residual vacation hours equal to half or more of a full shift may be taken as a vacation day with the residual hours paid, or the employee may elect to be paid for those hours in lieu of time off. Residual hours of less than half a full shift may not be taken as a vacation day and the employee will be paid for the unused vacation hours. Scheduling of vacations is subject to the approval of the Company.

5.    Employees working on a holiday will be paid according to Article 10, Section A. Employees will be paid eight (8) hours straight time pay for holidays not worked, subject to Article 10.

6.    The employee will receive full shift pay for the regularly scheduled workdays, for the purposes of and subject to the terms and conditions of Article 10, Section D (Jury and Witness Duty).

7.    Employees will receive full shift pay for the regularly scheduled workdays, for the purposes of and subject to the terms and conditions of Article 10, Section C (Bereavement Leave).

8.    Employees will receive compensation for lost time according to Article 3, F, 2 (occupational injury or illness time), based on the hours they otherwise were scheduled and would have worked. Accommodations for employees needing time off or shift trades will be handled according to current practice, keeping in mind that the additional days off inherent in extended shifts should allow employees more than ample time to take care of most personal business. The Company will have final approval of all schedules and reserves the right to discontinue the extended shift schedules if the needs of the operation so require. In addition, reference to ten or twelve-hour shifts in this or any other Article regarding extended shifts is not intended to preclude scheduling for shifts of any length up to twelve hours in accordance with this Agreement.

# Article 6.  Joint Efforts

**Section A.       Partnership**

1.   Purpose and Intent

The purpose of this Section is to create a framework for ongoing discussion between the Company and the Union about issues that arise during the term of the BLA, including changes in the market or business conditions, adjustments to business strategy and Workplace Change.

2.   Access to Information

The Company shall provide the Union and its advisors with:

   a.   full and continuing access, in accordance with Securities and Exchange Commission requirements, to its short and long-term operating and financial results and forecasts including inputs relevant to the development of them;

   b.   the earliest practicable notification and continuing updates of any contemplated material corporate transactions, including mergers, acquisitions, joint ventures and new facilities to be constructed or established; and

   c.   information and continuing updates on any proposed Workplace Change.

Access to and the use of this information will be covered by a reasonable confidentiality agreement.

3.   Comprehensive Training and Education Program

Company and Union representatives shall receive jointly-developed, ongoing training in the application of this Section, which shall be paid by the Company.

4.   Mechanisms

The parties agree to the following to carry out the intent of this Section:

   a.   Strategic Labor Management Committee

      (1)   Appointment and Composition

         A Joint Strategic Labor Management Committee (Strategic Committee) shall be established consisting of for the Company: the Chief Executive Officer, Corporate Director of Human Resources and the highest ranking official at each of the Company's Copper Group and Ray facilities, and for the Union: the Chair of the Union's Negotiating Committee, the Secretary of the Union's Negotiating

Committee and the Local Union President(s)/Unit Chairs(s) at each of the Company's same facilities.  Each side shall designate a Co-Chair and provide the other with an updated list of its members of the Committee.

(2)   Meetings

The Strategic Committee shall hold at least semi-annual meetings of at least one (1) full day.  These meetings will be for the purpose of reviewing and discussing the information described in Paragraph 2 above (it being understood that the Union Co-Chair will be updated more frequently regarding time-sensitive information) as well as other information and updates reasonably requested by the Union.

b.   Plant Labor Management Committees

The Strategic Labor Management Committee may create one or more Plant or Area Problem Solving Teams to study and report back on specific problems or projects.

c.   Company-Wide Meetings

(1)   In each calendar year the parties will hold a two (2) day meeting (the first day for separate meetings for preparation) in proximity to a Company facility to review and discuss the information described in Paragraph 2 above with the Union's leadership at the plants, Districts and International.

(2)   Union participants shall include the Chair of the Union Negotiating Committee, Secretary of the Union Negotiating Committee, Local Union Presidents/Unit Chairs and Grievance Committee Chairs (or their designees) at each of the Company's covered facilities.  Company participants shall include the Company's officers, General Managers and such others as the Company may designate.

5.   Workplace Change

A Plant or Area Problem Solving Team appointed by the Strategic Labor Management Committee to consider any plan to significantly modify or change in any way machinery, equipment, controls, materials, software, work organization, or any other work process that would directly or indirectly impact Employees (a Workplace Change) shall be provided:

a.   a description of the purpose, function and established timetable of the Workplace Change, and how it would fit into existing operations and processes;

b.   the estimated cost of the proposed Workplace Change;

c.   the number and type of jobs which would be impacted;

    d.    the expected impact on job content, method of work, safety and health, training needs and the utilization of Outside Entities.

6.    Safeguards and Resources

    a.    No entity created under this Section may amend or modify this Agreement, recommend or effect the hiring or discipline of any Employee or take any action with respect to contractual grievances.

    b.    Employee participation or training contemplated in this Section shall normally occur during normal work hours.  All joint meeting time and necessary and reasonable expenses associated with any committee created under this Section shall be paid for by the Company.

    c.    All Union participants involved in any and all joint activities under this Section, or in any other joint committee involving members of a Union bargaining unit, shall be chosen and removed from the process exclusively by the relevant Local Union President/Unit Chair.

# Article 6.  Joint Efforts

**Section B.        Contract Coordinators**

In this BLA, the parties have committed themselves to a number of joint undertakings crucial to the success of the Company, its Employees and the Union. In recognition of the crucial role being served by the Union in accomplishing the joint goals of the parties, the parties agree as follows:

1.    The Chair of the Union Negotiating Committee shall select and direct three (3) Contract Coordinators who shall be responsible throughout the Company for implementation and ongoing monitoring of joint undertakings of mutual interest to the Company and the Union. It is expected that Contract Coordinators will visit each of the Company's locations on a regular basis in the performance of their duties.

2.    Each Contract Coordinator shall be an Employee of the Company. The Contract Coordinator shall be compensated by the Company in the amount of the appropriate wages, benefits and other fringe benefits s/he would have earned during his/her normal course of employment with the Company, but for this assignment. In addition, each Contract Coordinator shall be reimbursed for reasonable out-of-pocket expenses including, but not limited to, travel (coach airfare, hotel and per diem) incurred in connection with this assignment and as reasonably agreed to by the Company and the Union in advance of incurring such expense. In order to receive such lost time payments and expense reimbursements, supporting vouchers must be provided by the Contract Coordinator.

# Article 6.  Joint Efforts

**Section C.        New Employee Orientation**

1.    The parties agree that within one-hundred eighty (180) days of the Effective Date they shall jointly develop an Employee Orientation Program which shall include the following:

    a.    an introduction of plant Company officials, International Union officials and Local Union representatives as may be appropriate;

    b.    distribution and discussion of the BLA, including any relevant local agreements;

    c.    discussion of safety and health programs and safe working procedures;

    d.    presentation and discussion on labor-management participation, problem solving, communications and the role of the Union and the workforce in quality and customer satisfaction;

    e.    discussion (not more than ten (10) minutes) of the history and achievements of the Union and the particular Local Union;

    f.    discussion (not more than ten (10) minutes) of the structure of the Union and the particular Local Union and the services that are provided by the various offices and committees;

    g.    presentation on the history of the Company and plant;

    h.    review of the markets in which the Company participates, the products produced and the customers serviced; and

    i.    discussion of the structure of the Company, the plant organization and the functions and services that are provided by the various departments.

2.    This program shall be jointly presented to each new Employee of the Company during their probationary period. The Union will be allotted a portion of the program to address the Employees.

3.    All costs associated with developing this Program shall be borne by the Company.

## Article 7.  Training

### Section A.  Workforce Training Program

1.   Commitments

The parties are committed to:

   a.   the Company's workforce being sufficiently skilled so that all Bargaining Unit Work can be performed in accordance with this Agreement by Employees; and

   b.   Employees receiving sufficient training to allow for all reasonable opportunities to progress within the workforce and maximize their skills to the greatest extent possible.

2.   Plant Training Committees

The parties shall establish a Plant Training Committee at each of the Company's facilities. The Plant Training Committee shall be composed of three (3) Union representatives who are Employees of the Company and an equal number of Company representatives (except that the number of Union representatives shall be four (4) at Mission Complex).  The Company members of each Plant Training Committee shall include the General Manager or his designee (who shall serve as the Company Co-Chair).  The Company Members of the Committee shall be selected and serve at the pleasure of the General Manager. The Union members of each Plant Training Committee shall include a Local Union President/Unit Chair (who shall serve as the Union Co-Chair).

3.   Study of Workforce Training Needs

Within six (6) months of the Effective Date, each Plant Training Committee shall complete a report (Report) of the expected training needs of the workforce over the term of the Agreement, given the Commitments outlined in Paragraph 1 above.  Such Report shall include Findings and Recommendations as described below.

   a.   Findings

     (1)   an age and service profile and the anticipated attrition rates of the workforce over the life of the Agreement;

     (2)   an assessment of the current skill requirements (both competencies and force levels) of the plant, the availability of such skill requirements within the existing workforce and any training practices or programs necessary to bring the competencies and/or force levels of the current workforce into prompt conformity with the plant's current skill requirements;

      (3)    an evaluation of the appropriateness of existing training programs and the necessity of developing additional training programs, giving due consideration to changing technology and future skill needs; and

      (4)    an examination of methods by which productivity and efficiencies can be improved through additional training of Employees.

b.    Recommendations

Based on its Findings, the Plant Training Committee shall develop a recommended training program designed to meet the commitments outlined in Article 7, Section A, 1, above.

c.    Constructive Participation

The Union and the Company commit that their participation on the Plant Training Committee will be constructive.  Nothing in this Article or the parties' commitment to joint efforts shall detract from the Company's right to manage the workforce and to adopt reasonable training programs and requirements following satisfaction of its statutory bargaining obligations.

4.    Record Keeping

a.    The Company shall keep detailed records of who is trained where and when.

b.    The Company shall share such records with the Union.  The Union may discuss additional or supplemental training on positions with the Company.

# Article 8.  Earnings Security

**Section A.      Supplemental Unemployment Benefits**

1.    Eligibility

An Employee shall be eligible for a weekly supplemental unemployment benefit (Weekly Benefit) for any week beginning on or after the Effective Date, if s/he:

a.    has completed two (2) years of Continuous Service prior to his/her seeking weekly benefits;

b.    is and remains an Employee within the meaning of the Agreement;

c.    does not receive sickness and accident benefits under an agreement between the Company and the Union;

d.    is not in the military service, including training encampments;

e.    is eligible, applies for state unemployment benefits for the week and takes all reasonable steps to receive such benefits; provided, however, that this requirement will not apply if s/he has exhausted state unemployment benefits, receives other compensation in an amount that disqualifies him/her for state unemployment benefits, has insufficient employment to be covered by the state system, fails to qualify for state unemployment benefits because of a waiting week, is unable to work by reason of disability, or is participating in a federal training program; and

f.    either:

(1)    is on layoff for any week in which, because of lack of work, s/he does  not work at all for the Company;

(2)    is on layoff during a plant vacation shutdown and s/he is not entitled to vacation during the shutdown; or

(3)    became disabled while on layoff and is not physically able to return to work.

2.    Amount and Duration of Benefits

a.    Weekly Benefits are equal to:

(1)    $150 per week in which s/he is eligible for a state unemployment benefit; and

(2)    $250 per week in which s/he is ineligible for a state unemployment benefit.

b.   Benefit durations shall be as follows:

| Seniority | Maximum Duration of Benefits |
|---|---|
| 2 but less than 10 | 26 weeks |
| 10 but less than 20 | 52 weeks |
| 20 and over | 104 weeks |

c.   Notwithstanding the above, the duration of Weekly Benefits payable to an Employee who becomes disabled while on layoff and is not physically able to return to work shall be limited to fifty-two (52) weeks beginning with the week the Employee is recalled to work.

d.   The amount of a Weekly Benefit is not reduced for the receipt of state unemployment benefits or Trade Adjustment Allowance, but is subject to reduction due to any Excess Other Compensation.

e.   Excess Other Compensation means any weekly earnings from an employer other than the Company in excess of the amount that would reduce the Employee's state unemployment benefit to zero. The amount to be offset shall be $1 for each $2 of Excess Other Compensation.

3.   Company Payment

The Company shall make reasonable calculations of Weekly Benefits and pay such benefits based on the best information in its possession and obtained from the state system.

4.   Disputes

In the event an Employee believes that his/her Weekly Benefit or eligibility determination has been made in error, the Employee may file a grievance, as outlined in the grievance procedure of this Agreement.

5.   Administration of the Plan

Subject to and in accordance with the terms and conditions outlined in this Section, the Company shall administer the Supplemental Unemployment Benefits Plan (Plan) and may prescribe reasonable rules and regulations. The costs of administering the Plan shall be borne by the Company.

6.   Finality of Determination

The Company shall have the right to recover overpayments and correct underpayments to Employees. However, any benefit determination shall become final six (6) months after the date on which it is made if (a) no dispute is then pending and (b) the Company has not given notice in writing of an error.

**Article 8. Earnings Security**

7.    Termination

Notwithstanding the provisions of Article One, Section B (Term of the Agreement), this Section and the Plan on which it is based shall expire 150 days after the Termination Date.

8.    Documentation

The parties shall adopt a mutually agreed upon Plan to provide the benefits described in this Section.

# Article 8.  Earnings Security

**Section B.      Interplant Job Opportunities**

1.  As described below, an Employee with more than two (2) years of Company Seniority who is continuously on layoff for at least sixty (60) days and not expected to be recalled within sixty (60) days shall be given priority, for permanent bargaining unit job vacancies at other Company locations over new hires and probationary Employees at such locations (without the right to bump probationary employees out of their current jobs):

   a.  The Employee must file with his/her home plant, on a form provided by the Company, a written request for such transfer specifying the other plant or plants at which s/he would accept employment.

   b.  Employees who apply shall be given priority in the order of their Company Seniority (the earlier date of birth to control where such service is identical), provided the Employee has the necessary qualifications to perform the job. In determining qualifications, the Employee shall be treated as if the job were an opening at his/her home plant.

   c.  An Employee laid off from his/her plant who is offered and accepts a job at another plant, will have the same obligation to report for work there as though s/he were a laid-off Employee at that plant. During his/her employment at that plant, s/he will be subject to all the rules and conditions of employment in effect at that plant. S/he will be considered as a new Employee at that plant and therefore such Employee's Plant Service shall be defined in accordance with Article 5, Section E, 3,b.

   d.  An Employee shall be deemed to reject such job if s/he does not affirmatively respond within five (5) days of the time the offer is made, which offer shall be directed to his/her last place of residence as shown on the written request referred to in Paragraph (a) above.

   e.  An Employee who accepts employment at another plant under this Section will continue to accrue Plant Seniority for seniority purposes at his/her home plant in accordance with the applicable seniority rules for a maximum period of six (6) months from the date of transfer. If within six (6) month period, s/he is recalled to work at his/her home plant and s/he elects to return, his/her Plant Seniority for seniority purposes at the other plant will be cancelled. If s/he elects to remain at the other plant for more than six (6) months, his/her Plant Seniority for seniority purposes at his/her home plant will be cancelled.

   f.  When an Employee is recalled to his/her home plant, the Company may require the Employee to remain at such other plant for the calendar week following the calendar week during which such recall occurs.

**Article 8. Earnings Security**

2.  An Employee who accepts a job at another plant more than 100 miles from his/her former plant will receive a relocation allowance of $500 promptly after the commencement of employment at the plant to which s/he is relocated, provided the Employee relocates his/her permanent residence to within thirty (30) miles of the new reporting location. If the Employee does not voluntarily remain employed at the new reporting location for six (6) months, he shall repay the relocation allowance.

# Article 9.  Economic Opportunity

**Section A.      Wages**

## Amarillo Refinery USW

| Class | Current | January 1, 2007 | September 30, 2008 | September 30, 2009 |
|---|---|---|---|---|
| 1 (starting rate) | $13.445 | $14.445 | $15.445 | $16.445 |
| 1 (intermediate rate) | 14.445 | 15.445 | 16.445 | 17.445 |
| 1A (Post 5/22/95 Hire) | 15.445 | 16.445 | 17.445 | 18.445 |
| 2 (Post 5/22/95 Hire) | 16.115 | 17.115 | 18.115 | 19.115 |
| 1 (Pre 5/22/95 Hire) | 16.745 | 17.745 | 18.745 | 19.745 |
| 2A (Pre 5/22/95 Hire) | 17.015 | 18.015 | 19.015 | 20.015 |
| 3 | 17.285 | 18.285 | 19.285 | 20.285 |
| 4 | 17.555 | 18.555 | 19.555 | 20.555 |
| 5 | 17.825 | 18.825 | 19.825 | 20.825 |
| 6 | 18.095 | 19.095 | 20.095 | 21.095 |
| 7 | 18.365 | 19.365 | 20.365 | 21.365 |
| 8 | 18.635 | 19.635 | 20.635 | 21.635 |
| 9 | 18.925 | 19.925 | 20.925 | 21.925 |
| 10 | 19.225 | 20.225 | 21.225 | 22.225 |
| 11 | 19.525 | 20.525 | 21.525 | 22.525 |
| 12 | $19.825 | $20.825 | $21.825 | $22.825 |

**Article 9. Economic Opportunity**

# Amarillo Refinery IBEW

| Class | Current | January 1, 2007 | September 30, 2008 | September 30, 2009 |
|---|---|---|---|---|
| 1 (starting rate) | $13.445 | $14.445 | $15.445 | $16.445 |
| 1 (intermediate rate) | 14.445 | 15.445 | 16.445 | 17.445 |
| 1 | 15.445 | 16.445 | 17.445 | 18.445 |
| 2 | 16.115 | 17.115 | 18.115 | 19.115 |
| 3 | 17.225 | 18.225 | 19.225 | 20.225 |
| 4 | 17.505 | 18.505 | 19.505 | 20.505 |
| 5 | 17.780 | 18.780 | 19.780 | 20.780 |
| 6 | 18.055 | 19.055 | 20.055 | 21.055 |
| 7 | 18.340 | 19.340 | 20.340 | 21.340 |
| 8 | 18.610 | 19.610 | 20.610 | 21.610 |
| 9 | 18.905 | 19.905 | 20.905 | 21.905 |
| 10 | 19.215 | 20.215 | 21.215 | 22.215 |
| 11 | 19.515 | 20.515 | 21.515 | 22.515 |
| 12 | $19.830 | $20.830 | $21.830 | $22.830 |

# Hayden Smelter

| Class | Current | January 1, 2007 | September 30, 2008 | September 30, 2009 |
|---|---|---|---|---|
| 1 (starting rate) | $13.085 | $14.085 | $15.085 | $16.085 |
| 1 (intermediate rate) | 14.085 | 15.085 | 16.085 | 17.085 |
| 1A (Post 5/22/95 Hire) | 15.085 | 16.085 | 17.085 | 18.085 |
| 2 (Post 5/22/95 Hire) | 15.630 | 16.630 | 17.630 | 18.630 |
| 1 (Pre 5/22/95 Hire) | 16.840 | 17.840 | 18.840 | 19.840 |
| 2A (Pre 5/22/95 Hire) | 17.150 | 18.150 | 19.150 | 20.150 |
| 3 | 17.260 | 18.260 | 19.260 | 20.260 |
| 4 | 17.480 | 18.480 | 19.480 | 20.480 |
| 5 | 17.670 | 18.670 | 19.670 | 20.670 |
| 6 | 17.880 | 18.880 | 19.880 | 20.880 |
| 7 | 18.090 | 19.090 | 20.090 | 21.090 |
| 8 | 18.300 | 19.300 | 20.300 | 21.300 |
| 9 | 18.500 | 19.500 | 20.500 | 21.500 |
| 10 | 18.710 | 19.710 | 20.710 | 21.710 |
| 11 | 18.920 | 19.920 | 20.920 | 21.920 |
| 12 | 19.120 | 20.120 | 21.120 | 22.120 |
| 13 | 19.330 | 20.330 | 21.330 | 22.330 |
| 14 | 19.540 | 20.540 | 21.540 | 22.540 |
| 15 | 19.750 | 20.750 | 21.750 | 22.750 |
| Multi-Skill (1 additional skill) | 20.040 | 21.040 | 22.040 | 23.040 |
| Multi-Skill (2 additional skills) | $20.540 | $21.540 | $22.540 | $23.540 |

# Hayden Smelter, IBEW

| Class | Current | January 1, 2007 | September 30, 2008 | September 30, 2009 |
|---|---|---|---|---|
| 1 (starting rate) | $13.085 | $14.085 | $15.085 | $16.085 |
| 1 (intermediate rate) | 14.085 | 15.085 | 16.085 | 17.085 |
| 1A (Post 5/22/95 Hire) | 15.085 | 16.085 | 17.085 | 18.085 |
| 2 (Post 5/22/95 Hire) | 15.630 | 16.630 | 17.630 | 18.630 |
| 1 (Pre 5/22/95 Hire) | 16.840 | 17.840 | 18.840 | 19.840 |
| 2A (Pre 5/22/95 Hire) | 17.150 | 18.150 | 19.150 | 20.150 |
| 3 | 17.260 | 18.260 | 19.260 | 20.260 |
| 4 | 17.480 | 18.480 | 19.480 | 20.480 |
| 5 | 17.670 | 18.670 | 19.670 | 20.670 |
| 6 | 17.880 | 18.880 | 19.880 | 20.880 |
| 7 | 18.090 | 19.090 | 20.090 | 21.090 |
| 8 | 18.300 | 19.300 | 20.300 | 21.300 |
| 9 | 18.500 | 19.500 | 20.500 | 21.500 |
| 10 | 18.710 | 19.710 | 20.710 | 21.710 |
| 11 | 18.920 | 19.920 | 20.920 | 21.920 |
| 12 | 19.120 | 20.120 | 21.120 | 22.120 |
| 13 | 19.330 | 20.330 | 21.330 | 22.330 |
| 14 | 19.540 | 20.540 | 21.540 | 22.540 |
| 15 | 19.750 | 20.750 | 21.750 | 22.750 |
| Multi-Skill (1 additional skill) | 20.040 | 21.040 | 22.040 | 23.040 |
| Multi-Skill (2 additional skills) | 20.540 | 21.540 | 22.540 | 23.540 |
| Head Multi-Skill (1 additional skill) | 20.250 | 21.040 | 22.040 | 23.040 |
| Head Multi-Skill (2 additional skills) | $20.750 | $21.750 | $22.750 | $23.750 |

# Mission Complex

| Class | Current | January 1, 2007 | September 30, 2008 | September 30, 2009 |
|---|---|---|---|---|
| 1 (starting rate) | $13.595 | $14.595 | $15.595 | $16.595 |
| 1 (intermediate rate) | 14.595 | 15.595 | 16.595 | 17.595 |
| 1A (Post 5/22/95 Hire) | 15.595 | 16.595 | 17.595 | 18.595 |
| 2 (Post 5/22/95 Hire) | 16.428 | 17.428 | 18.428 | 19.428 |
| 1 (Pre 5/22/95 Hire) | 16.852 | 17.852 | 18.852 | 19.852 |
| 2A (Pre 5/22/95 Hire) | 17.352 | 18.352 | 19.352 | 20.352 |
| 3 | 17.672 | 18.672 | 19.672 | 20.672 |
| 4 | 17.961 | 18.961 | 19.961 | 20.961 |
| 5 | 18.282 | 19.282 | 20.282 | 21.282 |
| 6 | 18.603 | 19.603 | 20.603 | 21.603 |
| 7 | 18.944 | 19.944 | 20.944 | 21.944 |
| 8 | 19.264 | 20.264 | 21.264 | 22.264 |
| 9 | 19.585 | 20.585 | 21.585 | 22.585 |
| 10 | 19.906 | 20.906 | 21.906 | 22.906 |
| 11 | 20.231 | 21.231 | 22.231 | 23.231 |
| 12 | $20.406 | $21.406 | $22.406 | $23.406 |

Note:   The purpose of this table is only to illustrate the effect of the negotiated wage increase. The Mission job titles and rate structure are as contained in the July 1, 2001 Collective Bargaining Agreement.

# Ray Complex

| Class | Current | January 1, 2007 | September 30, 2008 | September 30, 2009 |
|-------|---------|-----------------|--------------------|--------------------|
| A | $13.60 | $14.60 | $15.60 | $16.60 |
| B | 13.81 | 14.81 | 15.81 | 16.81 |
| C | 16.33 | 17.33 | 18.33 | 19.33 |
| D | 16.90 | 17.90 | 18.90 | 19.90 |
| E | 17.55 | 18.55 | 19.55 | 20.55 |
| F | 18.27 | 19.27 | 20.27 | 21.27 |
| G | 19.02 | 20.02 | 21.02 | 22.02 |
| H | 19.81 | 20.81 | 21.81 | 22.81 |
| I | 20.69 | 21.69 | 22.69 | 23.69 |
| J | 21.57 | 22.57 | 23.57 | 24.57 |
| J+$1.00 | $22.57 | $23.57 | $24.57 | $25.57 |

# Silver Bell Mining

| Class | Current | January 1, 2007 | September 30, 2008 | September 30, 2009 |
|---|---|---|---|---|
| 1 (starting rate) | $13.595 | $14.595 | $15.595 | $16.595 |
| 1 (intermediate rate) | 14.595 | 15.595 | 16.595 | 17.595 |
| 1A (Post 5/22/95 Hire) | 15.595 | 16.595 | 17.595 | 18.595 |
| 2 (Post 5/22/95 Hire) | 16.285 | 17.285 | 18.285 | 19.285 |
| 1 (Pre 5/22/95 Hire) | 16.856 | 17.856 | 18.856 | 19.856 |
| 2A (Pre 5/22/95 Hire) | 17.208 | 18.208 | 19.208 | 20.208 |
| 3 | 17.356 | 18.356 | 19.356 | 20.356 |
| 4 | 17.675 | 18.675 | 19.675 | 20.675 |
| 5 | 17.823 | 18.823 | 19.823 | 20.823 |
| 6 | 17.964 | 18.964 | 19.964 | 20.964 |
| 7 | 18.283 | 19.283 | 20.283 | 21.283 |
| 8 | 18.417 | 19.417 | 20.417 | 21.417 |
| 9 | 18.603 | 19.603 | 20.603 | 21.603 |
| 10 | 18.944 | 19.944 | 20.944 | 21.944 |
| 11 | 19.263 | 20.263 | 21.263 | 22.263 |
| 12 | 19.583 | 20.583 | 21.583 | 22.583 |
| 13 | 19.902 | 20.902 | 21.902 | 22.902 |
| 14 | $20.241 | $21.241 | $22.241 | $23.241 |

Note:   The purpose of this table is only to illustrate the effect of the negotiated wage increase. The Silver Bell job titles and rate structure are as contained in the July 1, 2001 Collective Bargaining Agreement.

# Article 9.  Economic Opportunity

**Section B.        Shift Premium**

1.  For the purpose of determining the application of shift differentials, the shifts shall be defined as follows:

    a.     Day or First Shift:  a work shift starting between 6:30 and 9:00 a.m.

    b.     Afternoon or Second Shift:  a work shift starting between 3:30 and 4:30 p.m.

    c.     Night or Third Shift:  a work shift starting between 11:30 p.m. and 12:30 a.m.

2.  Employees on the day shift shall receive no shift differential for work during their regular shift hours or for overtime work immediately following their regular shift hours.

3.  Employees on the afternoon shift shall receive a shift differential of thirty (30) cents per hour for work during their regular shift hours or for overtime work immediately following their regular shift hours.

4.  Employees on the night shift shall receive a shift differential of forty-five (45) cents per hour for work during their regular shift hours or for overtime work immediately following their regular shift hours.

5.  In the case of an employee whose starting time does not fall within the time limits specified above, a shift differential of thirty (30) cents per hour shall be paid if four (4) hours or more of his shift falls within the afternoon shift, while a shift differential of forty-five (45) cents per hour shall be paid if four (4) hours or more of his shift falls within the night shift.

# Article 9.  Economic Opportunity

**Section C.       Copper Price Bonus**

1.  Commencing with the first calendar quarter of 2007 and for each quarter thereafter a lump sum cash payment will be made depending on the average copper price during that calendar quarter.

2.  The payment will be based on the average quarterly copper price in U.S. Dollars per pound on the London Metals Exchange.  The average LME copper price will be determined by taking the 3 month average of the London Metal Exchange daily cash settlement prices (i.e. daily cash seller and settlement price) for high grade cathode copper for each market day during the applicable 3 month period beginning on January 1, 2007 through June 30, 2010.

3.  Copper Price Bonus Payment Scale

    Payments will be made according to the scale below.  The average quarterly LME price will be rounded to the nearest $0.001.  For example, for the purposes of this Plan, $1.9995 shall round up to $2.000 per pound.

| Average LME Copper Price | Quarterly Bonus Payment |
|---|---|
| Below $1.600 | $0 |
| $1.600-1.699 | $270 |
| $1.700-1.799 | $324 |
| $1.800-1.899 | $378 |
| $1.900-1.999 | $432 |
| $2.000-2.099 | $486 |
| $2.100-2.199 | $594 |
| $2.200-2.299 | $702 |
| $2.300-2.399 | $810 |
| $2.400-2.499 | $918 |
| $2.500-2.599 | $1,026 |
| $2.600-2.699 | $1,134 |
| $2.700-2.799 | $1,242 |
| $2.800-2.899 | $1,350 |
| $2.900-2.999 | $1,458 |
| $3.000-3.099 | $1,620 |
| $3.100-3.199 | $1,755 |
| $3.200-3.299 | $1,890 |
| $3.300-3.399 | $2,025 |
| $3.400-3.499 | $2,160 |
| $3.500-3.599 | $2,295 |
| $3.600-3.699 | $2,430 |
| $3.700-3.799 | $2,565 |

| Average LME Copper Price | Quarterly Bonus Payment |
|---|---|
| $3.800-3.899 | $2,700 |
| $3.900-3.999 | $2,835 |
| Above $4.000 | $2,870, plus $135 for every $0.10 the copper price exceeds $4.00 per pound |

4.   Payment Period

The Copper Price Bonus will be paid within thirty (30) days of the end of each calendar quarter.

5.   Individual Entitlement

The Copper Price Bonus will be paid to each such Participant accruing Continuous Service under the Retirement Income Plan for Hourly Rated Employees of Asarco Inc. at the end of the calendar quarter.

Any payments made to a Participant pursuant to this Plan shall not be included in the Participant's earnings for purposes of determining any other pay, benefit or allowance of the Participant.

6.   Administration of the Plan

a.   The Plan will be administered by the Company in accordance with its terms and the costs of administration shall be the responsibility of the Company.  Upon determination of each Copper Price Bonus calculation, such calculation shall be forwarded to the Chair of the Union Negotiating Committee.

b.   The Union, through the Chair of its Negotiating Committee or his/her designee, will have the right to review any information, calculation or other matters concerning the Plan.  In the event of a dispute between the parties, the Chairs of Negotiating Committees or their designees will attempt to reach an agreement to resolve the discrepancy.   In the event that they cannot resolve the dispute, either party may submit such dispute to final and binding arbitration under the grievance procedure provided in this Agreement.

# Article 9.  Economic Opportunity

**Section D.      Travel Time and Time Donning and Doffing Protective Equipment**

1.  Applicable to Mission, Silver Bell and Ray Mine – When the Company requires pit Employees to report prior to the start of their shift for transport into the pit ("Positive Relief").

    a.  Pit employees will be ready for transport into the pit (10) ten minutes prior to their scheduled shift. The Company will pay ten (10) minutes of travel time at straight time pay each day for such reports. Travel time into the pit will not be considered time worked for overtime purposes unless a meeting is held prior to travel to the pit.

    b.  Van drivers, (bus, etc.) who transport employees into the pit will be paid for such time at the rate of time and one-half (1 ½).

    c.  If the report time is changed or increased, it will be paid at straight time. However, in no event will the Employees be required to report more than twenty (20) minutes before their scheduled shift.

    d.  If the Company decides not to use positive relief, the employees will report to the Change House/Pit Office at the start of the shift and will be returned to the Change House/Pit Office by the end of the shift.

    e.  In the event more than twelve (12) minutes pass before an individual in Pit Operations is returned to the change house from his work station at the end of the shift, s/he will be paid overtime for the actual time in excess of twelve (12) minutes based on the nearest 1/10th hour (for Positive Relief purposes only).

2.  Employees required to wear protective equipment (other than hard hats, safety shoes, safety glasses, respirators and hearing protection) shall be paid for all time spent donning and doffing such equipment, waiting and traveling to their work station. Such time will be considered time worked for overtime purposes.

**Section E.      Apprenticeship**

1.  Contained in a separate document, the plans of apprenticeship as agreed-to between the parties outline standards covering selection, training and periodic examinations.

2.  Upon successful completion of an approved apprenticeship program, and presentation of paid receipts to the Company, the Employee will be reimbursed by the Company for the cost of all authorized books and required training aids and materials. One-half of the total reimbursement shall be paid to the Employee upon successful completion of his or her apprenticeship – the remaining half shall be paid one year thereafter, provided the Employee is still employed by the Company.

# Article 9.  Economic Opportunity

**Section F.        Payment for Company Mandated Training**

1.      In the event that the Company requires an Employee to obtain a certification, license, or special training to perform his or her job, the Company will pay the cost of obtaining same including any lost time involved. Any renewal expense(s) shall likewise be paid by the Company if the Company requires renewal.

2.      The Company will reimburse Employees for the cost of tuition and fees for job-related courses that are pre-approved by the Human Resources Manager.  Reimbursement is contingent upon the Employee receiving a passing grade.

# Article 10.  Paid Time Off and Leaves Of Absence

**Section A.      Holidays**

1.    Designated Holidays

For the purpose of this Agreement, the following nine (9) days are designated as holidays, whether worked or not. It is understood that, by mutual agreement, the parties at each Company location may agree to substitute other days for the holidays listed below:

New Year's Day
Easter Sunday
Memorial Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Eve Day
Christmas Day
New Year's Eve Day

2.    Holidays Not Worked

Employees covered by this Agreement shall be paid their straight -time rate of pay for holidays designated in Article 10, Section A, 1, when not worked, subject to the following terms and conditions:

a.    A new Employee must have been on the Company's payroll continuously for forty-five (45) days prior to the holiday in question. Any Employee who receives Sickness & Accident Benefits for the day of the holiday shall not be eligible for holiday pay.

b.    An Employee must work his last scheduled shift prior to the holiday and his/her first scheduled shift after the holiday; provided, however, that if an Employee is absent on either or both of these days because of personal illness, illness within his/her family of such a nature as to necessitate that the Employee remain home, or death in the family, and reports such facts promptly to his/her Supervisor, such days will not be counted as scheduled.  Such illness of the Employee or a family member must be verified by a licensed health care provider. An Employee who has been excused by his/her Supervisor from working his/her last scheduled shift before the holiday, his/her shift occurring on the holiday, or his/her first scheduled shift after the holiday shall be considered as not having been scheduled to work on such day or days.

c.    Notwithstanding subparagraph b, above, if an Employee is absent on either his/her last scheduled shift prior to the holiday or his/her first scheduled shift after the holiday because of jury duty, witness appearance in court, certified Union business (other than a leave of absence under Article 10, Section E), or military encampment, such days will not be counted as scheduled.

d.    A holiday not worked shall not be considered as time worked in the computation of weekly overtime.

e.    If an employee is scheduled and assigned to work on a holiday and does not work, he shall receive no pay.

f.    Should a holiday occur during an employee's vacation, an additional day's vacation with pay shall be granted or, in lieu of the additional vacation day, the Employee may elect to receive holiday pay.

3.    Holidays Worked

An employee who works on any of the holidays designated in Article 10, Section A, shall be paid double and one-half (2-1/2) for all hours worked computed at his regular straight-time basis as defined in Article 7, Section E.  All hours worked on a holiday shall be used in computing weekly overtime.  No more than two and one-half (2-1/2) times the straight-time pay as herein above set forth will be paid for work performed on any of the holidays listed above.

# Article 10.  Paid Time Off and Leaves of Absence

**Section B.      Vacations**

1.    Eligibility

    a.    To be eligible for a vacation in any calendar year, an Employee must:

        (1)    have one year or more of Seniority; and

        (2)    have worked for at least 1,040 hours during the preceding calendar year.

2.    Length

    a.    The amount of vacation due an eligible Employee shall be based on his/her Seniority as follows:

| Years of Service | Weeks of Vacation |
|---|---|
| 1 but less than 3 | 1 |
| 3 but less than 10 | 2 |
| 10 but less than 17 | 3 |
| 17 but less than 25 | 4 |
| 25 or more | 5 |

    b.    A week of vacation shall consist of seven (7) consecutive days in accordance with current practices.

3.    Scheduling

    a.    On or promptly after November 1 of each year, each Employee entitled or expected to become entitled to vacation in the following year shall receive a Company form asking him/her to specify in writing the desired vacation period or periods.  The Employee shall return the form to the Company within thirty (30) days.

    b.    Vacations will, so far as practicable, be granted at times most desired by Employees (longer service Employees being given preference as to choice), but the final right to allot vacation periods and to change such allotments is reserved to the Company.

    c.    Employees will be provided with their vacation schedule at least fourteen (14) days prior to the start of their vacation period, but in all cases no later than January 1 of the year in which the vacation is to be taken.

    d.    Where an Employee transfers from one seniority unit to another, s/he shall take his/her vacation in accordance with the schedule established in his/her old seniority unit, except as orderly operations of his/her new seniority unit preclude it, and his/her

86

transfer shall not be a basis for altering the schedule established prior to his/her transfer.

e.   Consistent with Paragraphs 3(a) through 3(d) above, Employees shall be permitted to use up to two (2) weeks (i.e., ten (10) days) of their allotted vacation on a day-at-a-time basis.

f.   At the request of the Employee and with the consent of the Company, the Company may pay up to three (3) weeks of vacation allowance, in lieu of time off for vacation, in any one (1) calendar year but not more than one (1) week in any calendar quarter.

g.   The Company may schedule vacations during a shutdown period but, when the timing of the shutdown is within the Company's control, the Company must provide affected Employees with at least sixty (60) days notice.

h.   At the time of his/her retirement, an Employee may elect to receive a lump-sum payment for any unused vacation entitlement.

i.   Vacation time not utilized by the end of the calendar year shall be paid out.

4.   Grievances

Grievances regarding vacation scheduling must be referred to Step 1 of the grievance procedure not later than fifteen (15) days after notification to the Employee of the scheduled vacation (or changed scheduled vacation) is given to the Employee and shall be handled in a manner that assures resolution prior to the disputed date(s).

5.   Vacation Rate of Pay

a.   Employees will be paid for each week of vacation based upon forty (40) multiplied by the Base Rate of Pay of the Employee's permanent job as of the end of the payroll period immediately preceding the vacation (such amount the Vacation Rate of Pay).

b.   The Daily Vacation Rate of Pay of each Employee shall be the Vacation Rate of Pay divided by five (5).

c.   The Hourly Vacation Rate of Pay of each Employee shall be the Vacation Rate of Pay divided by forty (40).

6. Minimum Vacation (Employees Other Than New Hires)

Notwithstanding Sub-Section 1(a)(2) above, an Employee with one (1) year or more of Seniority who is not eligible for vacation based on the above and who works at least 520 hours in a calendar year shall receive one (1) week of vacation during that calendar year. The Company shall make reasonable efforts to schedule that vacation at the time desired by the Employee, provided it does not disrupt the vacation schedule already established hereunder.

7. Vacation Bonus

    a. In addition to the regular vacation pay to which an employee is entitled, there shall be paid a vacation bonus in accordance with the following schedule:

| **Vacation Week Commencing in:** | **Bonus:** |
| --- | --- |
| April, May, October, December | $35.00 per week |
| January, February, March, November | $50.00 per week |
| June, July, August, September | No Bonus |

    b. The amount of vacation bonus applicable to a particular vacation week (full week only) shall be determined by the calendar month in which such week commences, that is, the first day thereof the employee would otherwise have been scheduled to work. For example, an employee whose two consecutive-week vacation begins Monday, September 27, 2007, would be entitled to NO bonus for the first week but would be entitled to a $35.00 bonus for the second vacation week, which begins October 4, 2007. The bonus payment shall be included with the pay for the regular vacation week to which it corresponds. A $20.00 bonus shall be paid for vacation weeks paid in lieu of time off.

    c. The vacation bonus is an add-on to, and not part of, an employee's regular vacation pay.

8. Vacation for Laid Off Employees

An Employee with one (1) year or more of Seniority and who has qualified for a vacation but is laid off before the Employee has received his vacation pay, shall be given the vacation pay that the Employee would have been entitled to in the absence of such layoff.

9. Vacation for Employees Who Quit or are Discharged

An Employee with one (1) year or more of Seniority and has qualified for a vacation but quits or is discharged before the Employee has received his vacation pay, shall be given the vacation pay that the Employee would have been entitled to in the absence of such quitting or discharge.

10. Industrial Compensable Disability, Sickness, Injury

Regularly scheduled time lost due to a compensable disability for purposes of workers' compensation or due to sickness or injury certified by a Company physician shall be considered both employment and time worked for the purpose of computing vacation eligibility under Section B, 1, a (2), above, but in no event shall more than sixty (60) days in any qualifying year be so considered.

11.   Vacation for Employees on Union Business

Time lost from an Employee's normal working schedule spent on official Union business for which s/he is entitled to reimbursement under the provisions of this Agreement shall be considered as time worked in computing vacation eligibility.

12.   Prorated Vacation

In the event an Employee retires or dies, the Employee or the Employee's personal representative shall be paid a vacation allowance equal to his hourly rate of pay for vacation purposes multiplied by a pro rata portion of the number of hours of vacation time he would have earned, under this Agreement, had he continued to work the same relative proportion of the available time he had theretofore worked during the qualifying period.

# Article 10.  Paid Time Off and Leaves Of Absence

**Section C.        Bereavement Leave**

1.    In the event of the death of any of the relatives listed below, an Employee, upon request, will be excused and paid for scheduled shifts as detailed below, which fall within a consecutive day period, provided however that one such calendar day shall include the day of the funeral and it is established that the Employee attended the funeral.

| Relation | Scheduled Shifts Off |
|---|---|
| Legal Spouse, Parent, Child or Step-Child | 5 |
| Sibling, Step-Parent and Step-Siblings, Mother or Father in-law, Grandparent or Grandchild | 3 |

2.    Payment shall be eight (8) hours at the Employee's Regular Rate of Pay.  An Employee will not receive bereavement pay when it duplicates pay received for time worked or not worked for any other reason. Time thus paid will not be counted as hours worked for purposes of determining overtime or premium pay.

**Section D.        Jury or Witness Duty**

An Employee who is called for jury service or subpoenaed as a witness shall be excused from work for the days on which s/he serves. Service, as used in this Section, includes required reporting for jury or witness duty when summoned, whether or not the Employee is used. The Employee shall receive, for each such day of service on which s/he otherwise would have worked, the difference between the payment received for such service and the amount calculated by multiplying eight (8) hours at his/her Regular Rate of Pay. To receive payment the Employee must present proof that s/he did serve, report for service or was subpoenaed and reported as a witness and the amount of pay, if any, received therefor.

# Article 10.  Paid Time Off and Leaves Of Absence

**Section E.**      **Leave of Absence for Employment with the Union**

1.  Leaves of absence for the purpose of accepting positions with the International or Local Unions shall be made available to a reasonable number of Employees. Employees who intend to apply for such leaves shall give the Company adequate notice to enable it to fill the jobs vacated.

2.  Leaves of absence for the purpose of accepting or continuing in a temporary position with the International shall be for periods of up to six (6) months and shall be extended upon request; provided, however, in no event shall an Employee be entitled under this provision to a leave of absence exceeding two (2) continuous years.

3.  Leaves of absence for the purpose of accepting permanent positions with the International Union shall be for a period concurrent with the individual's permanent employment with the International Union.  When an individual is made a permanent employee of the International Union (by completing his/her probationary period), s/he shall, from that point forward, retain his/her leave of absence status with the Company but shall not receive any Covered Service under the Asarco Retirement Income Plan for Hourly-Rated Employees. Such individual shall accumulate Seniority for all other purposes under the Agreement and local agreements thereunder; provided that s/he shall not be entitled to actually receive any contractual benefits during the period of the leave of absence.

4.  Leaves of absence for the purpose of accepting positions with the Local Unions shall be for a period not in excess of three (3) years and may be renewed for further periods of three (3) years each.

5.  Except as set forth above in Paragraph 3, Seniority shall continue to accrue and shall not be broken by a leave of absence under this Section.

# Article 10.  Paid Time Off and Leaves Of Absence

**Section F.      Service with the Uniformed Services**

1.   Reemployment Rights

An Employee who leaves the Company employment to enter the Uniformed Services shall be granted all statutory rights to reemployment and shall continue to accrue Seniority during such service. For the purposes of this Section, Uniformed Services means the Armed Forces; the Army National Guard and the Air National Guard when engaged in active duty for training, inactive duty training, or full-time National Guard duty; the commissioned corps of the Public Health Service; and any other category of persons designated by the President in time of war or national emergency.

2.   Training

An Employee shall be provided with a reasonable program of training in the event s/he does not qualify to perform the work on a job which s/he might have attained except for his/her service in the Uniformed Services.

3.   Educational Leave of Absence

Any Employee entitled to reemployment under this Section who applies for reemployment and who desires to pursue a course of study in accordance with a federal law granting such opportunity because of his/her military service shall be granted a leave of absence for such purpose. Such leave of absence shall not constitute a break in Seniority for purposes other than a break in service under the Pension Plan. Any such Employee must notify the Company and the Union in writing at least once each year of his/her continued interest to resume active employment with the Company upon completing or terminating such course of study.

4.   Disabled Returning Veterans

Any Employee entitled to reemployment under this Section who returns with a service-connected disability which makes returning to his/her prior job onerous or impossible shall be assigned to a vacancy suitable to such impaired condition during the continuance of such disability.

5.   Vacation Pay

a.   An Employee who did not receive but was entitled to paid vacation during the calendar year in which s/he enters the Uniformed Services shall be paid an amount equal to the vacation pay to which s/he was entitled.

b.   Notwithstanding any other provisions of this Agreement to the contrary, an Employee who is reemployed after being honorably discharged shall be entitled to paid vacation

92

**Article 10. Paid Time Off and Leaves of Absence**

for the calendar year in which s/he is reemployed, provided that no Employee shall be afforded more than one (1) vacation allowance for any one (1) calendar year, at a rate of pay based on his/her earnings for the last full year in which s/he worked prior to his/her serving.

6.   Military Encampment Allowance

An Employee who is required to attend an encampment of the Reserve of the Armed Forces or the National Guard shall be paid, for a period not to exceed two (2) weeks in any one (1) calendar year, the difference between the amount paid by the Government (not including travel, subsistence and quarters allowance) and his/her Regular Rate of Pay for the number of days s/he would have been scheduled to work during such encampment.

# Article 10.  Paid Time Off and Leaves Of Absence

**Section G.**    **Family and Medical Leave Act**

1.  The Company shall comply with the Family and Medical Leave Act of 1993 (FMLA) and shall apply its requirements as set forth below. Nothing in this Section shall be construed to provide lesser treatment than that required under the FMLA or to deprive any Employee of any right or forum thereunder.

2.  A copy of a summary of the law and Employee rights and obligations thereunder is available at the Company's Human Resources Office for review and will be issued upon request and at the time any FMLA leave is requested. The required posting under the FMLA will be maintained by the Company.

3.  Eligibility and Entitlement

    a.  Leave under this Section shall be available to any Employee who has twelve (12) months or more of Seniority calculated pursuant to the Seniority provisions of this Agreement. There shall be no hours-worked requirement for eligibility.

    b.  Any eligible Employee shall be entitled to up to twelve (12) weeks of unpaid leave in any twelve (12) month period for reasons specified in the FMLA. This period shall be measured on a rolling twelve (12) month basis, measured backward from the date any FMLA leave is used. Any time taken off in connection with any of the situations covered by the FMLA shall be counted toward the twelve (12) week period, except as otherwise excluded.

4.  Pay During FMLA Leave

    a.  Employees seeking FMLA leave under this Section may be required to utilize unused paid vacation.

    b.  An Employee may request to utilize additional paid vacation during the FMLA leave time. The Company reserves the right to approve such a request where it involves a change in the vacation schedule.

    c.  Except for the utilization of Sickness and Accident, or Workers' Compensation benefits, all time off provided shall be unpaid and shall be considered as time not worked for all other matters. Treatment of time not worked while receiving Sickness & Accident or Workers' Compensation benefits is subject to the limitation in Article 10, Section B, Paragraph 10.

    d.  An Employee on FMLA leave is not eligible for Supplemental Unemployment Benefits in the event of a layoff, until following the termination of the leave.

5.   Seniority

Leaves of absence under this Section shall not constitute a break in Seniority and the period of such leave shall be included in an Employee's length of Seniority under this Agreement and all benefit agreements.

6.   Benefit Continuation

a.   All Employees' benefit coverage will continue during such leave, provided the Employee is otherwise eligible for such coverage and the Employee continues making any normally-required premium or other payments in a manner acceptable to the Company. In the event the Employee fails to make such payments, all benefit coverage shall terminate.

b.   In the event an Employee fails to return to work or quits after the Employee's FMLA leave period has been concluded, the Company waives its right to recover the cost of health insurance coverage provided by the Company during such leave.

# Article 10.  Paid Time Off and Leaves Of Absence

**Section H.**     **Political Leave**

The Company will grant to an Employee a leave of absence for a period not to exceed four (4) years for full-time elected or appointed Federal, State, County or City political office. This leave will be limited to one (1) Employee at a location at any given time. Upon the termination of this political office, the Employee shall be reinstated to his or her previously held job with accrued seniority rights unless the Company's circumstances have so changed as to make it impossible or unreasonable to do so; such as a reduction in force requiring his or her layoff had s/he been working; provided however, that such Employee is physically able to perform the essential functions of such job and that he make application to the Company for reinstatement within twenty-one (21) days after said termination. No benefits of employment, except seniority, shall accrue during the period of absence; provided that the break-in-service rules and other provisions of the Asarco Retirement Income Plan for Hourly-Rated Employees shall apply.

# Article 11.  Corporate Governance

**Section A.     Board of Directors**

1.  The Company and the Union acknowledge that every member of the Company's Board of Directors (Board, members of such Board, Directors) has a fiduciary duty to the Company and all of its stockholders.

2.  The Company agrees that the Union shall have the right, subject to the procedure; the Directors' discharge of their fiduciary duties; and as described below, to designate two (2) individuals to serve on the Board.

    a.  The USW International President shall provide the Board's Chairman with the names and resumes of the individuals whom s/he wishes to have serve on the Board.

    b.  Provided that the individuals are acceptable to the Chairman, (it being understood that in all respects each individual will be dealt with separately) such acceptance not to be unreasonably withheld, the Chairman shall promptly recommend such individual(s) to the Board's Nominating Committee, who absent compelling reasons to the contrary, shall promptly recommend such individual(s) to the full Board for election at its next meeting.

    c.  Once elected, the individual(s) shall be recommended by the Board for election by the shareholders to serve a regular term at the Company's next Annual Meeting of Shareholders.

3.  If after election, the individual(s) becomes unwilling or unable to serve or the Union wishes to replace one or both of them, the International President shall provide the Board's Chairman with the name of a new individual(s) whom s/he wishes to have serve on the Board and the process outlined above shall thereafter be followed.  In such case the individual(s) previously named by the USW International President may be removed from or not nominated for re-election to the Board.

4.  At the time that any person is nominated by the Union as provided in this Section A, said nominee shall acknowledge in whatever fashion such acknowledgement is given by all of the Company's other Directors, that such nominee, if elected to the Board, would have a fiduciary duty to the Company and its stockholders.

5.  In the event the Company's Board of Directors has fewer than seven (7) members, the Union shall have the right, as described above to designate one (1) individual to serve on the Board.

# Article 11.  Corporate Governance

**Section B.        Investment Commitment**

1.    The Company agrees to make the capital expenditures required to maintain the competitive status of the facilities covered by this Agreement.

2.    The Company agrees that, except during maintenance and repair outages and temporary production outages or shortfalls, that it will not directly or indirectly replace the product which could have been produced at any facility covered by this Agreement with product obtained from other than producers that provide base wages and other economic benefits (including holidays, vacation pay, premium pay, overtime, and health and welfare benefits) that are substantially equivalent to those provided in this Agreement, unless it is operating the relevant facility covered by this Agreement at full capacity.

3.    The Company shall make all capital expenditures required to maintain the competitiveness and capacity of facilities within the plants covered by this Agreement, including investments that increase competitiveness and productivity, unless:

   a.    such facilities have been shut down pursuant to provisions of this Agreement; or

   b.    the Company has conducted full and extensive consultation with the Union and fully and carefully considered all Union input concerning the subject Capital Expenditures; and

   c.     making the subject Capital Expenditure would be imprudent.

# Article 11.  Corporate Governance

**Section C.      Upstreaming**

1. The Company agrees that it will only Upstream if after accounting for the Upstreaming the Company's credit statistics are equal to or better than those of an average BBB rated company in the mining sector, using criteria published by S&P; and upstream only if the Coverage Ratio at such time, calculated on a pro forma basis after giving effect to such Upstreaming and any incurrence of indebtedness of other funding consummated in connection therewith, is greater than or equal to 1.80 to 1.00.

2. "Coverage Ratio" means, for any 12-month period, the ratio of (1) the sum of (a) EBITDA for such period, plus (b) to the extent deducted from earnings in computing EBITDA for such period (x) pension expense incurred by the Company during such period and (y) all expenses incurred by the Company during such period in respect of any environmental or asbestos-related obligations, to (2) the sum of (a) interest expense plus (b) capital expenditures of the company for such period, plus (c) cash pension contributions made by the Company during such period plus (d) cash payments made by the Company during such period in respect of any environmental or asbestos-related obligations.

3. Without in any way limiting the applicability of Paragraph 1 above, the Company agrees that all transactions (including, without limitation, sales, loans, purchases, leases, guarantees, fees of any kind, and equity transactions) between the Company and any equity holder or any Affiliate of any equity holder, shall be conducted on an arm's-length basis, on commercially reasonable terms not less favorable to the Company than those that could be obtained from an unrelated third party, and in accordance with any shareholders agreement of the company.  In addition, any loan or similar transaction to any such person shall only be made if it is beneficial to the Company and on terms consistent with the business relationship between such person and the Company.  Subject to the foregoing, the Company may engage in transactions with its equity holders an their Affiliates.

4. For the purposes of this Section, Upstreaming includes directly or indirectly, paying any dividends on, or making any distributions, exchanges, conversions, retirements, repurchases or redemptions, in respect of the Company's stock.

# Article 11.  Corporate Governance

**Section D.      Right to Bid**

1.  Should the Company decide or be presented with an offer to sell or otherwise transfer a controlling interest in the corporate entity which owns its assets (a Controlling Interest) or all or a portion of one or more of its facilities (Facilities) (either or both, the Assets), it will promptly advise the USW in writing and grant to the USW the right to organize a transaction to purchase the Assets (a Transaction).

2.  The Company will provide the USW with any information provided to other bidders so that the Union may determine whether it wishes to pursue a Transaction.  All such information shall be subject to an executed Confidentiality Agreement.

3.  The Company shall promptly notify the USW of the schedule and/or timetable for consideration by the Company of any possible transaction.  The Company will provide the USW with the greater of (a) forty-five (45) days or (b) the time provided by the schedule and/or timetable given to other interested parties to submit an offer for the Assets, except in the case of an unsolicited offer for a controlling interest in the Company in which case the USW shall be provided with the time provided by the schedule and/or timetable given to other interested parties.

4.  During the period described in Paragraph 3 above, the Company will not enter into any contract regarding the Assets with another party, provided however that this prohibition does not apply to any contract not related to the bidding process**.**

5.  In the event that the USW submits an offer pursuant to the above, the Company shall not be under any obligation to accept such offer.  However, the Company may not enter into an agreement with regard to the Assets with an entity other than the USW unless that Transaction is superior to the USW offer.  The Company may only deem a proposed Transaction superior if its Board of Directors reasonably determines that such Transaction is more favorable to the Company and/or its shareholders, taking into consideration such factors as price, certainty of payment, conditions precedent to closing and other factors which influence which of the transactions is in the best interests of the Company and/or its shareholders.

6.  This Section is meant to cover only sales or transfers of a Controlling Interest and shall not cover any public offering of equity securities.

7.  The rights granted to the USW in this Section may be transferred or assigned by the USW; provided, that the USW's transferee or assignee must be reasonably acceptable to the Company (but the transferee may not thereafter transfer such right to bid).

# Article 12.  Benefits

**Section A.        Active Welfare Benefits**

The Company and Union have negotiated the following welfare benefit plans which are described in Summary Plan Descriptions and incorporated by reference herein:

1.    Asarco Health Plan (including Weekly Accident and Sickness Benefits);

2.    Asarco Prescription Drug Plan;

3.    Asarco Dental Plan;

4.    Asarco Vision Plan

5.    Asarco Group Life Insurance and AD&D Plan; and

6.    Flexible Spending Accounts.

**Section B.        General**

1.    The terms of Sections B through N shall control over any provisions of the summary plan descriptions or booklets distributed by the Company or plan administrators ("SPD's") that address such matters.  Notwithstanding any language to the contrary in those SPD's, the benefits or covered services described therein shall not be subject to amendment, modification or termination except as the Union and the Company agree otherwise (except as necessary to comply with applicable law).

2.    The Company shall pay the full cost of the benefits during the term of this Agreement (with the exception of all monthly contributions, deductibles, copays and supplemental/dependent life insurance contributions). Monthly Employee contributions are as follows:

| Family Size | Monthly Contribution |
|---|---|
| Employee | $8 |
| Employee plus one Dependent | $17 |
| Employee plus Family | $26 |

**Section C.        Effective Date of Coverage**

Employees will become covered as of the Effective Date of the Agreement.  Newly hired Employees will become covered as of the first day of employment except for Sickness and

Accident benefits, which will become effective following the completion of their probationary period.

**Section D.        Dependent Coverage**

1.      Dependent coverage will become effective on the same date as the Employee becomes covered or the date the Employee acquires a dependent, if later.

2.      The term "dependent" includes:

    a.      spouse;

    b.      unmarried children less than 19 year of age, including:

        i.      Employee's natural children;

        ii.     Employee's legally adopted children (including a child living with the adopting parents during the period of probation) and those for whom the Employee is legal guardian;

        iii.    stepchildren (i.e., the natural children of the Employee's spouse) residing in the Employee's household and principally supported by the Employee ("Principally supported" means the child was reported as a dependent on the Employee's most recent federal income tax return);

        iv.     children for whom coverage is required under a Qualified Medical Child Support Order (QMCSO);

    c.      Employee's children 19 years of age or more but less than 25 years of age provided such child is unmarried, dependent upon the Employee for support and maintenance and is attending an accredited school or university on a full-time basis (the Employee must provide supporting documentation semi-annually); and

    d.      children in the above categories who are totally disabled are covered under the Plan, regardless of age, for as long as they are dependent upon the Employee for support and maintenance provided they became totally disabled prior to age 19 and were eligible for coverage as a dependent child prior to attaining age 19.

    For purposes of qualifying as disabled, dependent children must be certified by the Asarco Corporate Medical Director, as suffering from an injury or illness which prevents them from living independently from their parents and obtaining gainful employment. Coverage for disabled children will continue until both parents qualify for Medicare or otherwise lose coverage through the Asarco Health Plan.

3.      Dependent Benefits After the Employee's Death

a.   Coverage under the Asarco Health Plan (including prescription drug, dental and vision benefits) will continue for the eligible dependents of active Employees who die in active service with 10 years or more of Seniority and who have been married for at least one year.

b.   In the event of the death of a retired Employee, coverage under the Asarco Health Plan (including prescription drug, dental and vision benefits) applicable to retired Employees will continue for the eligible dependents, if the spouse is eligible to receive a post-retirement spouse's pension allowance.

**Section E.        Termination of Coverage**

1.   Disability

a.   Insurance benefits will continue for the duration of an absence due to occupational or non-occupational accident or illness up to a maximum of twenty-four (24) months from the end of the month last worked or the month the Employee receives a pension from the Company.

b.   Insurance benefits will continue for twenty-four (24) months from the end of the month last worked or the Employee's 65th birthday (whichever comes first) for Employees absent from work because of permanent and total disability due to occupational or non-occupational accident or illness. At such time if the Employee has ten or more years of Continuous Service under the Pension Plan s/he will be provided benefits as long as s/he is totally disabled. If the Employee has less than ten years of Continuous Service at such time, your benefits will terminate. This Paragraph shall be subject to the requirements of the Age Discrimination in Employment Act.

c.   An Employee who recovers from a disability within twenty-four (24) months after their last day worked and are unable to return to work because of a reduction in force for lack of work, s/he shall be considered on layoff at such point and eligible for a maximum of six (6) months from the date of layoff.

2.   Layoff

If the Employee ceases work because of layoff, the following provisions will be applicable to insurance coverage:

a.   Sickness and Accident coverage will terminate on the last day worked.

b.   All other insurance coverage under the Asarco Welfare Plans will be continued during such layoff up to a maximum of six (6) months from the end of the month last worked.

3.    Leave of Absence

    a.    If the Employee ceases work because of a leave of absence, all coverage under the Asarco Welfare Plans will cease six months from the end of the month last worked.

    b.    If the Employee ceases work because of a leave of absence for union business, all coverage under the Asarco Welfare Plans will continue for the entire period of such leave.

    c.    If the Employee ceases work due to authorized military duty, Medical, Dental, Vision, Life, AD&D and Prescription Drug benefits coverage will terminate as of the thirty-first (31st) day after the last day worked.

    d.    If the Employee ceases work due to authorized leave under the Family and Medical Leave Act, Medical, Dental, Vision, Life, AD&D, and Prescription Drug coverage will terminate upon expiration of the authorized leave, unless the Employee returns to work at that time.

4.    Suspension

Benefits will be continued as if the Employee were on layoff, except that Sickness and Accident coverage will be continued during a period of suspension which is not converted into discharge.

5.    Strike

Coverage under the Asarco Welfare Plans for striking Employees and their dependents will terminate at the end of the month the strike commences. In the event of a strike, Employees and dependents may elect continuation coverage under COBRA.  During the strike, Weekly Accident and Sickness benefit coverage shall not continue for disabilities which arise after the commencement of the strike, but shall commence for such disabilities upon the cessation of the strike and recall to work. Notwithstanding the above, Weekly Accident and Sickness benefit payments shall continue to Employees whose disabilities arose prior to the commencement of the strike

6.    Reinstatement or Re-Employment

If the Employee returns to work following an absence on account of layoff, leave of absence or disability during which some or all of the coverage under the Asarco Welfare Plans shall have terminated, all such coverage will be reinstated on the day the Employee returns to work.

7.    Termination of Employment

If employment is terminated by other than retirement, all coverage under the Plans will cease on the date of such termination.

In the event an Employee is discharged by the Company and there is a dispute as to whether or not the discharge was justified, the Company shall continue the benefits under the Plans for such employee until the case is finally resolved but not exceeding 90 days.

In the event an Employee or dependent is hospitalized on the date the Employee's benefits terminate, health care benefits shall be covered until the earlier of (a) completion of the hospital stay; or (b) the date on which the hospital reaches the maximum number of days under the Health Care Plan.

## Section F.        Coverage Following Retirement

1.    Employees who retire (other than deferred vested) under the Asarco Retirement Income Plan for Hourly-Rated Employees will continue to be covered by the Asarco Health Plan (including prescription drug benefits) and Group Life Insurance Plan, including spouse and eligible dependents as long as they remain eligible, as described in Section O of this Article.

2.    The benefits otherwise provided for covered medical expenses shall be reduced by any benefits for or because of such expenses being available under Medicare, excluding benefits due to being in the first 18 months of end stage renal disease. The Asarco Health Plan is primary, subject to coordination of benefit provisions, for benefits due to being in the first 18 months of end stage renal disease.

## Section G.        Continuous Service

Wherever the term Continuous Service is used herein, it means Seniority as determined in accordance with Article 5, Section E, of the Basic Labor Agreement.

## Section H.        Summary of Life Insurance Benefits

1.    Active Employees

    a.    $50,000 of coverage shall be provided for each active Employee, including a waiver of premium in event of disability at any age.

    b.    Active Employees shall be allowed to purchase at cost, supplemental life insurance for themselves and dependent life insurance for their spouses and children. Employees are responsible for payment of these premiums.

2.    Retired Employees.

Upon retirement under the Company's Retirement Plan, the amount of coverage to be continued without cost to the Employee will be $4,500.

**Section I.         Summary of Accidental Death or Dismemberment Benefits**

Death or dismemberment by accidental means due to non-occupational causes will provide:

1.     $50,000 for loss of life.

2.     $25,000 for loss of one hand or one foot or the sight of one eye.

3.     $50,000 for loss of two or more such members.


**Section J.         Summary of Weekly Sickness and Accident Benefits**

1.     $400.00 per week for 52 weeks for absences caused by non-occupational accidents or sickness; benefits to start the 1st day in case of accidents or hospitalized sickness or outpatient surgery and 6th day in case of un-hospitalized sickness.

2.     For any week that temporary and total disability benefits are payable under State Worker's Compensation law, such payments shall be supplemented by an amount equal to the difference (if any) between such weekly payment and the Non-Occupational Weekly Sickness and Accident Benefit, provided that the Company recognizes the disability causing the absence to be work incurred. There is no change in the terms or conditions of the Non-Occupational Weekly Sickness and Accident Benefit Plan, including the duration of such benefits, except to provide a Workers Compensation Supplement.

3.     Benefits will terminate at commencement of benefit payments under the Pension or Permanent and Total Disability Benefit Plans.


**Section K.         Summary of Medical Benefits**

1.     Medical benefits will be provided through a Preferred Provider Organization (PPO), which offers two (2) levels of benefits.  Services from a provider who is in the PPO network will be covered at the highest level of benefits.  Services from a provider who is not in the PPO network will be covered at the lower level of benefits.  In either case, there is no requirement to select a Primary Care Physician (PCP) to coordinate care.

2.     The Company has contracted with a Managed Care Organization to implement a pre-certification and utilization review program. This program includes the following:

        a.     Pre-Certification for all In-Patient Courses of Treatment;

        b.     Continuing Stay Review for all Confinements; and

c.    Case Management including alternative setting reviews and Discharge Planning.

Employees securing In-Patient care on a fee-for-service basis (outside of Network) will be required to contact the Managed Care Organization prior to admission. Claims for In-Patient treatment submitted by Employees who have failed to contact the Managed Care Organization will be subject to a per confinement deductible of $250. Employees obtaining In-Patient care from Network providers need not contact the Managed Care Organization. This program shall include an appeals procedure.

3.    Reimbursement for all medical services is subject to the annual deducible, coinsurance and applicable copayments.   However, deductibles and coinsurance shall not apply to Preventive or Wellness Care.

4.    Reimbursement for in-network services is subject to coinsurance calculated according to the negotiated amount; the Employee is not responsible for any amount in excess of the negotiated rate.  Reimbursement for out-of-network services is subject to coinsurance according to the usual, customary and reasonable and customary (UC&R) rate; the Employee is responsible for any amount in excess of the UC&R rate.

5.    If network services are not available within a reasonable distance from the Employee's home, out of network services will be reimbursed at the in-network level. (For example, the distance from Kearny or Hayden to Tucson, Phoenix or Globe would be considered a reasonable distance).

6.    Annual out-of-pocket maximum includes deductible and coinsurance amounts for covered (in and out-of-network) medical expenses each calendar year, excluding prescription drug expenses and amounts above UC&R amount.  Prescription drug expenses shall not apply to the lifetime benefit maximum.

## Summary of Health Insurance

| | In-Network | Out-of-Network |
|---|---|---|
| **Deductible:** | | |
| Individual: | $200 combined in and out-of-network | |
| Family: | $400 combined in and out-of-network | |
| **Out-of-Pocket Maximum:** | | |
| Individual: | $2,000 combined in and out-of-network | |
| Family: | $2,000 combined in and out-of-network | |
| **Annual Maximum:** | None | |
| **Lifetime Maximum:** | $1 Million combined in and out-of-network | |
| **Inpatient Care** | | |
| **Precertification of Admission** | Not Required | Required or $250 penalty per confinement |
| **Inpatient Hospital Care** Facility Services | 90% * | 80% UCR * |
| **Inpatient Hospital Care** | 90% * | 80% UCR * |

|  | In-Network | Out-of-Network |
|---|---|---|
| Physician Services |  |  |
| **Inpatient Surgery** Professional Provider Services | 90% * | 80% UCR * |
| **Diagnostic Tests, X-Rays, and Lab Services** | 90% * | 80% UCR * |
| **Inpatient Rehabilitation Services** (Occupational Therapy, Physical Therapy, Speech and Language Therapy) | 90% * | 80% UCR * |
| **Maternity Services** | 90% * | 80% UCR * |
| **Abortion** | 90% * | 80% UCR * |
| **Skilled Nursing Facility** | 90% * | 80% UCR * |
| **Hospice Care** | 90% * | 80% UCR * |
| **Human Organ and Tissue Transplants** | 90% * | 80% UCR * |
| **Home Health Care** | 90% * | 80% UCR * |
| **Home Private Duty Nurses** | 90% * | 80% UCR * |
| **Alcohol and Substance Abuse Care** | 90% * | 80% UCR * |
| **Mental Health** (Limited to two admissions per lifetime per individual) | 90% * | 80% UCR * |
| **Outpatient Care** |  |  |
| **Office Visits, Primary Care Physician** | 90% * | 80% UCR * |
| **Office Visits, Specialist** | 90% * | 80% UCR * |
| **Outpatient Surgery** | 90% * | 80% UCR * |
| **Second Surgical Opinion** | 90% * | 80% * |
| **Pre-admission Testing** | 100% * | 100% * |
| **Allergy and Other Injections** | 90% * | 80% UCR * |
| **Diabetic Supplies & Equipment** | 90% * | 80% UCR * |
| **Family Planning** | 90% * | 80% UCR * |
| **Infertility Treatment** | 90% * | 80% UCR * |
| **Chiropractic Services** | 90% * | 80% UCR * |
| **Podiatry Services** | 90% * | 80% UCR * |
| **Outpatient Mental Health Care** | 60% * | 60% UCR * |
| **Outpatient Substance Abuse Care** Facility Services | 60% * | 60% UCR * |
| **Ambulance Services** (including air ambulance) | 90% * | 80% UCR * |
| **Emergency Room** | 90% * | 80% UCR * |
| **Emergency Accident Care** | 90% * | 80% UCR * |
| **Occupational Therapy** | 90% * | 80% UCR * |
| **Physical Therapy** | 90% * | 80% UCR * |
| **Speech and Language** | 90% * | 80% UCR * |

| | In-Network | Out-of-Network |
|---|---|---|
| **Therapy** | | |
| **Durable Medical Equipment:** (wheelchairs, oxygen, etc.) | 90% * | 80% UCR * |
| **Prosthetic Devices** (pacemakers, braces, artificial limbs and eyes, etc.) | 90% * | 80% UCR * |
| **Diagnostic Tests, X-Rays, and Lab Services:** | 90% * | 80% UCR * |
| **Dialysis Treatment:** | 90% * | 80% UCR * |
| **Radiation Therapy:** | 90% * | 80% UCR * |
| **Preventive and Wellness Care** | | |
| **Physical Examinations** (subject to frequency limitations) | 100% UCR, with no deductible. | 80% UCR, with no deductible. |
| **Cancer Screening Exams** (including pap test, prostate and colon exams) | 100% UCR, with no deductible. | 80% UCR, with no deductible. |
| **Sigmoidoscopy:** | 100% UCR, with no deductible. | 80% UCR, with no deductible. |
| **Mammogram:** Annual for women age 50 and over and one mammogram every other year for women age 35 and over with a first degree relative with breast cancer. | 100% UCR, with no deductible. | 80% UCR, with no deductible. |
| **Well Baby Care:** | 100% UCR, with no deductible. | 80% UCR, with no deductible. |
| **Immunizations:** The plan pays scheduled benefits for immunizations as part of well-baby care for infants (EMMR, DPT, Oral Polio, etc.). | 100% UCR, with no deductible. | 80% UCR, with no deductible. |
| **Retail Prescription Drug Copayments** | | |
| Maximum Supply: | 30 days | 30 days |
| Generic Drugs: | 10% | 10% plus difference between cost at network pharmacy and out-of-network pharmacy. |
| Brand-Name Drugs: | 20% | 20% plus difference between cost at network pharmacy and out-of-network pharmacy. |
| **Mail Order Prescription Drug Copayments** | | |
| Maximum Supply: | 90 days | Not Applicable. |
| Generic Drugs: | $5.00 | Not Applicable. |
| Brand-Name Drugs: | $10.00 | Not Applicable. |

**Note:**   * After deductible up to out-of-pocket maximum.

7.   Expenses incurred for kidney dialysis provided at home or in a kidney dialysis unit which s not connected with a hospital will be covered to the same extent such services would be covered if the procedure was provided in a hospital.

8.   Expenses incurred for extraction of impacted teeth in the out-patient department of a hospital will be covered to the same extent such services would be covered if the extraction was performed as a hospital in-patient.

9.   Expenses incurred for surgery performed in an ambulatory surgical facility will be covered to the same extent such services would be covered if the surgery was performed as an in-patient in a hospital.

10.  An ambulatory surgical facility is described as a legally constituted and operated ambulatory care health center (either part of a hospital or otherwise) with permanent plant, equipment and supplies not usually available in a physician's office for surgical or medical care not requiring in-patient confinement.

11.  Temporomandibular Joint Dysfunction (TMJ) services will be covered at 80%. Services provided by an in-network physician will be covered at 90%.

12.  Skilled Nursing Coverage will be provided in a Skilled Nursing Facility. Details of this benefit are included in the Summary Plan Description.

13.  Benefits shall be provided for sterilizations, abortions and transplant procedures, including donor expenses not covered by other plans.

14.  **Limitations**

     a.   Alcoholism and Drug Addiction

          Benefits under any provision of the Plan for treatments received in an accredited treatment center for alcoholism or drug addiction will be limited to two confinements of not more than 30 days each, unless the course of treatment requires additional days (to a maximum of 15 additional days) during a covered individual's lifetime.

     b.   Chiropractic services are covered for the initial consultation and up to a maximum of 18 visits in any calendar year (excluding initial consultation).

     c.   X-Rays are limited to three in any 90-day period.

     d.   Mental Health

          i.   Benefits paid under any provision of the Plan for expenses incurred as the result of out-patient mental health services shall be reimbursed on a 60%/40% Coinsurance basis.

ii.     Benefits paid under any provision of the Plan for expenses incurred as the result of confinement in a hospital for psychiatric treatment shall be limited to two confinements of not more than 30 days each during a covered individual's lifetime.

15.   **Nonduplication of Benefits**

a.     Benefits available to any covered individual under any provision of the Asarco Health Plan shall be reduced to the extent like benefits are payable under the provisions of any group insurance plan or group pre-payment plan.

b.     Benefits available to any covered individual under any provision of the Asarco Health Plan shall be reduced to the extent like benefits are available under the provisions of any group insurance plan or group pre-payment plan.  Group insurance or prepayment plan include: (1) coverage under a governmental program or coverage that is provided or required by statute, including any motor vehicle no-fault coverage required by statute and (2) group insurance or other coverage for a group of individuals, including student coverage obtained through an educational institution.

c.     In the event a dependent or early retiree covered under the Asarco Health Plan is, or shall become, covered, or eligible for coverage, under any group insurance or group pre-payment plan by virtue of employment, benefits under the Asarco Health Plan shall be secondary to the benefits provided or available under such other plan and aggregate benefits payable under both plans may not exceed the benefits that would have been payable under the Asarco Health Plan.

d.     Notwithstanding the foregoing sentence, the Plans shall not coordinate the benefits of a dependent who is eligible for a group insurance or group pre-payment plan by virtue of employment if such plan requires the dependent to pay premiums for health care coverage greater than those required under the Asarco Welfare Plans.

e.     The Asarco Health Plan shall be the primary source of coverage for active Employees who continue to work beyond their Medicare entitlement date. The dependents of such Employees will also continue to be eligible for coverage, provided that the Employee is actively at work.

f.     Expenses and benefits which are recovered by legal action or settlement are not covered under any provision of the Asarco Health Plan.  Accordingly, the Company shall be entitled to a refund for any benefits paid under any provision of the Asarco Health Plan which are recovered by legal action or settlement.  The right of the Asarco Health Plan to a refund shall be applied to the aggregate amount recovered by the Employee or covered dependent from legal action or settlement related to non-occupational injuries for which Plan benefits were paid.  Reimbursement to the Asarco Health Plan shall not exceed the portion of such expenses or benefits which are covered by legal action or settlement which is attributed to health care benefits.

Reasonable legal expenses (attorney's fee and costs) incurred in obtaining payments from a third party will not be considered as included in the aggregate amount subject to reimbursement.  Employees are required to notify Asarco promptly of the fact of such legal action, or of a judgment or settlement in favor of the Employee (or covered dependent) and make available all information relevant to the administration of any provision of the Plan.

g.   If, during the term of this contract, like benefits are provided under a compulsory contributory Federal or State program, the Company and the International Union will meet to reach mutual agreement on the amount and reallocation of funds released as a result of reduction of Asarco Health Plan benefits.

16.   **Coordination of Benefits**

a.   If an Employee or eligible dependent is eligible for more than one plan of benefits, the rules establishing which plan is primary and which one is secondary, are as follows:

1.   The benefits of a group plan which covers the person other than as a dependent shall be determined before the benefits of a group plan which covers such person as a dependent.

2.   In the case of dependent children who are eligible for coverage under any other group insurance or group pre-payment plan, the plan of the parent whose birthday falls earlier in a year shall be primary and the benefits of the parent whose birthday falls later in the year shall be secondary.

Note:   If your spouse's birthday falls first in the year and their employer's plan requires a  contribution in order to obtain dependent coverage, your dependents will only be covered on a secondary basis by the Asarco Health Plan, even if you choose not to enroll them in that plan.

b.   If a dependent child is covered under both parents' plans, the primary plan for coverage will be the plan covering the parent whose birthday comes earlier in the year, unless:

1.   The parents are separated or divorced and the parent with custody of the child has not remarried.  In such a case, the benefits of the plan covering the child as a dependent of the parent with custody will be determined before the benefits of the plan covering the child as a dependent of the non-custodial parent.

2.   The parents are divorced and the parent with custody of the child has not remarried.  In such a case, the benefits of a plan covering the child as a dependent of the parent with custody will be determined before the benefits of a plan provided by the stepparent, whose benefits will be determined before those of the parent without custody.

3.    A court decree has been established one parent as having financial responsibility for the medical, dental or other health care expenses of the child.  In such a case, the benefits of the plan of that parent will be considered primary.

c.    When the rules do not establish an order of benefit determination, the benefits of the group plan which has covered the person for the longer period of time will be considered to be primary.

d.    When only one plan has a non-duplication (or coordination) of benefits provision the plan without such provision will determine its benefits first.

e.    If a person is being covered as an Employee under two plans, the benefits of the plan which has covered the employer for the longer period of time will be determined first.

**Section L.**       **Summary of Vision Care**

Employees, early retirees and their eligible dependents shall be covered under the Asarco Health Plan. Details of the Vision Care Benefits are included in the Summary Plan Description.

## Summary of Vision Benefits

| Service/Product | Allowance |
|---|---|
| Eye Exam and Refraction | $32 per exam |
| Single Vision Lenses (standard) | $24 per lens |
| Bifocal Lenses (standard) | $36 per lens |
| Trifocal Lenses (standard) | $46 per lens |
| Aphakic/Lenticular Lenses | $72 per lens |
| Non-Standard Lenses (e.g. photochromatic, polycarbonate) | Same allowances as standard |
| Progressive Lenses | $41 per lens |
| Frames | $24 per frame |
| Contact Lens Fitting and Prescription | $20 per lens – Daily $30 per lens – Extended |
| Standard Contact Lenses | $48 per lens |

**Section M.**       **Flexible Spending Accounts**

Active full-time Employees may elect to establish flexible spending accounts of up to $2,400 for uncovered medical, vision and dental expenses, with a minimum contributed of $240 required. Active full-time Employees may elect to establish flexible spending accounts of up to $5,000 (unless a lower maximum is required by law) for dependent care, with a minimum contribution of $480.  Eligible expenses incurred between January 1st and March 15th of the following year may be submitted for reimbursement by May 15 of the following year. For detailed information concerning Flexible Spending Accounts refer to the Summary Plan Description.

**Section N.**      **Summary of Dental Benefits**

The dental benefits for Employees and their eligible dependents are as outlined below.

## Summary of Dental Benefits

| Benefit Provision | Plan Coverage |
|---|---|
| **Annual Deductible** | $100 per Individual |
| **Annual Maximum** | $3,000 per Individual |
| **Lifetime Orthodontic Maximum** | $3,000 per covered dependent |
| **Preventive Services** | |
| Routine oral examinations and prophylaxis | 100% of UC&R charges, limited to twice in any 12 month period, separated by at least 150 days. No deductible. |
| Application of fluoride | 100% of UC&R charges. No deductible. |
| Space Maintainers | 100% of UC&R charges. No deductible. |
| Emergency treatment for the temporary relief of pain which does not affect a definite cure. | 100% of UC&R charges. No deductible. |
| **Restorative Services** | **Plan Coverage** |
| Dental X-rays | 85% of UC&R charges, after deductible. |
| Fillings | 85% of UC&R charges, after deductible. |
| Inlays, onlays, gold fillings or crown restorations | 85% of UC&R charges, after deductible. |
| Extractions and oral surgery | 85% of UC&R charges, after deductible. |
| General anesthetics | 85% of UC&R charges, after deductible. |
| Periodontal treatment | 85% of UC&R charges, after deductible. |
| Endodontic treatment, including root canal therapy | 85% of UC&R charges, after deductible. |
| Repair or recementing of crowns, inlays, onlays, bridgework or dentures | 85% of UC&R charges, after deductible. |
| Relining or rebasing dentures | 85% of UC&R charges, after deductible. |
| **Prosthodontic Services** | |
| Initial installation of fixed bridgework | 50% of UC&R charges after deductible. |
| Replacement of an existing partial or full removable denture or fixed bridgework | 50% of UC&R charges after deductible. |
| **Orthodontics.** Coverage limited to dependent children under 19 years of age. | 50% of UC&R charges after deductible, up to lifetime maximum per covered individual. |

# Article 12.  Benefits

**Section O.**        **Retiree Health Care**

1.   Effective January 1, 2007 ("Effective Date"), the Company will maintain its program of medical, prescription drug and life insurance benefits ("Program") for retirees (and their spouses and surviving spouses) who, by reason of any collectively bargained agreement between the Union and the Company (or any one of its predecessors or direct or indirect subsidiaries) were eligible for retiree insurance benefits as of the Effective Date or who retire from the Company on or after the Effective date with eligibility for retiree insurance coverage ("Participants"), subject to the modifications to the Program as outlined herein.

2.   Benefit Plans

    a.   The current Program and Participant premiums will continue through February 28, 2007.

    b.   Effective March 1, 2007:

        (1)   the Program for Participants who are not eligible for Medicare will be the same medical and prescription drug coverage (excluding premiums) as outlined in the June 30, 2002 Settlement Agreement between the Unions and the Company for active employees at Asarco's Ray Operations.

        (2)   the Program for Participants age 65 and over or who are eligible for Medicare will be the same medical and prescription drug coverage (excluding premiums) as provided to non-Medicare eligible Participants (coordinated with Medicare).

        (3)   Life insurance benefits shall be those in effect at the time of the retiree's date of retirement.

        (4)   Notwithstanding the above, a Participant's eligibility for coverage under the Program after obtaining Medicare eligibility will be determined based on the rules of the Plan in effect at the time of the retiree's date of retirement.

3.   Beneficiary Premiums

Participant premiums for all Participants covered by this Program will be as follows:

    a.   Pre Medicare:     $100 per participant (each retiree, spouse, or surviving spouse) $200 maximum per family per month

    b.   Post Medicare:   $75 per participant (each retiree, spouse, or surviving spouse) $150 maximum per family per month

# Article 12.  Benefits

**Section P.        401(k) Savings Plan**

1.    The Company shall offer Employees the opportunity to participate in a 401(k) Savings Plan in accordance with the following:

2.    Eligibility

All Employees who have completed one (1) month of service will be eligible to participate in the Plan.

3.    Elections

Participants may elect to make, increase or decrease contributions at any time.

4.    Plan Administration

    a.    The Plan shall be administered by the Company.  The Company shall bear the payroll administrative costs associated with the Plan. The per participant, trustee, recordkeeping, transaction and other administrative fees will be borne by the Plan.

    b.    The Company reserves the right to make administrative changes to the 401(k) Savings Plan from time to time. However, these changes cannot diminish the benefits negotiated under the terms of the agreement.

5.    Vesting

    a.    Participants shall be fully vested in their contributions.

    b.    Participants shall be fully vested in company matching contributions once they have completed three years of service; or are permanently separated (immediately or over a scheduled period of time) because your plant, is permanently shut down; retire; reach age 65; become totally disabled; or die while actively employed by the company.

6.    Withdrawals and Distributions

Withdrawals will be available at age 59 - 1/2 or above (age 55 or above upon termination of employment) or in the event of "hardship" (as determined by IRS deemed hardship distribution standards).  Distributions will be available at retirement, death, disability or termination.

7.    Additional Requirements

The Plan will accept eligible rollover contributions from eligible qualified plans and IRA accounts subject to Internal Revenue Service rules.

8.    Investment Options

The Plan will offer at least seven (7) investment options, including a broad range of investment objectives and risk.  Participants will be able to change investment options or transfer funds among options at any time.

9.    Plan Funding

   a.    Participants may defer from 1% to 25% of eligible pay on a pre-tax basis, or 1% to 25% of eligible pay on an after-tax basis (subject to Internal Revenue Service regulations).  Participants who choose to save using a combination of pre- and after-tax contributions may save up to 25% of eligible pay.

   b.    Eligible earnings shall mean basic straight time hourly earnings, including vacation pay and holiday pay, but excluding overtime, shift differential, premium pay, bonuses, profit-sharing, special payments, add-ons or any similar payments. Contributions to the Plan shall not exceed the maximum permissible by law.

10.    Company Matching Contributions

The Company will match 50% of employee pre-tax contributions up to 6% of eligible pay in cash.  The Company does not match any portion of bonus, variable pay, profit sharing or other similar payments.  Participants who are fully vested may access all company matching contributions and request withdrawals, transfers and loans of these amounts.

11.    Loan Provision

The minimum loan shall be $1,000.  The maximum loan shall be fifty percent (50%) of the participant's account balance or $50,000, whichever is less.  No more than one general purpose and one primary residence loan shall be outstanding at any time.  Loan repayment will through automatic payroll deduction or an agreed upon alternative for Employees on layoff, disability or in the event of a labor dispute. All loan origination fees and loan service charges will be the responsibility of the employee requesting the loan.

12.    Documentation

All documents necessary to the establishment of the Plan will be reviewed with the Union and the Company shall make reasonable efforts to accommodate the Union's issues and concerns.

# Article 12.  Benefits

**Section Q.      Pension Plan**

The Company and Union have negotiated a Pension Agreement regarding the Retirement Income Plan for Hourly-Rated Employees of Asarco, which is contained in a separate document along with a Summary Plan Description.

The Company shall draft a summary plan description for the Pension Agreement, which will be reviewed with the Union and the Company shall make reasonable efforts to accommodate the Union's issues and concerns.

The Pension Agreement shall control over any provisions of the summary plan description distributed by the Company or plan administrator ("SPD") that address such matters. Notwithstanding any language to the contrary in those SPD, the benefits described therein shall not be subject to amendment, modification or termination except as the Union and the Company agree otherwise.

## LETTER OF UNDERSTANDING ON
## ESTABLISHMENT OF NEW WAGE SCALE

January 1, 2007

Mr. Terry Bonds
Chairman, Union Negotiating Committee
Director, District 12
United Steelworkers
3150 Carlisle Blvd, NE, Suite 110
Albuquerque, NM  87110

RE: New Wage Scale

Dear Mr. Bonds:

This will confirm our understanding that the parties have agreed to create a single, unified wage scale which will be effective as soon as possible across all locations covered by the January 1, 2007 Labor Agreement.

As a result of this process, some jobs or wage grades may receive wage increases in additional to those provided for under the January 1, 2007 Labor Agreement. No employee will suffer a reduction in wage due to the implementation of the new wage scale.

Such wage scale shall have uniform increments between wage grades. Effort will be made to establish uniform rates for identical jobs between covered locations and units, to the maximum extent possible, and to adequately reward Employees for accepting jobs which require additional training, responsibility, communication, problem-solving and self-direction.

Care will be taken in establishing this new wage scale to enable the Company to attract and retain skilled and experienced Employees.  The Company and Union agree to review the compensation paid to highly-skilled crafts or operations employees in the local area labor markets or its industry or area competitors as part of this process.

In the event that the parties are unable to reach agreement on a new wage schedule by June 1, 2007, they shall submit a final proposed wage schedule to an arbitrator, who shall choose from between the two offers. The wage schedule selected by the arbitrators shall be established retroactive to June 1, 2007.

Sincerely,

Jon E. Pettibone
Chief Negotiator
Asarco

Agreed:

_____
Terry Bonds
Chairman
Union Negotiating Committee

### LETTER OF UNDERSTANDING ON
### EL PASO RECALL RIGHTS

January 1, 2007

Mr. Terry Bonds
Chairman, Union Negotiating Committee
Director, District 12
United Steelworkers
3150 Carlisle Blvd, NE, Suite 110
Albuquerque, NM  87110

RE:  El Paso Recall Rights

Dear Mr. Bonds:

This will confirm the understanding reached during these negotiations that employees laid off from Asarco's El Paso plant who have not retired will continue to accrue Seniority for the duration of the 2007 Labor Agreement for purposes of recall only.  This is not intended to extend the Employee's Seniority for accrual of Employee benefits.

Sincerely,

Jon E. Pettibone
Chief Negotiator
Asarco

Agreed:

Terry Bonds
Chairman
Union Negotiating Committee

**LETTER OF UNDERSTANDING ON
EL PASO PLANT**


January 1, 2007

Mr. Terry Bonds
Chairman, Union Negotiating Committee
Director, District 12
United Steelworkers
3150 Carlisle Blvd, NE, Suite 110
Albuquerque, NM  87110

RE:  El Paso Plant

Dear Mr. Bonds:

During these negotiations the parties discussed scenarios under which the El Paso, Texas smelter could reopen. The parties agree that the El Paso plant shall be covered by the terms of this Agreement in the event it resumes operations, subject to any modifications agreed to by the bargaining chairs.

Sincerely,



Jon E. Pettibone
Chief Negotiator
Asarco

Agreed:



Terry Bonds
Chairman
Union Negotiating Committee

## LETTER OF UNDERSTANDING ON
## LOCAL SUPPLEMENTAL AGREEMENTS

January 1, 2007

Mr. Terry Bonds
Chairman, Union Negotiating Committee
Director, District 12
United Steelworkers
3150 Carlisle Blvd, NE, Suite 110
Albuquerque, NM  87110

RE:  Local Supplemental Agreements

Dear Mr. Bonds:

This will confirm our understanding that workplace practices and local supplement agreements that were in effect prior to our 2006 negotiations will remain in effect unless modified in the Basic Labor Agreement or as a result of local supplement discussions between the parties at each company location.  The parties will work to document the current workplace practices and other applicable continuing provisions and incorporate them into the applicable Local Supplemental Agreements.  Until the Local Supplemental Agreements are finalized, the current workplace practices and other provisions of the collective bargaining agreements will remain in effect.

In the event of a dispute between the parties, the Chairs of Negotiating Committees or their designees will attempt to reach an agreement to resolve the matter.   In the event that they cannot resolve the dispute, either party may submit such dispute to final and binding arbitration under the grievance procedure provided in this Agreement.

Sincerely,

Jon E. Pettibone
Chief Negotiator
Asarco

Agreed:

Terry Bonds
Chairman
Union Negotiating Committee

124

**Letters of Understanding**

Union Negotiating Committee

## LETTER OF UNDERSTANDING ON
## ADDITIONAL BENEFITS CHANGES

January 1, 2007

Mr. Terry Bonds
Chairman, Union Negotiating Committee
Director, District 12
United Steelworkers
3150 Carlisle Blvd, NE, Suite 110
Albuquerque, NM  87110

RE:  Additional Benefits Changes

Dear Mr. Bonds:

This will confirm our understanding and agreement on the above captioned matters.

1.  As of the Effective Date of this Agreement, the Asarco benefits plans (Health Plan (including Weekly Accident and Sickness Benefits), Dental Plan, Prescription Drug Plan, Vision Care Benefits Plan, Group Life Insurance Plan; and Flexible Spending Accounts) shall be as outlined in the June 30, 2002 Settlement Agreement and Summary Plan Description between the Unions and the Company for active Employees at Asarco's Ray Operations, except as agreed otherwise.

2.  Notwithstanding the above, the above Health Plan will be modified to

    a.  adopt the Asarco Copper Group coverage for second surgical opinion and ambulatory surgery and delete the Ray Unit Plan provisions for mandatory second surgical opinion (including incentives and penalties) and 100% coverage for 22 specified types of outpatient surgery, and

    b.  delete the "opt out" provisions and payments.

Sincerely,


Jon E. Pettibone
Chief Negotiator
Asarco

Agreed:

Terry Bonds
Chairman
Union Negotiating Committee

126

## LETTER OF UNDERSTANDING ON
## RETIREE HEALTH CARE ENROLLMENT

January 1, 2007

Mr. Terry Bonds
Chairman, Union Negotiating Committee
Director, District 12
United Steelworkers
3150 Carlisle Blvd, NE, Suite 110
Albuquerque, NM  87110

RE:  Retiree Health Care Enrollment and Contribution Payments

Dear Mr. Bonds:

This will confirm our agreement that the changes to the Retiree Health Plans will be as described in Article 12, Section O of this Agreement. The Company will conduct an open enrollment for current participants in the Retiree Health Plans, and retirees and surviving spouses who were eligible for such coverage. This enrollment will be for a 90-day period, with an initial mailing by February15st and a follow-up mailing by March 30th.  Coverage will become effective the later of March 1, 2007, or the effective date of enrollment.

Thereafter a 30-day open enrollment shall be conducted biannually in November among hourly retirees for participation in the Plan for the following calendar year.

Participants may elect to defer participation in the Program based on the availability of other health care coverage. Participants who lose coverage from other sources will be allowed to enroll (or reenroll) in the Program immediately upon notice and payment of the applicable premium. Participants who elect to defer participation will be given the opportunity to enroll (or reenroll) in the Program during the next annual enrollment period. Such coverage and required contributions due will be prospective from the date of reenrollment.

Participants who withdraw or whose coverage is terminated for failure to make the required premium contribution, will be allowed to enroll (or reenroll) in the Program during the next annual enrollment period with coverage to be effective the following calendar year.  Coverage and required contributions due will be prospective from the date of reenrollment.

The required retiree health care contributions for participants who enroll in the Program shall be deducted from their monthly retirement check, unless directed otherwise by the pensioner or surviving spouse.

Sincerely,

Jon E. Pettibone
Chief Negotiator
Asarco

Agreed:


Terry Bonds
Chairman
Union Negotiating Committee

## LETTER OF UNDERSTANDING ON
## MISCELLANEOUS CORPORATE ISSUES

January 1, 2007

Mr. Terry Bonds
Chairman, Union Negotiating Committee
Director, District 12
United Steelworkers
3150 Carlisle Blvd, NE, Suite 110
Albuquerque, NM  87110

Re:     Miscellaneous Corporate Issues

Dear Mr. Bonds:

This letter will confirm our agreement on the matters set forth below in connection with the Collective Bargaining Agreement (the "Agreement") between ASARCO LLC (the "Company") and the United Steelworkers ("USW" or the "Union") on behalf of the applicable bargaining units.

**Parties to the Agreement**

For purposes of Article 1, Section A of the Agreement, "Asarco" or the "Company" shall refer to (a), during the pendency of the chapter 11 reorganization case, ASARCO LLC and any entity that is under the Control of ASARCO LLC and (b), upon entry of a final, non-appealable order confiming a plan of reorganization for the Company and at any time thereafter, ASARCO LLC and any entity that Controls, or is under the Control of, or is under common Control with ASARCO LLC.  For purpose of this Letter of Understanding, "Control" shall mean possession, directly or indirectly, of either: (a) fifty percent (50%) of the equity of the enterprise; or (b) the power to direct the management and policies of said enterprise; provided, however, that the definition of "Control" shall exclude any business enterprise, including hedge funds and financial sponsors, whose primary business is providing equity or debt capital.

**Neutrality**

For purposes of Article 2, Section E concerning Neutrality, the definitions of "Affiliate" and "Venture" shall exclude any business enterprise, including hedge funds and financial sponsors, whose primary business is providing equity or debt capital.

**Board of Directors & Right to Bid**

Article 11, Section A concerning Board of Directors and Article 11, Section D concerning Right to Bid shall be effective only upon entry of a final, non-appealable order confirming a plan of reorganization proposed or supported by the Company.

**Letters of Understanding**

Very Truly Yours,


Joseph Lapinsky
President and CEO of ASARCO LLC


Agreed:


_____
Terry Bonds
Director, USW District 12
And Union Chair, ASARCO Bargaining Committee

Dated: _____

# LETTER OF UNDERSTANDING ON
# EFFECTIVE DATE OF PENSION MULTIPLIER

January 1, 2007

Mr. Terry Bonds
Chairman, Union Negotiating Committee
Director, District 12
United Steelworkers
3150 Carlisle Blvd, NE, Suite 110
Albuquerque, NM  87110

RE:  Effective Date of Pension Multiplier

Dear Mr. Bonds:

This will confirm our understanding and agreement on the above-captioned matter.  It has been agreed, among other things, that the Hourly Pension Plan (the "Plan") will be amended – subject to ASARCO's obtaining and/or retaining initial approval by the Internal Revenue Service – to provide that the "pension multiplier" thereunder shall be $40.00 (the "Amendment").  To assure that the Plan satisfies the requirements of section 401(a)(33) of the Internal Revenue Code of 1986, as amended (the "Code"), the parties agree that the effective date of the Amendment shall be the same date that ASARCO's plan of reorganization that will be filed with the bankruptcy court becomes effective.  Accordingly, ASARCO agrees to adopt the Amendment no later than March 5, 2007 to be effective on the effective date of ASARCO's plan of reorganization.  In addition to providing the $40 multiplier applicable to all pensions commencing on or after the Amendment's effective date, the Amendment also shall provide to individuals retiring or otherwise separating from service on or after January 1, 2007, but before the Amendment's effective date, (or to the beneficiaries of such individuals) supplemental pension payments in an amount equal to the excess of the value of the pension benefits that would have been payable to such individuals had they commenced their pension benefits under the Plan on or after the effective date of the Amendment over the value of the pension benefits that such individuals were actually paid from the Plan.  Such supplemental pension payments shall be paid as soon as administratively practicable (taking into account any legal requirements) after the effective date of ASARCO's plan of reorganization in a single lump sum, and shall be calculated to include interest (based on the Plan's assumed rate of return on its assets) from the date that the individuals would have received such payments had the Amendment's effective date been January 1, 2007.  In the event that the Plan does not pay such supplemental payments for any reason, ASARCO either (1) shall contribute to individual accounts established or maintained under the Hourly 401(k) Plan on behalf of the individuals (or to the beneficiaries of such individuals) who are entitled to such supplemental pension payments an amount equal to the value of those payments; or (2) shall provide an equivalent after-tax value to such individuals (or to the beneficiaries of such individuals) in a manner that the parties subsequently determine by mutual agreement.   ASARCO shall take such action as is required under the Collective Bargaining Agreement to effectuate this agreement.

Sincerely,


Jon E. Pettibone
Chief Negotiator
Asarco

Agreed:


Terry Bonds
Chairman
Union Negotiating Committee

# Memorandum of Understanding
# Signing Bonus

As soon practical after the Effective Date of this Agreement, the Company will pay $3,000 to bargaining unit employees accruing pension service as of January 1, 2007 under the Retirement Income Plan for Hourly Rated Employees of Asarco Inc.

# Memorandum of Understanding
# Flexibility

To promote efficiency and productivity, thereby enhancing job security, the parties recognize the legitimate need for increased flexibility in assignments. Assignments within classifications will remain the same on a day-to-day basis unless there is a legitimate operations purpose for temporary assignment of tasks outside those normally performed within an Employee's classification. Routine day-to-day absences and permanent vacancies that occur will not be affected by the terms of this Memorandum of Understanding (MOU). Such routine temporary and permanent vacancies shall be filled in accordance with the Local Supplemental Agreements and the Seniority Provisions in the Basic Labor Agreement. It is understood the relationship and jurisdiction between the various unions shall not be disturbed by this MOU. This MOU is intended to enhance flexibility and it supplements, but does not supersede, existing flexibility existing by agreement or practice. Implementation of this objective shall be accomplished within the following guidelines:

a.   In order to achieve the desired flexibility as described above, a Flexibility Pool will be established made up of volunteers or junior Employees who will be used for cross-classification assignments whenever possible. The size of the Flexibility Pool and the classifications within the Pool at each Company location will be determined by the Company, with the understanding the Flexibility Pool will be no larger than 10% of the Employees at any Company location. In the event 10% is not sufficient to accomplish the desired flexibility, the parties shall discuss and seek agreement on the appropriate percentage. In the event the parties are unable to agree, the company may elect to raise the percentage, but in no event shall the percentage be higher than 15%. Any disagreement over the proper percentage may be appealed to the Top Level Committee as outlined in paragraph l. below. All temporary assignments to other classifications from the Flexibility Pool will be offered by seniority (senior qualified) and mandatory for the junior Employee. Such temporary assignments will not extend beyond two weeks unless the person assigned volunteers to extend it. Temporary assignment will not affect an Employee's seniority or job assignment in his/her department, classification, Line of Progression, or regular job assignment.

b.   When there is a legitimate operations purpose for cross-classification assignments, employees may be temporarily assigned to perform the work of another classification. Without limiting the foregoing, legitimate operations purposes are recognized as the elimination of contracting out, emergencies, major equipment failure, unexpected absences, production requirements, curtailments, major maintenance outages, other major projects, spillages or Acts of God.

c.   In the event there is no one available from the Flexibility Pool to perform cross-classification assignments, the Company may temporarily assign other Employees to perform work in a classification other than their own classification provided the Employee is qualified to perform the work safely. Temporary assignments shall be made by seniority as described in a, above, and will not extend beyond two weeks unless the person assigned volunteers to extend it. Every effort will be made to use Employees from the proper

classification within the department to get the work done.  In day-to-day equipment breakdowns, the operator assigned to operate the equipment that is down for repair may be assigned to assist maintenance personnel assigned to repair the equipment.

d.   It is understood that cross-department assignments will be made only from the Flexibility Pool except where permitted by local agreement or practice; however, this shall not preclude within-classification assignments between bargaining units represented by different local unions of the same international union.

e.   There shall be no favoritism, retaliation or punishment against any Employee by the Company in the exercise of its rights under this MOU.  No Employee will be disciplined for poor work performance due to lack of training while performing work on a cross-classification or cross-department assignment.

f.   The Company may organize Maintenance Crews designed to perform other than routine day-to-day maintenance work at any of the various Copper Group or Ray locations.  Such Maintenance Crews shall be used to perform skilled maintenance tasks such as responding to emergencies, surge maintenance periods, eliminating contracting-out, major equipment failure, other major maintenance needs, or to supplement normal maintenance forces.  Such Maintenance Crews shall not be used to erode the normal maintenance forces at any of the Company locations nor to reduce apprenticeship opportunities.  Subparagraphs a through d above shall not apply to Maintenance Crews.  For Maintenance Crew Employees who perform work at other than their home plants, the Company will pay in advance for reasonable travel and other necessary expenses and compensate for travel time pursuant to agreements reached between the parties.

g.   It is understood additional training will be required.  Such training is the responsibility of the Company.  No Employee who has more than 25 years of service or who is 55 years of age or older shall be required to accept the training nor be forced to accept cross-classification assignments under this MOU.

h.   Temporary assignments outside an Employee's job classification will not affect the Employee's seniority or regular job assignment in his/her department, classification, or line of progression.

i.   Safety training shall be provided when Employees are assigned outside their regular classifications.  Any necessary safety training shall be the responsibility of the Company.

j.   Employees who volunteer or are forced (junior Employees) for cross-classification assignments in the Flexibility Pool, or who are on a Maintenance Crew, shall be paid $1.00 per hour above their regular rate of pay or above the rate of the classification to which they are assigned, whichever is higher.

k.   The Joint Workplace Committee as described in Article 5, Section L, 1 and 2, will meet as soon as possible after the Effective Date of this Agreement to discuss, identify and seek agreement to reduce the number of classifications and possibly combine classifications.  If

the Joint Workplace Committee is unable to reach agreement, the parties will refer the issues to the Top Level Committee described in paragraph l, below.  The Top Level Committee shall meet and try to resolve any differences.  Should the Top Level Committee fail to reach an agreement, it is understood that nothing in this MOU shall detract from the parties' rights under the provisions of the Basic Labor Agreement or the local supplemental agreements.

l.    In order to assure the purpose and intent of this MOU is carried out and the principles herein are followed and to assure that Employees are protected from abuse or favoritism, a Top Level Committee will be established.  This Committee shall be made up of the Chairman of the Unions' Asarco Bargaining Committee and the CEO of Asarco.  In the event a dispute arises that cannot be settled by the Top Level Committee, the issue(s) will be submitted to immediate arbitration to determine whether or the Company violated any provision of this MOU or the purpose and intent or the principles herein.  The arbitrator shall have full discretion to determine the appropriate remedy.

# Exhibit A
# Alcohol and Drug Abuse Policy

**PHILOSOPHY:**  The dangers of drug or alcohol abuse in the workplace are far reaching.  Such abuse can affect not only the abusing employee but their fellow employees as well. Asarco's employees work closely together and rely upon one another to a great extent. The safe performance of the work that our employees undertake demands each employee's full attention and clear thinking.  As a result, the Company, as well as each employee, has a right to expect that all employees are drug and alcohol free and prepared to do their jobs in as safe a manner as possible at all times.

**PURPOSE:**  It is the policy of the Company to provide a workplace free of alcohol and drugs, and to take reasonable measures to insure that employee alcohol and drug use does not jeopardize the safety and health of its employees, the success of its operations, nor adversely affect the Company, or its customers.  Implementation is subject to restrictions under applicable local, state, and federal laws.

**POLICY:**

**<u>Education</u>:**

Employees are to be advised in writing of the Company's Alcohol and Drug Abuse Policy and Program.  Information provided is to cover various aspects of the policy including the reasons for the program, effects of alcohol and drugs on individuals and their families; use of inspections, alcohol tests and drug tests.

**<u>Rules of Conduct</u>:**

The following Rules of Conduct apply to all employees.  Violation of such rules subjects the employee to discharge:

A.   The use, sale, attempted sale, manufacture, purchase, attempted purchase,  possession or transfer of alcohol while on Company property, or in Company vehicles, is a violation of Company rules and will result in severe disciplinary action up to and including discharge. However, possession of a sealed beverage container in an individual's automobile shall not constitute a violation of this rule of conduct.

B.   The use, sale, attempted sale, manufacture, purchase, attempted purchase, possession or transfer of an illegal drug while on Company property or in Company vehicles is a violation of Company rules and will result in severe disciplinary action up to and including discharge.

C.   Any individual who is under the influence of alcohol or an illegal drug while on Company property or in a Company vehicle is in violation of Company rules and will be subject to severe disciplinary action up to and including discharge. Being "under the influence" shall not excuse or be a defense to any other misconduct which is a violation of Company rules.

**Alcohol and Drug Abuse Policy**

D.   An employee who is convicted under any criminal drug statutes for the use, sale, attempted sale, manufacture, purchase, attempted purchase, possession or transfer of an illegal drug, shall be immediately subject to unannounced drug testing for a period of eighteen consecutive months.  In the event of a confirmed positive drug test during that period, such employee will be discharged.  Absence from work due to such conviction shall be considered unauthorized and the employee shall be subject to disciplinary action, up to and including discharge.

E.   Any employee who is currently taking medication of any kind, either over-the-counter or prescription, which may affect the employee's ability to perform his job in any way, or may present a safety risk, is to report such drug use to the Company to ensure the safety of themselves, other employees and Company property.

## Inspection for Alcohol or Drugs

A.   Notices

1.   Each facility is to have a notice prominently placed at or near each entrance which states that by entering the premises persons are consenting to an inspection of themselves and their property, including their vehicles.

2.   Example of acceptable notice:

RIGHT TO INSPECT

THE COMPANY RESERVES THE RIGHT TO INSPECT THE PROPERTY AND PERSON OF ALL INDIVIDUALS WHILE ON COMPANY PROPERTY.  THIS RIGHT INCLUDES, BUT IS NOT LIMITED TO, THE INSPECTION OF VEHICLES, PARCELS, PACKAGES, PURSES, LUNCH BOXES, BRIEFCASES, LOCKERS, WORK STATIONS AND DESKS.

B.   Inspections

1.   In addition to routine industrial inspection practices, such as gate inspections, where the Company has information that would cause a reasonable person to believe that the provisions of this policy have been violated, the Company may require individuals to submit to special inspections of their personal lockers,   purses, lunch boxes, briefcases, tool boxes, desks, file cabinets, or other containers or personal vehicles when on Company property.

2.   Individuals who are being inspected may not be touched.  If it is deemed necessary to ascertain what is on the individual's person, the individual is to be directed to empty the  contents of his/her clothing.

**Alcohol and Drug Abuse Policy**

3.   Employees who refuse to permit an inspection are not to be forcibly detained nor inspected.  However, they are to be advised that submission to such inspection is a condition of employment.  Failure to permit such an inspection will result in immediate discharge.

4.   Non-employees who refuse to permit an inspection are to be informed that this is a requirement of individuals allowed on Company property.  Continued failure to submit to an inspection will result in their expulsion from Company property.

5.   Trained dogs may be used to detect illegal drugs in personal and Company property.

**Alcohol and Drug Testing**

A.   Applicants for Employment

1.   All applicants to whom a job offer is made are to undergo examinations for prohibited levels of illegal drugs.  An alcohol test is to be conducted whenever there is reasonable suspicion that the applicant may be subject to the effects of alcohol.

2.   Applicants who test positive for alcohol or illegal drugs are to be denied employment.

3.   An applicant who declines to undergo the alcohol and/or drug test is to be denied employment.

B.   Current Employees

1.   Testing for Alcohol and Drugs is based on circumstances where the Company has information about an employee's conduct that would cause a reasonable person to believe the employee is demonstrating signs of impairment due to alcohol or illegal drugs, or has used or continues to use alcohol or illegal drugs on Company property.

When an employee shows signs of impairment, including but not limited to, difficulty in maintaining balance, slurred speech, erratic or atypical behavior, or demonstrates deteriorating job performance or appears unable to perform his/her job in a safe manner, the employee is to be escorted to a medical facility for evaluation.

i.   If judged appropriate by supervision, a test for alcohol is to be conducted, and/or a urine specimen for drug testing is to be required.

ii.   In the event a Company location does not have a medical department, or has a medical department which is not staffed when the employee is escorted to it for evaluation, the decision to require an employee to be sent to an outside medical facility for an alcohol and/or drug test is to be made by a management official.  If the decision is to conduct an alcohol and/or drug test, the employee is to be escorted to the Collection Site for testing.

When the Company otherwise has a reasonable suspicion that an employee is in violation of Company Rules of Conduct on use of alcohol or drugs, a test for alcohol and/or a urine specimen for drug testing may be required. The employee is to be escorted to the Collection Site for testing. Employees will not be tested for drugs or alcohol based solely on anonymous tips.

2.  An employee who is recalled after being on layoff for a period of six (6) months or more, or who is otherwise returning to work after a period absence of six (6) months or more, shall be required to take a Company directed medical examination, including a drug and/or alcohol test.  In the event of a confirmed positive test, the employee will be denied reinstatement until such time as he successfully passes a Company directed drug and/or alcohol test.  Upon successfully passing such a test, the employee will be reinstated but will be immediately subject to unannounced drug testing for a period of eighteen consecutive months.  In the event of a confirmed positive test during that period, such employee will be discharged.

3.  An employee or group of employees who are involved in an on-the-job accident may be required, at the Company's discretion, to submit to a test for alcohol and/or a urine analysis for drug testing.

## PROCEDURE:

A.  <u>**Consent**</u> – No alcohol test may be administered, urine or blood sample obtained or any drug test conducted on such sample without the written consent of the person being tested (See Appendix A.)

B.  <u>**Pre-collection Interviews**</u> -  Prior to the administration of an alcohol test and/or the collection of a urine specimen for drug testing, individuals are to be thoroughly interviewed to determine if there may be any medications (over-the-counter or prescription) or other substances that may have been inhaled, ingested, or injected in the past two weeks which could result in a positive test.  That information is to be provided to the testing laboratory.

C.  <u>**Employee Refusal to Consent to an Alcohol Test or Drug Test**</u> -  An employee's refusal is viewed as insubordination and subjects the employee to immediate discharge.

D.  <u>**Alcohol Testing**</u> – The administration of an alcohol test is to be in accordance with the test equipment manufacturer's instructions or via obtaining a blood or a urine sample.

E.  <u>**Chain-of-Custody**</u> – Collection and shipment of all urine samples is to follow strict chain of custody and collection procedures as determined by the Company.

F.  <u>**Retention of Sample**</u> – All urine samples confirmed positive for illegal drugs are to be frozen by the testing laboratory and retained for two years.

G.  <u>**Notification**</u> – All employees who test positive are to be so notified by the Company and given an opportunity to provide the Company any reasons they may have which would

explain the positive alcohol or drug test other than the presence of alcohol or illegal drugs. If an individual provides an explanation acceptable to the Company that the positive alcohol or drug test result is due to factors other than the presence of alcohol or illegal drugs in the test specimen, the positive test result is to be disregarded and all records of the test result destroyed.

**H.**   **Confidentiality –** The identity of employees who have tested positive are to be limited to those persons having a need-to-know.

**I.**   **Grievance and Arbitration –** Disciplinary action taken under this Policy shall be subject to the grievance and arbitration procedure.

**J.**   **Union Representation**

A bargaining unit employee shall, upon request, be afforded union representation at any time he or she is confronted with a consent, interview or test for alcohol or drugs.

Nothing in this Policy and Program is to be construed as a guarantee of employment for any period of time, including but not limited to the time any employee is participating in the Company's drug testing program.

**DEFINITIONS:**

**Alcohol -**  A colorless, volatile, and flammable liquid that is the intoxicating agent in fermented and distilled liquors.  It includes but is not limited to beer, wine, and liquor.

**Being Subject to the Effects of Alcohol or an Illegal Drug -**  Having the presence of alcohol, an illegal drug or a drug metabolite in an individual's system, as determined by appropriate testing of a bodily specimen that is equal to or greater than the levels specified below for the confirmation test.  This is referred to as "positive test", "positive level", "prohibitive level", or "positive screen."  A confirmed positive shall be a basis for immediate discharge, unless otherwise provided herein.

|  |  | Initial Test Level | Confirmation Test Levels |
|---|---|---|---|
| A. | Alcohol | 0.05% | 0.05% |
| B. | Marijuana metabolite | 50 ng/ml | 15 ng/ml ** |
| C. | Cocaine metabolite(s) | 300 ng/ml | 150 ng/ml |
| D. | Morphine and/or codeine | 2000 ng/ml | 2000 ng/ml |
| E. | Phencyclidine (PCP)(and/or metabolites) | 25 ng/ml | 25 ng/ml |
| F. | Amphetamine and/or methamphetamine | 1000 ng/ml | 500 ng/ml |
| G. | Oxazepam and/or other benzodiazepine or metabolite | 300 ng/ml | 300 ng/ml |
| H. | Barbiturates | 300 ng/ml | 200 ng/ml **** |
| I. | Methadone and/or metabolite | 300 ng/ml | 300 ng/ml |
| J. | Methaqualone (quaaludes) | 300 ng/ml | 300 ng/ml |

|  |  | Initial Test Level | Confirmation Test Levels |
|---|---|---|---|
| K. | Propoxyphene (Darvon) | 300 ng/ml | 300 ng/ml |

\*        percent blood alcohol level

\*\*        delta-9-tetrahydrocanabinol-9-carboxylic acid

\*\*\*        benzoylecgonine, ecgonine methyl ester, and/or ecgonine

\*\*\*\*        amobarbital, butabarbital, butalbital, pentobarbital and/or secobarbital, etc.

**Collection Site** – A location for specified applicants/employees to report for the purpose of participating in a test for alcohol and/or contributing urine specimens for the detection of drugs in urine.  The collection of urine specimens is to be conducted under tightly controlled conditions.  The Collection Site can be separate and apart from the work site, if adequate facilities are not available at the work site.

**Company Property** – Includes, but is not limited to, all land (including parking lots), property, and buildings owned or leased by the Company and automobiles, trucks or vans owned or leased by the Company.

**Drug Test** – A multiple step urine test which involves an immunoassay screening method and a confirmation by use of Gas Chromatography and Mass Spectroscopy (GC/MS).  The laboratory to conduct such tests shall be a certified laboratory, selected at the discretion of the Company.

**Split Sample** - An employee may request a split sample of his or her urine sample submitted at the collection site and, upon a confirmed positive of one sample, the employee may request a test of the other sample at his or her own expense.

**Illegal Drug** – A controlled substance, as defined by Section 812 of Title 21 of the United States Code, the possession of which is unlawful under Chapter 13 of that Title.  The term "illegal drugs" does not mean the use of a controlled substance pursuant to a valid prescription or other uses authorized by law.

EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arnold Contreras, et al., | **Case No.: 2:18-cv-03495-SRB** |
| Plaintiffs/Cross-Defendants, | |
| v. | |
| ASARCO LLC, et al,, | CLASS ACTION |
| Defendants/Cross-Plaintiffs. | **PROPOSED ORDER GRANTING PLAINTIFFS' CONSENT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT** |

Upon consideration of Plaintiffs' Consent Motion for Preliminary Approval of Class Action Settlement Agreement, it is **ORDERED** that the motion is **GRANTED**.  The Court, having reviewed the motion, supporting memorandum of law, the Settlement Agreement, the proposed Notice to the Class, and the entire record in this case, orders as follows:

1.     Capitalized terms used herein, unless otherwise noted, have the meaning given to them in the Settlement Agreement.

2.     The Settlement Agreement is preliminarily approved subject to notice and a Final Fairness Hearing.

3.     The Court finds that the Settlement Agreement is within the range of possible approval.  It was negotiated by experienced counsel after four years of highly contested litigation under the auspices of the Ninth Circuit Court of Appeals Mediation Program with the assistance of Ninth Circuit mediator Roxanne Ashe.  Moreover, the Settlement Agreement does not improperly grant preferential treatment to Class Representatives, their attorneys, or any segment of the Class, nor does it contain any other obvious deficiencies that would suggest a collusive settlement.  Accordingly, the Court concludes that the Settlement Agreement appears to be the product of serious, informed, non-collusive negotiations.

4.     In addition, the Court finds that as a substantive matter, the Settlement

appears capable of being finally approved under the factors guiding the approval of class settlements enumerated in Fed. R. Civ. P. 23(e)(2) and in decisions of the Ninth Circuit such as *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). Notwithstanding this Court's judgment that ASARCO maintains the right to unilaterally amend or terminate the retiree healthcare benefits ASARCO currently provides to the Class, the Settlement provides that ASARCO will continue those benefits through June 30, 2025, and a $500 payment to those Medicare-eligible Class Members not currently eligible for those benefits.  This bargain provides a tangible and valuable benefit to the Class, treats Class Members equitably relative to each other, and provides for automatic relief without requiring any affirmative action on the part of Class Members to participate.  Accordingly, the Settlement appears fair and reasonable to the Class when weighed against the risks and costs associated with continued litigation.

5.      The Court has reviewed the proposed form of the Notice to the Class attached to the Settlement Agreement as Exhibit E and finds that it complies with the requirements of Fed. R. Civ. P. 23(e), and fairly presents the terms of the Settlement Agreement and the Class Members' rights in the settlement approval process.

6.      The Court further finds that the notice procedure established by the Settlement Agreement will comply with the requirements of Rule 23 and due process.

7.      American Legal Claims Services, LLC is appointed as the Settlement Administrator for the purpose of providing Notice to the Class Members and making the $500 check payments to eligible Class Members.

8.      The Court directs that notice of the Settlement Agreement be provided to the Class pursuant to Fed. R. Civ. P. 23(e)(1).

9.      Pursuant to the Settlement Agreement, within seven (7) calendar days following entry of this Order, ASARCO shall provide Plaintiffs and the Settlement Administrator with the most current mailing address for Class Members.  The Settlement Administrator will process those addresses through the U.S. Postal Service's National

Change of Address database to obtain the most current mailing addresses for Class Members.  Within fourteen (14) calendar days of receipt of the list of Class Member addresses, and no more than twenty-one (21) calendar days following entry of this Order, the Settlement Administrator will mail the Notice to Class Members via U.S. first class mail, postage prepaid.

10.     At any point prior to the Final Fairness Hearing, for any Notices that are returned as undeliverable to the Settlement Administrator without a forwarding address, The Settlement Administrator will consult with Plaintiffs and undertake reasonable efforts to locate a correct address and resend the Notice.

11.     The Final Fairness Hearing will be conducted before this Court on _____ [date at least 100 days after entry of this Order] at _____ [time] to finally determine the fairness, reasonableness and adequacy of the terms and conditions of the Settlement.

12.     Each Class Member who wishes to object to the Settlement shall file with the Court a timely written notice of his or her objection.  Such notice shall state: (i) the objector's full name, address, telephone number, and email address; (ii) all grounds for the objection, including any legal support for the objection; (iii) copies of any documents upon which the objection is based; (iv) the name and address of any attorney representing the objector; (v) whether the objector will appear at the Final Fairness Hearing; and (vi) a list of all persons who will be called to testify at the Final Fairness Hearing in support of the objection.  The objector must also mail the objection and all supporting law and evidence to the Court, Class Counsel and Defendants' counsel at the following addresses:

| *Clerk of Court:* | *Plaintiffs' Counsel:* | *Counsel for Defendants:* |
|---|---|---|
| Clerk of the Court, Sandra Day O'Connor U.S. Courthouse, 401 West Washington Street Phoenix, AZ 85003 | Joel R. Hurt FEINSTEIN DOYLE PAYNE & KRAVEC, LLC 429 Fourth Avenue Law & Finance Building, Suite 1300 Pittsburgh, PA  15219 | David Lubben DAVIS & CAMPBELL, LLC 400 Main Street Suite 1600 Peoria, IL 61602 |

13.     To be considered timely, the objection must be postmarked no later than thirty (30) calendar days before the Final Fairness Hearing.

14.     Plaintiffs may file a motion seeking final approval of the Settlement Agreement, and responding to any objections, no later than fourteen (14) calendar days before the Final Fairness Hearing.

15.     The Final Fairness Hearing may be continued or adjourned by order of this Court, from time to time, and without further notice to the Class, except that notice will be provided to any Class Member who has timely filed an objection.

DATED this _____ day of _____, 2022.


_____
The Hon. Susan R. Bolton
Senior United States District Judge

EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Arnold Contreras, et al.,

                    Plaintiffs/Cross-Defendants,

    v.

ASARCO LLC, et al.,

                    Defendants/Cross-Plaintiffs.

**Case No.: 2:18-cv-03495-SRB**

---

## IMPORTANT NOTICE ABOUT A PROPOSED
## CLASS ACTION SETTLEMENT

---

**You should read this notice carefully if you (or a family member) were:**

1. **A former union-represented employee at ASARCO's Ray Unit who retired between November 30, 1986 and November 30, 2015 (or who gave notice of their intent to retire by November 30, 2015 and then retired within 180 days), who either (i) was Medicare-eligible and receiving healthcare benefits from ASARCO, or (ii) could become eligible in the future to receive healthcare benefits from ASARCO after becoming Medicare-eligible.**

   **OR**

2. **A former union-represented employee at ASARCO's other facilities who retired between January 1, 2007 and November 30, 2015 (or who gave notice of their intent to retire by November 30, 2015 and then retired within 180 days), who either (i) was Medicare-eligible and receiving healthcare benefits from ASARCO, or (ii) could become eligible in the future to receive healthcare benefits from ASARCO after becoming Medicare-eligible.**

## A FEDERAL COURT AUTHORIZED THIS NOTICE.

## IT IS NOT A SOLICITATION FROM A LAWYER.

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION**................................................................................................................

    1. Why did I get this notice package?
    2. What is this lawsuit about?
    3. Why is this a class action?
    4. Why is there a settlement?

**WHO IS IN THE SETTLEMENT** ................................................................................................

    5. How do I know if I am part of the settlement?
    6. Do I need to do anything to join the case and share in the settlement?
    7. Can I exclude myself from the settlement?

**THE SETTLEMENT BENEFITS — WHAT YOU GET**.................................................................

    8. What does the settlement provide?
    9. When will the settlement be approved?
    10.    What am I giving up in the settlement?

**THE LAWYERS REPRESENTING YOU** ...................................................................................

    11.    Do I have a lawyer in this case?

**OBJECTING TO THE SETTLEMENT** ......................................................................................

    12.    What does it mean to object?
    13.    How do I tell the Court that I don't like the settlement?

**THE COURT'S FAIRNESS HEARING** ....................................................................................

    14.    When and where will the Court decide whether to approve the settlement?
    15.    Do I have to go to the fairness hearing?
    16.    May I speak at the hearing?

**IF YOU DO NOTHING** .............................................................................................................

    17.    What happens if I do nothing at all?

**GETTING MORE INFORMATION**............................................................................................

    18.    Are there more details about the settlement?
    19.    How do I get more information?

## BASIC INFORMATION

| 1. | Why did I get this notice package? |
| --- | --- |

This notice was sent to:

1. Former union-represented employees of ASARCO's Ray Unit who retired (other than deferred vested) under the ASARCO Retirement Income Plan for Hourly-Rated Employees between November 30, 1986 and December 31, 2006, and their spouses and eligible dependents, who are, were, or will be eligible to receive ASARCO medical and prescription drug benefits after becoming eligible for Medicare.

2. Former union-represented employees of ASARCO who retired (other than deferred vested) under the ASARCO Retirement Income Plan for Hourly-Rated Employees between January 1, 2007 and November 30, 2015 (including anyone who provided the requisite notice by November 30, 2015 and then retired within 180 days of providing the notice), and their spouses and eligible dependents, who are, were, or will be eligible to receive ASARCO medical and prescription drug benefits after becoming eligible for Medicare.

You were sent this notice because you have the right to know about a proposed settlement of a class action lawsuit in which you are a Class Member before the Court decides whether to approve the settlement.

This package explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how those benefits will be provided.

The lawsuit is called *Arnold Contreras, et al. v. ASARCO LLC., et al.*, Case No. 2:18-cv-03495-SRB (D. Ariz.). The Court in charge of this case is the United States District Court for the District of Arizona, and the judge presiding over this case is United States Senior District Judge Susan R. Bolton.

| 2. | What is this lawsuit about? |
| --- | --- |

This lawsuit is about the changes that the ASARCO made, effective January 1, 2020, to the health benefits of Medicare-eligible retirees (and their spouses and eligible dependents). Before the changes were made, ASARCO provided group insurance coverage administered by UMR to both Medicare-eligible and pre-Medicare retirees, spouses, and dependents. Starting on January 1, 2020, ASARCO eliminated that coverage for Medicare-eligible participants and replaced it with a Health Reimbursement Arrangement (or "HRA") through which it offered up to $1,800 per participant in annual contributions. Participants in the HRA could use that contribution towards the cost of purchasing new coverage through a third-party administrator called Via Benefits. As part of the HRA plan, ASARCO also provided Catastrophic Coverage Special Payments ("Catastrophic Coverage") which reimburses participants for eligible out-of-pocket prescription drug expenses incurred in excess of the Medicare Part D catastrophic threshold in a given year.

Participants who did not enroll for the HRA plan when they were first eligible to do so, were unable to enroll again in the future.  ASARCO continued (and continues) to offer the UMR administered insurance to pre-Medicare retirees, spouses, and dependents, but as those people become Medicare-eligible they are offered the HRA plan.

After it had announced its intention to switch Medicare-eligible retirees to an HRA plan but before it made the change, ASARCO had filed two lawsuits in federal court asking for a "declaration" from the courts that it had the right to modify retiree healthcare benefits or even terminate those benefits altogether.  At the same time, several ASARCO retirees (the "Class Representatives")—along with unions that had represented ASARCO employees in bargaining, filed their own lawsuit against ASARCO.  They alleged that by eliminating the group insurance coverage unilaterally, ASARCO had violated the terms of collective bargaining agreements and violated a federal law called the Employee Income Retirement Security Act ("ERISA").

The two lawsuits filed by ASARCO and the lawsuit filed by the Class Representatives were consolidated under one case and the Court certified this case as a class action.

In October of 2021, ASARCO filed a motion for summary judgment asking the Court to rule, based on the language of the relevant collective bargaining agreements and other undisputed facts of the case, that ASARCO had the right to modify or terminate retiree medical benefits.  The Class Representatives and the unions opposed the motion, arguing that the case should go to a trial to determine which side is right.   In February 2022, the Court granted ASARCO's motion and then entered a judgment in ASARCO's favor finding that ASARCO had the right to modify or terminate retiree medical benefits for the Class Representatives and the Class.

The Class Representatives and unions appealed the Court's decision to the United States Court of Appeals for the Ninth Circuit.  While the matter was on appeal, the parties engaged in settlement discussions through the Ninth Circuit's mediation program, and eventually agreed to settle the case on the terms described further in this notice.

| **3.** | **Why is this a class action?** |
|---|---|

In a class action, one or more persons sue on behalf of people who have similar claims.  All of these people are class members.  One court resolves the issues for all class members, and all class members are bound by the court decision or settlement.

Here, the Class Representatives brought this lawsuit on behalf of all members of the Class, as defined below in Question 5.

| **4.** | **Why is there a settlement?** |
|---|---|

The Class Representatives and unions believe that it is desirable to settle this case to avoid the risks of continuing to litigate, including the possibility that they will lose their case on appeal and be left with no right to any medical benefits at all, as the Court held in February of 2022.  ASARCO likewise believes that the settlement is worth avoiding the costs, inconvenience, and risk that it faces if litigation goes forward.

Under the settlement, ASARCO will guarantee that it will continue to provide the benefits that it currently provides to both Medicare-eligible and pre-Medicare Class Members through at least June 30, 2025, as described further below, and will pay $500 to those Medicare-eligible Class Members who lost the ability to enroll in the HRA plan because they are not currently enrolled in the HRA plan.

## WHO IS COVERED BY THE SETTLEMENT?

| | |
|---|---|
| **5.** | **How do I know if I am part of the settlement?** |

The Court certified this suit as a class action on July 29, 2019, and the Class consists of persons who fit within one of the following two definitions:

Pre-2007 Ray Retirees

All former union-represented employees of ASARCO's Ray Unit who retired (other than deferred vested) under the ASARCO Retirement Income Plan for Hourly-Rated Employees between November 30, 1986 and December 31, 2006 and their spouses and eligible dependents, provided that such former employees, spouses, and eligible dependents were either (i) eligible for Medicare and receiving retiree medical and prescription drug benefits from ASARCO, or (ii) could become eligible in the future to receive retiree medical and prescription drug benefits from ASARCO after becoming Medicare-eligible.

Post-2007 Retirees:

All former union-represented employees of ASARCO who retired (other than deferred vested) under the ASARCO Retirement Income Plan for Hourly-Rated Employees between January 1, 2007 and November 30, 2015 (including anyone who provided the requisite notice by November 30, 2015 and then retired within 180 days of providing the notice) and their spouses and eligible dependents, provided that such former employees, spouses, and eligible dependents were either (i) eligible for Medicare and receiving medical and prescription drug benefits from ASARCO, or (ii) could become eligible in the future to receive medical and prescription drug benefits from ASARCO after becoming Medicare-eligible.

You were sent this notice because the parties have identified you as a Class Member.

| | |
|---|---|
| **6.** | **Do I need to do anything to join the case and share in the settlement?** |

No.  You do not need to take any action to join the case.  If the proposed settlement is approved by the Court, you will be able to receive the benefits and payments as described in the response to Question 8.

| 7. | Can I exclude myself from the settlement? |
|---|---|

No, you do not have the option to exclude yourself (or "opt out") of the Class or, if it is approved by the Court, the settlement.

Although you cannot exclude yourself from the case, you can object to the settlement and ask the Court not to approve it.

## THE SETTLEMENT BENEFITS – WHAT YOU GET

| 8. | What does the settlement provide? |
|---|---|

Under the settlement, ASARCO would guarantee the medical benefits that it currently provides to the Class through at least June 30, 2025, on the following terms:

1.  For Class Members who are Medicare-eligible, ASARCO will continue to provide the HRA, as well as the Catastrophic Coverage offered to participants who spend enough on prescription drugs in a given year to enter the "catastrophic coverage" phase of Medicare Part D as set forth in the ASARCO Retiree Medical Plan. The annual HRA contribution from ASARCO will continue to be at least $1,800 for 2023 and 2024. For 2025, the annual HRA contribution will be at least $900.

2.  For Class Members who are not Medicare-eligible, ASARCO will continue to provide the Pre-65 Medical Plan currently administered by UMR. As Class Members become eligible for Medicare, they shall be offered the opportunity to enroll for the HRA and Catastrophic Coverage, and thereafter receive benefits on the same terms as the Medicare-eligible Class Members.

3.  Class Members who are not currently enrolled in the HRA and Catastrophic Coverage and therefore are not eligible for these benefits now will receive a check for $500.

4.  After June 30, 2025, ASARCO will have the right to modify or terminate the retiree healthcare benefits it provides to the Class at any time without advance notice to or approval of the Class Representatives or the unions and without any obligation to bargain over the same.

In addition, ASARCO had asked the Court to order the unions to pay for its attorneys' fees, costs, and expenses. The settlement provides that ASARCO will pay for its own attorneys' fees, costs, and expenses.

In exchange for the benefits provided under this settlement, the Class Representatives and unions would give up their appeal to the Ninth Circuit, which means that Class Members will be bound by the Court's judgment that ASARCO has the right to modify or even terminate retiree medical benefits. That means that after June 30, 2025, ASARCO would have the right to change or terminate those benefits.

| 9. | **When will the settlement be approved?** |
|---|---|

The Court will hold a hearing at [time] on [date] to decide whether to approve the settlement. It may take the Court several weeks after the hearing before it decides. If the Court approves the settlement, there may be appeals. If appeals are filed, it is uncertain how long it will take to resolve them. Please be patient.

| 10. | **What am I giving up in the settlement?** |
|---|---|

Under the settlement, the Named Plaintiffs and unions will give up their appeal to the Ninth Circuit in exchange for the benefits described in response to Question No. 8. This means that the Court's judgment that ASARCO has the right to modify or even terminate retiree medical benefits will continue to bind Class Members, except as the settlement provides otherwise.

Accordingly, Class Members will give up (or "release") the right to sue ASARCO over any claims that were asserted in the lawsuit. This means that even if you discover facts in the future that were not known at the time of the settlement which you think demonstrate violations by ASARCO related to this case, you may not sue ASARCO. Each Class Member assumes the risk that he or she may discover new information. Even if new information is discovered, the settlement will be binding.

**THE LAWYERS REPRESENTING YOU**

| 11. | **Do I have a lawyer in this case?** |
|---|---|

The Court has appointed the following lawyers to represent the Class:

Pamina Ewing
Joel R. Hurt
William T. Payne
Ruairi McDonnell
**FEINSTEIN DOYLE PAYNE**
  **& KRAVEC, LLC**
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
Telephone: (412) 281-8400

Gerald Barrett
**WARD, KEENAN & BARRETT, P.C.**
2141 East Camelback Rd., Suite 100
Phoenix, AZ 85016
Telephone: (602) 279-1717

These lawyers are called Class Counsel. The parties will bear their own attorneys' fees and expenses. You will not be charged any fees or expenses by these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

## OBJECTING TO THE SETTLEMENT

You can tell the Court that you do not agree with the settlement or some part of it.

| 12.  What does it mean to object? |
| --- |

Objecting is simply telling the Court that you do not like something about the settlement.  It will not have any bearing on your right to receive benefits under the settlement if the settlement is approved.

| 13.  How do I tell the Court that I don't like the settlement? |
| --- |

You can object to the settlement if you dislike any part of it.  To object, you must send a letter or other written statement stating that you object to the settlement in *Arnold Contreras, et al. v. ASARCO LLC., et al.*, Case No. 2:18-cv-03495-SRB (D. Ariz.).  Be sure to include your name, address, telephone number, your signature, and a full explanation of all the reasons you object to the settlement (and, if applicable, the name, address and telephone number of your attorney).  **Your written objection must be filed with the Court, and mailed to the counsel listed below, postmarked no later than [date] at the following addresses:**

| *Clerk of Court:* | *Class Counsel:* | *Counsel for Defendants:* |
| --- | --- | --- |
| Clerk of the Court, Sandra Day O'Connor U.S. Courthouse, 401 West Washington Street Phoenix, AZ 85003 | Joel R. Hurt FEINSTEIN DOYLE PAYNE   & KRAVEC, LLC 429 Fourth Avenue Law & Finance Building, Suite 1300 Pittsburgh, PA  15219 | David Lubben DAVIS & CAMPBELL, LLC 400 Main Street Suite 1600 Peoria, IL 61602 |

**Be sure to include "*Arnold Contreras, et al. v. ASARCO LLC., et al.*, Case No. 2:18-cv-03495-SRB (D. Ariz.)" on the first page of all documents.**

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlement.  You may attend and you may ask to speak, but you are not required to.

| 14.  When and where will the Court decide whether to approve the settlement? |
| --- |

The Fairness Hearing will be held at [time] on [date], before U.S. Senior District Judge Susan R. Bolton, Sandra Day O'Connor U.S. Courthouse, Courtroom 502, 401 West Washington Street, Phoenix, AZ 85003.

At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Judge will determine whether and to what extent parties will be permitted to address the Court at the hearing. After the hearing, the Court will decide whether to approve the settlement. We do not know how long these decisions will take.

| 15. | Do I have to go to the fairness hearing? |
|---|---|

No, Class Counsel will answer questions the Court may have. You are, however, welcome to come at your own expense. If you send an objection, you do not have to go to Court to talk about it. As long as your objection is filed with the court by [date] and mailed to counsel, postmarked no later than [date], the Court will consider it. You have the right to retain a lawyer at your own expense to represent you at the fairness hearing, but it is not necessary to do so.

| 16. | May I speak at the hearing? |
|---|---|

If you are a Class member and have submitted an objection to the settlement as described in the response to Question 13, you may ask the Court for permission to speak—with or without an attorney—at the Fairness Hearing. To do so, you must send a letter to the attorneys indicated above in the answer to Question 13, saying that it is your "Notice of Intention to Appear." Be sure to include your name, address, telephone number, and your signature (and, if applicable, the name, address and telephone number of your attorney). Your Notice of Intention to Appear must be postmarked no later than [date].

## IF YOU DO NOTHING

| 17. | What happens if I do nothing at all? |
|---|---|

The settlement does not require you to do anything and there is no penalty for doing nothing at all. If the Court approves the settlement, you will be bound by it – regardless of whether you filed an objection.

## GETTING MORE INFORMATION

| 18. | Are there more details about the settlement? |
|---|---|

This Notice summarizes the proposed settlement. More details are set forth in the parties' Settlement Agreement. To obtain the Settlement Agreement, or for more information regarding the settlement, you may contact Class Counsel to request a copy. The address, phone number, and website are:

Feinstein Doyle Payne & Kravec, LLC
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, Pennsylvania 15219
(412) 281-8400
www.fdpklaw.com

You can also inspect any of the documents filed in this case, free of charge, by visiting the Clerk of Court, Sandra Day O'Connor U.S. Courthouse, 401 West Washington Street, Phoenix, AZ 85003 during regular business hours.  You can purchase copies of those documents from the Clerk of Court.

| | |
|---|---|
| **19.** | **How do I get more information?** |

You can call Class Counsel at (412) 281-8400 or write them at the address above to get more information about the settlement, or to help you determine whether you are a Settlement Class member.

**PLEASE DO NOT CONTACT THE COURT.  Court personnel cannot or are not authorized to answer your questions.**

DATE: _____